## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SARA & MICHAEL TILLER, *as parents and next friend of minor child* A.T., | |
| Plaintiffs, | |
| | Civil Action No. 07-1736 (JR) |
| v. | |
| DISTRICT OF COLUMBIA, | |
| Defendant. | |

### FILING OF PART II OF THE ADMINISTRATIVE RECORD

Attached is Part II of the administrative record documents in this proceeding.[1]

Consistent with LCvR 5.4(f), Defendant has redacted personal information about the

minor A.T.[2]

Respectfully submitted,

PETER J. NICKLES
Interim Attorney General
for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

*/s/ Edward P. Taptich*
EDWARD P. TAPTICH [#012914]
Chief, Equity Section II

---

[1] Due to the length of this record (over 600 pages), Defendant has filed the record in two parts.
[2] Defendant has redacted the minor's name, date of birth, and social security number.

_**/s/ Amy Caspari**_
AMY CASPARI [#488968]
Assistant Attorney General
441 Fourth Street, N.W.
Sixth Floor South
Washington, D.C. 20001
(202) 724-7794
Amy.Caspari@DC.gov

January 15, 2008

1       MS. DALTON:  Okay, then I'll change them.

2       MS. THOMPSON:  Okay. Let's see.  Do you want to look at the

3    most current report?

4       MS. DALTON:  Give us both.

5       MS. THOMPSON:  In October her articulation percentile rank

6    --.

7       HEARING OFFICER: Where are you at now.

8       MS. THOMPSON:  I'm on --.

9       MS. PUCKETT: Where are you at in the document?

10      MS. THOMPSON: I'm sorry.

11      MS. PUCKETT: Ten  -- Eighteen.   Eighteen. Eighteen.

12      MS. THOMPSON: In October 2006 --.

13      HEARING OFFICER: What page?

14      MS. THOMPSON:  Page 2.  Her percentile rank was for the

15   Goldman Frisco which is articulation at 12%.  For the Reynolds

16   her percentile rank for verbal comprehension was less than 4,

17   and expressive language was less than 1 as a percentile rank.

18   For the SELP P2, sentence structure percentile rank was a 50.

19   Word structure percentile rank was 1.  Expressive vocabulary was

20   a .4; concepts and following direction was a .1; recalling

21   sentences was 9; basic concepts was a 25; core language

22   percentile rank was a 3; receptive language percentile rank was

23   a 8; expressive language percentile rank was a 1; and language

1    content percentile rank was a 1; language structure percentile

2    was a 8;  vocabulary percentile rank, Peabody Pitcher was a 1;

3    and expressive was less than 1.

4        MS. DALTON: In coming up with those percentile ranks, tell

5    me how they come up with.

6        MS. THOMPSON:  It's based on the raw score which is then

7    converted to a scale score, and scale score is then converted to

8    percentile ranks and you get age-equivalents.

9        MS. DALTON:  When you were looking at everything in regard

10   to A████, what things did you consider important in your

11   decisions?

12       MS. THOMPSON:  That she was very bright.  That she seemed

13   as though she could - she had stronger skills in other areas

14   that would help her with her language; that she had made some

15   really good gains and that therapy should focus in on - you know

16   - expressive and receptive and articulation.

17       MS. DALTON:  And you mentioned previously that when you

18   consider whether or not she was speech and language impaired you

19   also considered hearing impairment disability?

20       MS. THOMPSON:  HmmmHmmm.

21       MS. DALTON:  Did you also consider any background

22   information on A████ such as her birth and subsequent illnesses?

23       MS. THOMPSON:  Everything was read and it was discussed at

47

318

1  the table with the MDT team and I think all pertinent issues

2  with the large group that was there was placed on the table. I

3  wasn't the only professional that was there.

4      MS. DALTON:  Was there anything in A████ background that

5  was significant to be considered with regards to her

6  disabilities?

7      MS. THOMPSON:  Well the age she was at the time she had her

8  cochlear implant, how long it had been on, and what her hearing

9  age was and what that gap looks like, that was definitely

10  significant.

11      MS. DALTON:  Any illnesses significant?

12      MS. THOMPSON:  I don't remember.

13      MS. DALTON:  And when you're looking at standard scores you

14  mentioned the word deviations from the norm, that would be 15

15  points or more, is that correct?

16      MS. THOMPSON:  Say that.  Say that again.

17      MS. DALTON:  Standard deviation?

18      MS. THOMPSON:  It's 15.

19      MS. DALTON:  A standard deviation is considered 15.

20      MS. THOMPSON: Plus or minus 15.

21      MS. DALTON:  So in some of the areas she is more than 2

22  deviations from the norm in speech and language?

23      MS. THOMPSON: HmmmHmmm.  Yes.

1      MS. DALTON:  Now you testified previously that in the

2  speech and language evaluation that you have reviewed from the

3  River School, all the recommendations are the same.  Have you

4  reviewed all speech and language evaluations ever generated from

5  the River School?

6      MS. THOMPSON: I'm sorry what was the question again?

7      MS. DALTON:  You previously testified on direct.

8      MS. THOMPSON:  HmmmHmmm.

9      MS. DALTON:  That you had reviewed some speech and language

10  evaluations from the River School.

11      MS. THOMPSON:  Yes.

12      MS. DALTON:  And that they generally recommend the same

13  things.

14      MS. THOMPSON:  They generally recommend the same amount of

15  hours.

16      MS. DALTON:  Okay.  And have you reviewed all speech and

17  language evaluations -- .

18      MS. THOMPSON:  No.

19      MS. DALTON:  Generated from the River School.

20      MS. THOMPSON:  No.  Everyone I've reviewed has recommended

21  the same amount of hours.

22      MS. DALTON:  And how many have you reviewed?

23      MS. THOMPSON:  I think 4.

320

1    MS. DALTON:  Now, you testified on direct that when A▓▓▓

2    needed help she would seek an adult to help her?

3    MS. THOMPSON:  Yes.

4    MS. DALTON:  And who was that adult or adults that she

5    would seek out?

6    MS. THOMPSON:  I don't remember the names.

7    MS. DALTON:  Do you know what type of person they were?

8    MS. THOMPSON:  I don't remember right off hand, but I am

9    assuming it was the speech - there - I don't want to say he was

10   a gym teacher that was there for lack of a better title. A

11   classroom and speech therapist was there.  There was another

12   lady in the room also. And I'm not pretty sure he she was.

13   MS. DALTON:  And, you reviewed the IEP, correct.

14   MS. THOMPSON:  Yes.

15   MS. DALTON:  And you aware that there is pages of

16   communication goals, correct?

17   MS. THOMPSON:  Two.

18   MS. DALTON:  And there is 12 goals, correct? On those two

19   pages?

20   MS. THOMPSON:  Yes.

21   MS. DALTON:  And it is your testimony as a professional and

22   speech and language that those 12 goals could be adequately

23   addressed in an hour and a half a week?

1    MS. THOMPSON:  Yes.

2    MS. DALTON:  Have you ever provided treatment to a student?

3    MS. THOMPSON:  Yes.

4    MS. DALTON:  And have ever had to provide treatment to a

5    student with a hearing impairment, cochlear implant?

6    MS. THOMPSON:  No.  Hearing impairment, yes.  Cochlear

7    implant, no.

8    MS. DALTON:  That might be all the questions I have.

9    MS. THOMPSON:  And I would like to also state that it's not

10   all goals - stating that these 12 objectives would be covered in

11   an hour and a half each week.  A lot of times the goals are not

12   to look at them as she needs to do this - she needs to do that -

13   there are done in conjunction.  A lot of the goals can be

14   addressed at the same time.  They go through over, doing big and

15   long, we're doing verb tenses, and that can all be done and

16   incorporated into an hour and half a week session. So yes. I've

17   seen that done.

18   MS. DALTON:  And your testimony previously was that in 4

19   months between the testing that was done at the River School,

20   A███ had made significant progress?

21   MS. THOMPSON:  Not clinically significant.  I thought she

22   had made nice gains.

23   MS. DALTON:  And that is based on the services that she had

1  been receiving?

2      MS. THOMPSON:  Yes. Based on the scores she had obtained

3  from June to October.

4      MS. DALTON:  I have no further questions.

5      HEARING OFFICER: Okay, Ms. Puckett

6      MS. PUCKETT: Yes, one follow-up question.  Do you know

7  specifically why she made those gains?

8      MS. THOMPSON:  No.

9      MS. PUCKETT: Nothing else.

10     HEARING OFFICER: Okay, anything further.  Thank you. Is

11  that it?

12     MS. PUCKETT: HmmmHmmm.

13     MS. THOMPSON: Can I be dismissed?

14     HEARING OFFICER: Yes.  I would assume, unless there is.

15  Okay.  What were you about to say?  DCPS rests.

16     MS. PUCKETT: HmmmHmmm.

17     HEARING OFFICER: Okay.  Shall move into closing or is there

18  anything further from Ms. Dalton.

19     MS. PUCKETT:  Are we doing closings orally today?

20     HEARING OFFICER: Oh, you want to do it in writing?

21     MS. DALTON: Yes, I prefer, since we came down here and we

22  have a set until 3 o'clock. I'd like to go ahead and do the

23  closing.

1      MS. PUCKETT: I'm going to need time to prepare my closing.

2  I wasn't aware that we were going to do the closing after - we

3  didn't say that.

4      MS. DALTON: We certainly did.  We said that -0.

5      MS. PUCKETT: We said that we were -

6      MS. DALTON: We said that if you decided to call your

7  witness, you blocked off this whole day so we could.

8      MS. PUCKETT: I'm not saying.  Ms. Dalton I'm not saying I

9  can't do the closing today.  What I'm saying is that I need some

10 time to prepare the closing.

11     MS. DALTON: I just didn't want days to drag out.

12     HEARING OFFICER: Okay.

13     MS. PUCKETT: I need some time to go back to my office over

14 there and prepare my closing based on - because there is a lot

15 of information in this case.  And I didn't recall her saying

16 specifically if we were going to continue straight into closing.

17 Because I remember last time we were going to do them in

18 writing, that is if we didn't come back to the table. But we

19 didn't discuss if we were going to do closings in writing today

20 - closings in writing or closings right after my witness

21 testimony.  But what I'm saying is that if we are going to do

22 closings today, and the Hearing Officer is going to allow us to

23 do closings today, then I'm going to need some time to go.

1      MS. DALTON: If I can have one second with my client, I need

2    to make a determination of whether I wanted to call a rebuttal

3    witness, so.

4      HEARING OFFICER: Okay.

5      MS. DALTON: Before we decide to this for closing.

6      HEARING OFFICER: Okay, why don't we take time in and allow

7    them to decide whether they are going to rebut and then we can

8    deal with the closing.

9      MS. PUCKETT: Rebuttal as far as Ms. Thompson's testimony.

10     MS. DALTON: Yes. Correct.

11     HEARING OFFICER: Okay.  We're back on the Hearing Record.

12   Ms. Dalton, you were considering whether you wanted a call.

13     MS. DALTON: Yes sir.  And I do want to recall one brief

14   rebuttal witness and would be Dr. Morere.

15     HEARING OFFICER: Okay, Dr. Morere do you swear or affirm

16   that the testimony you are about to give will be the truth?

17     DR. MORERE: Yes I do.

18     HEARING OFFICER: Okay, Ms. Dalton.

19     MS. DALTON:  Yes. Dr. Morere you were able to listen to the

20   expert testimony provided Ms. Sidney Thompson's speech and

21   language pathologist for DCPS Public Schools and in your expert

22   opinion, do you believe Ms. Thompson's opinions were based on

23   complete and accurate objection.

54

325

1          MS. PUCKETT: Objection.  I don't believe that the question

2     that she's asking can be considered rebuttal testimony.  I

3     believe that parent's expert witness, Dr. Morere who is not a

4     speech and language pathologist gave her views and some

5     significant and detail testimony in regards to her opinions

6     regarding this case.  Rebuttal, the purpose of rebuttal witness

7     is not to - is to rebut what was said by my witness as far as

8     factual testimony and things of that nature.  I don't believe

9     that calling the expert a witness again to ask her if she

10    believes my witness's testimony if it based on a clear and

11    accurate view of the record is appropriate at this point.  They

12    had an opportunity to present what they believe the accurate

13    record was, we presented what we believed the accurate record

14    was and its up to the Hearing Officer at the point to weigh the

15    credibility of the witnesses and determine what his view of the

16    record is at this point.  I don't believe this is what rebuttal

17    evidence is at this point. And I believe we had this discussion

18    last time with Ms. Morere testifying after - possibly testifying

19    after my witness Zaundra Johnson testified.

20         HEARING OFFICER: Is it possible to stipulate you disagree

21    with the testimony and maybe deal directly with what you feel is

22    contracted by something.  You said something was contradicted.

23         MS. DALTON: I guess I can try to word it in a different

1  way.  Ms. Thompson's testimony that her disability – that A███

2  disability is based on the fact she – her hearing impairment –

3  was based on the fact she was born with congenital hearing loss

4  and so rendered her opinions based on that.

5      HEARING OFFICER: Are you talking to us?

6      MS. DALTON: I am saying what Ms. Thompson said.

7      HEARING OFFICER: Oh.

8      MS. DALTON: And then I'm going to ask  Ms. – that was the

9  testimony that Ms. Thompson rendered that her testimony was

10  based on the fact A███ had a congenital hearing loss.  My

11  question to you Dr. Morere is whether or not that opinion is

12  accurate?

13      MS. PUCKETT:  Objection.  Once again, we're going to

14  findings of two separate providers. It's up to the Hearing

15  Officer to determine who findings are more creditable at this

16  point. I don't believe that – there is nothing that she can

17  possibly rebut that my witness testified.  If my witness said

18  something that was untrue as far what was stated at the IEP

19  meeting. I can see were you at the meeting? Is it true that –

20  you heard Ms. Thompson testify that she did not say that the

21  student needed 20 hours of week of service, is that accurate.

22  Isn't it true that Ms. Thompson did say that.  That is rebuttal

23  testimony.  We can't – we'll go back and forth because if you're

1   going to allow them to put on what they think their opinion is

2   better than our opinion, and I go back and recall a rebuttal to

3   this rebuttal and we'll keep rebutting expert witnesses after

4   expert witnesses Mr. Woods.  We all know what rebuttal testimony

5   is.  We had this discussion last time when Ms. Dalton tried to

6   offer the same thing.

7       MS. DALTON: Mr. Woods rebuttal testimony is not limited

8   only factual scenario.  Whatever fact – when you have expert

9   witnesses in a case, and as we all know the parent does bear the

10  burden of the proof in this case. Dr. Morere could not have

11  anticipated that Ms. Thompson would testify that her opinions

12  are based on the fact that A▆▆▆ was born with congenital hearing

13  loss and therefore she is entitled to rebut that testimony.

14      MS. PUCKETT: And I don't believe I heard her specifically

15  say that.  I believe she said the team indicated that the

16  student was hearing impairment, and due to her hearing

17  impairment she also had some other concerns that needed to be

18  addressed. I don't specifically recall my witness indicating

19  that the student's hearing impairment was primarily due to some

20  hearing loss.  I don't believe she specifically laid it out that

21  that detail. I do not recall her laying out that detail, why

22  this student was hearing impaired.  She specifically tailored

23  most of her testimony towards speech and language services which

57

328

1    she was found an expert in. Parent counsel was found an expert

2    in something totally different.  My witness acknowledged that

3    she has not – she has not had a significant amount of experience

4    in regards to hearing impaired students or students who have

5    implants. So I'm not sure what they are going to rebutting as

6    far as witness expert testimony, which comes in the realm of the

7    speech and language therapist as far as assessment and

8    evaluation of students who are early childhood.  What is someone

9    whose experience and experteeism is completely different from

10   this witness is going to rebut.  I'm not sure. I don't

11   understand.  We're going to keep rebutting each other Mr. Woods.

12   They presented their evidence. The witness presented her expert

13   testimony.  My witness presented her testimony.  And it is up to

14   the Hearing Officer to make the finding of fact at this point.

15        HEARING OFFICER: Okay. If the testimony is to rebut the

16   cause of the Hearing Impairment, I don't believe I heard the

17   words congenital either.  I don't recall that testimony. So we

18   do have to stick with the testimony.

19        MS. DALTON: The testimony was that --.

20        HEARING OFFICER: I don't think she knows the source.  I

21   don't even think your witness knows the cause. She knows the

22   contributing factors.

23        MS. PUCKETT: My witness didn't say anything about source.

58

329

1      HEARING OFFICER: I don't think she knew the cause. I don't

2  believe she ever testified that she knew what the cause was.

3      MS. PUCKETT: And I believe she asked the question

4  specifically about medical concerns. And she said that she did

5  not recall. She said, I do not remember. That is what she

6  specifically said. She does remember - she doesn't recall.

7      HEARING OFFICER: Because if that is your point, we already

8  know that point, that is at issue, if it's important to the

9  resolution. I think what we're looking at now is how best to

10  service this child?

11      MS. DALTON: I guess the point was that she made - she

12  stated the opinion that based on her - her opinion A████ did not

13  have a separate speech and language impairment disability

14  because is was a result - her speech and language was a result

15  of her hearing impairment.

16      HEARING OFFICER: That's correct. That's correct.

17      MS. DALTON: And that is exactly --,

18      HEARING OFFICER: But she didn't say congenital.

19      MS. DALTON: Well maybe I used that word.

20      HEARING OFFICER: Yes you did.

21      MS. DALTON: She said that the speech and language

22  impairment was a direct result of the hearing impairment.

23      MS. PUCKETT: Parent's witnesses testified that it was not.

1    It was separate.  So we have testimony that is conflicting at

2    this point.  We can't continue to go back and forth.  She

3    already testified that the student had speech and language

4    impairment.  That's not why we're here today.  They're saying

5    that the student's classification should not only be hearing

6    impairment.  It should be speech and language impaired.  That's

7    one of the issues here today.  Are we going to continue to go

8    back and forth?  Our position - we presented our position as far

9    as what the speech and language impairment - if the student

10   should be classified with speech and language impairment.  They

11   presented several - several witnesses, two of which have been

12   found experts indicating that they believe that the student

13   should be listed as speech and hearing impairment.  So why are

14   we going back to this?  There is already testimony on the record

15   why their witnesses believe that the student should have been

16   found speech and language impaired along with --.

17           HEARING OFFICER: Please stop writing notes.

18           MS. PUCKETT: Hearing impairments and that it wasn't just

19   the speech and language deficits were not just coming from the

20   Hearing Impairment.  There was a lot of detail testimony from

21   parent's witnesses regarding that.

22           HEARING OFFICER: Okay the record reflects that the witness

23   was writing a note.  That is not acceptable.  And shaking your


                                  60


                                                                  331

1    head that is not acceptable.

2        MS. DALTON: For the record Mr. Woods I didn't see anything.

3        HEARING OFFICER:  I – I--.

4        MS. DALTON: I understand. I just want you to be aware that

5    I did not see it.

6        HEARING OFFICER: Is there direct conflict with the

7    testimony.  Actually we know that your position is different.

8    But I think her point is if you are going to rehash your

9    position is that really rebuttal?  That's her point.

10        MS. DALTON: I think the purpose of it was to explain that

11    the basis of which Ms. Thompson formulated her decision was

12    based on incorrect information.  In other words, she said that

13    her hearing impairment was a result of – her speech and language

14    impairment was a result of her hearing impairment and she based

15    that on the fact of the hearing age of the student.  My witness

16    would say that's not correct.

17        HEARING OFFICER: And we already have that testimony though.

18    She said the meningitis and the hearing impaired.

19        MS. DALTON: But I guess it was to rebut how Ms. Thompson

20    arrived at her opinion.

21        HEARING OFFICER: How does she know?  She didn't even know

22    Ms. Thompson before today probably.

23        MS. DALTON: Because of what she testified here today, she

61

332

1    based it on the hearing age of the student.

2         HEARING OFFICER: Again, this is not even a speech language

3    pathologist, so I mean.

4         MS. DALTON: Well Dr. Morere has extensive communication and

5    language background working with students with hearing

6    impairments with cochlear implants.  However if Mr. Woods, if

7    you're not going to allow the witness to testify then we'll

8    proceed with --.

9         HEARING OFFICER: I think the objection is sustained to the

10   extent that if it's the rehash the same testimony and not to

11   rebut specific statements of the witness.  That is the only

12   thing Ms. Puckett is objecting to.

13        MS. DALTON: And that is what we were going to rebut the

14   specific statements that the students - speech and language

15   impairment is a direct result of a hearing impairment and she

16   based on that on looking at the hearing age of the student.

17        HEARING OFFICER: And that is - and what would be new to

18   that, cause I specifically asked Dr. Morere that, and I

19   concluded she doesn't know. She says it's the confluence of the

20   Hearing Impairment and the meningitis. She doesn't know herself,

21   what caused it. I think that's mystery, what actually caused it.

22   It's how should it be treated.

23        MR. DALTON: Well I disagree with that Mr. Woods. I don't

1  believe that she say she doesn't know.

2      HEARING OFFICER: That's her testimony.  I recall asking

3  that question specifically.

4      MS. DALTON: I think you might be confused as to whether or

5  not to believe what her primary disability is. I do recall that

6  testimony as well. And that her primary disability is not

7  (inaudible).  The speech and language impairment did not come

8  from the hearing impairment.

9      HEARING OFFICER: But again, that's getting back to Ms.

10  Puckett's point, that's her opinion. I already know it.  She

11  feels that she would - this is just to show. Dr. Morere feels

12  that even if she didn't have the hearing impairment, she'd have

13  a speech and language difficulty.  Then again, I already know

14  this.  That's what she's getting at.  What are you adding that's

15  new.  Is just that she disagrees.  The other sides disagree.

16      MS. DALTON: The new part would be explaining why her theory

17  is not correct.  Why Ms. Thompson's theory is not correct.

18      MS. PUCKETT: That's not rebuttal evidence.

19      MS. DALTON: It is but --.

20      MS. PUCKETT: Explaining why another witness's - that's not

21  especially when you have two different individuals who have two

22  different trainings. How can their witness who has not been

23  qualified as the same type of expert explain why my witness'

63

1    testimony is incorrect, especially when they do different

2    things.  The witness' focus is on speech and language

3    assessments and evaluations, Mr. Woods. I don't think there is

4    anything to rebut at this point. I think there is very clear

5    concise testimony from parents witnesses as to why this student

6    was speech and language impaired, separate and apart from the

7    hearing impairment and that's why we're here today.  One of the

8    issues in the complaint and the student is not only hearing

9    impaired, the student is speech and language impaired.  So

10   essentially letting them testify is again is allowing them to

11   put on more evidence. It's not rebuttal evidence they've already

12   presented their evidence in regards to that and it very

13   detailed. It very, very detailed.  And I do recall the Hearing

14   Officer asking several questions regarding – regarding causation

15   and all those things surrounding the speech and language

16   impairment.  We had some very detailed testimony regarding that.

17   My witness never made any determination of what caused the

18   speech and language impairment, what caused the hearing

19   impairment.  All she said is that based on the IEP the student

20   is hearing impaired, and that the student's classification, even

21   though that the classification, the student has speech and

22   language concerns that can be addressed by IEP. And she

23   explained why the student needed speech and language and what

64

335

1   her opinion was in regards to how much speech and language is

2   appropriate and what's not appropriate.

3       HEARING OFFICER: I think the only objection is to the

4   extent if it rehashes what's already been said.  I'm giving you

5   a sense of this has been over a series of months and how much I

6   remember. So if it is different than that, and if it rebuttal,

7   but if it to say that again, her objection is sustained. So you

8   know where you're headed. If it's to say the same thing, she's

9   right, that's not rebuttal, you're just saying the same thing.

10  You are not directly saying look she said this. I'm rebutting

11  what she just said.  And you begin – and I think what started

12  this is you said congenital.  But she said that this was – I

13  don't recall that. I thought she didn't know is what I concluded

14  from her testimony.  She didn't know what caused this.  She just

15  said just what she is.  I didn't hear her say she knew the

16  cause, I didn't hear Dr. Morere she knew the cause.

17      MS. DALTON: I definitely heard Ms. Thompson say her speech

18  and language impairment was caused her hearing problem. I

19  definitely recall that.

20      HEARING OFFICER: You said congenital.

21      MS. DALTON: I'm saying hearing impairment now Mr. Woods.

22      HEARING OFFICER: Again, I think I think the bottom line

23  was, that's the probably what started was number 1 she didn't

1    testify as to the cause, but the link I think is true, as this

2    discussion went forward, it appears that the only objection that

3    the Hearing Officer would certainly agree if this is to rehash

4    the testimony and not the specifically what Ms. Sydney Thompson

5    said.  I will sustain the objection on that basis.  But it's not

6    to say you couldn't do a rebuttal, it's just can we add

7    something.

8         MS. DALTON: What we were attempting to add was the

9    underlying basis of her decision is inaccurate.  That she

10   couldn't arrive at that conclusion that the speech and language

11   impairment was a result of the hearing impairment based on what

12   she testified.

13        MS. PUCKETT: That's essentially what they did - that's

14   essentially what they were trying to do when they put their case

15   on.

16        MS. DALTON: We couldn't have.

17        MS. PUCKETT: That's the issue in the complaint.

18        MS. DALTON: We didn't know what she was going to testify to

19   Mr. Woods.

20        MS. PUCKETT: The complaint says DCPS got it wrong.  Our

21   team who is the speech and language therapist, the psychologist,

22   the occupational therapist, and everyone else they got it wrong.

23   They considered the evidence wrong.  The student is not only

1    hearing impaired, the student is speech and language impaired.

2    They presented testimony to that effect. What is there to rebut

3    at this point?  I'm not sure. That is the main issue in this

4    complaint. It would be repetitive, it would be allowed

5    additional testimony; it would be just adding additional

6    information to this case.  It is not rebuttal testimony. That is

7    the issue.  We - if that is not the issue Mr. Woods, then we

8    wouldn't have had that testimony earlier.  How can you arrive at

9    that issue without them saying DCPS did it wrong. DCPS

10   considered the information wrong.  Because our position is that

11   the student is speech and language impaired, not just hearing

12   impaired.  The student is speech and language impaired outside

13   of hearing impairment.  It said in the notes that we thought the

14   student's speech and language concerns can be addressed under

15   hearing impairment classification. These are all things in the

16   notes that are in the facts of the complaint.  So why is it

17   being brought up again in rebuttal.

18       MS. DALTON: Mr. Woods it is not what happened before today.

19   It is directly the testimony that Ms. Thompson gave today.

20       HEARING OFFICER: Okay, why don't you ask the question,

21   maybe without - we'll see.  I will sustain the objection to the

22   extent it's rehashing the testimony.

23       MS. DALTON: Dr. Morere was there anything is Thompson's

67

1    testimony here today that with regard to how she arrived at her

2    decision that A▮▮▮▮ speech and language impairment was a direct

3    of her hearing impairment that you would disagree with?

4         MS. PUCKETT: Objection.   That is question is too broad.

5    That is definitely not rebuttal testimony - rebuttal evidence

6    Mr. Woods. To ask a expert witness if there anything in this

7    witness' testimony that is incorrect.

8         MS. DALTON: I'm trying not to rehash.

9         MS. PUCKETT: That is definitely not rebuttal testimony.

10   When you rebut - most rebuttal question go as follows: "You

11   heard the witness here today say, that this, this, and this

12   occurred --.

13        MS. DALTON: That's what I did originally.

14        MS. PUCKETT: Let me finish.   That this, this, and this

15   occurred.   Did this, this and this occur?   If they have some

16   type of evidence that is completely conflicting from my witness

17   that it did not occur that way, at that factual time and place

18   and second, then they can present that. Or if my witness said

19   something was incorrect.   But when she sat here and say she did

20   not say she recommended 20 to 25 hours. If she wanted to recall

21   the witness and say, you said her Ms. Thompson say, that she did

22   not say at that meeting that she recommended 20 to 25 hours.

23        MS. DALTON: Ms. Puckett is completely wrong with rebuttal.


68

339

1   Rebuttal doesn't have to be related to actual circumstances.

2       MS. PUCKETT: Mr. Woods.  Mr. Woods. Her broad statement is

3   not an appropriate rebuttal question. You can't just ask an

4   expert witness, oh you heard the testimony is there anything

5   wrong about it.  That's not - that's not - that's not an

6   appropriate question form?

7       HEARING OFFICER: Okay.  Okay. Can we narrow it. I guess the

8   whole thing is, it was very broad.  What specifically are you

9   asking her about what she said and maybe that can narrow her.

10      MS. DALTON: Ms. Thompson stated that A█████ speech and

11  language impairment is a result of a hearing impairment based on

12  the fact that she looked at hearing age to arrive at that.

13      MS. PUCKETT: Objection.  I do not recall Ms. Thompson

14  saying specifically that this student's hearing impairment -

15  speech and language impairment was a result of hearing.  She

16  said the student had hearing impairment and needed to have

17  speech and language deficits on that needed to be addressed on

18  the IEP.  There was no specifics.  Ms. Thompson to appeared to

19  stay away all of that.  She focused her - her testimony and time

20  on what the student needed. She focused on the services that

21  were needed and the goal that were needed. She did not focus on

22  what caused what, who caused what and what happened prior to her

23  finding out if this student needed deficits Mr. Woods.  She

69

1    specifically, it appeared to me tried to stay away from that

2    whole determination.

3        MS. DALTON: If I can ask in the future, I'm starting to get

4    a headache, we are all here in a small room and we don't need to

5    scream and yell, if you could just - mind you making your

6    argument, but if we could not scream and yell.

7        MS. PUCKETT: I'm not screaming.  If the Hearing Officer

8    believes my tone is inappropriate, the Hearing Officer will let

9    me know and I will change it.

10        HEARING OFFICER: With respect too - let me - if you can

11    remember the question, over the objection, so that we could just

12    so we can get past this question to see how you are going to

13    answer.  I certainly again, that if it's just rehashing the

14    testimony, that's not really use of this time and this witness.

15    So I'll leave it to you. I'm going to overrule the objection for

16    that specific question just to see where we are headed.

17        DR. DALTON:  Oh she can - you're saying that --.

18        HEARING OFFICER: You can answer that question.

19        DR. MORERE: Okay. I'm going to try to answer the question

20    to the best of my ability. There were a lot of questions.  There

21    was a concern about - I heard her state.

22        HEARING OFFICER: You can't --. Just answer the question.

23        DR. MORERE:  Can you restate the question.

70

341

1     HEARING OFFICER: Yes.

2     DR. MORERE: Just one more time.

3     HEARING OFFICER: You can't characterize the witness

4 testimony--.

5     DR. MORERE: No.

6     HEARING OFFICER: You have to answer the question.

7     MS. DALTON: All right.  The testimony of Ms. Thompson was

8 that A████, speech and language impairment was a result of a

9 hearing impairment and she based that on the fact that the

10 student - based that on the fact that the student's hearing age

11 and the fact that the student was born deaf.

12     MS. PUCKETT: I'm going to object and I know the Hearing

13 Officer is going to allow this question, but I'm objecting

14 because I would ask the Hearing Officer to make sure he checks

15 his record, prior because I do not specifically remember my

16 witness saying anything of such nature.  She continued to focus

17 her concerns on need and what services the student needed and

18 not the causation - what caused what?

19     MS. DALTON: She did testify to that.

20     MS. PUCKETT: I'm sorry and like it said, I know you're

21 going to allow the question, but I am objecting for the record

22 because there was no, no, no testimony of that specific nature

23 that she said that.

71

342

1       HEARING OFFICER: I certainly don't recall her saying that

2   the child was born deaf.

3       MS. DALTON: I do recall her saying that she had – her

4   speech and language impairment was a direct result of her

5   hearing impairment.

6       HEARING OFFICER: That's it.  That's a correct statement.

7       MS. DALTON: And that she received her cochlear implant and

8   that is what is affecting her speech and language.

9       MS. PUCKETT: I didn't hear her say anything about cochlear

10  implants at all.

11      MS. DALTON: Yes she did talk about a cochlear implant.

12      MS. PUCKETT: The only thing she said about a cochlear

13  implant was – there was a question did she ever worked with

14  students with cochlear implants and she said, although she

15  worked with students who had hearing impairments, she had not

16  worked with a student who had a cochlear implants. That's the

17  only time I heard cochlear implant come out of mouth.

18      MS. DALTON: Towards the end of the testimony she did say

19  that she took into consideration that the child received an

20  cochlear implant and arriving at her decision as to whether not

21  the speech and language was caused by the hearing impairment.

22      HEARING OFFICER: I will think this will certainly go to

23  weight, I'm going to allow it just so we can forward. I don't

1   recall that testimony. And I certainly don't recall this

2   linkage. This is an interesting linkage, even if those

3   statements were said, to put them all together like that --.

4      MS. PUCKETT: If they do not recall, why are they allowed to

5   recall them on rebuttal. I don't understand that. It's basically

6   bolstering the case, being allowed to present an expert again

7   after their case-in-chief has been presented. If you don't

8   recall that, if that statement is not recalled, how can that be

9   presented as a rebuttal testimony.

10      HEARING OFFICER: I'd rather err on the side that I can be

11   wrong, if the record doesn't reflect that, then I can deal with

12   that in my decision.

13      MS. PUCKETT: Then I would definitely ask for there to be

14   the ability to do written closings then. Because I would

15   definitely like a transcript of this - of the statements that

16   were made here today.

17      MS. DALTON: I'm going to (inaudible) closing arguments, and

18   I obviously this is an avenue that this Ms. Puckett is

19   attempting to take.

20      MS. PUCKETT: I'm here till 5 o'clock. I'm assigned to this

21   case till 5 o'clock. I don't need that much time to come up with

22   a closing argument. I didn't have the burden in this case, I'm

23   not required to do a closing argument. Parent's not required to

1    do a closing argument. None of us are required, because the

2    reality is, the Hearing Officer has the evidence, the Hearing

3    Office makes the findings and just because you hear our

4    positions, is not going to guarantee that you're going to change

5    anything, so parent's indicating that this is the route I'm

6    trying to go is incorrect.  What I'm saying to you is that if

7    you're going to allow her to present additional testimony, then

8    I will want a copy of the transcript so that I can appropriately

9    respond to what her witness is about to say right now.

10       MS. DALTON: And I will just move on to closing arguments.

11       HEARING OFFICER: Do you want to consult with your witness

12    before you do.

13       MS. DALTON: No, because I don't want to respond.  Because I

14    don't think my clients in anyway want to postpone closing

15    arguments today.  To get a transcript to get a long delay in

16    this case.

17       HEARING OFFICER: No, I don't see – that's the request, it

18    hasn't been granted. If you feel – the question that – again, I

19    think what she is saying is in terms of accuracy.  Or this is

20    this a question of that accurately reflects what's in the

21    record.

22       MS. DALTON: We can just move to closing arguments.

23       HEARING OFFICER: Do you need time?

1      MS. PUCKETT: Yes I do.

2      HEARING OFFICER: How much time do you want?

3      MS. PUCKETT: Probably an hour.

4      MS. DALTON: Mr. Woods,

5      MS. PUCKETT: We're set till 5 o'clock.

6      MS. DALTON: No we're not.

7      MS. PUCKETT: We're set till 1 o'clock.

8      MS. DALTON: (inaudible).

9      MS. PUCKETT: I will request an hour to put myself together.

10   And if I'm not ready Mr. Woods, then I won't make a closing,

11   because I don't necessarily have to make a closing.

12      MS. DALTON: Well it's quarter to 12 now, we'll set just

13   till 1 o'clock.

14      MS. PUCKETT: Well, actually the notice I got says 9 until

15   3, that's the notice I got from the Student Hearing Office.

16      HEARING OFFICER: I don't remember.

17      MS. PUCKETT: It came down 9 till 3.

18      MS. DALTON: I have another hearing at 3 o'clock.

19      MS. PUCKETT: This case is set for 9 until 3.  DCPS is

20   requesting an hour to prepare a closing. If I am not prepared in

21   an hour, then I will not make a closing. My closing is not

22   evidence.

23      HEARING OFFICER: I don't remember, I have to look at the

75

346

1  calendar.

2      MS. DALTON: I don't have a problem with giving Ms. Puckett

3  an hour.  I just want to conclude the case today.

4      HEARING OFFICER: Shall we then just convene here at 1?

5      MS. PUCKETT: 1:45.  What time is it?

6      HEARING OFFICER: 1:45?

7      MS. PUCKETT: Is it 12:45?

8      MS. DALTON: No.

9      MS. PUCKETT: Oh, I thought you said it was 12:45? It's

10  11:45.  12:45.

11      MS. DALTON: Thank you very much.

12      HEARING OFFICER: Thank you.  We're back on the record after

13  taking our recess here and I believe there is no further

14  testimony and the parties are going to their closing statements.

15  Is that where we are?

16      MS. DALTON: Yes sir.

17      HEARING OFFICER: Ms. Puckett, we're still there?

18      HEARING OFFICER: Okay.

19      HEARING OFFICER: Ms. Dalton you get the first and last

20  word, so we'll let you proceed.

21      MS. DALTON: Thank you.  This is case is about A▆▆▆ T▆▆▆▆▆

22  and she is a little girl who was born with normal development,

23  but at age 2½ months contracted bacterial meningitis.  As the

347

1   testimony has born out from the expert witnesses who have

2   testified who have experience and information regarding

3   bacterial meningitis, it has profound affects on children on

4   children who have contracted bacterial meningitis. Not only with

5   regard to the hearing but with regard to their motor and other

6   sensory neural effects on the child. So we have is A███ T█████

7   who before coming into DCPS's jurisdiction had an IFSP and that

8   IFSP was developed on July 13th, 2006.  That is parent's document

9   AT06.  Additionally, let me just start with the issues in this

10  case, where the issues that were outlined in the complaint and

11  the first issue was whether DCPS violated A█████ right to FAPE

12  by failing to evaluate her in all areas of disability. We need

13  not look any further than the IFSP with regard to that issue.

14  The IFSP which was dated July 13, 200 required that A███ receive

15  one hour a week of physical therapy. When DCPS obtained

16  jurisdiction over A███ they had the ability to evaluate A███ in

17  all areas of suspected disability.  Not only the ability because

18  the parent's consented but they had a duty to evaluate her in

19  all areas of suspected disability. As the documents will reveal

20  when DCPS convened a transition meeting which was September 1st –

21  I'm sorry actually September 27th, 2006, the invitation to the

22  meeting was September 1st, and that is AT15.  DCPS convened that

23  meeting to obtained consent to evaluate and indicated that they

77

348

1    would only be reviewing her evaluations and performing a

2    brigance (sp?) - a brief brigance evaluation.  One of the

3    evaluations that DCPS reviewed was the comprehensive

4    developmental assessment by Little Hands and Feet, which was

5    AT05, document AT05.  And in that evaluation, Little Hands and

6    Feet, which was a provider at that time, recommended physical

7    therapy services one time a week. ·So the evaluation that DCPS

8    reviewed at the IEP meeting which took place eventually by DCPS

9    February 1st, the evaluation concerning physical therapy

10   recommended physical therapy.  In addition her IFSP recommended

11   physical therapy. However at the meeting, DCPS determined that

12   the child did not need physical therapy on her DCPS IEP.  And

13   there was some discussion about that, the mother raised the fact

14   that the only evaluation that they had reviewed had recommended

15   it.  That is was currently on her IFSP and didn't understand how

16   DCPS could then say she doesn't need physical therapy since they

17   had not done their own evaluation.  Finally, DCPS agreed at the

18   end of the meeting that a PT evaluation should be completed and

19   that is at AT26 which is DCPS's own meeting notes. By their own

20   admission on the last page of those meeting notes it says, "DCPS

21   recommends that a physical therapy evaluation be completed." Now

22   DCPS had the opportunity prior to convening her eligibility

23   meeting and should have performed that evaluation prior to that

1    time. They still have not convened a meeting with the parent to

2    go over any result of an evaluation that DCPS has performed with

3    regard to physical therapy and that recommendation was made back

4    in February 1st, 2007.  So not only did DCPS fail to evaluate her

5    in all areas of disability, and by their own admission admit at

6    the eligibility meeting that they should have done a physical

7    evaluation, they still to date have not done a physical

8    evaluation or convened a meeting to go over that with the

9    parent. So all of those reasons, DCPS failed to evaluate A▬ in

10   all areas of suspected disability and the area that we are

11   concerned about is with regard to the physical therapy.

12       The second issue is whether DCPS violated A▬▬ rights to

13   FAPE by failing to determine her eligibility, developing an IEP

14   and determining placement by the time she turned 3 years old.

15   The evidence was, and it was rebutted that DCPS did not convene

16   an eligibility meeting until February 1st, 2007.  The records

17   indicate and document that A▬ turned on October 17th, 2006.

18   The regulations that govern this section in this area are

19   300.124(B), which states that an IEP – by the third birthday, it

20   talks about transition of children from Part C to preschool

21   programs.  And it says, " the state must have in effect policies

22   and procedures to insure that by the third birthday of the child

23   described in paragraph A of this section and IEP or if

79

350

1    consistent with 323(B) and section 636 D of the Act an IFSP has

2    been developed and is being implemented for the child. Now the

3    only way that after age 3 DCPS can let the IFSP stand and not

4    develop an IEP is if, and that is 300.323, if they gain consent,

5    informed consent from the parent's to allow the IFSP to continue

6    in place of the IEP.  It is very clear in that regulation that

7    they have to ask the parent and obtain their consent. That was

8    never done. In fact the testimony of Ms. Tiller was that she

9    repeatedly asked and wanted to have the IEP in effect by the

10   time A███ turned 3.  Additionally, with regard to that issue is

11   that FAPE must be available to all children ages 3 to 21, and

12   that is section 300.101.  Lastly, the section that is pertinent

13   to issue is 300.17, which requires FAPE includes an appropriate

14   preschool and that's very important.  Because even DCPS's last

15   witness, Ms. Thompson that the reason that A███ was not provided

16   with a classroom placement was because she was not of school

17   age.  But the regulations don't require A███ to be five years in

18   order to have classroom placement.  So based on the testimony of

19   the parent and she attempted to have DCPS and she registered

20   A███ prior the child turning 3, she registered her and DCPS was

21   aware of her. Besides that Ms. Johnson testified that DCPS

22   regularly gets lists of children who are on – who currently have

23   an ISFP that are in the Part C program.  And that that's how

80

351

1    DCPS becomes aware of these students, but beside the fact, Ms.

2    Tiller – Mrs. Tiller registered A███ with the DCPS at least a

3    month before DCPS was required to have developed an IEP.  So

4    with regard to that issue, DCPS violated A█████ rights by not

5    convening this meeting and developing her IEP by the time she

6    turned 3.

7           The third issue is whether DCPS violated rights to FAPE by

8    failing an appropriate IEP including, but not limited to A████

9    disability classification as well as the amount of her services.

10   And from there we look more at the testimony of the witnesses as

11   well as the documents in the record. The testimony of the expert

12   witness, Dr. Morere who specializes in clinical neuro psychology

13   and has a vast amount of experience in working with students who

14   have cochlear implants and hearing impairments, not only in that

15   area, but in the language communication disorders and other

16   disabilities that these children have.  She is a professor at

17   Galludet. She has provided consultation to other school systems

18   in Maryland and Virginia.  She doesn't specifically only testify

19   for parents. She has been an invited lecturer at school systems

20   such as Arlington County School System. She has studied and

21   treated deaf students with additional disabilities such as

22   learning disabilities and communication disorders.  That is all

23   found in her CV, which is document number 39 and is record, and

81

1    in addition to what she testified to.  Dr. Morere testified that

2    she reviewed all of the A█████ evaluations and she also observed

3    in her classroom at the River School. Dr. Morere's testimony was

4    that based on her observation of A███, based on her review of

5    all the evaluations and her knowledge and expertise that she

6    brought to this case, that even someone with just a simple

7    hearing loss, would require more time on the IEP than is on

8    A██████ current IEP drafted by DCPS. That it clearly is not

9    enough to time to service a child even with a simple hearing

10   loss.  But A████ is not a child with a simple hearing loss. A████

11   present a much more complex picture.  She is a child with

12   multiple disabilities. She has disabilities in the area of

13   language, she has disabilities in the area of motor and gross

14   movement.  That is why she has the related services of

15   occupational therapy, of physical therapy, of audiology, and of

16   speech and language.  With A██████ delays, the IEP provides her

17   far less than what she requires. She needs to have all of her

18   issues addressed and she needs to have them addressed in a

19   classroom setting. Dr. Morere testified that children who have

20   contracted bacterial meningitis have severe impacts on their

21   development.  She also testified based on her experience and

22   based on her knowledge of A███ and her review of the evaluations

23   that her primary disability at this point, is not hearing

82

1    impairment, but in fact speech and language impairment.  The

2    only services that DCPS offered to A███ was 3.5 hours a week at

3    Janey Elementary which would have been neighborhood school. This

4    means that the remainder of the day, DCPS proposed for A██ to

5    remain at home.  Initially DCPS seemed to want to rebut that

6    issue, but the last witness clearly testified that that was the

7    placement proposed for A███, that she would remain home for the

8    rest of the time until she was of school age, which would be 5

9    years old according to when they actually enter regular school.

10   However as the regulations indicated DCPS is required to have a

11   continuum of placement available and placements include

12   preschool programs.  Dr. Morere testified and it was unrebutted

13   by anyone with expertise and working with students with cochlear

14   implants that have additional disabilities involving

15   communication and motor problems that the level of intervention

16   that would be required for A███ was far more than was on the IEP

17   drafted by DCPS. She testified additionally that if A███ only

18   received the services that were on the IEP, that she would not

19   be adequately prepared to enter kindergarten.  And in fact she

20   stated – she stated that it would be probable that she would

21   actual require a more restrictive setting, a more restrictive

22   placement by the time she reached kindergarten age. And that is

23   because her deficits would not have been addressed.

83

354

1        The last issue was whether DCPS violated A█████ rights to

2    FAPE by failing to provide an appropriate educational placement.

3    And the answer to that issue again is simply yes.  Mrs. Tiller

4    testified that DCPS told her the least restrictive environment

5    at this age would be home. And that may very be for some

6    students, but clearly not for a complex student such as A███.

7    DCPS failed to provide her with an appropriate placement.  They

8    only offered 3.5 hours of services at Janey.  Dr. Morere

9    testified that the placement at home would not provide her

10   adequately for the services that she needed.  Additionally and I

11   think most importantly if you look at A█████ IEP which document

12   number 28, and this is something that I asked the speech and

13   language pathologist about.  The goals that are on her IEP

14   clearly state for all of the areas that the providers would

15   include a speech and language pathologist, a classroom teacher

16   and audiologist and classroom staff.  Going through each of

17   those goals on each of those pages except for the audiology,

18   they require classroom intervention.  And yet, DCPS did not

19   propose a classroom placement for A███. So these goals could not

20   be implemented.  Now Ms. Thompson's response to that was, well

21   those were goals if she was going to be a placement – in a

22   classroom placement. But Mr. Hearing Officer, this is A█████

23   IEP. This is her unique individual educational plan. And DCPS is

84

355

1    obligated to follow this plan and to implement this plan.  This

2    is what the parent's agreed to.  And they agreed to it before

3    they go to the point where DCPS then said, we are not going to

4    place her.  DCPS by Ms. Thompson's own testimony testified that

5    DCPS participated in the development of this IEP and accepted

6    the goals and the objectives of this IEP. In addition to the

7    fact that providers are listed as classroom teacher and

8    classroom staff on each of the goal pages regarding

9    communication, then if you look at the individual goals under

10   audiologial.  It says A███ will localize her name in a noisy

11   classroom environment.  Now if A███ does not have a classroom

12   placement there is no way this goal can be implemented.  In

13   addition, the next goal under occupational therapy says A███

14   will sustain attention and active participation in classroom

15   group and small group activities.  Again, no way that this goal

16   can implemented without A███ being in a classroom.  A███ will

17   sustain erect desk posture for classroom activities up to 15

18   minutes.  A███ will navigate around her home and school

19   environments.  Again, if A███ is not in a school environment

20   then how is she going to master these objectives.  Again, on

21   another occupational therapy page, the last goal, A███ will

22   spontaneously cross midline when appropriate to the task as

23   observed in a classroom.  Again, if A███ is not in a classroom,

1    how will they implement these goals.  And lastly A▬ will

2    sustain erect direct posture for classroom activities up 20

3    minutes, therapies desks to sit on classroom routine throughout

4    her day.  Again, these goals were implemented for her to be a

5    classroom-based setting.  The last page of the IEP says general

6    education is accepted.  Again, there should have been a

7    classroom placement. DCPS failed to provide the student with a

8    classroom placement.  When DCPS put their witnesses on, it

9    seemed to be that the attack was against the River School.  That

10   the River School was on trial. But that is not what this case is

11   about.  This case has to focus on what's A▬ needs and A▬

12   needs requires more than what DCPS provided to A▬. DCPS failed

13   to provide an appropriate IEP.  They failed to provide an

14   appropriate educational placement and based on that the parent

15   is entitled under Florence to request that the student in placed

16   in an appropriate non-public placement that can provide her

17   educational benefit. By DCPS's own admission from their

18   witnesses, A▬ has received educational benefit. She has made

19   gains at the River School and so from DCPS's own testimony she

20   has received educational benefit. For all of these reasons, the

21   parent is requesting that DCPS be required to place and fund the

22   student at the River School and to provide the parent with

23   reimbursement consistent with what they have paid for the

1    services A███ services have received from the River School since

2    she date she turned 3, October 17, 2006.

3          HEARING OFFICER: Okay. Ms. Puckett.  Excuse me.

4          MS. PUCKETT: Mr. Woods, this case is not as clear and

5    simple as parent's counsel would like for you to read into it.

6    This is a case in which a student presented to the Care Center

7    30 days prior to the 3-year birthday for an IEP. My witness

8    testified that typically parents register 90 days prior to the

9    3rd birthday of that student. That once the student registered,

10   we developed the SEP plan for the student and eventually we did

11   develop an IEP for the student.  It is DCPS's position and

12   continues to be DCPS's position that this student was identified

13   in all areas of suspected disability, although parent's counsel

14   is bringing the up this occupational – PT evaluation which the

15   student's parent school staff also had some concerns about.

16   There was a lot of discussion at that meeting the physical

17   therapy evaluation was completed in the home.  And that there

18   was nothing to indicate that this student needed physical

19   therapy based on an educational setting and that is what the IEP

20   is about.  It's about the educational setting, not the home

21   setting.  It is our position that this student received an

22   appropriate IEP on February 1st 2007.  This student's evaluation

23   were reviewed. DCPS staff observed the student, found out

87

1  information in regards to this student, rejected the

2  recommendations of the parent placement, with reason and

3  concern, based on prior relationships with the River School.

4  DCPS has not turned this into a case against the River School.

5  But what we are saying is that there are some concerns, and this

6  Hearing Officer take into consideration in regards to this

7  student recommendation from the River School staff.  You have

8  two individuals from the Care Center, one a speech and language

9  pathologist and the other one who is one of the case manager's

10  but a licensed psychologist testifying to this Hearing Officer

11  today that every speech and language evaluation that they've

12  seen to come through the Care Center from the River School

13  recommends 20 to 25 hours of speech and language services.  And

14  not only does it recommend that, but that's the basic layout of

15  the program of the River School. You had testimony today,

16  throughout the course of the hearing from the River School

17  explaining that that's their way out. Between DCPS witnesses and

18  parent's witnesses, it was established that the speech and

19  language therapist is in the classroom, helping not only the

20  student who needed speech and language therapy, but also all the

21  students in the classroom and is acting more in a teacher

22  capacity, minding this is not a special ed placement.  There is

23  no special ed teacher.  This is a general ed setting, but it

88

1    acting in a teacher capacity in the classroom.  How can DCPS

2    accept recommendations that are the same the recommendations for

3    every student that comes through the Care Center that is

4    currently at the River School. That is not personalized

5    recommendations, Mr. Woods.  That is developing an IEP to fit

6    the program – that is trying to develop an IEP to fit the

7    program. This is not a situation where you have my staff

8    indicating well yes, we've had River School evaluations and some

9    of them say the student needs 10, and even less go between 5 and

10   25. You have two witnesses here today saying every last of those

11   speech and language evaluations say 20 to 25 hours. And you have

12   someone from the speech and language department indicating that

13   the amount of services those students who pay additional to be

14   in that classroom with a speech and language therapist, that's

15   the amount of services that they get.  This is a student in

16   which our speech and language therapist went to the school to

17   observe the student for two hours. There was a speech and

18   language therapist in that classroom. She was interacting with

19   all the students. She indicated that in the two hours that she

20   was there she probably spent about 10 minutes with A███.  That

21   interacted with all of the students and her role was more of a

22   teacher capacity which is consistent with the testimony of Ms.

23   Johnson who gave very extensive discussion as to what her

89

360

1  understanding of the River School was based on her experience

2  working with the River School for many years now.  The IEP that

3  we developed which parent's counsel indicated that parent agreed

4  to which is incorrect.  The parent never agreed to this IEP.

5  This IEP is not checked that they are agreeing to this IEP.  I

6  know parent's counsel just indicated that DCPS and the parents

7  agreed to this IEP so DCPS is supposed implement everything in

8  the IEP.  The parent never agreed to this IEP. I just wanted to

9  make that clear for the record.

10      We have an IEP that gives this student 1.5 hours of speech

11  and language services, 1 hour of occupational therapy, 1 hour of

12  audiological services and .5 hour of OT consultation.  DCPS even

13  though parent's complaint says that they never issued a

14  placement. We issued a placement to implement this IEP. There is

15  a placement notice in the record.  It says Janey Elementary

16  School. Parent counsel continues to argue that we never gave the

17  student a placement. What is a placement Mr. Woods?  A placement

18  is the placement, the setting in which the IEP will be

19  implemented.  It includes the location in which the IEP will be

20  implemented. What was Janey.  The testimony of my witness, Janey

21  was the location of the IEP and the placement setting that the

22  IEP was to implemented in. Parent counsel wants to continue to

23  say that we said the student's placement was at home. If the

90

361

1    student's placement was at home, then the student wouldn't have

2    an IEP.  Because there has to be a placement to implement these

3    services.  The only way the student's placement would be fully

4    at home Mr. Woods is if that student was found ineligible and

5    did not need any services.  This is a child whose services --

6    related services which were - which were our team found is only

7    needed right now can be implemented at the local school.  Now

8    there was testimony that that are students who did need a

9    classroom placement because those were the students who needed

10   specialized instruction.  Our team determined that based on this

11   student's cognitive and academic performance, that the student

12   is not in need of specialized instruction, therefore the

13   placement would be for related services only.  Parent's counsel

14   like wants to that argue that Ms. Thompson indicated that the

15   only reason the student didn't have a placement is because she

16   wasn't of school age.  That's not what Ms. Thompson said.  Ms.

17   Thompson said the student was not of school age, but she also

18   said that this student did not require specialized instruction

19   based on the student's academic performance.  So we can't just

20   single-out one mind sentences and say that's what she said. She

21   also said the student did not require specialized instruction

22   and based on the review of the student's academic record, at

23   this point in time, there was not need for specialized


91


362

1  instruction with a specialized teacher.

2      It is our position that the placement that we provided for

3  student, Janey Elementary School was appropriate. Ms. Zaundra

4  Johnson testified that the student services, the speech and

5  language therapist, occupational therapist, audiological

6  services and the OT consult was available at Janey and even its

7  in the notes – and its in the notes that whatever --. There was

8  some indication about a gym that was needed and things of that

9  nature, Ms. Zaundra Johnson indicated that if it is not there,

10  that DCPS will make sure that it gets there.  This placement

11  could have implemented these related services in this IEP. The

12  student had a placement.  The placement was Janey Elementary

13  School. It is our position at this point in time, that parent

14  wants to claim they wanted a placement, a classroom placement,

15  and actually, the IEP, if you look at it, you have to take into

16  consideration that, when this IEP was developed, the student –

17  the student and the school has some involvement in it too, the

18  student was at River School attending the preschool there.  And

19  there was discussion about DCPS trying to help this student

20  maybe a Head Start program or one of the Day Care programs,

21  which is not special ed and I believe Ms. Zaundra Johnson said

22  her office does not have any control over that because it is not

23  a special ed program.  It's a program that all students are

1  eligible to participate. All students can apply for Head Start

2  and all students can apply for preschools and she said that if

3  she can help the facilitate even though she couldn't guarantee

4  anything, she doesn't have any control over the principals or

5  what amount of students that school can handle at that point.

6  She said that she would possibly to get the student up the

7  waiting list so the student can have – can go to a pre-school –

8  a general ed preschool with DCPS.

9      This is a child who there is testimony that --.  I guess

10 parent is testifying that she was thinking about considering the

11 DCPS placement, but there is testimony that one of the River

12 School witnesses came into the meeting, at the placement

13 discussion saying, why are we discussing this, isn't this about

14 funding.  Isn't this about funding. During the time period in

15 which they were going to discuss where this student is going to

16 be receiving a placement at.  I would ask the Hearing Officer to

17 take that into consideration. All the witnesses that you have

18 here today, outside of Dr. Morere, I don't believe she has an

19 affiliation with the River School.  The rest of your witnesses

20 have an affiliation with the River School, including the mother.

21 They all are inter-related. The mother even works for the River

22 School.  So you have to take that into consideration Mr. Woods

23 when you are making your determination. You do not have a

1    situation where you have independent fact finders, independent

2    experts – not independent but, ones who might not have a motive

3    at this point.  Everybody in this case essentially has some type

4    of interest in this case.  This is a student who – who currently

5    is supposedly needed 20 hours of – of speech and language

6    services but that 20 hours is put in everyone's speech and

7    language evaluation. It's up to you to take the evidence that

8    you heard today and look at the credibility of the witnesses,

9    you have found several people to be experts in different areas,

10   and everyone you found – I don't think any one had the same

11   area, but it's up to you as the Hearing Officer to take it and

12   consider the credibility of the witnesses, and consider the

13   evidence overall and determine if there has been a denial of

14   FAPE in this case.  DCPS is asking that you find that we have

15   denied this student FAPE.

16        But Mr. Woods but if you do find that we made – we missed

17   something, we don't believe that private school is warranted in

18   this case. Because first of all DCPS is only required to provide

19   a basic floor of opportunity, this IEP and this IEP team that

20   came over from River School obviously want to give this student

21   more than a basic floor of opportunity. I'm not saying, that the

22   parent cannot provide her student with that, but DCPS is not

23   required to provide the student with the optimum services. We

1    are required to provide a basic floor of opportunity.  We are

2    required to provide a Lexus, not a Bentley.  We are required to

3    provide – we are not required to provide the same amount of

4    services that the parent might think – the parent might want.

5    And our testimony from our witnesses, our special ed – special

6    ed staff who have working with early childhood development

7    students testified as to why this IEP was appropriate. Our

8    speech and language therapist indicated that these goals can be

9    implemented in a hour and five – an hour and half a week.  And

10    she indicated that this was actually an extended amount of time

11    due to the significant concerns that the student had.  Ms.

12    Zaundra Johnson testified as to why the student didn't need the

13    amount of the services that were proposed by the River School.

14    Now the River School staff and the services might be helping the

15    student; my witness never acknowledged that it was the River

16    School that this student – caused this 4-year growth; and

17    parent's counsel wants you to believe she said that. But I

18    believe when I asked her on cross-examination did she

19    specifically know why the student has made growth.  She

20    indicated no, she does not work at the River School and she does

21    not know what the River School is doing. All she knows is what

22    she is told that there was a speech and language therapist in

23    the classroom and the student receives pull out services.   But

1    we do not that the speech and language therapist is acting in a

2    teacher capacity role.  That is what we do know.  And we do know

3    that that individual was helping everybody else in class.

4        Mr. Woods if you do determine that DCPS needs to reimburse

5    this parent for placement, I would seriously ask you to consider

6    that you order, not only that there be tuition bills provided,

7    but there be monthly account statements from this bank statement

8    that the mother indicated that that tuition was coming out of

9    monthly because there is a huge concern.  We don't know what the

10   truth is right here today because the mother changed her story

11   four times.  Initially when I asked her was she paying for

12   tuition, she said No.  Then she turned into saying she is

13   receiving a grant.  Then she turned into it is a part of her

14   employment. Then she turned into she is paying $8000.00 a month.

15   She turned into she is paying $8000.00 a month for 4 kids.  And

16   I asked her was paying a credit, debit cash or what and she said

17   it was directly taken out of their bank account.  And so I would

18   ask that you specifically require them to provide, and I think

19   she said since October, provide statements from October, bank

20   account statements showing a withdrawal of tuition payments from

21   these parents bank accounts, from the bank – along with tuition

22   bills from those days. Because I seriously have concerns with

23   the inconsistency in the testimony as to if this student – if

1    the parent is number 1, actually paying tuition.  Number 2 if

2    the student, if the student – how much the parent is paying

3    because Mr. Woods it is not uncommon and I've sat in hearings in

4    multiple times where there has always been some type of

5    arrangement made with private schools where is called a grant,

6    and through the pendency of the hearing. Where the parent never

7    pay any money. And is not uncommon, because several attorneys

8    have – and I'm not saying Ms. Dalton, but several attorneys have

9    relationships with schools who do that.  And as I soon as I ask

10   about the tuition payment, then it always causes confusion.

11   Because there is always some type of grant.  So I would ask you

12   that if you do allow reimbursement that this be a really

13   scrutinized reimbursement Mr. Woods; had the parent initially

14   from the beginning of the question said, yes, I pay $8000.00 a

15   month for all four of my children and the comes directly out of

16   checking account, then I wouldn't request that Mr. Woods,

17   because I understand that as a Hearing Officer you do have the

18   ability to consider placement as a remedy in this case. But

19   because the answer was changed 4 to 5 times, I am requesting

20   that you please require some type of scrutinized verification of

21   payment in this case.  I'm almost finished.

22        Parent's counsel indicated the link between the reasons why

23   the student should have been speech and language impaired also,

1   the reality is Mr. Woods, the student's IEP says hearing

2   impaired. The important aspects of this IEP, like the my

3   witnesses, the two witnesses pointed out, for what is in the

4   IEP.  The student has a IEP that requires speech and language

5   services. It has goals in it.  And like my witnesses indicated,

6   even if the student was found speech and language impaired, all

7   we're doing is putting another on here.  It would not have

8   changed the IEP.  They focused on the what the student needs.

9   What services the student needs based on the student's concerns

10  and my speech language therapist kept focusing on that. She

11  wouldn't even go into the causation. They want to causation and

12  make this causal link as to how this hearing impairment is

13  separate from the speech and language impairment, but the

14  reality is, let's take away the classification names.  The

15  student's concerns are right here.  What the student needs are

16  right here. Looking at this one word right here, if you took

17  this word out, or if you had this word or not this, you would

18  not know.  Hearing impairment does not tell you exactly what the

19  student needs.  Speech and language impairment does not tell you

20  exactly what the student needs or the amount of services that

21  the student needs. What tells you what the student needs Mr.

22  Woods and what the student needs to have is the amount of

23  services and the goals. That what tells you that.  And if you

98

369

1    find Mr. Woods that this student is speech and language

2    impaired, that's a procedural violation in regards to putting on

3    the front page of the IEP.  And where's the harm? Especially if

4    you have an IEP in which there is speech and language services

5    on here and there is goals. If you had an IEP that said hearing

6    impaired, but there were not speech and language services and no

7    speech and language goals, then you argue that that is a

8    procedural violation that rolls to the level to a substantive

9    violation, but you don't have that here.  You have an IEP that

10   doesn't say speech and language impaired, but it goals and it

11   has services on there for speech and language, which tells us

12   that the student has speech and language concerns and deficits.

13   DCPS, Mr. Woods, parent's counsel also indicated that we have

14   not evaluated the student since that last meeting.  I would

15   parent's witness presented testimony that there has been a

16   related service provider that came to the school since the

17   complaint was filed in to do some evaluations on this child. So

18   I don't where that came from and was a DCPS related service

19   provider.  I'm almost finished.

20        Our position was that the student didn't need to be placed

21   in a special ed setting for special ed instruction purposed, but

22   only needed a placement for related services – purposes.  We

23   just ask that the Hearing Officer seriously consider the River

370

1    School's recommendations and consider that that was a testimony

2    - the recommendations that they had in their evaluations was

3    also the format of their programming for all of their students

4    who have speech and language delays in those classrooms; and we

5    would also ask you to take into consideration that the speech

6    and language therapist is acting the teacher capacity that the

7    student is not in an special ed program; the student is not

8    receiving specialized instruction; and that the student's

9    disability classification would not have changed the student's -

10   the amount of services or goals in the IEP; and find that DCPS

11   has not denied the student FAPE, Thank you.

12       HEARING OFFICER: Okay, Ms. Dalton, anything else you want

13   to add?

14       MS. DALTON: Yes sir. I would like to rebut. Ms. Puckett

15   indicated that DCPS didn't violate the A██████ right to FAPE by

16   not convening the eligibility decision by the time she turned 3

17   and relied on the fact that DCPS only had knowledge 30 days

18   before that and that the parent should have enrolled or

19   registered the child 90 days before that.  However, there was

20   absolutely no testimony that document that the parent was ever

21   advised that she was required to enroll A███ 90 days prior to

22   that.  But more telling than that is there is no regulation

23   requiring that the parent enroll the child 90 before in order to

100

371

1     insure that she receives an IEP by the time she turns three. In

2     fact the regulations put the burden on DCPS.  And the burden is

3     the state must have an effect policies and procedures to insure

4     that by the 3rd birthday of the child, they have an IEP.  But is

5     not a burden on the parent as Ms. Puckett would like to switch

6     the situation.  The burden is on DCPS.  With regard again, spent

7     a large amount of her closing argument trying to put the River

8     School on trial again, saying that every single speech and

9     language evaluation requires 20 hours of push-in services.

10    However as you heard Ms. Thompson stated, she's only reviewed 4

11    evaluations, speech and language evaluations. But also if you

12    recall the testimony of Amy Muldoon who testified and she is

13    support staff coordinator – I forget her exact title at the

14    River School, but anyway she testified that there are some

15    students who have IEP's at the River School who do not require –

16    who do not have on their IEP and do not requires 20 hours of

17    push-in speech and language therapy. That can be recalled from

18    the testimony on the transcript.  It really again, aside from

19    all the argument what the River School is doing or isn't doing,

20    the issue is what DCPS do in this case, and was it appropriate.

21    We only get to the River School to determine if it is providing

22    educational benefit. But the duty is on DCPS to propose an

23    appropriate IEP. And I think the evidence is overwhelming in

1    this case that DCPS did not provide the student with an

2    appropriate IEP.  Now, Ms. Puckett stated that there was no

3    agreement on the IEP, that the parent didn't agree with the IEP,

4    but it is absolutely undisputed that everybody agreed to the

5    goals and objectives of the student. The disagreement broke down

6    in the placement that DCPS was recommending and the amount of

7    services, otherwise, the parent would have agreed to the IEP.

8    And everybody from DCPS as well as the parent testified that the

9    goals and objectives were agreed to. And that is what I was

10   pointing out to you, Mr. Hearing Officer, that those specific

11   goals and objectives cannot be implemented unless she has a

12   classroom placement.  The mother testified and Ms. Johnson

13   testified both, testified that she would not have been able to

14   attend a general education classroom in her neighborhood school

15   this year and possibly not next year.  That there is a waiting

16   list and that she didn't have a placement and those goals can't

17   be implemented, most of them unless she is in a placement.  Now

18   she also stated that the River School employees testified and

19   therefore you shouldn't believe them, because they are not

20   independent. It is not unusual that the people that have been

21   working with the student, the providers and the teachers and the

22   speech and language pathologist and those that have worked with

23   her will testify on behalf of the student.  They have the most

1    knowledge of the student. You as the Hearing Officer can
2    determine the credibility. The mere fact that they are employees
3    of the school where the student attends does not automatically
4    discredit their testimony.  And there was independent testimony
5    in this case by an expert who is not connected to the Rive
6    School, who is a professor at Galludet University who has
7    extensive experience in working with students with cochlear
8    implants who have additional disabilities of language and motor
9    problems.  DCPS didn't even have an independent witness.  I mean
10   I can sit here and argue the same thing, but because they are a
11   DCPS employee, they are biased. But it comes down to when you
12   listen to the credibility of each of these witnesses, not where
13   they are from, but how they testified and the honesty with which
14   they testified.  And then Ms. Puckett argued that A██████ is only
15   entitled to the basic floor of opportunity and what the parent
16   wants in this case is something more than that.  That has never,
17   ever been the testimony by Mrs. Tiller. Mrs. Tiller has only
18   asked that she have an appropriate public education. She asked
19   DCPS to provide her with one and DCPS did not do that.  Ms.
20   Tiller - Mr. And Mrs. Tiller's only concern is that their
21   daughter who has multiple disabilities has a complex picture
22   receive the basic floor of opportunity and the IEP and the
23   placement proposed by DCPS does not provide her with that at

1    all.  Now Ms. Puckett also stated that there was testimony that

2    a related service provider came to the school to perform a

3    physical therapy – physical therapy evaluation after the IEP

4    meeting. I don't have any knowledge of that, I'm not contesting

5    it, it might not be true but there is absolutely no evidence

6    that any meeting – that they have provided the parent with a

7    copy of that evaluation or that they have reconvened an IEP

8    meeting to discuss that. That is still an outstanding issue.

9    And the last issue I do what to address has to do with the prior

10   Order entered by this Hearing Officer and that is you granted

11   Interim Relief for DCPS to provide occupational therapy services

12   during the pendency of this Hearing a the River School and that

13   was in a Hearing Order issued on May 13th and to date DCPS had

14   not provided any of the OT services that DCPS indicated they

15   would provide.

16       HEAIRNG OFFICER: Okay.  The case is submitted and I'll have

17   the Order within ten days.

18       MS. PUCKETT: Because that just threw me off by surprise,

19   because that was never brought up earlier. And I just want to

20   put on the record that that was never told to me. I never found

21   out about and I have not received any – there has been no

22   testimony or anything that these services have not been provided

23   and Ms. Dalton's representations are not evidence.  And I just

104

375

1    want as like I indicated to you I've was not put on that notice,

2    I was not put on notice of that.  And Ms. Dalton has not

3    presented you with an witness to testify to that.  Ms. Dalton's

4    representations in the closing argument are not evidence that

5    this has not happened.

6        MS. DALTON: I will Ms. Puckett time to submit any

7    documentation that she wants to provide to the Hearing Officer

8    that these services are actually been rendered.

9        MS. PUCKETT: That is not before the Hearing Officer today

10   in regards to what was ordered in his Interim HOV.  My

11   understanding is that we are arguing the issues that are in the

12   complaint. There was an interim relief granted due to the case

13   being continued over.  I have not had an opportunity to find out

14   what the circumstances are behind the OT services and things of

15   that nature and I believe that it is inappropriate to bring it

16   up at this point. Why was that not brought up when we first

17   started today?  Before we got to closing. The case has been

18   submitted, both parties have rested and DCPS has a problem with

19   that becoming an issue in this complaint at this point.

20       MS. DALTON: For judicial economy, I don't' think we have to

21   file another Hearing Request and have another Hearing on that

22   issue, Mr. Woods. It is something you Ordered in an Interim

23   Order.

1        MS. PUCKETT: And Mr. Woods the reality is – it is something

2    that was initially offered at the school. We are not required to

3    provide the services at the student's private school. The law

4    allows us to provide them in a school setting, in the private

5    school setting or in dependently. We are not required to provide

6    them at the school setting. It was something that happened

7    because this case got continued over. We offered those services

8    in the beginning, the parent rejected those services at Janey,

9    so definitely take that into consideration.

10        HEARING OFFICER: Okay, thank you both and the case again is

11    submitted.

12        MS. PUCKETT: Thank you Mr. Woods.

13

14

377

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
STUDENT HEARING OFFICE

IN THE MATTER OF A█████ T████████

HEARING DATE:  MAY 24, 2007

TRANSCRIBED BY
LEGAL PERSONNEL, INC.  (301) 277-5711

378

## APPEARANCES

| | |
|---|---|
| HEARING OFFICER: | FRED WOODS |
| ATTORNEY ADVISOR FOR<br>    DISTRICT OF COLUMBIA<br>      PUBLIC SCHOOLS | MS. TIFFANY PUCKETT |
| ATTORNEY FOR PARENT | MS. DALTON |
| PARENT OF A█████ T███████ | MS. TILLER |
| EXPERT FOR PARENT<br>River School | MS. O'LEARY KANE |
| | DR. DONNA MORERE |
| Director of Teacher Training | MS. MULDOON |
| Enlist Supervisor for Early<br>Childhood Special Educ. DCPS | MS. ZAUNDRA JOHNSON |

379

1    HEARING OFFICER:  Good Morning. Today is Thursday May 24th,

2    2007. My name is Fred Woods, the Hearing Officer reconvening the

3    Due Process Hearing for ██████████    The Hearing had convened

4    on May 9th, 2007 and there was not enough time to complete all

5    testimony in that case, so the parties agreed to continue the

6    case until today. Let me pause here to allow everyone present to

7    introduce themselves and then just remind you all the rules.

8    Can you all hear me or do I need to talk louder.

9        MS. PUCKETT:  You need to talk louder.

10       HEARING OFFICER: Okay. Okay.

11       MS. PUCKETT:  Tiffany Puckett, attorney for DCPS.

12       MS. DALTON: Ellen Dalton, attorney for the parent.

13       MS. JOHNSON:  Zaundra Johnson, Supervisor for Early

14   Childhood Special Education with the District of Columbia Public

15   Schools.

16       Inaudible.

17       MS. TILLER: Sarah Tiller, ██████████ mother.

18       DR. MORERE: Dr. Morere, I am a psychologist (inaudible).

19       ?: (Inaudible) Director, the River School.

20       HEARING OFFICER: Okay. And again, welcome and thank you for

21   being here.  And make sure we all can hear each other, I guess

22   we'll talk up a little bit. (Inaudible- talking in background)

23   My understanding that we'll just be picking up with testimony.

380

1    I believe we were still in the parents' case-in-chief.

2        MS. DALTON: That's correct sir.

3        HEARING OFFICER: Having so far taking the testimony of the

4    mother, Ms. Tiller and also Dr. Morere.

5        DR. MORERE: Morere.

6        HEARING OFFICER: Morere. So unless there are any

7    preliminary matters, I think we will just pick up with the

8    testimony.

9        MS. DALTON: I would ask that we had evoked the rule on

10   witnesses, except for the expert who you allowed to stay in

11   after she testified.  I think all other individuals need to

12   leave the room.

13       HEARING OFFICER: Any objection to the rule on witnesses?

14       MS. PUCKETT: No, I'm the one that actually evoked the rule

15   on the last time.  So I'm going to call you on our cell phone.

16       MS. PUCKETT:  Seriously, this is - it is --.

17       MS. DALTON: This is really certainly irritating.

18       MS. PUCKETT: Yeah, like I had difficulty, I heard it, but I

19   don't know if the record is going to actually be able to pick up

20   clearly Mr. Woods, to be honest.

21       MS. DALTON: Is there any way that they you could tell them

22   they need to something or they just --.

23       HEARING OFFICER: Yeah.  Okay, Let me try one more --.

1      MS. PUCKETT: Because it's not clear at all.

2      MS. DALTON: Either that or is there any other room –

3      HEARING OFFICER: All right and we're back on the record,

4  and as I had indicated a few minutes ago, it appears that today,

5  we're just going to pick up where we left off and that is,

6  completing the testimony in this case and we were still in the

7  parent's case-in-chief so, unless there are preliminary matters,

8  we'll just pick up there. Are there any preliminary matters?

9      MS. DALTON: No.

10     HEARING OFFICER:  Why don't we then continue with the

11  witness testimony and Ms. Dalton you may proceed with calling

12  your first witness.

13     MS. DALTON: Thank you sir.  I call Mary O'Leary Kane.

14     HEARING OFFICER:  Okay, Ms. Kane.  Is that you?  Okay.  Ms.

15  Kane do you mind taking this oath? Do you swear or affirm that

16  the testimony that you are about to give would be the truth?

17     MS. KANE: Yes.

18     HEARING OFFICER: Okay, what we'll do is as we did last

19  time, I do believe you were here last, after being sworn in, Ms.

20  Dalton will ask questions of you and then be followed by

21  questions from Ms. Puckett. Ms. Dalton.

22     MS. DALTON: Thank you.  Ms. Kane, can you please state your

23  full name for the record?

1       MS. KANE: Mary O'Leary Kane.

2       MS. DALTON: And what is your current occupation?

3       MS. KANE:  I'm a speech pathologist.

4       MS. DALTON: And where are you currently employed?

5       MS. KANE:  At River School.

6       MS. DALTON: Okay, and can you please briefly describe your

7   educational experience and your professional work experience.

8       MS. KANE:  I received both my Bachelors degree and my

9   Master's Degree in Speech Pathology.  My graduate work was

10  centered in (inaudible) to work with people with hearing loss

11  and who were deaf and hard of hearing, which is a specialty

12  track that I took in addition the (inaudible). Upon graduation,

13  I did my clinical fellowship here in Baltimore, and (inaudible)

14  hearing and speech agency for five years and had very

15  (inaudible) there children who had severe speech and language

16  disorders and including children with hearing loss.  And then I

17  went to River School faculty in January -- I'm sorry August of

18  2000 and worked as a classroom speech pathologist and then was

19  promoted to my present position, which is Director of Speech and

20  Language Services.

21      MS. DALTON: And, have you published any papers in your area

22  of expertise?

23      MS. KANE:  Yes I have.  I (inaudible) in several research

1    grants, funded by the Deafness Research Foundation, also by the

2    National Institute of Health; I worked collaboratively with

3    Johns Hopkins Listening Center where they do cochlear ear

4    surgery and collaboratively to (inaudible) Development Children

5    with program plans. So we have published papers.

6    Collaboratively I also published in an academic journals and

7    also presented National - Local, National and International

8    conferences.

9         MS. DALTON: And with regard to IEP development, how many

10    IEP's have you participated in with students in educational

11    settings?

12        MS. KANE:  I don't know the exact number, but I would say

13    over 100.

14        MS. DALTON: Okay, and with regard to placement meetings,

15    how many placement meetings have you been involved in, in

16    developing programs for students with speech and language

17    concerns?

18        MS. KANE:  I would say about the same number and follow

19    through the IEP placement (inaudible).

20        MS. DALTON: And you're expertise within the speech and

21    language area, what is that?

22        MS. KANE:  My specialty is working with children who are

23    deaf and hard of hearing.

1    MS. DALTON: And does it also include children with cochlear

2  implants?

3    MS. KANE:  Absolutely.

4    MS. DALTON: At this time – oh, let me just ask you.  I have

5  in the documents, document number 36 and I would show that to

6  you, is that your curriculum vitae?

7    MS. KANE:  Yes it is.

8    MS. DALTON: And at this time I would proffer Ms. O'Leary

9  Kane as an expert in the field of speech and language as it

10  relates to children with cochlear implants.

11    MS. PUCKETT: DCPS would like to voir dire the witness?

12    HEARING OFFICER:  Okay.

13    MS. PUCKETT: Ms. Kane you testified that you participated

14  in over 100 IEP meetings, regarding students.  Were all of these

15  students related to the River School?

16    MS. KANE:  No they were not.

17    MS. PUCKETT: What other schools were the students related

18  to?

19    MS. KANE: The Gateway School in Baltimore, and there is

20  also clinic and a hard of hearing speech agency, where I helped

21  students develop IFSP's and IEP's.

22    MS. PUCKETT: And you indicated, -- I'm sorry one second.

23  You indicated that you worked with the Gateway School, how long

1   did you work at the Gateway School?

2        MS. KANE:  For five years.

3        MS. PUCKETT: And that was right after your training,

4   correct?

5        MS. KANE:  HmmmmHmmmm.

6        MS. PUCKETT:  Okay.

7        DALTON: You have to say yes or no.

8        MS. KANE:  Yes. I'm sorry yes.

9        MS. PUCKETT: And, I have no additional questions. It is our

10  position that this witness did the evaluation that she can be

11  fact witness for this witness. I don't believe that - although

12  she has had experience, but I don't believe that there has been

13  sufficient testimony or evidence presented that this witness is

14  a expert in the area of speech and language services for

15  students who are hearing impaired, she does do some evaluations

16  regarding those students, but I don't' believe even though she

17  did some publications, those were in conjunction with other

18  individuals agencies and things of that nature.  She can't

19  testify as a fact witness.

20        HEARING OFFICER: Any response?

21        MS. DALTON: She is absolutely qualified by her credentials,

22  and by her testimony and by her CV as an expert in speech and

23  language, especially in relation to the area of children with

1  cochlear implants.  She is published, she has extensive

2  training, she laid an adequate foundation for the reason why she

3  has expertise in this matter.

4      HEARING OFFICER: What specifically are you saying?  Again,

5  it is a narrow specialty.  Are you saying she doesn't have

6  specialty in that particular area?

7      MS. PUCKETT: No. I'm saying that she does not have enough

8  experience to be considered an expert.  That is my position. I

9  mean your position might be completely different.

10     HEARING OFFICER: In that particular area.

11     MS. PUCKETT: In that particular area, yes.

12     HEARING OFFICER: And the reason is?

13     MS. PUCKETT: Because she does not have enough experience in

14  that particular area.  What I am saying is that you might see if

15  differently, but I'm saying, based on what I'm seeing, that she

16  does not.  And I'm just objecting for the record. If the hearing

17  officer is going to find her an expert then --.

18     HEARING OFFICER:  Where is the experience in that

19  particular area?  Can you highlight that particular area?

20     MS. KANE: Over the course of my eleven years working as a

21  speech pathologist, it has been in the field of communication

22  disorders center for children who are deaf and hard of hearing.

23  Most of them have cochlear implants.  The training that I

10                                                              387

1    received at the University of Northern Colorado was a specialty

2    program to work with those individuals, and since I've graduated

3    that has always been my primary focus to work with those

4    children. And the research that I've done, some of it has been

5    with collaboration with Johns Hopkins Listening Center. I've

6    also done independent research where I've been the principal

7    investigator on grants given by the Deafness Research Foundation

8    and also National Institutes of Health.

9         MS. DALTON: Ms. O'Leary Kane have you been qualified as an

10   expert in other due process hearings in the District of

11   Columbia?

12        MS. KANE: Yes I have.

13        HEARING OFFICER:  In what area?

14        MS. KANE: In this area.

15        HEARING OFFICER: What's this area?

16        MS. KANE:  As a person who is qualified as expert to work

17   with children with cochlear implants.

18        HEARING OFFICER: Sounds like what you're saying I worked

19   with students for eleven years with communication disorder, what

20   specifically though, what are you saying that do?  What does

21   that entail?

22        MS. KANE: I've provided treatment--,

23        HEARING OFFICER: Okay.

11

388

1      MS. KANE: I've provided assessments; I've done research

2   where you sort of analyze the developmental progression of

3   children with cochlear implants.  Some work more specifically

4   than that.

5      HEARING OFFICER: In there in that particular areas, as a

6   speech language pathologist, is there is a way that one is

7   certified to be an expert in that field? Or is this a claimed

8   expertise?

9      MS. KANE: Well - It is sort of a claimed expertise based on

10  experience.

11     HEARING OFFICER:  Okay.

12     MS. KANE:  So ASHA is the American Speech and Hearing

13  Association, and they are the governing body for speech

14  pathologists.  I am certified through ASHA, and they don't

15  recognize or they give an additional credential for working with

16  children who are deaf and hard of hearing.  But, because that

17  has been my personal focus and my professional focus for my

18  entire career, going into my career and that's why I consider

19  myself to be an expert in that field.

20     HEARING OFFICER: And its 11 years?

21     MS. KANE: Yes.

22     HEARING OFFICER:  Okay. How many students in that time

23  period have you treated or assessed or watched their progress?

1      MS. KANE: I would say at least a hundred children.

2      HEARING OFFICER: And are you –,

3      MS. KANE: Maybe two hundred children – I know I'm being

4   modest.

5      HEARING OFFICER:  Okay. Okay. Is your testimony today

6   basically focused on ███ or what you've done with those 200

7   students?

8      MS. KANE: I think both.

9      HEARING OFFICER: Okay.

10      MS. KANE: I think the (inaudible) I'm going to bring about

11   the development progression, what you see typically with

12   children with cochlear implants, where I'll use my general

13   knowledge about that, but ███ specifically (inaudible) at River

14   School is to oversee that the deaf and hard of hearing children

15   and that – that they have the opportunity to benefit from the

16   program. So I supervise the speech pathologists who directly

17   treats her.

18      HEARING OFFICER:  Okay.  An expert is to the help the Court

19   as you know, and I'm Hearing Officer.  So what are you going to

20   help me with?

21      MS. KANE: I hope I'm going to help you appreciate what is a

22   cochlear implant, and how that benefits ███ as a child who is

23   profoundly deaf, but functions as if she is a child with mild

13

1  hearing loss.  I know I can help you appreciate what we

2  anticipated projection of development would be for a child with

3  implants, specifically ████.  And then I hope that I can lend

4  some insight into ████ personally in the growth that I've seen

5  her experience (inaudible).

6       HEARING OFFICER: Did you view yourself as helping me or did

7  you view yourself as an advocate?

8       MS. KANE: That's a good question.  I think I would say

9  both.  I mean I think that I am here as an advocate for ████,

10 but then as an expert I hope that I can bring some information

11 to Court.

12      HEARING OFFICER: Yeah.  Anything further on this?

13      MS. PUCKETT: I'm just concerned as far as her being a –

14 like I said, she has worked with the student, the evaluation was

15 done by her, --.

16      MS. DALTON: The evaluation was not done by her.

17      MS. PUCKETT: I'm sorry – the evaluation was done by one of

18 the individuals that she supervises.  She is the Director of

19 Speech and Language services.  She coordinates the services for

20 the student, I think.  I just have a problem with her testifying

21 as a fact witness as well as an expert witness in this case for

22 this student. Like I said she has factual knowledge regarding

23 ████.

1    HEARING OFFICER: I thought you said you had problems.

2    MS. PUCKETT: And I have problems with - I mean she just

3    gave more detail as to what she's specifically did in regards

4    hearing impairment, but I have problems with her testifying as

5    an expert based on she - I think I said this, based on her

6    amount of experience as well as the fact that she is a factual

7    witness. I think I did say that in both - when I initially

8    objected to her being an expert witness in this case.

9    HEARING OFFICER: I thought you just said she is not a fact

10   witness because she didn't do the evaluation.

11   MS. PUCKETT: No, I said she can testify as a fact witness

12   because she is aware of ███.  She supervises the individual who

13   did the evaluation and I believe that she coordinates the

14   services for A███.  So she can testify as a fact witness.

15   MS. DALTON: Mr. Woods, If I may. I think that the rules on

16   expert witnesses is if a person has expertise above the lay

17   person's knowledge that would benefit the Hearing Officer in

18   understanding the particular issues in a case, they are

19   qualified to render their opinions.  Now, certainly you can look

20   at one's experience and whether they have enough experience to

21   be able to provide the Hearing Officer with more than what a

22   layperson would understand about speech and language, about

23   cochlear implants, about the development of students with

1    significant language concerns. However, it this case she has

2    laid an adequate foundation for her experience.  She has

3    published in this area, she has trained in this area, she has

4    assessed students in this area, she has treated students in this

5    area, she clearly is a qualified expert witness.

6        HEARING OFFICER:  Are these the publications in this area

7    that you got in resume -- did you see your resume that you

8    submitted to us?

9        MS. KANE: Did I see my resume, yes, I did.

10       HEARING OFFICER: I said, did you see those publications, I

11   don't know if you remember what the publications are --.

12       MS. KANE: I just have the first page.

13       HEARING OFFICER: Oh, you didn't see the second page.

14       MS. KANE: But, the last time I updated it was with the most

15   current -.

16       HEARING OFFICER: Current articles that are on this --.

17       MS. KANE: In April there's one that is not included in this

18   document. In April, I presented at the (inaudible) 2007, and the

19   International Symposium on Cochlear Implants for pediatrics. So

20   it was an international conference posted by the University of

21   North Carolina and was accepted to go down to share a

22   (inaudible) session with the attendees of the conference.

23   (Inaudible) people at that conference including audiologists,

1   speech pathologists, surgeons and rehab specialists. So I really

2   worked very diligently to keep the skills sharp, because the

3   technology in the field changes quite quickly.  The expectations

4   of the children have changed dramatically in the years that I've

5   been working.

6       MS. DALTON: In each one of your publications have to do

7   with either cochlear implants or hearing loss of children. .

8   Correct?

9       MS. KANE: Yeah.  That's been my specialty for the length of

10  my career.

11      HEARING OFFICER: Last question, you work at the River

12  School?

13      MS. KANE: Yes I do.

14      HEARING OFFICER:  Do they consider you an expert?

15      MS. KANE: Yeah. I'm the Director of the Program there. I

16  oversee the speech and language.

17      HEARING OFFICER: Do they consider you an expert?

18      MS. KANE: I think they do.

19      HEARING OFFICER: Do they call you an expert?

20      MS. KANE: They call me the Director.

21      HEARING OFFICER: Okay.

22      MS. KANE: I think my boss would say yes.

23      HEARING OFFICER: Okay.  Is your boss here today?

1       MS. KANE: No she's not.

2       HEARING OFFICER:  Any other questions Ms. Puckett. I'm

3   going to admit this witness as an expert in the area of - it the

4   limited - because it sounds like that's what you're testifying

5   about - communications disorders, specifically students with

6   cochlear implants. And that is what is at issue in this

7   particular case.  It appears to this Hearing Officer that

8   although, there is not a recognized specialty, where one can be

9   deemed an expert in this field of speech and language pathology

10  that this person is.  I guess its like lawyers, you just say

11  that you're an expert and base it on your experience and

12  education, training and writings.  And so the Hearing Officer

13  finds that over the past 11 years, it appears that this witness

14  has focused primarily in that particular area and that is an

15  issue in this case.  That is the key issue in this case, and the

16  Hearing Office would find it helpful to hear someone speak with

17  regards to the needs of ▆▆▆ with regard to a child with

18  cochlear implants.  So you may proceed.

19      MS.DALTON: Thank you.  Ms. O'Leary-Kane, can you please

20  describe your knowledge, your familiarity with ▆▆▆?  How often

21  do you see ▆▆▆▆▆▆▆?

22      MS. KANE: I seen ▆▆▆ on a very regular basis, I'm at the

23  school everyday and I spend time observing in her classroom. I

1   am in touch very regularly with her teachers.  We meet regular

2   basis to discuss the happenings in the classroom and during

3   those meetings, I always, -- my focus is how ███ and there is

4   another child in her classroom with a hearing loss (inaudible)

5   to see how she's progressing and if there are any concerns and

6   ways to go about problem-solving.

7       MS. DALTON: How often would you say you observe her?

8       MS. KANE: I would say on a weekly basis.

9       MS.DALTON:  And have you reviewed her prior speech and

10  language evaluations?

11      MS. KANE: Yes I have.

12      MS.DALTON: Can you describe Anna's current levels of

13  performance with respect to speech and language or

14  communication?

15      MS. KANE: Yes. Would you like me to review the report?

16      MS.DALTON:  Certainly.  Can you describe it without looking

17  at the report or do you need to look at the report to refresh?

18      MS. KANE: I can describe, but if you want me to cite exact

19  numbers, I want to make sure I they are accurate; Oh I'll get

20  started while looking at this sheet.  I think that she is doing

21  very well for a child who has the history that ███ has.  She

22  was born a twin, she has a twin sister, (inaudible) little girl

23  as a typically developing child, and at 2½ months she contracted

19

396

1    meningitis which is really debilitating concern because it has

2    so many complicating factors that can be – that can really run

3    the gamut.  And the way meningitis impacted ▆▆▆ was through her

4    hearing and through her motor skills. So she passed the hearing

5    screening after the exposure to meningitis, but then at 15

6    months she was diagnosed as being profoundly deaf.  So that

7    implies that the cochlear, which is this snail shaped bone in

8    your inner ear, it should be hollow has ossified, and therefore

9    the signal – the auditory signal could not process to auditory

10   nerves to give her access to sound.  And her parents decided to

11   undergo go surgery to get a cochlear implant for ▆▆▆ after

12   that.  And the way that that works is that it bypasses the

13   system so they were able to get the electric ray in cochlear and

14   activate the processor so that that information goes to ▆▆▆▆

15   brain and activates the auditory nerve so she has that access to

16   sound. Therefore she is obviously very different from her twin

17   or from any other typically developing child because she is

18   hearing very differently than anyway I would hear.  So, what

19   we've done with ▆▆▆ is that she is making steady gains.  We

20   think that she has a lot of potential to be a full oral

21   communicator. She doesn't rely on sign language to communicate.

22   She is able to access information (inaudible) through the air

23   and process that information to the extent of it and you can see

1  that the standardized tests. So the first one that was

2  administered was the Goldman (inaudible) test of articulation.

3  And that's how she – how she had produced individual speech

4  sounds.  And for all the tests that I'll review, the standards

5  score is 100.  That's the mean, and the standard deviation is 15

6  points on either end.

7      HEARING OFFICER: What are you reading?

8      MS. KANE:  Number 18.

9      MS. DALTON: Yes, document number 18.

10     HEARING OFFICER: Can we introduce that so the record

11  reflects what's she reading.

12     MS. DALTON: Certainly, she is referring to the speech and

13  language evaluations conducted on October of 06 and its document

14  – parent's document number 18.

15     HEARING OFFICER: One other thing for our record, did you

16  perform this evaluation?

17     MS. KANE: No I did not.  I have given all the tests and

18  administered (inaudible) of the tests.

19     MS. DALTON: And you've reviewed this evaluation in

20  formulating your opinions here today?

21     MS. KANE: Yes.  So the first test is the Goldman –

22  (inaudible) of Articulation, and the mean standard score is 100,

23  and ▮▮▮▮▮▮ score is 72. So it shows that there is a definitely a

21

398

1    delay in her scores, that is her score in below the average

2    range, but the good news is that she made an improvement in that

3    area, but her percentile rank shows that compared to children of

4    her same age, she still is well below how they are performing.

5    But she is stimulable to produce those sounds, so when given the

6    opportunity to imitate the speech sounds or given physical

7    prompts to do that she is able to do.  And to her language

8    development, the first test is the Ranyall Development Language

9    Scales. And her score on this into verbal comprehension, her

10   understanding of word and sentences was standard score 72 and an

11   age equivalent of 2 years 3 months. That shows lag of nine

12   months from her chronological and her developmental levels.  So

13   that that means that she is certainly making an improvement in

14   her understanding and the idea that she's improved up to 2 year

15   3 month level is good. That shows good clinical progress, but a

16   nine-month gap.  That is something that really needs to be

17   addressed. And also according to the expressive language

18   component of this test, because there is significant difference,

19   her standard score on that is 63. So that is in the very low

20   range and she shows a lag of 13 months, so she is more than a

21   year behind in ability to express her ideas into single words at

22   the sentence level.  The next test that was administered to ▮▮▮

23   was the CELF. The Clinical Evaluation of Language Fundamentals

1    at the pre-school level.  And this is a test that it's a more –

2    it's a higher level test, because it asks children to appreciate

3    information and show their understanding and expressive skills

4    at a higher level. So they are shown pictures and they are asked

5    to describe the pictures or to list more information to show

6    that their understanding and her score language score there, the

7    second table at the bottom shows that the core language score 71

8    and again there is a discrepancy between her ability to

9    understand and her ability to express.  So receptively, her

10   standard score was 79, but expressively it was only 63. So the

11   important component there is that ████ is smart little girl.  I

12   think she has a lot of potential in understanding things.  But

13   clinically what this would mean to me is if there is going to be

14   a level of frustration for children who obviously are not able

15   to express themselves more competently, to be understood by

16   their peers and to be understood by their, not the adults in

17   their environment, but this is real red flag.  Clinically it

18   means that she needs a lot of intervention to close that gap

19   between her understanding of her expression and then between her

20   chronological age and her developmental age.  The next two tests

21   are single world tests. So the first one is her ability to

22   understand vocabulary. So at the one word level it's called the

23   Peabody Teacher Vocabulary Test.  It is very involved receptive

1    test used in the industry and her standard score of 65 shows

2    that again, a significantly delayed as to understanding

3    vocabulary, (inaudible) chosen by this test her words were not

4    familiar to ███.  She needs a lot of support to improve those

5    skills, was obviously her overall language development your

6    vocabulary and -- (inaudible)--.

7       MS. DALTON:  Let me just stop you right there.  Can you

8    describe what the average vocabulary milestones would be for

9    children? At what age should they have how many words?

10      MS. KANE: HmmmHmmm. HmmmHmmmm.  Yeah, for children, for

11   particularly typically developing hearing children we would hope

12   to see if at the at the one year mark they are using single

13   words. They are using words to describe things in their

14   environment that are usually nouns or verbs that they can use

15   and then when they start combining words, then they are looking

16   at more descriptive words, so to incorporate adjectives and the

17   adverbs into their sentences and then they are beginning to

18   follow a case of combined sort of an agent and a action

19   together. So combining words at the two-word level and at the

20   three word level until they can fluently string together words

21   to create cohesive sentences and the grammatical structure are

22   the last ones to fall into place, articles, verb endings,

23   irregular verb tense, that sort of thing will fall into place

1    later.  So this—and in terms of the number of words, children

2    should be able to (inaudible) hundreds of words by their third

3    birthday. So ███ is past her third birthday and she has a

4    significant deficit in her vocabulary skills.  She should be at

5    the stage where she is combining several words together to make

6    a more grammatically appropriate sentence.

7        MS. DALTON: So, by her third birthday, a child should be

8    able to have a vocabulary that consists of hundreds of words,

9    and where is ███ at?  She's past her third birthday.

10       MS. KANE: She's past her third birthday. And this test

11   doesn't show the number of words necessarily, it's more their

12   understanding and use of single words.

13       MS. DALTON: From your observation of ███, where would you

14   say she is?

15       MS. KANE: I would say that her vocabulary is very

16   scattered, which is not usual for children with hearing loss.

17   Because it is more effortful for them to hear and process

18   sounds. They need so many exposures to sounds - I mean to words

19   to incorporate that into their vocabulary.  So she's, you know

20   she's at that point - sort of including more words into her

21   vocabulary and she is not stringing them together as you hoped

22   to see.

23       MS. DALTON: Okay, go ahead, I didn't mean to interrupt you.

1    MS. KANE: Similarly with the expressive one word feature of

2    the vocabulary test, that shows her ability to label words and

3    the word level. And her standard score of 58 shows a significant

4    --- a significant delay in that area and again there is a

5    difference between her ability to understand 65 and her ability

6    to express at 58.  But that's a regular pattern I'm seeing with

7    her, the difference in her understanding and expression.  The

8    next is the world motor evaluation and the important thing about

9    ▓▓▓ is that her motor functioning is definitely impacted.  You

10   see it her gross motor skills and her balance and her fine motor

11   development and sort of across the continuums the speech

12   production is a very fine motor task. Your tongue moves from

13   position to the next, it's really asking a lot of your motor

14   system.  So because of ▓▓▓▓ Apraxia speech, which is a

15   clinical diagnosis that implies a neurological component to her

16   ability to synthesize motor speech movements.  That really

17   impacts her ability to produce multi syllabic words.  One thing

18   that was done in this testing, their called dyadophene sp?

19   Phonetics rates. And that is the ability for a child to string

20   together several syllables in a smooth repeated tasks.  So the

21   examiner would ask ▓▓▓ to repeat a (inaudible).  Examiner would

22   say, say this word (inaudible) say it as many times as you can

23   and then it is a timed tasks. And then for most children over

1   three they can say it several times without confusing the

2   syllables, without omitting sounds, (inaudible) until they were

3   exhausted and they would stop.  But ███ did was that she

4   deleted sounds, she inverted the sounds, and her stamina to do

5   that sort of task is very low.  So she wasn't able to complete

6   that task with much accuracy, or her fluidity, and that is just

7   one example but that is what we see when she's trying to string

8   together sentences or with multiple words, she 's not able to do

9   that because that motor speech component (inaudible) brain to

10  coordinate those movements and her tongue and her lips and jaw

11  are in the right place to produce those sounds (inaudible).

12      MS. DALTON: Now do all children who have speech and

13  language deficits have a diagnosis of apraxia?

14      MS. KANE: No.

15      MS. DALTON: Apraxia is a separate diagnosis?

16      MS. KANE: Yes it is.

17      MS. DALTON: And again that relates to the description of--.

18      MS. KANE: That relates to a child's inability to process

19  oral speech movements and it is a neurologically based disorder

20  that implies a neurological component to getting your

21  articulator's coordinated for systematic speech.

22      MS. DALTON: Do you have any opinion as to what caused the

23  oral motor deficits that ███ has?

27                                                              404

1       MS. KANE: It is my opinion that meningitis is what impacted

2   (inaudible) for ███.

3       MS. DALTON: And that opinion is based on?

4       MS. KANE: Experience with other children.

5       MS. DALTON: And does ███ have other motor concerns besides

6   oral motor concerns?

7       MS. KANE: Yes she does.  She has gross motor concerns,

8   there is fistibular or balance concerns.  And there are also

9   fine motor concerns.

10       MS. DALTON: Has she received intervention in the past for

11   both the gross motor and the fine motor concerns?

12       MS. KANE: Yes.

13       MS. DALTON: And that would be in the form of what type of

14   services?

15       MS. KANE:  Physical therapy and occupational therapy.

16       MS. DALTON: That did conclude the testing that was done?

17       MS. KANE: Yes. That is the review of all of the

18   evaluations.

19       MS. DALTON: So based on your review for current levels of

20   educational performance and the review of her speech and

21   language evaluation, can you describe what deficits in the area

22   of speech and language or communication that ███ has?  Can you

23   just briefly review those again?

1     MS. KANE. Yes. Yes.

2     MS. DALTON: Summarize.

3     MS. KANE:  What I would see as ███ sort of overall

4  picture right now, is that she is significantly delayed. She

5  wants to communicate.  She is a social little girl.  She is very

6  interested in other children, but she doesn't have the tool to

7  do that very productively or effectively or her own.  She needs

8  a lot of support to understand concepts and also to be

9  understood when she is expressing herself. Her vocabulary is

10  very limited. Her ability to understand a higher level of

11  information so when the questions forms, her answer questions in

12  generate questions is a concern for ███.  And also her ability

13  to continue to act as more academic information.  She is over

14  three, so – and she is a very smart little girl. So in terms of

15  her non-verbal problem-solving task completion, she can do a lot

16  of those things. So we notice she has good potential for

17  language learning, but the apraxia speech continues to be sort

18  of a roadblock for ███.  As she is understanding more, you can

19  see on the scores the discrepancy between her understanding of

20  her discretion than for children with apraxia speech, there is a

21  road-block where the understanding that they need a lot of

22  intervention in a very systematic way. They are programs

23  designed by speech pathologists that need to be done on a daily

1  format and very systematic way to overcome that neurological

2  competent to really retrain the brain to allow the muscles in

3  the articulator's to work together to create more appropriate

4  speech.

5      MS. DALTON: Do you have an opinion as to whether or not

6  ███████ speech and language deficits that you described, whether

7  they affect her educational performance?

8      MS. KANE: They do.

9      MS. DALTON: Can you describe how they affect?

10      MS. KANE:  They do because it's harder for ████ to

11  understand information, the test showed that that's deficit area

12  for her, so when given opportunities to learn more academic

13  skills, we know that -- that her with her presentation with the

14  speech and language disorder that she has, it impacts her

15  ability to understand, because she needs extra support to get it

16  that new information.  And also for the teachers she work her,

17  they only know her level based on her response.  So you know

18  that academics are adversely affected because in order to

19  challenge her at the next level you need to work on those

20  expressive skills and so she can answer questions and she can

21  ask for additional information.

22      MS. DALTON: And where you part of the team, the MDT team

23  that discussed ██████ disability classification - let me give

1    you the date – on February 1st, 2007.

2        MS. KANE: Yeah.

3        MS. DALTON: Did you present to the team at that time your

4    opinion as to the appropriate disability classifications for

5    ██████?

6        MS. KANE: Yes I have.

7        MS. DALTON: And what was your opinion at that time?

8      .   MS. KANE: My opinion in terms of ██████ in terms of ██████

9    disability classification is that she should be labeled as

10   multiplied disabled.  Because she clearly presents as child who

11   is HI.  Because she has a profound hearing loss and because she

12   presents as child with her implant she will and is hearing

13   impaired.  But in addition to that because of meningitis and

14   because of the apraxia speech, because of her unusual sort of

15   profile I strongly believe that to let that label to really

16   capture her needs (inaudible) SLI.

17       MS. DALTON: And SLI stands for?

18       MS. KANE: Oh, I'm sorry. Speech and language impaired

19   classification.

20       MS. DALTON: Do you – is it your opinion that every hearing

21   impaired student is speech and language impaired as well.

22       MS. KANE: No.  Definitely not.

23       MS. DALTON: And was your opinion accepted by the team at

1   the February 1, 2007 meeting?

2        MS. KANE: No it was not.

3        MS. DALTON: When I say the team, what members of the team

4   disagreed with your opinion?

5        MS. KANE: Zaundra Johnson specifically disagreed with the

6   debate about whether SLI should be included and the disagreement

7   or discussion ended, when she said I am the LEA and I say she's

8   HI.

9        MS. DALTON: And Zaundra Johnson identified herself as the

10  LEA?

11       MS. KANE: Yes she did.

12       HEARING OFFICER: Just a second.

13       MS. PUCKETT: You need to call the office.

14       HEARING OFFICER: I think it can still record, it just won't

15  be on the CD.

16       MS. PUCKETT: If you think -- .

17       HEARING OFFICER: Yeah, I better make sure. Cause I don't -

18  it has its own brain.

19       MS. DALTON: Did we catch everything up to --.

20       HEARING OFFICER: It's always on the computer. It's just

21  whether it's on the CD. It's just open, so the CD is --.  The

22  issue is saying the CD for - it's still recording, unless you

23  want to make sure.

1       MS. DALTON: I've used it all for that computer, if it

2   doesn't go on to a CD.

3       HEARING OFFICER: It has its own memory, so it's like a

4   computer.

5       MS. DALTON: Ohhhhh. And you have to put a CD in it to

6   download it?

7       HEARING OFFICER: CD in it to download it. But we can do it

8   at the same time. We can record it or the hard drive and record

9   it on the CD during a Hearing and that's why we do that.  Let me

10  just get in because it's probably easier.

11      MS. DALTON: Yeah with their move and everything.

12      HEARING OFFICER: Going to the hard drive.  Okay, so we're

13  back on the record and you were asking about whether the MDT had

14  agreed with her recommendations?

15      MS. DALTON: Right.  And then after the MDT meeting

16  discussed disability classification, was there then a discussion

17  with regard to the type of services that ███ required.

18      MS. KANE: Yes there was.

19      MS. DALTON: And did you participate in that discussion?

20      MS. KANE:  Yes I did.

21      MS. DALTON: And what did you recommend as far as speech and

22  language services for ███?

23      MS. KANE:  We recommended no less than 20 hours per week of

1    speech and language services, because she is showing progress

2    with the amount of services that she is receiving now, I think

3    she needs some improvement (inaudible).

4        MS. DALTON: In your opinion can she make educational

5    progress with less than that amount.

6        MS. KANE:  Definitely not.  And I think that looking at the

7    data is really important because you can see (inaudible) and

8    number of tests and she some existing deficits in her ability to

9    understand and use language and even in the percentile range in

10   those tests show how ███ compares on to her age match peers in

11   the general population of hearing children. And she falls at the

12   first percentile approximately for all those tests, mean that

13   99% of hearing peers are performing better than she is.  She is

14   clearly at the bottom of the ladder. She needs to really have

15   attentive intervention to make those (inaudible) to catch up to

16   the other children, because if she doesn't catch up she will lag

17   behind and given ████ potential, she is in the first

18   percentile is not where you want her to stay. (Inaudible).

19       MS. DALTON: Now you mentioned her potential.  Now have you

20   reviewed evaluations that determined what her full scale IQ is?

21       MS. KANE: Yes. She was tested.

22       MS. DALTON: Do you recall what that is?

23       MS. KANE: HmmmmHmmm.

411

1       MS. DALTON: If you don't remember the number, you can just

2   give the range of --.

3       MS. KANE: It was in the superior range.

4       MS. DALTON: Do you know whether that particular IQ test,

5   how was it - was it a language-based on non-language- based

6   test.

7       MS. KANE: It was a non-language-based, it was a non-verbal

8   test.  (Inaudible) psychologist.

9       MS. DALTON: How would she perform in your opinion on a

10  language-based IQ test.

11      MS. KANE: I think there would be huge discrepancy if you

12  would compare those two tests, non-verbal (inaudible) and a

13  (inaudible).  She doesn't have the capability to express that

14  the idea that she has.

15      MS. DALTON: Now, did the LEA representative, Ms. Johnson or

16  anyone else there on behalf of the LEA give an explanation as to

17  why they did agree with your opinion as to the amount of

18  services.

19      MS. KANE: Yeah.  They didn't give any concrete reasons, Ms.

20  Johnson or anyone on the (inaudible) gave no concrete reasons,

21  it was that they disagreed and they agreed to disagree.  They

22  did not offer any additional (inaudible).

23      MS. DALTON: Did they give you any explanation as to why

1    they did not agree with your opinion that she should be

2    multiplied classified as multiplied disabled?

3        MS. KANE: She didn't give a definite reason for that and

4    she didn't apply that (inaudible) how it was done.  We really

5    worked as a team to say this is how ███ presents and we want to

6    make sure (inaudible) classification that represents ███.

7        MS. DALTON: What type of speech and language services did

8    the LEA representative agree to provide to ███?

9        MS. KANE: She agreed to provide an hour and a half-hours of

10   speech and language services and not in a classroom setting. In

11   a pullout (inaudible).  Actually she didn't say individual, she

12   said 1½ of not classroom based.  Pullout classroom.

13       MS. DALTON: Can you describe again the difference between

14   what you believe she needs and use the words of the – I think

15   you used push-in or pullout?

16       MS. KANE: Yes.

17       MS. DALTON: And what DCPS thought she needed?

18       MS. KANE:  Okay.  What I think she needs and what the team

19   thinks she needs at the River School based on the progress that

20   she's been making is to continue that push-in model.  That means

21   of 20 hours of support in a classroom setting.  So it's very

22   meaningful, very natural way to teach children language,

23   especially children who are as delayed as ███, the best way to

1   go about doing that is through the course of the school day, to

2   give her opportunities to learn language along side her peers in

3   a way that's meaningful and productive.  But what was presented

4   was pull-on; I'm sorry, pullout therapy.  So the idea of

5   learning language in isolation and in a therapeutic setting

6   separate from the classroom setting.

7       MS. DALTON:  And did the LEA representative give any reason

8   why they would not provide her more pull-out services in speech

9   and language other than an 1½?

10      MS. KANE:  She didn't give a reason; she just said this is

11  what is being recommended.

12      MS. DALTON:  And do you have an opinion as whether the

13  amount of services that was being recommended by ████ by the LEA

14  would be appropriate to meet her needs?

15      MS. KANE:  You want an opinion about that?

16      MS. DALTON:  Yes.

17      MS. KANE:  I do have an opinion and I think that it would

18  definitely not meet her needs.  I think that the idea that

19  (inaudible) so much therapy to go do an hour and a half in a

20  different sort of model, absolutely not (inaudible) meet her

21  needs and (inaudible) reports you can see that an hour for these

22  sorts of scores really wouldn't be appropriate and also to

23  address the goals that were agreed upon could never accomplish

1    those goals in an hour and a half.

2        MS. DALTON:  Now when you say the goals that were agreed

3    upon, you're referring to the IEP that was developed on that

4    day?

5        MS. KANE:  Yes.

6        MS. DALTON:  And that is document number 28, for the

7    record, parent's document. How many speech and language goals

8    you need at the IEP are there in her IEP?

9        MS. KANE: They are pages.

10       MS. DALTON:  Or you can count up the goals.

11       MS. KANE:  4 pages of goals, and they work on the

12   objectives to help her reach the overall annual goal.

13   (Inaudible).

14       MS. DALTON:  Yeah.

15       MS. KANE:  There are 12 goals listed on 4 pages.  And the

16   objectives that we hope that ███████ would meet in the up-coming

17   year are pretty broad, they are pretty high-level. So we know

18   that she needs to make a lot of gains in a short amount of time

19   to catch up with the other children.  Though the intensity is a

20   really important component of meeting these goals.

21       MS. DALTON:  Do you have an opinion as to whether or not if

22   ███████ receives the appropriate intervention at this age, whether

23   she would eventually be able to be with less services in a

38                                                              415

1  general education classroom?

2      MS. KANE:  Yeah.  My opinion on that is that she certainly

3  will move in that direction.  (Inaudible) that she get the

4  services she needs right now and therapeutically, now is the

5  best time to work with her as a young child, while she is

6  capable of learning to listen while she is learning language,

7  that is therapeutically the best model for children.  I do

8  predict that she will be fully mainstream at one point outward.

9      MS. DALTON:  Now after the development of the IEP, did the

10  team move into a discussion regarding placement?

11      MS. KANE:  Yes we have.

12      MS. DALTON:  Did you participate in that discussion?

13      MS. KANE:  Yes I did.

14      MS. DALTON:  What did the LEA representative offer as an

15  educational placement for ███?

16      MS. KANE:  They actually - actually they did not offer an

17  educational placement for Anna.  What was offered to ███ was

18  services, therapeutic services, one and half hours of speech

19  pathology, one hour of occupational therapy, 30 minutes of

20  consults, occupational therapy, and one of audiology services,

21  to be delivered in a pull-out model. No classroom options

22  discussed.

23      MS. DALTON:  Do you know whether or not the parent

416

1    requested an educational placement?

2        MS. KANE:  The parent was hoping for an appropriate

3    educational placement.  The parents have really put in a lot of

4    effort to be in contact with D.C., to consider anything that

5    would be provided and actually in the Fall, the mother, Ms.

6    Tiller that Barnard may be an option for ███. So I accompanied

7    Mom to an observation there, Barnard, but that wasn't offered as

8    an option.

9        MS. DALTON:  They did not offer that as placement at the

10   IEP meeting?

11       MS. KANE:  No.

12       MS. DALTON:  Now, at the placement discussion, did the

13   other speech and language pathologist that attended the meeting

14   for DCPS, did she have any opinion as to whether or not ███

15   needed an educational placement?

16       MS. KANE:  HmmmHmmm. Yes she did.  When she reviewed the

17   report that was done by River School clinician, but the DCPS

18   speech pathologist reviewed that report and she was impressed

19   with the amount of improvement ███ had shown, and I think based

20   on those findings, she thought an educational placement would be

21   appropriate for ███ to continue that sort of intensity.  But

22   she did say that hearing-impaired children, she would recommend,

23   but because Anna is doing well with general ed students, she is

417

1    (inaudible).

2        MS. DALTON:  But the DCPS speech and language pathologist

3    did recommend that she be provided with an educational

4    placement?

5        MS. KANE:  Yes she did.

6        MS. DALTON:  Did the rest of the DCPS team agree?

7        MS. KANE:  No.

8        MS. DALTON:  And what DCPS state with regard to what would

9    ▓▓▓▓▓ placement be?

10       MS. KANE:  That said that they were not offering placement

11   to her at this time.  She does not show a need for special

12   education.  She can only be provided with services in terms of

13   that, a pullout, occupational and speech therapy, audiology

14   services and then that was repeated a few times actually.  That

15   she is not a student who requires special education.  But what I

16   said to that at the time of the meeting was she is a child who

17   is not performing where she needs to be, she is not performing

18   as if she were a three year-old child, she is showing

19   significant deficits and that if she does not have the

20   opportunity to be a school-based program with appropriate

21   support, she will not be ready for kindergarten. But that what

22   was presented to the family, but that for this up-coming year

23   and they even sort of alluded to the following year.  She said

418

1    that she'd be welcome as a school-age child into program.

2          MS. DALTON:   So what did DCPS say would be her placement?

3          MS. KANE:   That home would be placement.

4          MS. DALTON:   Until she reached?

5          MS. KANE:   School age.

6          MS. DALTON:   Now, you testified that DCPS said that ████

7    did not require special education.   In you opinion does ████

8    require specialized instruction?

9          MS. KANE:   Yes she does.   She does.

10          MS. DALTON:   And does specialized instruction --.   Who can

11    provide specialized instruction?

12          MS. KANE:   Specialized instruction can be provided by our

13    special educator, by a deaf educator or a speech pathologist.

14    But depending on individual needs of the child, the personnel

15    should really be determined by those needs and based on the

16    goals that are determined.   So if you look at ████ goals, the

17    language-based goals as you gets to speech delay, the apraxia

18    speech, the first specialized instruction needs to be defined a

19    speech pathologist.

20          MS. DALTON:   What it would be sufficient for her to have

21    specialized instruction by a speech and language pathologist

22    only in a pullout setting?

23          MS. KANE:   No. No.   That wouldn't be appropriate for ████.

1  I don't think she would generalize those skills.  ██████ is one of

2  those kids who is not even a (inaudible) and isolated setting

3  and generalize that (inaudible).  ████ cannot do that.

4      MS. DALTON:  I think you may have answered this, but why

5  was - in your opinion placement that DCPS recommended as home

6  not appropriate?

7      MS. KANE:  It's not appropriate because ████ needs to be an

8  environment that is challenging for her, but at the same time

9  supportive of clinical (inaudible). She is capable of learning,

10  she is capable of making progress (inaudible).  I also think

11  that home is not the right environment for Anna based on the IEP

12  that we developed as a team.  The IEP goals that were generated

13  at that meeting is very appropriate for ████.  She needs to work

14  on skills that are pragmatic language, social language used with

15  peers and with adults. She needs support from an educator speech

16  pathologist and that language is written into the goals, very

17  specifically written into those goals.  I mean those two things

18  just wouldn't match.  There aren't peers at home where she can

19  learn from.  They aren't the same sort of opportunities that

20  would need to avail themselves for her to work on those goals to

21  make progress.

22      MS. DALTON:  I have no further questions for this witness.

23      HEARING OFFICER: Okay.

420

1      MS. PUCKETT: I do have few questions for you. You indicated

2    that DCPS said that home would be her placement and Ms. Johnson

3    indicated that home would be her placement?  If D.C. indicates

4    that home would be her placement why was there an initial

5    placement notice issued to Janey if you refer to DCPS 01, which

6    is a placement notice. It should be the first page.  I don't

7    think that's it.  It's the first page of DCPS 01.  If you would

8    refer to, it says initial placement after development on the

9    IEP, team determined the student would receive special education

10   and related services, Janey School.  And you indicated that Ms.

11   Johnson said the student's placement was at home?

12      MS. KANE:  Yes she did.

13      MS. PUCKETT: And did you River School's meeting notes?

14      MS. KANE: Yes.

15      MS. PUCKETT: And referring to those meeting notes, I'm

16   sorry. You reviewed –

17      MS. KANE: Yes I did.

18      MS. PUCKETT: Janey's – not Janey's. River School's meeting

19   notes, and isn't it true that those meeting notes indicated that

20   Ms. Johnson indicated that her placement could be home?

21      MS. KANE: Yes that was a direct quote from Ms. Johnson, and

22   that's why it was included in the River School.

23      MS. PUCKETT:  HmmmHmmm.

1        MS. KANE:  She said, and I believe she said, uhm, "for some

2    babies, or some children, home is the right placement. What we

3    said was, "that's true for some children who are three or under

4    three or younger than 5, but not for children who have

5    significant delay and the need for specialized instruction as

6    A███ does, that home is not the appropriate placement for her."

7        MS. PUCKETT:  So can you explain how the statement "could

8    be home", translates to the student's placement is home?

9        MS. KANE:  No other placement option was offered at that

10   time of the meeting.

11       MS. PUCKETT:  What is Janey School?

12       MS. KANE:  That was only an option for her to receive her

13   speech and language therapy, occupational therapy, so it was not

14   a classroom option.

15       MS. PUCKETT:  But was it a placement for the services that

16   were listed in the IEP issued?

17       MS. KANE:  Yes.

18       MS. PUCKETT:  So it was placement.

19       MS. KANE:  That was true that the services would be

20   provided in a pullout session on a weekly basis at Janey

21   Elementary.

22       MS. PUCKETT:  So it was a placement, correct?

23       MS. KANE:  It was not a classroom placement.  It was a

422

1    therapeutic placement.

2         MS. PUCKETT:  The placement to receive the services?

3         MS. KANE:  Right, but not - not -

4         MS. PUCKETT:  And the IEP.

5         MS. KANE:  But not classroom.  The therapy would be

6    (inaudible) at Janey.

7         MS. PUCKETT:  You currently - you've worked with private

8    schools in the past, and isn't true that there are several

9    students who receive - who have a placement - a non-attending

10   placement at their local school to receive services?

11        MS. KANE:  For children who attend private school?

12        MS. PUCKETT:  Yes.

13        MS. KANE:  Can go back for therapeutic services?

14        MS. PUCKETT:  Yes.

15        MS. KANE:  Yes, that's true.

16        MS. PUCKETT:  You also testified that this student needs at

17   least 20 hours a week of services and that it would

18   inappropriate to get her any thing less. How many students are

19   currently receiving 20 hours a week of services at River School?

20        MS. KANE:  There are 35 kids in the building that have

21   either deaf or hard of hearing, but it depends on their IEP, the

22   amount of services that each child gets, it's determine on a

23   one-on-one basis.

423

1    MS. PUCKETT:  Isn't it true that several—that many of the

2    35 students are currently receiving 20 hours and many of the

3    IEP's - evaluations that are presented from River School

4    indicate that these students need a 20 hours a week?

5    MS. KANE:  Of - if that's what the reflection of their

6    progress and what the results of their testing show that they

7    need that intensity and that is what we provide, we provide what

8    is appropriate.

9    MS. PUCKETT:  How many classrooms do you have right now

10   that have speech and language therapist in there 20 hours a

11   week.

12   MS. KANE:  The model at the River School is for an educator

13   - a national educator and a speech pathologist to work as - to

14   collaborate. So their speech pathologist is in the classroom

15   full time.

16   MS. PUCKETT:  And isn't it true that - that as a part of

17   that model, your speech and language therapist are in that

18   classroom at least 20 hours a week?

19   MS. KANE:  Yeah. They're in there - the speech pathologist

20   is in there full time, but if the child needs a different sort

21   of approach, then they would be pulled out and they would be

22   given, you know special ed instruction from a adjunct educator

23   or from a special educator or another speech pathologist that

424

1  they need additional pull-out therapy so that it definitely

2  designed to meet the individuals needs.

3      MS. PUCKETT:  Now isn't it true that A▆▆▆▆ evaluation, the

4  recommendations of her evaluation are essentially the model of

5  the River School?

6      MS. KANE:  Uhm.  I can look at that to go through one at a

7  time, but there are things that she absolutely needs. She needs

8  an intensive oral language based program. She needs support in

9  an acoustically sound classroom.  She needs - she needs the

10  opportunity to learn language alongside her peers. So that is

11  specific to A▆▆▆, but in order to accomplish those goals that

12  needs to be done in a very supportive and very intensive way.

13      MS. PUCKETT: Now have you participated in the meetings at

14  the Care Center before?

15      MS. KANE:  Yes I have.

16      MS. PUCKETT:  And isn't that true that many of the students

17  who have speech and language services are recommended by River

18  School that River School has presented those students of needing

19  over 20 hours in their evaluations in the past?

20      MS. KANE:  Did they would need more than 20 hours?

21      MS. PUCKETT:  No, I'm sorry let me strike that.  Because I

22  just confused myself. You indicated that you participated in

23  meetings at the Care Center in the past?

1        MS. KANE:  Yes.

2        MS. DALTON:  I'm going to object to this line of

3    questioning because you're going now into other meetings and

4    that's not relevant to A█████ .

5        MS. PUCKETT:  I think it is very relevant Mr. Woods because

6    the student's classroom model is what's recommended in the

7    student's evaluation.  The evaluation was not done by an outside

8    educator – an outside related service provider.  It was done by

9    the individual who currently works in the school, and is such a

10   coincidence that the River School's model is the exact – is the

11   model is the same as the recommendations in the evaluation.  I

12   think it is very relevant to point out that in the past, Care

13   Center has been presented with this same recommendation, which

14   is the same model for the River School.

15       HEARING OFFICER: I think ah –––. Go ahead.

16       MS. DALTON: I just wanted to state DCPS accepted this

17   evaluation.  They had an opportunity; they had well over 120

18   days to do their own evaluation.  They chose not to do an

19   evaluation, so for Ms. Puckett to say they were presented with

20   this evaluation, is totally wrong, because they had an

21   opportunity to do their own evaluation. They chose not to do

22   their own evaluation.

23       MS. PUCKETT: I can just respond to that we can consider

49

426

1  outside evaluations, but we don't have to accept a

2  recommendations. They are recommendations. The team makes the

3  determination as to services, just because something is in the

4  evaluation, does not mean that it has to go on the IEP.

5      HEARING OFFICER: I think it goes to weight.  Ms. you can't

6  to talk to her.  Yeah. This goes to weight of the testimony. It

7  is important.  I think it's important because that is why I

8  asked the question earlier, are you an advocate or an expert,

9  because you actually work for the school, you're an advocate for

10  the child and you're --.  You've got such a blend here.

11      MS. KANE:   HmmmHmmm.

12      HEARING OFFICER: I think you have to separate it out this

13  line of questioning is appropriate.

14      MS. DALTON: What was the question again?

15      MS. PUCKETT: The question was she indicated in the past

16  that she has participated at meetings in the Care Center.  Isn't

17  it true that other students that you represented at the Care

18  Center also have a recommendation for over 20 hours a week for

19  speech and language services which is the same model of the

20  classroom at River School?

21      MS. KANE:   And again I would think that the reports are

22  written by the speech pathologist that work with them in the

23  classroom, they are written based on the results that they find

50

427

1   from that standardized testing and then the recommendations are

2   done as a review of their performance in the classroom.  Their

3   professional observations are written into the reports so they

4   are certainly individualized for each child.  But if the speech

5   pathologist sees that the child is making gains in that sort of

6   setting, it would make sense to me that those would be

7   recommendations to be continued. And when those reports are

8   shared at the Care Center or at the IEP meetings, the speech

9   pathologist has an opportunity and so does DCPS has an

10   opportunity to look at those.  And for A____ specifically, the

11   speech pathologist put that in, review the report and she said

12   that she agreed with those recommendations.

13       MS. PUCKETT:  Now, let me ask this another way.  Isn't it

14   true that all students that receive speech and language services

15   at the school in the classroom receive at least 20 hours of

16   service with a speech and language therapist in the classroom?

17       MS. KANE:  It depends. It depends on their IEP.  There are

18   some children who are pulled out of the setting so they are not

19   getting that full 20 hours of push-in because they are not in

20   the room.  The speech pathologist stays in the room, because

21   there are usually two kids with hearing loss in the room. So the

22   speech pathologist remains the classroom, but the child may be

23   pulled out for occupational therapy, and they may be pulled out

1    for special – time with a special educator, so that we would

2    subtract that amount of time from 20 with whatever number is

3    left after you subtract out the other therapy.   So yes the

4    speech pathologist is in there, but the child needs something

5    else.

6         MS. PUCKETT:   And the speech and language pathologist is in

7    the classroom full time correct?

8         MS. KANE:   Correct.

9         MS. PUCKETT:   And how many students that – how many

10   students have you presented for over the 20 hours to the Care

11   Center in the past? How many students have you presented the

12   recommendation for over 20 hours to the Care Center in the past?

13        MS. KANE:   I don't the exact number.   Over the past years,

14   --.

15        MS. PUCKETT:   In those students, isn't it true that the

16   River School did the speech and language evaluations for most of

17   the them?

18        MS. KANE:   We do it for – I would say the vast majority we

19   do, we do the testing.

20        MS. PUCKETT:   And for those students, hasn't DCPS in the

21   past rejected some of those recommendations?

22        MS. KANE:   For placement?

23        MS. PUCKETT:   For over 20 hours a week for speech and

52

429

1  language services?

2       MS. KANE:  Yes they have, (inaudible). But in that process,

3  they've actually --.

4       MS. PUCKETT:  I'm sorry, I didn't ask another question.

5       MS. KANE:  I was just finishing answering your last

6  question.

7       MS. PUCKETT:  I believe the answer was yes, and I did not

8  ask another question.  I would ask the Hearing Officer to ask

9  the witness to wait until I ask the next question.

10      HEARING OFFICER: You did seem to pause, were you finished

11  with your answer?

12      MS. KANE:  No.  I was speaking that yes it has been - has

13  not been approved, but then after going through the process, it

14  has been approved for the children because it was found to be

15  appropriate.

16      MS. PUCKETT:  And the River School did most of the

17  evaluations for the student, correct?

18      MS. KANE:  Yes.

19      MS. PUCKETT:  And outside of the speech and language

20  evaluation, DCPS has rejected recommendations for other

21  evaluations done by River School in the past also, correct?

22      MS. KANE:  I don't' think that's true. The other

23  evaluations that we provided are by our psychologist and our

1    occupational therapist and I think that they have been accepted.

2        MS. PUCKETT:  And the River School does not have any

3    special education, does not specialized instruction by a special

4    ed teacher, correct?

5        MS. KANE:  Yes we do. It depends on the classroom.  All the

6    teachers at the River School have their Master's degree. Some of

7    them are in special education, some are in early childhood

8    education, some are in deaf education.  So depending on the

9    needs of the student, they are placed with an educator that

10   would match the child's needs.

11       MS. PUCKETT:  Now, did the occupational therapist

12   participate in this meeting?

13       MS. KANE:  Yes he did.

14       MS. PUCKETT:  And at the meeting do you recall, you

15   indicated that you participated in a placement discussion,

16   correct?

17       MS. KANE:  Yes.

18       MS. PUCKETT: And do you recall at the meeting, at the

19   beginning of the placement discussion, the occupational

20   therapist indicating why are we going through this when we are

21   just looking for reimbursement.  Do you remember that statement

22   made?

23       MS. KANE: I do remember his saying that and I think what he

1   was saying was, he was wondering how the process worked and he

2   wasn't sure, he was just looking for clarification. I don't know

3   why he (inaudible) some clarification.

4       MS. PUCKETT: You indicated that the parent was seeking a

5   classroom placement for the student, so isn't it true that al

6   members were not aware that she was seeking a classroom

7   placement if the occupational therapist is saying, why are we

8   looking for a placement, if we are looking for reimbursement, at

9   this is not at the resolution meeting and this is at the MDT

10  meeting.

11      MS. KANE:  Right.  He meant – I think what he meant when he

12  said was for OT services. Because the discussion around that

13  comment was you know we don't know if we have an occupational

14  therapist, do they have occupational therapist services at

15  Janey, how is this going to work if she needs it now. The

16  question was if she needs it starting after the IEP meeting, how

17  can that get started. And I think what Mr. Smith, the

18  occupational therapist was saying was that the service that he

19  can provide but he didn't know how that would work in terms of

20  sort of stepping on anyone toes, and that's were that comment

21  came from.

22      MS. PUCKETT: And where did the reimbursement discussion

23  come in from?

1    MS. KANE:  I think he was afraid he would step on someone's

2    toes if he offered to do that therapy as she was going through

3    the IEP process. It was about OT specifically, it was not about

4    funding for tuition.

5    MS. PUCKETT: But it was during the discussion of placement,

6    correct?

7    MS. KANE:  But at the time they were talking about OT

8    services and where that placement would be for the services and

9    they were saying that Janey Elementary would be the place for

10    that pull-out service, but they said they could not be ready to

11    start it tomorrow, the day after the meeting.  And Mr. Smith has

12    a (inaudible) at the River School and I think he was offering

13    his services.

14    MS. PUCKETT: Now is speech and language therapy a part of

15    the tuition for River School?

16    MS. KANE:  No it's not.

17    MS. PUCKETT: And is that billed separately?

18    MS. KANE: Yes it is.

19    MS. PUCKETT: And are you currently billing the parent for

20    speech and language services?

21    MS. KANE:  Yes. The way that works is we have base tuition

22    because the majority of the kids at the River School, 85%

23    percent of the kids are general ed students.  Because many of

1    them could come to the program and they pay a base tuition.   And

2    then what we called related services.   In that covers sort of

3    the umbrella of additional services that those kids get, so they

4    get so much more intensity that covers the full time speech and

5    language support in a classroom setting, pays for the financial

6    testing that is done by speech pathologist, and also covers

7    audiological services which can be quite costly to have that on

8    site, to have a soul-working soundproof booth with the

9    capability to do audiograms, tem-testing which is middle ear

10   pressure testing and we also have napping services available the

11   audiologist is very well trained to do a computer processing of

12   the cochlear implant so that the children will never go without

13   sound, the policy is that they need to be able to listen to

14   appreciate what is happening in the environment. So all those

15   things are covered under related services.

16       MS. PUCKETT: What is the cost for full-time - to be in the

17   fulltime - what's the additional cost of tuition to be in that

18   full-time speech and language support class?

19       MS. DALTON: I'm going to object to this line of questioning

20   because I don't think that the cost is appropriate thing to be

21   asking.   It doesn't matter what a placement costs, it is whether

22   it is appropriate.

23       MS. PUCKETT: And it very relevant -

1      MS. DALTON: Funding should never --.

2      MS. PUCKETT: I'm sorry go ahead.

3      MS. DALTON: Funding should never be an issue in a case.

4  And I think it is totally inappropriate for Ms. Puckett to

5  bringing that up.

6      MS. PUCKETT: Mr. Woods the reason I am bringing this is up

7  is because the remedy that they are seeking is reimbursement.

8  And I think that you are very aware that when I asked the parent

9  on cross-examination, the first question I asked the parent was

10  is she paying for tuition.  And I clearly wrote it down and she

11  said no.  And then I said, so you're not paying for tuition?

12  Then what is there to be reimbursed? And then she changed it to,

13  my student is receiving a grant.  So then I asked her what type

14  of grant is the student is receiving and then she said, well

15  it's not really a grant, I teach for the school and so it's

16  basically through my employment benefit so then I asked her,

17  what are you paying?  Then she said she's paying $6000.00 a

18  month and then I asked her well how is she paying it?  She

19  indicated through her checking account, and then she indicated

20  that was for four children.  So I think it's very relevant here

21  if they are seeking a remedy of reimbursement.  And this Hearing

22  Officer has to consider reimbursement, I think it is relevant

23  for you know the amounts if necessary, as well concerns that --

1    concerns with reimbursement.  Because we actually really don't

2    know here today what the truth is because the parent changed the

3    story 4 times.  So I think this is - and this is the only -

4    there is no cross - there is no Hearing after the HOD comes out,

5    okay. So I think it is very relevant to point these issues out

6    to the Hearing Officer for him to consider in his reimbursement,

7    because I am going to be requesting that if you do Order

8    reimbursement, that there be some specific bills and statements

9    that this money came out of the account starting in August. It

10   was direct deposit and it was broken down to how much it was for

11   the student and showing that this was specifically for tuition

12   because the parent changed her story 3 times.  I didn't ask any

13   tricky questions.  The parent changed her story 3 times.  So is

14   very relevant to know the amount, this is the person who is the

15   Director of the Speech and Language Services and she indicated

16   that it is a separate charge and so it is very appropriate to

17   ask her the charges especially since they are asking for

18   reimbursement. It's part of the case, you can't separate it. I

19   would like to know how much speech and language services are.

20   Because my client, if ordered to pay this amount needs to know

21   how much it is and because there are concerns now that the story

22   changed.  Had that not been the case where the parent, when I

23   asked her that question, and she said "yes I'm paying for

436

1   tuition, and we pay this amount a month and comes out of the

2   checking account," and that was her first response to my

3   question then it would not be a concern. But the parent changed

4   her story 3 times Mr. Woods.

5       MS. DALTON: Mr. Woods, I again renew my objection that

6   reimbursement is a remedy allowed to a parent to seek.  Actual

7   funding amount is not appropriate for Ms. Puckett to bring up at

8   the Hearing.  I have never seen a Hearing determination when

9   they have ordered reimbursement to specify in the Order a

10  specific amount.  Obviously that is done.  What they do do in a

11  Order is to say the parent must provide documentation of the

12  amount that has been paid by the parent for the reimbursement to

13  DCPS.  Then if there is an issue between DCPS and the parent,

14  they have to work that out, but I have never in the years since

15  I've been practicing ever seen a Order state a specific amount

16  for the parent to be reimbursement. So this line of questioning

17  is not appropriate.  And I also want to object to Ms. Puckett's

18  mischaracterization of the parent's testimony. She can argue in

19  closing argument whatever she wants to do, but for her to put on

20  the record during an objection, that the parent's testimony was

21  – that she changed her testimony 4 different times in not an

22  appropriate objection.  That doesn't give her a basis to ask

23  about funding issues.  And again I think you are treading on a

1  very, very sensitive issue of IDEA's says that a placement

2  should not be based on funding. It should be based on what is

3  appropriate for the child.

4      MS. PUCKETT: I just like to indicated Mr. Woods that the

5  IDEA does allow the Hearing Officer to limit reimbursement. And

6  just for the record, I never said I was asking for a specific

7  amount to be reimbursed, what I said is I want to bring out

8  these concerns because I'm going to be asking that specific

9  documentation be presented if the Hearing Officer is going allow

10 reimbursement.  I do think that the IDEA gives the Hearing

11 Officer the ability to limit what reimbursement would be

12 considered in this as far as remedy in this case.  And they

13 asked for the remedy so it is a part of this case, and I think

14 it is a concern that the parent did change her stories on the

15 record.  I'm not trying to put on the record, the parent

16 indicated herself. And all the years I have been practicing, I

17 have never had a parent change her story three times in regards

18 to reimbursement.

19     HEARING OFFICER: As to whether the Hearing Officer gets

20 into the numbers, he does not.  But there is provision that says

21 that the Hearing Officer can limit the reimbursement. And so in

22 terms of evidentiary matters, that would be an appropriate

23 inquiry.  The other reason it would be appropriate, is the other

1    information is in so it really goes to credibility too. It's

2    what is the story and again, and I think this again because of

3    your role. You work at the River School. You said that you were

4    an expert and you are an advocate for the child.  I mean you are

5    wearing so many hats that, I mean to separate this out, I mean

6    credibility is just at issue. I think that that's --. You're not

7    independent this process.  And usually that is what you're

8    looking for in an expert.  They are just parachuting into a

9    situation and saying, well I have no stake in this.  And you do.

10   I mean this is a student at your school and so you want to keep

11   the student. I mean there is so much going on that so I these

12   are and that information that Ms. Puckett said, and I don't know

13   if it's accurate what she said, but there was testimony about

14   the mother with regard the reimbursement, but it just seems that

15   would be an --. I don't get into the numbers but I can limit -

16   she is right that the Hearing Officer have the authority of the

17   IDEA under certain circumstances.

18        MS. DALTON: And that is where I wanted it to stay for the

19   record, Mr. Woods. My understanding is the Hearing Officer has

20   the ability to limit reimbursement when certain prerequisites to

21   notify DCPS about the reimbursement or the parent's decision to

22   place the child. But that doesn't get into the amount of money.

23        HEARING OFFICE: No.

1     MS. DALTON: Or, the specific, you know, what was paid and

2   so forth.  So I think that your ability to limit reimbursement,

3   again the line of questioning that she's going down it's not

4   appropriate.

5     MS. PUCKETT: I just indicated that Mr. Woods, I wasn't

6   saying that you have the authority to limit based on this case.

7   I just pointed, because I believe parent's counsel said there is

8   no – the Hearing Officer does not have the authority to limit

9   reimbursement.  I was just pointing out that the IDEA does allow

10   you do that.  But what I'm saying is that I'm not asking the

11   Hearing Officer to order a certain amount. Or say that they

12   can't provide services or provide reimbursement for this.  I'm

13   pointing this out because like I said, I'm going to be

14   requesting that certain, if you're going to order reimbursement

15   I'm going to be requesting that there be certain items

16   associated with that reimbursement in regards to what the parent

17   needs to present because of concerns with the inconsistent

18   testimony.  So I'm not asking you to say, "Oh, DCPS does not

19   have to pay for this, or this or that."  What I am saying is

20   that I'm just bringing up a concern because I'm going to be

21   asking for certain things in closing in regards to this case, so

22   I think that it is very relevant as to how much this tuition and

23   how the tuition process works at the school.

1      HEARING OFFICER: Again, the Hearing Officer prefaces

2   remarks as he began, I don't get into the numbers, so that's not

3   the issue, it does get into the evidentiary matter of the way I

4   would see it as credibility and again because of your role, the

5   advocacy part of the role.  I mean that's the concern.  How do I

6   separate that from the part --.

7      MS. DALTON: Mr. Woods what does her advocacy part of the

8   role have anything to do with the funding issue in this case?

9      HEARING OFFICER: Because she is raising concerns about the

10   testimony she's already - and that testimony whether it's

11   accurate as she stated is on the record.  There was testimony

12   with regard to how much --.

13      MS. DALTON: I understand that but --.

14      HEARING OFFICER: So, its not gets to well. I'm going to

15   overrule the objection.  Again, I think I - I don't have to deal

16   with the numbers.  That's for sure. But --.

17      MS. DALTON: That is exactly what Ms. Puckett is asking her?

18      HEARING OFFICER: But I'm looking at a different --.  I

19   indicated to me that I'm looking for some consistency, what's

20   going on.

21      MS. DALTON: Not necessarily numbers?

22      HEARING OFFICER: No.

23      MS. DALTON: Okay so.

1    HEARING OFFICER: I wanted to make sure --.

2    MS. DALTON: I want to make clear that's understood.

3    HEARING OFFICER: Is there consistency in with how things

4    are being done.

5    MS. PUCKETT: And I'm not going to be requesting any

6    particular amount being reimbursed; I just pointing out that -

7    MS. DALTON: But I thought your question was how much is --?

8    MS. PUCKETT: I did ask that question. I did ask that

9    question.

10   MS. DALTON: But that's asking for a number.

11   HEARING OFFICER: But I don't have to treat the number?

12   MS. DALTON: But if you hear it, then are having it in

13   evidence, and I don't think how you separate that out.

14   HEARING OFFICER: Easy, because I've already heard the

15   number.  You all gave me the number the first day.

16   MS. PUCKETT: DCPS is asking because of our concerns with a

17   possible tuition bill coming to DCPS if you ordered a

18   reimbursement.  And I believe that DCPS, and this is very

19   relevant to get on the record, it is relevant because this

20   Hearing Officer might allow the parent a remedy of having

21   reimbursement.

22   HEARING OFFICER: The … the… I'm… I'm.

23   MS. DALTON: You made your ruling so --.

1    HEARING OFFICER: The evidence that the mother did testify

2    to the amount. No objection was made at that time.  Yeah, so she

3    went to.

4    MS. DALTON: What's she paying, it didn't go into what is

5    the tuition, with is the bill and so forth. She said what she is

6    paying.

7    HEARING OFFICER: She did say what the tuition was.  And she

8    said she had four children at that school. No I remember it.

9    MS. DALTON: She didn't specifically break out what speech

10   and language is billed for.

11   HEARING OFFICER: That's why she's asking her.

12   MS. DALTON: All right. Whatever.

13   MS. PUCKETT: I'm sorry you can answer the question.  What

14   is the --.

15   HEARING OFFICER: On top of tuition.

16   MS. PUCKETT: What is the extra amount for the student to be

17   a classroom that has a full time speech and language therapist

18   in the classroom.

19   MS. KANE: I don't do the billing.  I actually start with my

20   answer to that.  So we have a billing officer who does the

21   billing and notice, that sort of paperwork and mine is much more

22   of a clinical base, so I'll give you my best estimate.  But I

23   believe base tuition for her classroom is $15,000.00. And then

1    $16,000.00 and then with related services it's $38,000.00.

2         MS. PUCKETT: And the related services, is that only speech

3    and language or other --.

4         MS. KANE:  No, those are things that I just mentioned--.

5         MS. PUCKETT:  Okay.

6         MS. KANE:  So the full time speech for it in the classroom,

7    the biannual testing, the audiological support including

8    audiograms, equipment maintenance, programming of the cochlear

9    implant, so all of those services.  Oh also the weekly it's a

10   log that we keep how the teachers in speech and language are

11   addressing those IEP goals so that's something else that's a

12   timely document that is kept on a daily basis.  And it's sent

13   home on Friday to the parents to see how those goals are being

14   addressed, and something else that only the children who are

15   receiving the specialized instruction.

16        MS. PUCKETT: And the student is not currently receiving OT

17   services through your occupational therapist, correct?

18        MS. KANE:  Correct.

19        MS. PUCKETT:  And if that service is provided, that is an

20   additional cost?

21        MS. KANE:  That's correct.

22        MS. PUCKETT: I have no additional questions.

23        HEARING OFFICER: Ms. Dalton.

444

1    MS. DALTON:  Did anybody from DCPS at any time since A████

2    been placed at or since she's been at the River School, have

3    they ever indicated that they wanted to come the River School to

4    perform any evaluations? - For A████   For Anna.

5    MS. KANE:  For A███. Yes. After the IEP meeting, physical

6    therapy evolutions were recommended at the IEP meeting and that

7    person came out and did sort of (inaudible) --. I guess it was

8    an evaluation, he never submitted any paperwork to the parents

9    or to the school, so I don't know what he would call it but that

10   person did come out to spend some time with A████ they've also

11   come out to do observations of A████, but never speech and

12   language evaluations.

13   MS. DALTON: Other than after the meeting, I'm talking about

14   prior to the meeting that happened on February 1st.  I should

15   have been more clear in my question. Did any time from the time

16   that the parent signed consent for evaluation and the time that

17   the meeting took place, did DCPS ever perform any evaluations on

18   A████?

19   MS. KANE: No. No evaluations.

20   MS. DALTON: Any testing?

21   MS. KANE: No testing.

22   MS. DALTON: Did they ever request to come to the River

23   School to perform any testing?

1     MS. KANE: No.  Not for formal testing.

2     MS. DALTON: Would the River School would have allowed

3 formal testing to take place at the River School.

4     MS. KANE: Absolutely. Absolutely.  We were very

5 collaboratively work with any outside agency.  We want to make

6 sure that the testing isn't duplicated, so if that is the case,

7 we can certainly share what we have and then – (inaudible).

8     MS. DALTON: And, now I want to go back to – you said PT was

9 recommended at the meeting.

10     MS. PUCKETT: I'm sorry. I'm going to object. I believe that

11 is beyond the scope of my cross-examination. I don't recall ever

12 mentioning anything about PT in my cross-examination of this

13 witness.  I believe I solely focused on what services are at the

14 school and I asked her in regards what's the school model for

15 the classroom.  I have not said, I didn't ask her anything about

16 physical therapy services.

17     MS. DALTON: You asked her about evaluations.

18     MS. PUCKETT: No, I did not ask her about evaluations.  I

19 specifically said, isn't it true that DCPS has disagreed with

20 some evaluations in the past?  I don't know how this gets to PT

21 being recommended.  How is that related?  That is not related to

22 the question that I asked in regards DCPS disagreeing with

23 evaluations and that was specifically in terms of us not

446

1  agreeing to the recommendations in the speech and language

2  evaluation.  How does allow a question about PT services that

3  were recommended.

4        HEARING OFFICER: The only question that I recall and I

5  wanted to just open the door and you ask if she get any other

6  related services, isn't PT – well I was looking for the

7  evaluation in that part of the – I'm sorry the IEP.

8        MS. PUCKETT: Is PT a part of the IEP?

9        HEARING OFFICER: Yeah.

10       MS. PUCKETT: No.

11       HEARING OFFICER: It is not.

12       MS. PUCKETT: The student does not have PT in the IEP.  The

13  student has occupational therapy services, audiological

14  services, speech and language services in her IEP.

15       HEARING OFFICER: I see.

16       MS. PUCKETT: But there is no PT in the IEP. And I didn't

17  bring up any specifics about the PT.

18       MS. DALTON: She did ask Mr. Woods whether the River –

19  whether the River School did most of these evaluations and that

20  was I was about to ask.

21       HEARING OFFICER: Okay. So you're asking about the

22  evaluations?

23       MS. DALTON: Yes.

1      MS. PUCKETT: I didn't ask anything specifically about --.

2    Did I ask that question?

3      HEARING OFFICER: Not about PT, but - she said about the

4    evaluation.

5      MS. PUCKETT: No, but I didn't ask anything about a PT

6    evaluation. I did not have her go into any details about

7    recommendations. I'm asking these questions based on the

8    questions that Ms. Dalton asked on her direct testimony.  How

9    can we go into what's in a PT evaluation, this person is a

10   speech and language pathologist.  I didn't even bring up PT and

11   it's not in the IEP.  So I believe, just - it's over and beyond

12   what I asked at this point.

13     HEARING OFFICER: What - who was the person - what was that

14   a person - was that OT the guy that was --.

15     MS. PUCKETT: OT.  He was OT.

16     HEARING OFFICER: OT.

17     MS. PUCKETT: And I specifically asked her was OT services a

18   part of the tuition.  That's all I said, I have not even

19   mentioned PT.

20     HEARING OFFICER: Okay.

21     MS. PUCKETT: So how can we go to PT?

22     HEARING OFFICER: And you issue is about evaluation, not

23   about getting to the evaluation itself, and having her discuss,

1    you just want to know if --.

2        MS. PUCKETT: That was the question. She asked her if PT was

3    recommended and DCPS didn't --.

4        HEARING OFFICER: Oh.

5        MS. PUCKETT: So it's opening up a whole other door.

6        MS. DALTON: No, I was asking whether you - you asked the

7    question, did the River School do most of these evaluations?

8    There was no evaluation that the River School did not do but was

9    part of the IEP process.

10       MS. PUCKETT: Okay.

11       MS. DALTON: And that's what I was about to ask her.

12       MS. PUCKETT: I don't have a problem with that, but if it

13   goes beyond that and what's in the evaluation, then I'm

14   definitely going to objection to that.

15       HEARING OFFICER: Yeah.  I didn't think she was going to

16   talk about. You just wanted to know if was there an evaluation.

17       MS. DALTON: Was there an evaluation that they didn't do,

18   that was considered at the IEP meeting, because you asked her

19   did River School do all of the evaluations.

20       HEARING OFFICER: No. I think that is permissible.  I think

21   that --.

22       MS. PUCKETT: But I believe she mentioned something about

23   not, recommending - she was talking about what's in the

72                                                    449

1    evaluation Mr. Woods and that's the way she presented her

2    question.  I don't have a problem with her presenting it the way

3    that she just said it.

4         HEARING OFFICER: Okay, then that's fine. Well go ahead.

5         MS. DALTON: Did the River School with the evaluations that

6    were considered at A█████ IEP meeting, were there any

7    evaluations that were considered at that meeting that the River

8    School did not do?

9         MS. KANE: Yeah.

10        MS. DALTON: What evaluation was that?

11        MS. KANE: The physical therapy evaluation.

12        MS. DALTON: And who performed that physical therapy - I'm

13   sorry, that evaluation?

14        MS. KANE: That was performed by a DCPS therapist.

15        MS. DALTON: Okay.  Do you remember the agency that

16   conducted the - I'm talking about the physical therapy

17   evaluation.  Let me show you what's been marked as --. Bear with

18   me just a moment.  Okay, so there was a physical therapist at

19   the DCPS meeting who reviewed an assessment?  A physical therapy

20   evaluation?

21        MS. KANE: No.  It was my understanding that it was done

22   after the (inaudible).

23        MS. DALTON: I'm talking about before the meeting. At the

1    meeting was there a evaluation – PT evaluation, not done by

2    River School --.

3         MS. KANE: Yes.

4         MS. DALTON: That was considered at the MDT meeting?

5         MS. KANE: I don't know, I'm not remembering it.  I was

6    (inaudible).

7         MS. DALTON: May I ask if the witness can review the meeting

8    notes, parent's document number 27, It's page 4.  Specifically

9    4th paragraph down.

10        MS. KANE: Yes, I do remember.  I do remember. (Inaudible).

11        MS. DALTON: There was a DCPS physical therapist at the

12   meeting, who reviewed a physical therapy evaluation.

13        MS. KANE: Yes.

14        MS. DALTON: That physical therapy evaluation was not

15   performed by the River School?

16        MS. KANE: That's correct.

17        MS. DALTON:  Who performed that physical therapy

18   evaluation?

19        MS. KANE:  I think that was done by (inaudible) White who

20   worked for the Early Intervention system.  (Inaudible) DCPS.

21        MS. DALTON:  Okay.

22        MS. KANE:  And I'm sorry (inaudible) River School.

23        MS. DALTON:  All right.  Now, Ms. Puckett asked you to look

1    at the initial Notice of Placement, which was Number 29 and

2    asked you if in fact a placement had been made by DCPS to Janey

3    School.

4         MS. KANE:  Yes.

5         MS. DALTON: Again, what was the clear understanding at the

6    time of the meeting as to what would be provided at Janey

7    School.

8         MS. KANE:  The very clear understanding at the meeting was

9    that Janey was to house the services and that A███ could receive

10   (inaudible) speech pathologist at Janey Elementary School, pull-

11   out services I believe, occupational therapy pull-out only, and

12   audiology services only in the pull-out model. And now that I

13   look at the (inaudible) I see that the (Inaudible) 20% is

14   checked as well. (Inaudible)  100% of specialized instruction

15        MS. DALTON:  You were looking for a classroom based --.

16        MS. KANE:  Yes.

17        MS. DALTON:  So they did not offer Janey as for a

18   classroom?

19        MS. KANE:  No.

20        MS. DALTON:  Did they say when she could start Janey as in

21   a classroom?

22        MS. KANE: They said that she would definitely not be

23   enrolled in their up-coming year, and they said that they would

75                                                          452

1  do their best to put her on the top of the list the following

2  year, but it was not (inaudible) may not work out as well, the

3  following year.  They said that several times that she would do

4  well (inaudible) Janey when she is school age.  When she is

5  ready to enter kindergarten.  It is my understanding and I think

6  the team's understanding that (inaudible) Notice of Placement.

7      MS. DALTON:  I have no further questions.

8      HEARING OFFICER: Anything?  I may play the skeptic for a

9  moment. I'm going to have to separate you from the Advocacy

10  role.  How long have you been at the River School?

11      MS. KANE:  Ever since August of 2002.

12      HEARING OFFICER: Seven years?

13      MS. KANE: HmmmHmmm.

14      HEARING OFFICER: And when you testify at Due Process

15  Hearings, was the proposed placement the River School when you

16  gave expert testimony?

17      MS. KANE: Yes it has.

18      HEARING OFFICER:  You ever testify as an expert for the

19  student to be placed at another school other than River School?

20      MS. KANE: Yes I have.

21      HEARING OFFICER: Once, twice?

22      MS. KANE: Three times.

23      HEARING OFFICER: But most of the time when you testify,

453

1  you're testifying for the student's attendees.

2      MS. KANE: Right. Right. And I honestly look at the

3  individuals, I know I wear multiple hats, we have had children

4  who come to the Rive School, it was not the appropriate model

5  for them, so we work closely with the parents and counsel them

6  about the child's learning style, about the child's capabilities

7  and if it's not, you know appropriate for them, we really work

8  hard to match them another program that would be more

9  appropriate. Even though I work at the River School, I do not

10  believe it's the right place for every deaf child.  I really do

11  and I had to separate (inaudible) because that way and I really

12  am a child advocate, so if it's the child needs, (inaudible) the

13  child. (Inaudible).

14      HEARING OFFICER: Would that be on those three occasions you

15  felt there was some other placement or other times?

16      MS. KANE: (inaudible) but then I would say ---.

17      HEARING OFFICER: Other times when you're not at the River

18  School.

19      MS. KANE:  (inaudible) during the course of the school year

20  that happens (inaudible).

21      HEARING OFFICER: Now I think what you're saying that the

22  River School, that - help me with the class that (inaudible) is

23  she in a - what's the class size?

1    MS. KANE:  The general ed class –

2    HEARING OFFICER: Oh, it's the general ed class?

3    MS. KANE: Yep. HmmmHmmm. HmmmHmmm.  In the school, we'll

4    start with the school model, and 85% of the kids that are

5    enrolled in the school are typically developing kids. Some kids

6    who present with no complicated issues, no IEP's and then the

7    other 15% are either deaf or hard of hearing.  Some of them have

8    mild to moderate loss and have hearing aids, and other kids like

9    A████ who has severely profound hearing losses, benefit from

10   cochlear implants.  So what we do is incorporate those children

11   into the class setting in a way that is really truly inclusion.

12   So, there are 13 kids per class, 2 of them have cochlear

13   implants; I'm sorry one has hearing aids and then A████ has a

14   cochlear implant.  And the classroom is run by a national level

15   educator and a speech pathologist and they work together to

16   derive a curriculum that is age-appropriate.  And the speech

17   pathologists works with those kids with hearing loss to help

18   them access that developmentally appropriately curriculum.  The

19   speech and language skills that are allowed, cognitively she's

20   capable of what's being introduced to her, so the speech

21   pathologist works very diligently to help her to work on those

22   IEP goals, whether it's following directions or you know, using

23   expressive language to really socially integrate with the other

78                                                          455

1    kids.  And the reason that the model is disproportionate is we

2    have many more hearing children with good language, and we want

3    them to be models for the deaf and hard of hearing kids.  So the

4    speech pathologist works in small groups, either individually is

5    small groups or with the whole class, but always they are tuning

6    A███████ ear into those peers.

7         HEARING OFFICER: Is that Master level – master level

8    educator a special ed teacher?

9         MS. KANE: No, she is a special ed teacher.  But we do have

10   special education in other classes.

11        HEARING OFFICER: And, so there's no individualized

12   instruction, it's just group instruction.

13        MS. KANE: Yes, there is individualized instruction,

14   definitely as through the course of the day. And she's there

15   from 8:30 in morning until 3 o'clock.  So her day starts with

16   individualized instruction, A████ is pulled from the room to do a

17   talk-sound check, so the speech pathologists looks at her

18   device, make sure the equipment is working, they do a

19   (inaudible) sound check to make sure that she is capable of

20   hearing all of the range of frequencies – the range of sound

21   across frequencies spectrum.  And then during that time, they go

22   over the vocabulary for the day.  They do some pre-teaching

23   exercises that is definitely one-on-one, and she is brought back

1    into the room and then really integrated with her peers.

2    Because it is such a small group, the speech pathologist is

3    really able to talk without assistance.

4        HEARING OFFICER:  I guess the other question is - and this

5    is more for clarification is Ms. Puckett was asking you about

6    the model of the class in - I don't know if I was clear on what

7    you were saying is - - is that model what they - the speech and

8    language pathologist in the classroom, the traditional model?

9        MS. KANE: It is.  It is.  It's definitely true across the

10   board.  Our kids are there from 18 months up to third grade,

11   that's the scope of our program. And in every classroom there's

12   a national level educator and a speech pathologist.  And what I

13   was trying to convey was that that's definitely the classroom

14   model so that every minute that the child is in that classroom

15   they are benefiting form the speech pathologist. But there are

16   children who need additional pullout services, our model. So

17   they are pulled out for math instruction or reading instruction,

18   so their IEP's would reflect that level of service.  So we would

19   subtract the number of hours that are in individual service so

20   that they are not getting that full 20, because they are out

21   working with somebody else.  So it's now like, the model stays

22   the same, but then it's individualized for each student.

23       HEARING OFFICER: And I said, my question was, the skeptic

1    trying to (inaudible) so I'm being honest with you--.

2        MS. DALTON: I'm sorry, what did you just say?

3        HEARING OFFICER: I said my questions are because I'm being

4    the skeptic to separate her roles advocate, teacher at the

5    school, students at the school, and also expert.   In

6    recommending that model to MDT, you knew that was the model of

7    your school?

8        MS. KANE: Yes.

9        HEARING OFFICER: Any coincidence?

10       MS. KANE: I honestly don't.   It's not a coincidence because

11   you know we know A███, we know our model. So, I wouldn't call it

12   a coincidence or that there was any sort of --.

13       HEARING OFFICER: Is exactly the model, she didn't need 15,

14   she didn't 25.

15       MS. KANE: Right because she shows benefit from all those

16   hours in the classroom.   So I think that we are leary to

17   decrease her amount of services she needs right now because she

18   is still so very far behind, so we're also not increasing that

19   number to do any other sort of pullout with her at this time. So

20   she doesn't show a need for individualized reading instruction

21   or math instruction right now, for that part.   She would benefit

22   from a full-time inclusion, which that number does equal 20

23   hours.

1       HEARING OFFICER: Do you have a class were some are getting

2   15 and some are getting 25?

3       MS. KANE: Yes we do.

4       HEARING OFFICER: So in recommending the 20, that's exactly

5   what you needed?

6       MS. KANE: Right. Right.

7       HEARING OFFICER: Okay.  I think the other think that, then

8   again, I'm just going to be the skeptic who is going to talk out

9   loud.  It does appear that if you get those additional services

10  because you work at the school, you get more money.

11      MS. KANE: I'm sorry say that again.

12      HEARING OFFICER: If you add those additional services

13  because you work at the school, you actually – the school makes

14  more money.

15      MS. DALTON:  I'm not following you.

16      MS. KANE:  Well actually --.

17      HEARING OFFICER: She said the base tuition is $15,000 with

18  the related services it goes up to $38,000 and her model is the

19  20 hours of speech and language therapy in the classroom. And as

20  you said, that is the school's model. So in recommending that to

21  an MDT – again I am trying to separate out is it for money or is

22  it for need?

23      MS. KANE: Right and I see where you are going with that

459

1   now.  And I would think, it would actually be more expensive if

2   we had additional services on her IEP. So we - if she can

3   benefit from what is being offered in the classroom, she can

4   benefit from that speech pathologist in the room, that's covered

5   under the cost of the model, for that related services covers

6   that cost.  If we pull her out for more, you know, small group

7   instruction, or more individualized support, or pull her every

8   afternoon for an hour of individual therapy, that would make us

9   more money, but we don't do that.  Because we really, really

10  truly believe in inclusion.  So that's usually (inaudible)

11  dollars signs, but it is actually cheaper to do that.  Because

12  if it is pulled out and your task is a speech pathologist to

13  spend an hour a day individually, that's more expensive.

14      HEARING OFFICER: Let me make sure I understand because

15  again, I might have lost you a little bit here.  She's getting

16  the 20 hours because she had been getting it and she benefited?

17  Is that what you're saying?

18      MS. KANE: Because, because. Yeah. Because that I know that

19  is what's she's getting and she is showing benefit, so we don't

20  need to change that right now.  But if she lags farther behind

21  and we think she need more pullout, then that would be provided

22  to her.

23      HEARING OFFICER: My last question is, if because she's due

83                                                              460

1    other services, if she's get the pullout, is that right for

2    those other services?

3        MS. KANE: Yeah. For --.

4        HEARING OFFICER: Would that impact her 20 hours?

5        MS. KANE: Yeah, it would.

6        HEARING OFFICER: Would that reduce it?

7        MS. KANE: Yeah it would. It would. So then it would be 19

8    hours if she gets one hour of what - occupational therapy - that

9    hasn't started yet. It's still sort of in the process, but that

10   would reduce that.

11       HEARING OFFICER: But she needs 20, so how do we square

12   that?

13       MS. KANE: Some of the treatment is done in a co-treatment

14   approach.  Sometimes the speech pathologist accompanies the

15   occupational therapist into the therapy gym.  So that is

16   something that generally requires than that, so that she would

17   continue to have the 20 hours exposure to the speech

18   pathologist, one hour would be addition with the occupational

19   therapist.  She's (inaudible) very flexible so he's worked

20   really nicely with (inaudible).

21       HEARING OFFICER: Anybody want to ask any questions.

22       MS. DALTON: I think I have a couple if you don't mind, a

23   weighs after your question.

1      HEARING OFFICER: Okay.

2      MS. DALTON: You testified in response to Mr. Woods

3  questions about the make-up of a particular class that A███ in

4  and you indicated that there was a Master's Level Education, not

5  a special educator.

6      MS. KANE: Right.

7      MS. DALTON: You're not recommending that she needs special

8  education from a special educator?

9      MS. KANE: No.

10      MS. DALTON: You made the statement earlier and I think I

11  just want to clear it up for the record, you said we're

12  recommending that she gets 100%, you weren't saying 100% of

13  special education by a special education teacher, because

14  normally when you use a 100%, that's the terminology that is -

15  and I think that might be why Mr. Woods was asking the question,

16  so can you elaborate a little bit more on that?

17      MS. KANE: HmmmHmmm.    HmmmmHmmm.

18      MS. DALTON: When you said a 100% you were looking at this,

19  I think the Notice of Placement, 100% meaning, a 100% of what?

20      MS. KANE: I meant a full time.  Like a full time classroom

21  based opportunity for A██.  That what's (inaudible) in her

22  course per week, whether than 0 to 20%, she needs 100% exposure

23  to (inaudible) to learn.  That's what I meant.

                                 

1    MS. DALTON: Not special education by a special educator in

2    a full time 100% out of general education?

3    MS. KANE: No. Definitely not.

4    MS. DALTON: I just wanted to clear that up. Then you also

5    testified that speech and language pathologist is in the room to

6    provide the service.  Who is the speech and language pathologist

7    who provides service in that room?

8    MS. KANE: The speech pathologist is there to provide

9    service to the kids who are deaf and hard of hearing.  So in

10   A███ classroom, that means A███ and another little girl who

11   wear hearing aids benefit from the speech pathologist being in

12   the room.  The speech pathologist throughout the course of day

13   to target those IEP goals. She literally has clipboard with a

14   form. It was developed to see how those goals are being

15   addressed in a classroom setting.  So her interaction are very

16   therapeutic and they goals driven, so that we get the scope of

17   the curriculum (inaudible).

18   MS. DALTON: And when you initially accepted A███ into the

19   River School, did you make a determination at that time based on

20   the review of the evaluation as to what A███ needs were?

21   MS. KANE: Yes.

22   MS. DALTON: If A███ had not needed a type of model or

23   program that River School provides, would you have advised the

1    parent of that?

2        MS. KANE: Yes. Yes.

3        MS. DALTON:   If ▆▆▆▆ had needed more than what the River

4    School program could provide, such as a full time out of general

5    education, special education placement, would you have advised

6    the parent of that?

7        MS. KANE:  Yes.

8        MS. DALTON:   In your opinion as an expert opinion based on

9    your review of the evaluations, based on your observations of

10   A▆▆▆, and separating yourself as much as you can as an employee

11   of the River School, do you believe that A▆▆ needs the push-in

12   20 hours of speech and language service in the classroom?

13       MS. KANE:  Yes I do.

14       MS. DALTON:  Do you also believe that she needs

15   occupational therapy?

16       MS. KANE:  Yes I do.

17       MS. DALTON:  Do you also believe in your expert opinion

18   that she needs physical therapy?

19       MS. KANE:  Yes I do.

20       MS. DALTON: Do you also in your opinion believe that she

21   needs to be in a classroom based setting all day long?

22       MS. KANE: Yes.  I think that is essential.

23       MS. DALTON: I have no further questions.

1    HEARING OFFICER: All right, Ms. Puckett do you have any

2    question.

3    MS. PUCKETT: You indicated that the speech and language

4    pathologist, the two hearing impaired students benefit from a

5    speech and language pathologist being there, are the other

6    students in the classroom also benefiting?

7    MS. KANE: I think that they do.  I think that the class –

8    the whole benefits from the expertise of the speech pathologist

9    because they plan the curriculum together, the teacher and

10   speech pathologist work to decide what activities and what

11   (inaudible) based objectives to be in the room, so they benefit

12   from the expertise in that sense.  So the speech pathologist

13   focus is on those children are deaf and hard of hearing because

14   they need more support to get through the day.

15   MS. PUCKETT: And do the other students outside of the two

16   hearing impaired students, do their parents pay the additional

17   for that speech and language therapist to be in the classroom?

18   MS. KANE: No they don't.

19   MS. PUCKETT: Okay. I don't have any additional questions.

20   HEARING OFFICER: That might lead to a follow-up there –

21   that was a --. (Laughter)

22   MS. DALTON: (Laughter) All right.  In working with – when

23   the speech and language pathologist in the classroom, what is

465

1   her main – even though the other children can tangentially

2   benefit from her, what is the main role of the speech and

3   language pathologist, what is her main responsibilities?

4       MS. KANE: Her main responsibilities are to support the kids

5   who are deaf and hard of hearing.  There are two of them.

6       MS. DALTON: And to help them what?

7       MS. KANE: To help them to use the curriculum to work on

8   accomplishing their IEP goals, so that's done in a very

9   deliberate, very systematic way so her expertise is needing a

10  speech language and auditory skill development as well as

11  pragmatic skill development.  So she uses the materials in the

12  classroom to help those students who are hearing impaired to

13  make gains. To make progress.

14      MS. DALTON: And the fact that the student may tangentially,

15  another student may tangentially may benefit from those services

16  in the result of any inclusion setting?

17      MS. KANE: True.

18      MS. DALTON: I have not further questions.

19      HEARING OFFICER: Thank you.

20      MS. DALTON: My next witness would be Amy Muldoon and that

21  would be my last witness except for rebuttal witnesses. Can we

22  take just a

23      HEARING OFFICER: Yes!

1    MS. DALTON: Short bathroom break.

2    HEARING OFFICER: Yes. Absolutely.  You want to meet in

3  about 10 minutes.

4    MS. DALTON: Yes, 10 minutes max.

5    HEARING OFFICER: Okay.

6    MS. DALTONG: Because I'd like to conclude my case before

7  lunch and then--.

8    HEARING OFFICER: Yeah.  Yeah.  You get to get to go to

9  lunch and then you come back and its' all yours.

10    MS. DALTON: Is that okay with Ms. Puckett?

11    MS. PUCKETT: That's fine.

12    HEARING OFFICER: Okay.  We're back on the record.  And you

13  can call your next witness.

14    MS. DALTON: Yes, I would call Amy Muldoon.

15    HEARING OFFICER: You know I was thinking that was you in

16  the hallway.

17    MS. MULDOON: It was.

18    HEARING OFFICER: And you've already arrived.  Amy Muldoon.

19  Ms. Muldoon before giving me your testimony, do you mind taking

20  this oath? Do you swear or affirm that the testimony you are

21  about to give will be the truth?

22    MS. MULDOOD: I do.

23    HEARING OFFICER: Okay. And as you may recall, first you'll

1    be questioned by Ms. Dalton and then followed by questions from

2    Ms. Puckett.

3        MS. DALTON: Ms. Muldoon can you please state you full name

4    for the record?

5        MS. MULDOON: Amy Muldoon.

6        MS. DALTON: And what is your position currently?

7        MS. MULDOON: At the River School, I am the Director of

8    Teacher Training.

9        MS. DALTON: Can you provide a brief background of your

10   educational experience?

11       MS. MULDOON: Previous to working at the River School I was

12   the Director of Special Ed, Special Education at the Charter

13   School in the District of Columbia, where my mission was to

14   focus on children that learn differently and those with special

15   education needs. I also teach graduate school and training at

16   the university in special education.

17       MS. DALTON: And what is your degree in?

18       MS. MULDOON: I have a Masters' in Special Education.

19       MS. DALTON: And where do you currently work?

20       MS. MULDOON:  At the River School.

21       MS. DALTON: And what is your position there?

22       MS. MULDOON: Director of Teacher Training in the school.

23       MS. DALTON: And are you familiar with A▉▉ T▉▉▉r?

1     MS. MULDOON: Yes.

2     MS. DALTON: And how did you become familiar with A███

3 T█████?

4     MS. MULDOON: Part of my role at the River School is to work

5 students with IEP's or those students that are Part B or Part C

6 of the IDEA, and A███ T█████ is one of those students.  I became

7 familiar with her – her services, her program. I've observed her

8 in the classroom.

9     MS. DALTON: At the time you started working with A███, was

10 she under Part C or under Part B?

11     MS. MULDOON: Under Part C (inaudible).

12     MS. DALTON: And based on your knowledge as special educator

13 and also Director of Special Education previously, what is your

14 understanding of students who are in Part C, when do they

15 transition to Part B?

16     MS. MULDOON: It is my understanding that they transition to

17 Part B on their 3rd birthday. (Inaudible).

18     MS. DALTON: On or before their 3rd birthday?

19     MS. MULDOON: Yes.

20     MS. DALTON: When was Anna's 3rd birthday.

21     MS. MULDOON: She turned 3 October 17th, 2006.

22     MS. DALTON: Have you reviewed information as to when the

23 parents had initially enrolled Anna with Part B?

1      MS. MULDOON: Yes, I believe they – with Part B I believe

2  (inaudible).

3      MS. DALTON: And just so the record is reflected, is that

4  number 15 – let's me just show you – document number 15 and ask

5  you if that is the date?  Let me see something.  16, I'm sorry.

6  Number 16.

7      MS. MULDOON: Yes.  Yes, September 27th.

8      MS. DALTON: And on that date, I want to show you what's

9  marked as number 15 and can you describe – did you attend any

10  other meeting on that day?

11      MS. MULDOON:  On that day, no. That was I believe Ms.

12  Tiller went and registered her on the 27th.  We attended previous

13  meetings.

14      MS. DALTON: Okay.

15      MS. MULDOON: She was not allowed to register at that time.

16      MS. DALTON: When did you attend a previous meeting?

17      MS. MULDOON: It was September, I believe the 19th.

18      MS. DALTON: Okay, and tell me what happened at that

19  meeting.

20      MS. MULDOON: They were working on transitioning her from

21  Part C to Part B.  We reviewed her IFSP. We discussed just

22  getting her prepared for her 3rd birthday and what was coming up.

23  We submitted evaluations that were done independently.  The

93

1  woman that was running the meeting, we just talked about – she'd

2  talked about – you know when the process would happen.  And Sara

3  Tiller was very concerned that it would take a while or take a

4  long time and you know, at that time of the meeting, they did

5  tell us that it should not – it should be pretty quick because

6  all the evaluations were done.  We should be meeting soon.  But,

7  Sarah was not able to register. It couldn't begin until Sarah

8  registered her child and she wasn't able to do that on that day,

9  even though she did ask on that day.

10      MS. DALTON: And again on what date was that?

11      MS. MULDOON: That was the 19th, and she went back the 27th to

12  register her and I believe that A▬▬ had an observation that

13  day.

14      MS. DALTON: I want to show you what's been marked as

15  parent's exhibit number 12 and ask you if that was the

16  invitation to that meeting that occurred on September 19th?

17      MS. MULDOON: Yes.  That was (inaudible).

18      MS. DALTON: Okay, and then DCPS – anybody from DCPS attend

19  that meeting?

20      MS. MULDOON: Yes they did.

21      MS. DALTON: Do you recall who?

22      MS. MULDOON: There was a gentlemen Brocken sp?  And a woman

23  was running the meeting.  Her first name was Josephine.

1    MS. DALTON: And was anything else discussed at the meeting

2   that you recall other than, was it discussed that the process

3   shouldn't take that long?

4    MS. MULDOON: They discussed the process shouldn't be long

5   because evaluations were done, but Sarah had to register her

6   child, upstairs at the Care Center. Sarah was going to go

7   upstairs right then to register her and they said that it wasn't

8   how it was done, you had to call.

9    MS. DALTON: Was the meeting at the Care Center?

10    MS. MULDOON: It was.  I don't believe at the Care Center

11   Offices, but downstairs in Shaw in the basement, where the

12   cafeteria area.

13    MS. DALTON: In the same building.

14    MS. MULDOON: In the same building. Yes.

15    MS. DALTON: Did they explain to you why she could not

16   register A████ on that date?

17    MS. MULDOON: They just said that you need to call to be

18   able to register the student.  They just don't take walk-ins.

19    MS. DALTON: Was there any discussion on that date as to any

20   potential placements for A████?

21    MS. MULDOON: On that date – uhm—I don't know of a specific

22   placement – but we had visited – we did visit a school

23   (inaudible).  I don't believe it was on that date. (Inaudible).

1      MS. DALTON: Okay.  And who told you about that placement

2  previously?

3      MS. MULDOON: To be very honest with you, it was – it was—I

4  was just currently starting my position at the River School and

5  I believe it was - and I got word of going to the school from

6  Muriel Leary Kane, but I believe it came from Jean Tabanka, but

7  I'm not positive sure about - but I believe they were on

8  conversation, that's how I learned about the school.

9      MS. DALTON: And who is Jean Tabanka?

10     MS. MULDOON: The audiologist for DCPS.

11     MS. DALTON: Had she ever come to the River School?

12     MS. MULDOON: She has been at the River School.

13     MS. DALTON: Now, going back to the meeting with DCPS, so -

14  are you aware of whether or not subsequently Mrs. Tiller was

15  able to enroll A█████?

16     MS. MULDOON: With DCPS?

17     MS. DALTON: Yes, I'm sorry.

18     MS. MULDOON: On the 27th?

19     MS. DALTON: Yes.

20     MS. MULDOON: Yes, I believe the process was actually

21  difficult for her because she kept having to call and leave

22  messages, and I think her actually first date was December 6th to

23  register and then a cancellation happened. So she was able to go

1   on the 27th.

2       MS. DALTON: At that meeting on September 19th, do you recall

3   any concerns being noted by the parent of having services in

4   place by the time A▇▇▇ turned 3?

5       MS. MULDOON: Yes. Very much.  Sarah talked about that

6   they've been contacting D.C. since before she was 2½. There were

7   concerned that PT wasn't being provided. It had come twice and

8   at that time we had seen no PT since.  That Sarah was very

9   concerned about being (inaudible) by her 3rd birthday.

10      MS. DALTON: And subsequently, what's the next thing that

11  you were involved in with regard to A▇▇▇ in any meetings?

12      MS. MULDOON: Her IEP.

13      MS. DALTON: And when did that take place?

14      MS. MULDOON: It took place on February 3rd, 2007.

15      MS. DALTON:  And again, A▇▇▇ turned 3 when?

16      MS. MULDOON:  October 17th, 2006.

17      MS. DALTON:  And between the time that A▇▇▇ turned 3 and

18  the time that the meeting actually took place on February 1st

19  200y, can you describe what contacts you had with DCPS?

20      MS. MULDOON:  We were at the River School were made aware

21  that DCPS had contacted the Tillers and had suggested the

22  December 18th meeting, 2006.  Unfortunately our school is closed

23  for the break and our team would not be able meet, so we offered

97                                                              474

1   to do it beforehand.  Before the 18th or after (inaudible) when

2   we returned.  DCPS - it was our understanding that DCPS could

3   meet before the 18th when we would (inaudible) December 18th.

4   When we returned from break we received another letter of

5   invitation with 3 dates and times.  They referred January 16th,

6   January 18th and January 19th and we accepted the 16th.  We had

7   assumed the meeting would take place and we confirmed.  And the

8   16th, I believe it was at 1 o'clock, I believe it was about 2

9   hands beforehand, we got a call from Zaundra Johnson who stated

10  that DCPS would be unable to attend the meeting that day because

11  the audiologist would be unable to make it.  I spoke with

12  Zaundra on the phone and had said, you know there was concern,

13  because you had given us these 3 dates and times, buy yet your

14  team wasn't able to make it.  Yes, it was DCPS fault.  Please

15  send us over 3 more dates and times. So after that, I sent over

16  3 dates and times to Zaundra for the next week. I believe it was

17  the 22nd, 24th and 25th of January.  We hadn't heard from her on

18  the 22nd.  I had happened to be at the Care Center on the 23rd for

19  another student and I had bumped into Zaundra and Zaundra asked

20  if we were having the meeting that week, and she said no.  They

21  were not able to have the meeting that week because the

22  audiologist was not available.  But she only discusses this the

23  parents and that the parent was sent a letter on the 22nd about

1   that. So she had said, I'll go back and send over some more

2   dates and times.  And I said, you know this is the 2nd or 3rd

3   attempt really to have the meeting, (inaudible) or another

4   attempt to have the meeting.  So I sent over 3 more dates and

5   times, the following dates January 29th, the 31st and February

6   1st.  And I believe on January 30th, we got a confirmed fax saying

7   that they would be at the meeting on February 1st.

8       MS. DALTON:  And the meeting took place on February 1st.

9       MS. MULDOON:  Yes.  The meeting had started at 1.

10      MS. DALTON:  Did you participate in the MDT/IEP meeting?

11      MS. MULDOON:  Yes.

12      MS. DALTON:  Specifically with regard to the time when

13  placement was discussed, can you relate what you recall about

14  placement?

15      MS. MULDOON:  When we were talking about placement, DCPS

16  has offered - well they said she didn't require special

17  education, but she didn't require a placement.  They said she

18  can get services at her neighborhood school.

19      MS. DALTON:  What services did they offer her?

20      MS. MULDOON:  Speech and language, OT, Audiological and

21  they didn't offer her PT, but they felt that PT was not for a

22  (inaudible), but then further down the line they agreed to re-

23  evaluate her for PT because of (inaudible).

1    MS. DALTON:  Okay, so they did not a placement other than

2    for the related services?

3    MS. MULDOON:  For the related services and Zaundra spoke to

4    that typically developing children don't usually start school

5    until four, and that there LRE could be a home.

6    MS. DALTON:  Did she offer any other placement other than

7    for the related services only?

8    MS. MULDOON:  No she did not.  No other placements were

9    available except Janey, the neighborhood school for related

10   services.

11   MS. DALTON:  Do you recall any conversation of whether

12   could have enrolled in Janey at that time?

13   MS. MULDOON:  At that time, she could not enroll at Janey

14   as a student, she was not school age, so (inaudible), but there

15   was some talk about they would put her at the top of the list

16   (inaudible), but she couldn't enroll as a (inaudible).

17   MS. DALTON:  She couldn't enroll that year.

18   MS. MULDOON:  Correct.

19   MS. DALTON:  The year of the meeting.

20   MS. MULDOON:  The year of the meeting, they said next year

21   when she comes or when she does become old enough, they didn't

22   specify a year, they just said when she was old enough.

23   (inaudible)

477

1          MS. DALTON:   What was your understanding about what they

2   meant when they said kick her up to the top of the list?

3          MS. MULDOON:   My understanding was that they would make

4   sure they would put her up on top of the list maybe for first

5   thought or if it was a lottery system, she would bypass the

6   lottery system, I'm not quite sure.

7          MS. DALTON:   Now you mentioned about the PT, they did not

8   offer physical therapy services.

9          MS. MULDOON:   They did not offer physical therapy on her

10  IEP.

11         MS. DALTON:   And previous to the time of the meeting during

12  the evaluation process and the 120 days, did DCPS ever perform a

13  physical therapy evaluation to your knowledge?

14         MS. MULDOON:   There was a PT evaluation that I believe it

15  was over the summer as part of the IFSP.   And it was done in the

16  home.

17         MS. DALTON:   So it was – it was – she was – was she already

18  receiving – supposed to be receiving physical therapy services

19  on her IFSP?

20         MS. MULDOON:   Yes.   She was supposed to be receiving

21  physical therapy service.   The physical therapist, I believe

22  came twice and then just stopped coming.

23         MS. DALTON:   And that was under her IFSP?

101

478

1      MS. MULDOON: Her IFSP, yeah.

2      MS. DALTON: Okay.  So what reason did DCPS give for not

3  giving her a physical therapy evaluation prior to the meeting?

4      MS. MULDOON:  I trying to think if they gave a reason.  Its

5  just that it wasn't a (inaudible) academically, but they had

6  said the test was in the home, and that she's in school right

7  now so, the evaluation should be done. I done our OT had spoke

8  to them about the evaluation should be done in the school

9  setting.  There is a difference between a school and home

10  setting.  So DCPS further down line, they agreed to have a PT

11  evaluation done in a school setting and we offered the River

12  School, that they'd be more than welcome to use our school to

13  perform the evaluation.

14      MS. DALTON:  Has DCPS ever re-convened since February to

15  consider any results of the physical therapy evaluation?

16      MS. MULDOON:  No they have not.  And based on the IEP

17  meeting, the team agreed to reconvene (inaudible).

18      MS. DALTON: I have no further questions, please.

19      HEARING OFFICER: Excuse me, Ms. Puckett.

20      MS. PUCKETT: How do you pronounce your last name, I had

21  pronouncing people's last name wrong.

22      MS. MULDOON: MULDOON.

23      MS. PUCKETT: Meldoon.  Muldoon.

102

1     MS. MULDOON:  It's Muldoon, but don't worry about it.

2     HEARING OFFICER: (Laughter).

3     MS. PUCKETT: (Laughter).

4     HEARING OFFICER: I bet you had all kids - I can see so many

5 variations in it.

6     MS. MULDOON:  Yes.

7     MS. PUCKETT: Ms. Muldoon you testified that - strike that.

8 You participated in the development of the IEP, correct?

9     MS. MULDOON:  Yes I was at the MDT/IEP meeting.

10    MS. PUCKETT: And, you - and I am referring to parent's

11 documents number 24 and number 25.  You wrote two letters to

12 Zaundra Johnson, correct?

13    MS. MULDOON:  Yes I believe I did.

14    MS. PUCKETT: And what has been your role in dealing with

15 this matter outside of your role as the Director of Special

16 Education at the school?

17    MS. MULDOON:  My role at the school is Direct of Teacher Ed

18 Training Support.  You want to know my role in dealing with this

19 case in general?

20    MS. PUCKETT: Yes.

21    MS. MULDOON:  My role is to work with the students and the

22 teachers at the River School.  Part of my job description is to

23 work with the IEP students.

103

1        MS. PUCKETT: And are you familiar with the IDEA?

2        MS. MULDOON:  Yes I am familiar with the IDEA.

3        MS. PUCKETT: And I am referring to document number – the

4    document number 25 and the letter specifically where it says if

5    the parent of River School do not hear from you, we hold the

6    meeting on the 3rd day and time listed below.  It's in the first

7    paragraph, halfway through the paragraph.

8        MS. MULDOON:  Yes.

9        MS. PUCKETT: At this time were you serving in the capacity

10    as an advocate for the parent?

11        MS. MULDOON:  I was not serving as the advocate,

12    (inaudible), serving as the (inaudible) at River School.

13        MS. PUCKETT: Are you familiar with section 325 of the Regs

14    as well as section 1412A 10 A 10 B of the IDEA, that indicates

15    that the private school cannot hold a meeting without the

16    authorization of the LEA?

17        MS. MULDOON:  We didn't hold a meeting on that date.

18        MS. PUCKETT: I understand that, but your language indicates

19    that you will conduct a meeting without DCPS, we will conduct a

20    meeting on the 3rd day if we don't hear from DCPS.

21        MS. MULDOON:  It was written to say that if we don't hear

22    from you the 3rd week from the 3rd date on the letter?

23        MS. PUCKETT: If the parents from River School do not hear

104

481

1  from you we will hold a meeting, "we" will hold a meeting on the

2  3rd day and time listed below.  Who is "we"?

3      MS. MULDOON:  We would be the River School and the parents.

4  This was also the third attempt to hold the meeting.

5      MS. PUCKETT: Does River School has authorization to make

6  eligibility determination for the LEA without the LEA's

7  discretion?

8      MS. DALTON: I think you're asking her a legal – I'm going

9  to object to the form of questioning.

10     HEARING OFFICER: The question is definitely a legal

11 question.

12     MS. PUCKETT: No, I'm --.

13     MS. DALTON: And she is not an attorney, and she --.

14     MS. PUCKETT: But she is a special educator, and the

15 Director of Special Educator, and she is putting in a letter

16 that she is going to hold a meeting, if they don't hear from us

17 Mr. Woods.  This is very relevant, because this whole case is

18 really about – you know we have evaluations from the school.  We

19 have individuals who are experts as well as advocates for the

20 school. And if you read the tone of this letter, it's saying,

21 "Look, we're going to have this meeting, with or without you, it

22 is similar to something that would be written by an advocate or

23 a parent's attorney.  If you read it, this letter looks similar

105

1    to an advocate or parent's attorney's letter.  And I've seen

2    hundreds of them.   That's what it looks like.

3         HEARING OFFICER: I think maybe it's the form of the

4    question.  You - though - you asked her was she familiar with

5    the IDEA.

6         MS. PUCKETT: HmmmHmmm.

7         HEARING OFFICER: And then you cited specific sections of

8    the IDEA. And I don't know if she is that familiar with the

9    IDEA.

10        MS. PUCKETT: Without citing the specific sections, are you

11   responsible for conducting meetings with LEA's.

12        MS. MULDOONS: I hold meetings with LEAs. Yes.

13        MS. PUCKETT: Well isn't it true that you have to have

14   permission from the LEA to conduct an eligibility meeting

15   without them or any type of MDT meeting in regard's to the LEA's

16   responsibility without them?

17        MS. DALTON: And again, I'm going to object to the form of

18   the question.

19        MS. PUCKETT: And if she doesn't know, then she doesn't

20   know.

21        MS. DALTON: She is asking her a legal question.

22        MS. PUCKETT: It's not a legal question.  It based on what

23   her work is, what is her understanding of when she can conduct a

106

483

1    meeting.

2        HEARING OFFICER: Well, maybe --.

3        MS. PUCKETT: Well what is your understanding of when you

4    can conduct a meeting without the LEA?

5        MS. MULDOON: My understanding of when you can conduct a

6    meeting without the LEA is when 3 attempts have been made and 3

7    dates have passed.  We had been given 9 dates and times, 3

8    attempts at an meeting.

9        MS. PUCKETT:  So your understanding is that, River School

10   could have made this eligibility determination without the Care

11   Center?  Is that your understanding?

12       MS. MULDOON:  My understanding is when you can hold a

13   meeting after 3 dates and times and 3 attempts have been given.

14   9 dates and times had been given, and 3 attempts have been made.

15       MS. PUCKETT: Is it your understanding that River School can

16   make an eligibility

17       MS. DALTON: Objection.

18       MS. PUCKETT: She did not answer my question Mr. Woods, can

19   I please ask the question.

20       HEARING OFFICER: I said there is an objection.

21       MS. DALTON: There is an objection.

22       MS. PUCKETT: Okay.

23       MS. DALTON: Please. She's badgering the witness.  The

1  witness has already answered her question, that's her

2  understanding of when she can conduct a meeting.

3      MS. PUCKETT: No, she did not answer my question.

4      HEARING OFFICER: After --.

5      MS. PUCKETT: No.  Then I asked her can - is it your

6  understanding that River School can conduct an eligibility

7  meeting without the LEA--.  I didn't say --. I asked her can she

8  have an eligibility determination without the LEA being present?

9      HEARING OFFICER: That question is separate from --.

10     MS. DALTON: Same thing.

11     MS. PUCKETT: No it's not.  Can River School make a

12  eligibility determination as a meeting without a LEA present?

13     MS. MULDOON: Again, my understanding is that regardless of

14  school, after 3 dates and times and 3 attempts are made.

15     MS. PUCKETT: I take that as a yes. I guess that's a yes.

16     HEARING OFFICER: Are you saying she is not answering your

17  question?

18     MS. PUCKETT: She is not answering my question.  She once

19  again said, based on procedurally when they can schedule a

20  meeting.  I'm asking her --.

21     HEARING OFFICER: What can they do at the meeting?

22     MS. PUCKETT: Yes.  Can you make an eligibility

23  determination for an LEA without the LEA present? Without their

485

1   authority?

2       MS. MULDOON: Can you explain that one more time, because

3   they are two different questions?

4       MS. PUCKETT: Okay.   Can the River School – make an

5   eligibility determination – without the LEA present and without

6   the LEA's discretion to conduct that meeting?

7       MULDOON: If appropriate protocols had been done, 3 dates

8   and time had been made, there is no – that nothing had been

9   given in response to the meeting and we are attempting to have

10  the meeting then in order to comply, then yes, we have to

11  continue with the meeting.

12      MS. PUCKETT: Is the LEA responsible for implementing the

13  IEP which would be private school IEP?

14      MS. DALTON: Again, Mr. Woods I am going to object to this

15  line of questioning because it's irrelevant.  That's not what

16  happened in this case. They didn't conduct the meeting without

17  the meeting without the LEA.

18      MS. PUCKETT: No. I'll go ahead.

19      MS. DALTON: They made attempts and still waited for them

20  even after they made all of those attempts, so she is going down

21  a line of questioning that has no relevance at all in this case.

22      MS. PUCKETT: It does have relevance Mr. Woods.

23      MS. DALTON: It doesn't.

109

486

1       MS. PUCKETT: Can I please explain why it has relevance? It

2   has relevance Mr. Woods because you have someone writing an

3   advocate style letter saying that they are going to go forward

4   with a meeting.

5       MS. DALTON: That's your interpretation.

6       MS. PUCKETT: I have never --. Let me finish. I did not

7   interrupt you.  You have an advocate style letter saying if you

8   don't forward, then we're going to have this meeting.  You have

9   other witnesses who have - who have been presented as advocates

10  as well as experts in this case. And it goes to what credibility

11  we should give this witness.  It truly goes to what credibility

12  you should give this witness.  And I just pointed out, I just

13  asked that question because it's clear in the law that the LEA -

14  that the private school cannot make an eligibility determination

15  without the LEA's digression.  That section of the regulations

16  as well as the IDEA indicates it.  That there has to be

17  discretion for the LEA, that the private school cannot make

18  determination and cannot have that meeting without the LEA.

19      HEARING OFFICER:  But beyond that legal argument --.

20      MS. PUCKETT: I'll save it for closing, I'll continue on.

21      HEARING OFFICER: She is basically saying her understanding,

22  3 attempts, we hold meeting.  And you're saying - that beyond

23  that you are --.

110

487

1        MS. PUCKETT: I'll argue that her understanding is

2   incorrect.

3        HEARING OFFICER: But in fairness to Ms. Puckett's question,

4   she is basically getting to what can – even with that

5   interpretation, what can you do at that meeting and among the

6   things you can do, can you determine a child's eligibility; but

7   that gets to the legal argument --.

8        MS. PUCKETT: HmmmmHmmm.

9        HEARING OFFICER: More than --.

10       MS. PUCKETT: I'll argue legally in closing.

11       HEARING OFFICER:  It doesn't get to --.

12       MS. DALTON: And again, it's irrelevant because this isn't

13   what happened in this case.

14       HEAIRNG OFFICER: It didn't happen, yeah. So really that's

15   legal more than factual, right. I mean aren't you saying that

16   Ms. Puckett? You just wanted to know legally did she know the

17   scope of what she--.

18       MS. PUCKETT: I wanted to know legally did she know the

19   scope, but I really --.

20       MS. DALTON: She's not a lawyer Ms. Puckett.

21       MR. PUCKETT: Mr. Woods.  I wanted as her responsibilities

22   as the – and I think I changed my question to say that.  Now we

23   all know that legally stuff procedures are defined in the law,

111

488

1    but people who hold these meetings, you understand that they

2    understand what they are supposed to be doing.  So I asked her

3    that her question to find out if she stated that they are going

4    to have this meeting on the 3rd day if she doesn't hear from us;

5    so I'm trying to understand from her does she know procedurally

6    how she is supposed to conduct this meeting, and if so, what can

7    she do at the meeting.  But I think it is a very relevant

8    question.

9        MS. DALTON: But before you move on I just want to state

10    that Ms. Muldoon also stated that the way she wrote that letter,

11    what she meant was if you don't accept one of these dates, we

12    will assume it will be the third date.  And that is what she

13    testified to before you went into this whole rant and rave about

14    where you were going to have this meeting without me.

15        MS. PUCKETT: Thank you for classifying my argument as rant

16    and raving.  I don't know what to classify your as.  Anyway, Mr.

17    Woods I would like to continue at this point.  You indicated

18    that - that DCPS did not come to do a PT evaluation - that DCPS

19    did not provide the student with any PT services on the IEP and

20    that we said that we would do a PT evaluation. Isn't it true

21    that the whole team decided that she needed a new evaluation?

22        MS. MULDOON: That she needed a PT evaluation in the school

23    setting?

1      MS. PUCKETT: Yes.

2      MS. MULDOON: Yes.

3      MS. PUCKETT: And wasn't there concerns even by one your

4   staff members that - that because evaluations were done in the

5   home we don't know if she needed PT services in a educational

6   setting.

7      MS. MULDOON:  He was concerned that the PT evaluation was

8   done in the home, yes.

9      MS. PUCKETT: And did you participate in the September

10   meeting, correct?  September 06 meeting?

11      MS. MULDOON:  Yes.  I was at that meeting.

12      MS. PUCKETT: Okay, and you testified that that the parent

13   went to look at some placements, well the parent was interested

14   in getting some DCPS placements.  Did you attend any of the

15   placement observations with her?

16      MS. MULDOON:  Yes.

17      MS. PUCKETT: And which placement observation did you

18   observe?

19      MS. MULDOON:  We went to Barnard.

20      MS. PUCKETT: And did the parent tell you specifically that

21   she was interested in withdrawing the student from River School?

22      MS. MULDOON:  No, I don't believe so. The parent didn't

23   really with me, we just went to observe the school.

113

490

1     MS. PUCKETT: Now you indicated that Zaundra Johnson

2  indicated that the student's placement was a home placement?

3     MS. MULDOON:  She said it could be in the home at 4 years.

4     MS. PUCKETT: But did she say that DCPS was issuing a home

5  placement.

6     MS. MULDOON:  She said that it could be a typically

7  developing peers don't start school until 4.  And that Anna's

8  placement could be for home, for peer (Inaudible).

9     MS. PUCKETT: And what is your interpretation of the DCPS 01

10  which is an initial placement document?  What is your

11  interpretation of that document, you indicated that there has

12  been no placement issued.

13     MS. MULDOON:  My interpretation is that she will receive

14  special education and related services at Janey Elementary

15  School.

16     MS. PUCKETT: Okay.  So there was a placement issued to

17  Janey for related services?

18     MS. MULDOON:  Zaundra kept speaking to that because

19  specialized - special education wasn't needed, placement was not

20  needed so she could go to a (inaudible) non-attending at Janey.

21     MS. PUCKETT: Now your - are you involved in the hiring of

22  teachers as a Director of Training?

23     MS. MULDOON:  I sit on a Teacher (inaudible) yes.

1          MS. PUCKETT: And is one of the benefits of being a teacher,

2    reduced tuition for students.

3          MS. MULDOON:  I believe it is.

4          MS. PUCKETT: And do you know how much reduced tuition

5    student's parents receive for having a teacher on staff there?

6          MS. MULDOON:  I'm not part of the benefits part of the

7    contract.

8          MS. PUCKETT: Of course your indulgence Mr. Woods, just one

9    second, I want to make sure I've gotten everything I wanted to

10   ask her.  You testified that, and I just want this for

11   clarification purposes, you testified that the PT person only

12   came once.  That PT person was involved in the Department of

13   Human Services - the responsibilities of the Department of Human

14   Services, correct?

15         MS. MULDOON:  I believe she came twice.

16         MS. PUCKETT: But that was not related to DCPS?

17         MS. MULDOON:  It was part of her IFSP, where she had PT.

18         MS. PUCKETT: Okay.  I don't have any additional questions.

19         HEARING OFFICER: Ms. Dalton.

20         MS. DALTON: Yes, to follow-up on--. You testified that

21   Zaundra made the statement that because A███ was not of school

22   age she could get her related services at Janey, but she would

23   be non-attending?

115

492

1        MS. MULDOON:  I believe so, yes.

2        MS. DALTON: So what is your understanding that DCPS made

3   any placement for A███ other than just for the related services?

4        MS. MULDOON:  That's my understanding, just placement for

5   the related services.

6        MS. DALTON: The rest of the time, where would she be?

7        MS. MULDOON:  At home.

8        MS. DALTON: And then with regard to the PT, you were asked

9   that the whole team agreed that the student needed a physical

10  therapy evaluation?

11       MS. MULDOON:  Yes. That's right.

12       MS. DALTON: Do you recall at the meeting whether or not

13  anyone recommended that she have physical therapy services on

14  her IEP.

15       MS. MULDOON:  Yes.  The OT at the meeting was concerned

16  about it.  And I believe that Sarah was also concerned about it.

17       MS. DALTON: When you say concerned, what do you mean?

18       MS. MULDOON:  That she wasn't receiving PT on her IFSP and

19  that she should be getting PT on her IEP.

20       MS. DALTON: Okay and what was DCPS's response to the parent

21  raising the concern that A███ needed PT?

22       MS. MULDOON:  The spoke to that it wasn't affecting her

23  academic setting, and that when's the conversation came up about

116

493

1    just her balance and her – and just her moving around the

2    classroom and that the OT had seen a lot of sensory issues and

3    the vestibular problems. Sarah (inaudible) concerned about that

4    as well when she was not getting the PT, and the OT was – spoke

5    to the fact that – evaluations – PT evaluations should be done

6    in the classroom setting.

7        MS. DALTON: Do you recall if there was any evaluation PT –

8    PT evaluation that had been looked at or considered at – at the

9    MDT meeting?

10        MS. MULDOON:  I believe it was Little Feet and Little

11    Hands, White, Emma White.

12        MS. DALTON: And in that evaluation, do you recall whether

13    or not PT services were recommended?

14        MS. MULDOON:  They were recommended.

15        MS. DALTON: And is that the only evaluation that the team

16    had in front in on that day?

17        MS. MULDOON:  Yes.

18        MS. DALTON: And I'm going to show you what's been marked as

19    Exhibit number 26.  These are the meeting notes that were taken

20    by DCPS on February 1st, 2007.  And I'm going to ask you again,

21    you testified earlier that the whole team agreed that she needed

22    a physical therapy evaluation, but who was it in the notes that

23    recommended that she have the physical therapy evaluation?

1    MS. MULDOON:  I believe it came from the OT, but also his

2  evaluation as well. I would have to re-look at his evaluation.

3  I believe that was a statement in his evaluation as well.

4    MS. DALTON: And then DCPS then agree to perform an

5  evaluation?

6    MS. MULDOON:  Eventually they did. It wasn't at the time

7  that the OT spoke.  It was a little bit after that.  They had a

8  PT there and he spoke and then, a little bit after they finally

9  agreed to it.  They finally said that DCPS (inaudible).

10    MS. DALTON: Did they give any reason why they were

11  disagreeing to put physical therapy services on her IEP when the

12  only evaluation that they had before them recommended it?

13    MS. MULDOON:  Just that they didn't feel it affect her.

14  The PT was reading off a narrative done by the River School

15  saying "Oh she doesn't need it."  But the narrative is just

16  that, it's a narrative. It was done by a PT.

17    MS. DALTON: Did DCPS at any time, prior to that meeting,

18  send anyone out to perform a physical therapy evaluation?

19    MS. MULDOON:  No.

20    MS. DALTON: And then after the meeting, after they

21  recommended a physical therapy evaluation be performed, to your

22  knowledge has anyone come to the school to provide it – I mean

23  to perform the evaluation?

495

1        MS. MULDOON:  Yes.

2        MS. DALTON: And has the parent been provided with any

3    result of that evaluation?

4        MS. MULDOON:  Not that I am - to my knowledge no.  Nor has

5    the school.  I know the school has not.

6        MS. DALTON: Has there been a reconvening of the meeting?

7        MS. MULDOON:  No.

8        MS. DALTON: To consider any PT evaluation?

9        MS. MULDOON:  No.

10       MS. DALTON: What was your understanding of why the parent

11   was looking at placement other than the River School?

12       MS. MULDOON:  My understanding was to find the most

13   appropriate setting for A██.

14       MS. DALTON: Now in your role as a special education

15   director at the previous charter school that you were employed

16   at, did you have responsibility for convening MDT meetings - MDT

17   and IEP meetings?

18       MS. MULDOON:  Yes.

19       MS. DALTON: And in your role as special education director

20   at the public charter school, did you also have occasions to

21   write letters encouraging that MDT/IEP meetings be convened?

22       MS. MULDOON:  Yes. Absolutely.

23       MS. DALTON: Did you do that regardless of - whether you

119

1   were – did you do that as a part of your role at that school?

2       MS. MULDOON:  That was part of my role to make sure we stay

3   in compliance?

4       MS. DALTON: And did you understand that part of the

5   compliance was having – making sure that an MDT/IEP meeting took

6   place within the time period that it should take place?

7       MS. MULDOON:  Yes. Absolutely.

8       MS. DALTON: Was that what you were attempting to have

9   happen in this case?

10      MS. MULDOON:  Yes.

11      MS. DALTON: I have no further questions.

12      HEARING OFFICER: Anything further Ms. Puckett?

13      MS. PUCKETT: Nope.

14      HEARING OFFICER: Thank you.

15      MS. DALTON: And that would be the conclusion of the

16  parent's case at this point, except for rebuttal witnesses.

17      HEARING OFFICER: DCPS what would your pleasure be, starting

18  or --.

19      MS. PUCKETT: Two o'clock?

20      HEARING OFFICER: Will you be able to finish?

21      MS. PUCKETT: Yes.

22      MS. DALTON: I definitely want to make sure we finish today.

23      MS. PUCKETT: We will finish today.

497

1       HEARING OFFICER: Okay, that's fine with me?

2       MS. DALTON: How many witnesses are you planning on calling?

3       MS. PUCKETT: I believe two.

4       HEARING OFFICER: Is that fair. We've been promised we'll

5  finish.

6       MS. PUCKETT: I mean I need a lunch break Mr. Woods.  I

7  think 2 o'clock is a reasonable lunch break.

8       HEARING OFFICER: No, I agree. We have to have it.  Ms.

9  Dalton and I had a situation where we didn't take lunch, but no.

10  I think you're right, I think it is very prudent to do that.  My

11  just and only concern was to finish.

12       MS. DALTON: My concern too.  So if she can guarantee that

13  we will be able to finish today, I have no problem.

14       HEARING OFFICER: And certainly not to stop lunch.  That

15  wasn't my question at all, it was just can we finish?  So why

16  don't we break till 2 then, and we've been told that.

17       MS. DALTON: (Inaudible).  We're going to finish by 5

18  anyway, right?

19       HEARING OFFICER: Oh yes. Right.

20       MS. PUCKETT: We'll probably be finished, yeah, way before

21  that.

22       HEARING OFFICER: Okay. We'll recess to noon, - I mean till

23  2.

1       MS. DALTON: I guess I won't need to eat my peanut butter

2    and jelly sandwich by then.

3       HEARING OFFICER: Okay we're reconvening our afternoon

4    session in A████ T█████ and I believe Ms. Dalton you rested, the

5    parent's case except for a possible rebuttal witness, is that

6    correct?

7       MS. DALTON:   Yes sir.

8       HEARING OFFICER: Okay, so we'll move to DCPS's case-in-

9    chief and Ms. Puckett you may call your first witness.

10      MS. PUCKETT: Yes, I would call Zaundra Johnson.

11      HEARING OFFICER: Okay.  Ms. Johnson, do you swear or affirm

12   that the testimony will be the truth?

13      MS. JOHNSON: Yes.

14      MS. PUCKETT: And Ms. Johnson, you can just - these are just

15   copies of the documents, just don't refer to as why, saying to

16   them so you can sit them off to the side.

17      HEARING OFFICER: What will happen now is Ms. Puckett will

18   ask questions of you then to be followed by question from Ms.

19   Dalton.

20      MS. PUCKETT: Please state your name for the recall.

21      MS. JOHNSON: Zaundra Johnson.

22      MS. PUCKETT: And what is your current occupation?

23      MS. JOHNSON: Enlist supervisor for Early Childhood Special

1   Education for the District of Columbia Public Schools.

2       MS. PUCKETT: And can you give us a description of your

3   educational and professional background?

4       MS. JOHNSON: My Bachelor is in psychology.

5       MS. PUCKETT: Can you speak up a little bit?

6       MS. JOHNSON: My Bachelor's is in psychology.  My Master's

7   is in clinical psychology, my EDS is in Early Childhood Special

8   Education, I always change the Ed to George Washington

9   University and I am currently a 3rd year student in the doctoral

10  program for Administration and Urban Change.

11      MS. PUCKETT: And you tell us about your professional

12  background?

13      MS. JOHNSON: I worked, let's see in the field of psychology

14  and Early Childhood Special Education for 25 years. I have

15  worked as a consultant in psychologist. I worked as school

16  psychologist for Prince Georges' County Public Schools for 18

17  years and an Early Childhood Special Education Center, I worked

18  as Program Manager for an Early Childhood Program, the Judy Hoya

19  Family Learning Center. That was for 4 years.  I also have a

20  worked as a family therapist.  I also work as a contracting

21  psychologist for MRDDA for the District of Columbia Public

22  Schools, and I've also worked for the Associations for Mental

23  Retarded Individuals.  I have also worked as a Special Ed

500

1    teacher, I was certified as Special Education Teacher with the

2    Prince Georges County also and currently I work as the

3    supervisor for the Early Childhood Special Education with the

4    District of Columbia and my tenure began in 2004.

5        MS. PUCKETT: And you indicated that you were a consultant

6    for MRDD, what is that?

7        MS. JOHNSON: MRDDA is the – it is the organization of for

8    government for the District of Columbia that identify

9    individuals who are – who have mental retardation.

10       MS. PUCKETT: Now you indicated that you worked in PG

11   County in an Early Childhood specialist.  What were your duties

12   as a Early Childhood Specialist in PG County?

13       MS. JOHNSON: Well, I worked as the school psychologist for

14   the Early Childhood Center at James Rydell Randol Early

15   Childhood Center which was a connected the regular ed James

16   Rydell Randol Elementary School.  My duties there was to conduct

17   evaluations over the years; over those years I've conducted over

18   3000 evaluations for pre-school age children.  That was my

19   primary duty.  I also conducted functional behavioral

20   assessments.  I conducted training for children and family – I'm

21   sorry for staff and families on the different varying

22   disabilities for children, who qualify under IDEA, so in

23   consulting with teachers.

124

1      MS. PUCKETT: And so what is your experience in regards to

2  placement for students in who are in Early Childhood?

3      MS. JOHNSON: My experience over the last 20 years including

4  Prince Georges' county and with the District of Columbia, I sit

5  on the team – I either am a member of the team as a

6  psychologist, or was a member of the team as a psychologist or

7  in my current administrative position, I sit on the team as

8  either the Administrator or the LEA representative.

9      MS. PUCKETT: And how many students have you placed in Early

10  Childhood programs over the past 20 years?

11      MS. JOHNSON: Ohhhhhh --- let's – let's – oooh. I would say

12  we placed – I have assessed and placed more than over 20 years,

13  -- I'm trying to think – I'm going to say in the thousands.

14      MS. PUCKETT: And do you have any experience in placing

15  Hearing Impaired students?

16      MS. JOHNSON:  Yes I do.

17      MS. PUCKETT: What is your experience in placing Hearing

18  Impaired students?

19      MS. JOHNSON: I experience in Prince Georges County as when

20  I sat as a school psychologist, and also I have experienced as

21  an administrator in sitting on meetings, particular with the

22  River School for the last three years, as an administrator with

23  the District.

125

502

1      MS. PUCKETT: And what is your experience in regard to the

2    eligibility of Hearing-Impaired students?

3      MS. JOHNSON: Because I am a part of the team and oftentimes

4    the chair of the team, I do have experience in regards to

5    knowledge, what are the criterias for identifying children with

6    hearing impairments.

7      MS. PUCKETT: And you indicated that—that you strike that.

8    And have you provided any outside – any training to outside

9    agencies?

10     MS. JOHNSON: Yes. I do provide training to outside

11   agencies.  I provide training to the community Day Care Centers.

12   I provided training to family groups for example, for the Autism

13   Parent Associations in Prince Georges County. I provided

14   training to the Head Start programs in the community. We also do

15   training in fairs with a local church such as Shiloh Baptist

16   Church.  When there are also fairs on the mall, we participate

17   and provide training in screenings at the various fairs that are

18   conducted by the District of Columbia.

19     MS. PUCKETT: And what are these trainings, what types of

20   trainings are they?

21    MS. JOHNSON: The trainings that I provide varies.  I have

22   provided extensive training for children with autism; for their

23   families, how children - how to - how families can be more

1    effective in the – in handling their children with autism; the

2    developmentally delayed and the criteria for that; we provide

3    training for children with challenging behaviors; I provided

4    training for the development of IEP's; I provide training on

5    standards and curriculum and research-based development of

6    IEP's; provided training on the – let's just say in the area of

7    special education and pre-school, I've done extensive training.

8         MS. PUCKETT: One second.  At this time, I would like to ask

9    her to be found as expert as a psychologist in the area of Early

10   Childhood Development, as Ms. Dalton indicated in the finding of

11   expertism of the last witness, the purpose of the expert to

12   provide insight to the Hearing Officer as to information that a

13   layperson would not be privy to.  At this point she has

14   testified of over 20 years of Early Childhood eligibility as

15   well as Early Childhood placement.  She worked for PG County

16   schools for at I believe 18 years, in their Early Childhood

17   Program. She is a supervisor for the Early Childhood program

18   right now.  She worked as Certified Special Ed teacher in the

19   Early Childhood Program for PG County, also as a consultant and

20   provided to training to different pre-school groups involved in

21   other early childhood concerns.  I don't think I am required by

22   law to present a curriculum vita or resume prior to the request.

23        HEARING OFFICER: Ms. Dalton.

127

504

1      MS. DALTON: Well I think it's been a last minute decision

2    on DCPS to propose Ms. Johnson as a expert witness because as

3    Ms. Puckett clearly indicated, she doesn't think it's a

4    requirement, but she knows that her office has required all

5    parents' attorneys to provide curriculum vitas.  In our case, we

6    clearly gave notice to DCPS of the witnesses that we would be

7    relying on as expert witnesses by providing their curriculum

8    vitas. And all honesty and fairness I don't believe DCPS has

9    been as open with their disclosure, but beyond that.  I don't

10   believe that Ms. -- .  Well she may have some experience in

11   childhood education, the specific issues in this case are with

12   regard to cochlear implants and communication issues, speech and

13   language issues and I didn't hear anything from Ms. Johnson

14   about training or publishing or anything that would make her an

15   expert in the area of cochlear implants and the communication

16   disorders that children with cochlear implants have or

17   communication disorders separate from cochlear implants and for

18   that reason I would state that she is not an expert witness that

19   can provide this Hearing Officer with any additional knowledge,

20   particular to this case.

21     MS. PUCKETT: Mr. Woods I didn't ask for her to be an expert

22   in implants or communication disorders.  This case is about an

23   Early Childhood Program.  This is a student who is not of school

128

505

1    age; the student went to the early childhood program at Care

2    Center asking for to be evaluated and a determination of

3    placement.  Furthermore, Ms. Johnson has been working in this

4    area of Early Childhood for some time now.  And even though some

5    individuals in our office do require a resume and curriculum

6    vita, it is very clear that many hearing officers have allowed

7    it anyway.  So just because some people in our officer require

8    it ahead of time, does not mean that this hearing officer should

9    say today, that its required.  It is not required by law, and

10   she presented her background information in regards to Early

11   Childhood Development eligibility and placement.  And this

12   Hearing Officer can enter her as an expert for that purpose. She

13   is also a fact witness because she was involved for this

14   student's case file.  And I believe expert/fact witness for

15   several people in parent's counsel case.

16        HEARING OFFICER: Anything further on the objection?

17        MS. DALTON: No, my objections stand.

18        HEARING OFFICER:  I will admit the witness as a expert of

19   field, because it seems to me to be very limited, she didn't say

20   she was an expert in cochlear implants, in any of that.  You are

21   psychologist and early childhood development, and it sounds to

22   me that's what you're being offered for.  To the extent that

23   helps me --.

129

506

1       MS. PUCKETT: HmmmHmmm.

2       HEARING OFFICER: Obviously weigh that testimony.

3       MS. PUCKETT: That's it.

4       HEARING OFFICER: And there didn't appear to be any

5    objections to her expertise in that area.  The objection was

6    resume and she's not an expert in cochlear implants, but she was

7    not offered to be that.

8       MS. PUCKETT:  Shall I continue?

9       HEARING OFFICER: Yes.

10       MS. PUCKETT: Okay, what are your current roles at the Care

11   Center.

12       MS. JOHNSON: I am as a supervisor of Early Childhood

13   Special Education, my primary duties include Child Find, which

14   we are required as the LEA for the District of Columbia to

15   identify and locate children between the ages of 3 and 4 years

16   old - through 4 years old, that are suspected or have a

17   disability.  We are a what - after the child has been

18   identified, then we are responsible for the assessment and

19   evaluation of the child to determine if that child meets the

20   criteria as a child with a disability in accordance IDEA 2004.

21   After that has been determined, our team at the Care Center is

22   then responsible for the development of an IEP and after the IEP

23   has been developed, we are then responsible for implementing the

1    IEP and least restrictive environment. That's the Child Find

2    Aspect.  We are also, as the supervisor of Early Childhood

3    Special Education, I am also responsible for the monitoring of

4    the Early Childhood Programs that we have across the city.  We

5    have inclusion programs for children who can benefit from a

6    educational placement with their non-disabled peers.  They

7    require – they require approximately 10 hours of services of

8    specialized instruction and then we have our non-categorical

9    placements which are for self – children who require a self-

10   contained setting, a more restrictive program requiring at least

11   20 hours of specialized instruction.  It is our responsibility

12   to monitor to program. We train the teachers, we insure that

13   FAPE is delivered.  We insure that all of compliance issues are

14   adhered to and provide a high quality special education program

15   for our children.

16       MS. PUCKETT:   Can you explain the procedures in regards

17   how student get referred to Early Childhood Programs?

18       MS. JOHNSON:  Okay. Our referrals – referrals come – is

19   initiated once the parent has come into the Care Center and has

20   provided proof of residency, fill out a register and then

21   provide consent for evaluations.

22       MS. PUCKETT: And after that referral is made what typically

23   happens?

131

1        MS. JOHNSON:  The SEP or the Student Evaluation Plan is

2    developed, well prior to consent the SEP is developed. A student

3    evaluation plan is developed and then the child - and then we

4    ask for consent to implement the SEP.  Evaluations are then

5    conducted by our team and then after evaluations are completed,

6    we schedule an eligibility and IEP meeting.

7        MS. PUCKETT: Okay. Now, you indicated you're responsible

8    for the Early Childhood Programs --.

9        MS. JOHNSON:  HmmmmHmmm.

10       MS. PUCKETT: Are there other programs for 3 to 4 - for

11   students who are not of age in the schools?

12       MS. JOHNSON:  The District of Columbia also have general ed

13   programs for 3 and 4 year-old children.

14       MS. PUCKETT: And what types of programs are those?

15       MS. JOHNSON:  The District has a grant with the Head Start,

16   Head Start program for children who are 3 and 4 years old.  We

17   also have, I think at this point, 18 general ed Pre-K - Pre-

18   School for children who are pre-school - for children who are 3

19   years old. Pre-School classrooms - general ed.  We also an - and

20   let me just preference with those programs, they must hold 3

21   seats for children with special needs.  This is one of our

22   superintendent's initiatives because we are moving towards a

23   universal 3 year old.  We currently also a universal pre-school

132

509

1   for 4 year-olds.   The new 18 classrooms are our attempt to move

2   to universal pre-school programs for 3 year-olds.

3        MS. PUCKETT: And is the Care Center responsible for these

4   pre-schools and Head Starts.

5        MS. JOHNSON:  No. Those are under the auspices of the Early

6   Childhood regular ed, early childhood programs, under Dr. Cheryl

7   Roberts.

8        MS. PUCKETT:  And how do students find out about - how do

9   students get enrolled in those programs?

10       MS. JOHNSON:  Those programs are at the schools and they

11  apply at the local schools.

12       MS. PUCKETT: Okay.  Are you familiar with the River School?

13       MS. JOHNSON:  Yes I am.

14       MS. PUCKETT: And how are you familiar with the River

15  School.

16       MS. JOHNSON:  I've attended and chaired several meetings

17  with the River School for children who have come through the

18  Care Center with Hearing Impairments in seeking identification

19  as a under IDEA for educational disability.

20       MS. PUCKETT: Let me just back up because I think I went too

21  far.  Are you familiar with A████ T██████?

22       MS. JOHNSON:  Yes I am.

23       MS. PUCKETT: And how are you familiar with A████ T██████?

133

510

1      MS. JOHNSON:  I am familiar with A████, she came through the

2  Care Center and also I had a meeting with Mom at the River

3  School and familiar with her case.

4      MS. PUCKETT: And what involvement have you had in the

5  student's case?

6      MS. JOHNSON:  I chaired the meeting, the eligibility and

7  the IEP meeting.

8      MS. PUCKETT: And – I'm sorry.  Just one second.  I'm

9  referring to DCPS 01, as far as well as parent's document 28,

10  are you referring to the meeting of February 1st 07?

11      MS. JOHNSON:  Yes I am.

12      MS. PUCKETT: And what was your role at that eligibility

13  meeting.

14      MS. JOHNSON:  I chaired the meeting. I was the LEA

15  representative and then Administrator for the meeting?

16      MS. PUCKETT: And who else participated in that meeting from

17  DCPS?

18      MS. JOHNSON:  Our school psychologist, Dr. Mitchell, Sidney

19  Thomas, our speech pathologist.  Our occupational therapist,

20  Jose -- I can't get the pronunciation of this last name --. June

21  Tabenka of the DCPS audiologist and I'm sorry Kristen Beils,

22  special educator.

23      MS. PUCKETT: And who else attended that meeting who wasn't

511

1   from DCPS?

2        MS. JOHNSON:  That was not from DCPS? I have to refer--.

3        MS. PUCKETT: I'm sorry and I'm going to refer to meeting

4   notes from the meeting which are parent's documents 26 as well

5   as River School's meeting notes from the 27th.

6        MS. JOHNSON:  Okay.

7        MS. PUCKETT: Who else participated in that meeting?

8        MS. JOHNSON:  Jean Mertis, the and I may be mispronouncing

9   her name, the River School audiologist, Michael Smith of River

10  School Occupational Therapist, Patricia Gates, and I don't want

11  to murder her name, Ulanet River School's clinical psychologist,

12  Mrs. Tiller.  Also, Wanda Banks, our DCPS OT was in attendance.

13  And Amy Muldoon, Mary O'leary Kane, Director of Speech and

14  Language Support.

15       MS. PUCKETT: Okay and what was the purpose of this meeting?

16       MS. JOHNSON:  The purpose of the meeting was to determine

17  eligibility and to develop an IEP?

18       MS. PUCKETT: And during the meeting what was the outcome of

19  the meeting?

20       MS. JOHNSON:  The team determined that A██ met the

21  criteria to be identified as a child with a disability of deaf

22  impairment and the IEP was developed, because she did not have

23  deficits in the area of socialization, of cognition adaptive

135

512

1    functioning, there was no need to - those were areas of

2    strengths for her in which she fell within normal limits.  And

3    that we did not have to develop goals in those areas.  The areas

4    where she had deficits were in the areas of communication and

5    goals were developed by our speech pathologist.  In the area of

6    fine motor and goals were developed by our occupational

7    therapist and also in the area of audiology. Her hearing in

8    which our audiologist developed goals.

9         MS. PUCKETT: What did the team consider in making these

10    recommendations - I mean in developing goals?

11         MS. JOHNSON:  We first began as --- can I refer to the IEP

12    document.

13         MS. PUCKETT: You can't ask me a question.  Referring the

14    student's IEP can you tell us what the team consider in

15    developing recommendation for services?

16         MS. JOHNSON:  Okay, when we develop an IEP - to develop the

17    goals, the first thing that we do is to look at the child's

18    present level of functioning.  And we look at where the child is

19    functioning in the area of socialization, in the area of

20    cognition, in the area of adaptive functioning and communication

21    in fine and gross motor skills.  And these are the areas of

22    development for children, pre-school age children, which is

23    unlike older children where we're looking at written language,

136

513

1    and we're looking at reading, and math, and those areas.   So

2    that we're not – we're looking at how the child is develop –

3    development – developing as opposed to looking at the child's

4    academic functioning, because we are not expecting a 2.8 year

5    old child to be reading and doing math.   So that is the first

6    thing that we do.   We look at the child's present level of

7    performance. We compare that with the standards of pre-school,

8    the pre-school standards.   Because we are very conscious about

9    developing standard-based IEP's. So we look at the area of

10   development – in the area of daily living and that is refers

11   things of the child can do for himself, like can he put on his

12   coat, is he potty-trained, can he assist – is it (inaudible)

13   skills on target, can he hold a spoon and fork --  so we look at

14   that and we looked at ▮▮▮.   She had a standard score of 114,

15   well within normal limits.   The other area that we look is

16   cognition.   And she has non-verbal I.Q. test in which received

17   an I.Q. of 145, so clearly that was not in a deficit area for

18   her. In fact it is strength.   In the area of socialization, we

19   saw that she was functioning; her standard scores in that area

20   was 93.  Again, well within normal limits.   So, these were areas

21   of strengths, for those there were no needs to develop goals

22   because she is at the level at which she should be for her age

23   in those areas.   The other areas we looked at is, gross motor

1    skills. On the IEP — I'm sorry the ISFP, the test that was

2    conducted by the PT, the Bailey's.  A████ was tested at and going

3    on in my memory, at 33 months and her scores and her age

4    equivalent was 31 months, again within normal limits.  And then

5    we looked at communication and we clearly noted that that was an

6    area of deficit for her.  And so therefore, the speech and

7    language pathologist developed goals in that area; OT also was

8    an area of weakness for her; and the occupational therapist

9    developed goals in that area. So we looked at the child's

10   strengths and weaknesses. So we asked the question, where is the

11   child currently functioning and we looked at the pre-school

12   standards to determine where we want her to be.  And we then

13   looked to close that gap by developing goals and objectives that

14   will get her to where we want her to be functioning comparable

15   to her typically developing peers.

16       MS. PUCKETT: Now what types of areas of functioning do you

17   look at in regards to what pre-scholars should be doing?

18       MS. JOHNSON:  Again, with pre-school we're looking at

19   development, we're not looking at academics. We're looking at

20   how does the child interact with his peers; so if you're in pre-

21   school, if you go into a pre-school classroom, you'll see

22   kitchen sets, you'll see toys, you'll see a simple way of

23   putting it, play is their work. Play is their academic. That is

138

1   what we're looking to see. If the child plays well with other

2   children, can he get along with his peers and adults? We're

3   looking to see if he is potty-trained.  In the area of adaptive

4   functioning, we're looking to see what children - what

5   activities - develop children, typically developing children do

6   at that age.

7       MS. PUCKETT: And did the team consider those in making

8   their determination for the student?

9       MS. JOHNSON:  Yes we do.

10      MS. PUCKETT: Now you indicated that the student was found

11  eligible for as an hearing-impaired student?

12      MS. JOHNSON:  Yes.

13      MS. PUCKETT: Why wasn't the student found eligible as

14  speech and language impaired student, if you said there were

15  communication deficits?

16      MS. JOHNSON:  Okay.  The team determined that the hearing

17  impairment is the primary handicap and condition. In other

18  words, when we look at child who is multiplied disabled, if for

19  example, if a child is orthopedically impaired and also blind,

20  these disabilities can stand along. For example, so if he had an

21  operation and he is no longer blind, he's still orthopedically

22  impaired.  With hearing-impairment the question is, if the child

23  was not hearing impaired, how would we know that he would be

139

516

1    speech and language impaired?  We see that as an associated

2    disorder with hearing impairment. Of course if child is hearing

3    impaired he will have some speech and language delays.  That is

4    an associated disorder.  It is not a stand along handicapping

5    condition.

6        MS. PUCKETT: And did the parent or River Team agree with

7    the disability classification of hearing impairment.

8        MS. JOHNSON: No in fact we kind of stipulated at the

9    meeting, this has been an on-going disagreement with the River

10   School. It is their position that all children with hearing

11   impairment also should be speech and language impaired, those

12   children with cochlear implants and that's just their stance.

13   And in the meeting I express to Mom, we are going to agree to

14   disagree because we've been in several meetings with the River

15   School and their position is kind of like blanket.

16       MS. PUCKETT: Now you indicated that the River School

17   believes that the student should be hearing -impaired, how would

18   the IEP have changed if was listed as MD, speech and language

19   impaired as hearing-impaired.

20       MS. JOHNSON:  The goals and objectives would not have

21   changed, and the reason why is, as I explained.  We look at the

22   child's present level of performance; develop the goals in

23   accordance to what it will take for us to get the child at a

140

517

1    level comparable to typically developing peers. We do not write

2    goals and objectives in accordance to disabilities. We write to

3    in accordance what it takes to get the child from their current

4    present level of functioning to comparable to their peers.

5        MS. PUCKETT: And did the River School as well as the parent

6    participate in the development of these goals?

7        MS. JOHNSON:  Yes they did.

8        MS. PUCKETT: And how did they participate.

9        MS. JOHNSON:  We adopted several of the goals, the speech

10   and language goals that were presented by the River School; we

11   also adopted some of the OT goals; so we were in agreement with

12   the goals and I don't think that there was - if my memory serves

13   me correctly - any dispute with regard to the actual goals and

14   objectives.

15       MS. PUCKETT: And you have you sat in on eligibility

16   meetings and placement meetings for students with similar

17   disorders in the past?

18       MS. JOHNSON:  Yes I have.

19       MS. PUCKETT: And based on your experience and expertise as

20   an early childhood development, was the IEP that was developed

21   and the goals developed for the student appropriate for this

22   student?

23       MS. JOHNSON:  Yes I believe that the goals were. And the

141

518

1  development of the IEP was consistent with IDEA and Chapter 30

2  of DCPS.

3      MS. PUCKETT: And can you tell us specifically what

4  services, the team recommended for this student.

5      MS. JOHNSON:  The team recommended that A█████ receive and

6  hour and a half of speech and language services per week, a hour

7  of occupational therapy, an hour of audiology – audiological

8  services a week and then an additional .5 consultative services

9  – OT services which would be primarily with the teacher so that

10 the OT and the teacher collaborate to talk about or the

11 providers to talk about --.

12     MS. PUCKETT: Now why were there no specialized instruction?

13     MS. JOHNSON:  The reason why there were no specialized

14 instruction is because her level of performance in the areas in

15 where a special educator would or would provide services were

16 all within normal limits.  There were no goals developed for

17 specialized instruction because she fell within normal limits in

18 those areas.

19     MS. PUCKETT: Now if a student does not have specialized

20 instruction, how do you provide services?

21     MS. JOHNSON:  Those services are provided for children who

22 are not of compulsory age, they are provided by itinerant – as

23 itinerant services. The child goes to his home school and

142

519

1    enrolls and a non-attending student and the services are

2    delivered there. The parent and the related service providers

3    agree upon – initially agree upon time to bring the child to the

4    school to receive those services.

5         MS. PUCKETT: What about the students who – the early

6    childhood students who do have specialized instruction on their

7    IEP, where do they – how are their services provided?

8         MS. JOHNSON:  As I previously mentioned, we have inclusion

9    programs with – where we have children with disabilities who are

10   instructed with children – non-disabled children typically

11   developing children and we also have self- (inaudible). If the

12   child requires a more restrictive program, more than 20 hours of

13   specialized instruction they are placed in a non-categorical

14   early childhood programs.

15        MS. PUCKETT: Now like – let me go there.  Was there

16   discussion of placement at this meeting?

17        MS. JOHNSON:  Yes. We discussed where the IEP would be

18   implemented, what place the IEP would be implemented.  And the

19   place that we determined where the IEP could be implemented was

20   her home school, Janey.

21        MS. PUCKETT: And did you express that to the team at that

22   time?

23        MS. JOHNSON:  Yes I did.

1          MS. PUCKETT: And did you ever indicate that this student's

2     placement was home.

3          MS. JOHNSON:  No. Home school. Not her home.  Her home

4     school is Janey.

5          MS. PUCKETT: And referring - one second.  I would to refer

6     the parent - not the parent, Ms.Johnson to DCPS 01, which is the

7     initial placement notice. Where was the student's initial

8     placement to?

9          MS. JOHNSON:  The initial placement is to Janey Elementary

10    School.

11         MS. PUCKETT: And what is the placement for this student's

12    IEP of February 07.

13         MS. JOHNSON: Janey Elementary School.

14         MS. PUCKETT: And what types of services was the student

15    supposed to get at Janey Elementary School?

16         MS. JOHNSON: OT, audiol - audiologol -audi - audiologic,

17    speech and language, and speech and language, so OT, speech and

18    language and audiology services.

19         MS. PUCKETT: Okay.  Why wasn't the student considered for

20    one of the early childhood special ed programs?

21         MS. JOHNSON: There would have been a restrictive - more

22    restrictive program than is required for the implementation of

23    the IEP.

144

521

1      MS. PUCKETT: And why didn't the student need that type of

2    program?

3      MS. JOHNSON: Because she didn't have specialized

4    instruction.

5      MS. PUCKETT: And what types of - what does these programs -

6    what types of areas does these programs specifically focus on? -

7    the early childhood pre-school special ed programs?

8      MS. JOHNSON: In the early childhood special education

9    programs where instruction - the instruction is the centerpiece

10   of any placement that the child is in.  If a child in a early

11   childhood or any type of special education classroom, the goal

12   is for - is for - the focus is what the special educator does in

13   order to close that gap between the present levels and where we

14   want the child to be functioning at comparable to her non-

15   disabled peers.  The related services support what the special

16   education does in the classroom to get that goal of closing the

17   gap.

18     MS. PUCKETT: And how are the related services provided in

19   those programs?

20     MS. JOHNSON: They are different, the majority of them are

21   pullout services.

22     MS. PUCKETT: Now you testified that there are other pre-

23   school as well as Head Start program, did the student apply for

145

522

1    any of those programs.

2         MS. JOHNSON: Not to my knowledge.

3         MS. PUCKETT: Is the student eligible to apply for any of

4    those programs?

5         MS. JOHNSON: Every child that is a resident of the District

6    of Columbia can apply who are between the ages of 3 and 22, can

7    apply for any program that the District of Columbia offers.

8         MS. PUCKETT: Was there discussion about those alternative –

9    those general ed programs at the meeting?

10        MS. JOHNSON: Yes we did discuss that Janey does have a Pre-

11   K program.

12        MS. PUCKETT: And what was the discussion specifically about

13   that Janey pre-school program.

14        MS. JOHNSON: That even though we do not – that it is

15   program that – do I have authority over – we do have influence

16   in that we could assist and insuring that the – help to insure

17   that the child is selected as opposed to the very long waiting

18   list that often happens.

19        MS. PUCKETT: Okay. Now, do all pre-schools – do all

20   students 3 to 4 and early childhood special ed program have a

21   pre-school placement within the DCPS School?

22        MS. JOHNSON: That are with IEP's, with specialized

23   instructions, yes.

146

523

1      MS. PUCKETT: Now, you indicated that the student was

2   recommended for speech and services, who came up with the amount

3   of speech and language services the student needed?

4      MS. JOHNSON: Our speech pathologist determined that the 1½

5   hours was – the amount of hours that were needed to implement

6   the speech and language goals.

7      MS. PUCKETT: And did you participate in that discussion?

8      MS. JOHNSON: Yes.

9      MS. PUCKETT: And at any time did the speech and language

10  therapist say she agreed that the student needed 20 hours of

11  week of speech and language services?

12     MS. JOHNSON: No she did not.

13     MS. PUCKETT: And what was your understanding as to how much

14  speech and language therapy the student was getting in the

15  classroom currently at River School

16     MS. JOHNSON: It was my understanding that the speech and

17  language therapy in the form of pullout services was an hour at

18  the River School.

19     MS. PUCKETT: Now are you familiar with the classroom set up

20  at the River School?

21     MS. JOHNSON: Yes I am.

22     MS. PUCKETT: And how are you familiar with the classroom

23  set up at River School?

147

1      MS. JOHNSON: I have observed on another case with another

2  child.  I sat in the classroom and observed for an hour and

3  half; I looked at their schedule in regards; it doesn't seem

4  that they have curriculum, but looked at their activity – daily

5  activities.  I also am familiar with how their approach or their

6  model through the various meetings that we have participated in.

7      MS. PUCKETT: And are familiar with Ms. Kane, the Director

8  of Speech Services?

9      MS. JOHNSON: Yes I am.

10     MS. PUCKETT: How are you familiar with Ms. Kane?

11     MS. JOHNSON: When I came to observe, I had conversations

12  with her; I have been in several IEP meetings with Ms. Kane, so

13  I am familiar with not only in conversations with her, but also

14  through IEP meetings that she attended.

15     MS. PUCKETT: And approximately how many IEP meetings have

16  you participated in with Ms. Kane

17     MS. JOHNSON: I cannot say for sure, but we – I've been with

18  the District for 3 years, and we have had several meetings with

19  the River School.

20     MS. PUCKETT: And IEP meetings have speech and language

21  services been recommended?

22     MS. JOHNSON: Yes, they have.

23     MS. DALTON: I object to this line of question, because

148

525

1   again that's not relative to A█████. I've allowed a little bit,

2   but I think that you are going way over what is relevant to this

3   case.

4       MS. PUCKETT: I don't believe it's not – I believe it is

5   relevant Mr. Woods because Ms. Kane even testified to the model

6   of the classroom, and even when you asked her a question as to

7   if they come with the recommended time period, because the

8   student was receiving that, that's why she recommended it, she

9   say Yes! And I think it is very clear that it needs to be – I an

10  present testimony as to what DCPS's history is with the River

11  Schools, recommendations for speech and language services and

12  what types of recommendations they've done, because it is very

13  relevant as to the credibility of the witness. Especially since

14  she is considered being an expert in speech and language therapy

15  services, as well as a – Uhm…uhm… -- I guess she can looked –

16  can be looked as an advocate, because they are asking for the

17  student to remain there as well as a service provider for

18  student.  I think it is very relevant, I think she said herself

19  that you know, that's the classroom model that this speech and

20  language person is in that classroom.  And my team is very aware

21  of that approach and I think it does have some weight as to why

22  they came up with the services that they came up with.

23      MS. DALTON: And again, I'm going to objection because what

149

1  happened at another meeting, unless you tie in that's what

2  caused this meeting to be this way, has no relevance.

3      HEARING OFFICER: Is this question in regard to what she's

4  done at other meetings; I thought you were asking about – when

5  you said other meetings --.

6      MS. PUCKETT: In regards to recommendations for speech and

7  language services  --.

8      MS. DALTON: Other meetings.

9      HEARING OFFICER: Oh I see.

10     MS. DALTON: That has no relevance unless you can tie in

11  that she based that on what she's done in at other meetings?

12     MS. PUCKETT: Mr. Woods, I believe that uhmmm… it is DCPS's

13  position that in my witness and my witness will testify and I

14  think she sort of alluded to her at River School, they are not

15  seeing eye-to-eye in regards to speech and language services.

16  She needs to explain why she – why they are not seeing eye-to-

17  eye in regards in speech and language services without referring

18  to any particular students.

19     HEARING OFFICER: My understanding at the way – I didn't

20  pick the part that we were going to discuss some other students

21  MDT, the way I understood the question was you first said, have

22  you been to the school, and you said yes.

23     MS. PUCKETT: HmmmHmmm.

150

527

1      HEARING OFFICER: And you observed it for an hour and half,

2    and I thought the question was leading to what she observed, not

3    an abstract discussion of some other meeting.

4      MS. DALTON: What she observed at other meeting?

5      MS. PUCKETT: I didn't say that.  I didn't get to that part.

6      HEARING OFFICER: No. That is your objection, it didn't

7    appear to me that that's what her discussion was.

8      MS. DALTON: What is your question again?

9      MS. PUCKETT: My question was, I asked Ms. Johnson, if she

10    has participated in MDT meetings with Ms. Kane, specifically who

11    mind you Mr. Woods, is our expert and a fact witness, so the

12    credibility of Ms. Kane is at question here today.  So prior  --

13    prior dealings with this witness is very relevant to

14    credibility.  And I asked her, I was going to ask her about the

15    - about the discrepancies as far why they have different views

16    as far as speech and language services.  I believe she already

17    indicated that she's dealt with several meetings with the River

18    School who are hearing -impaired, because the majority of the

19    students who come to the Care Center who are currently at the

20    River School.  And she said in regards in to speech and language

21    services.

22      HEARING OFFICER: I think the question, at least in the

23    context that I understood it, maybe Ms. Dalton has a different

1    context, but it seemed appropriate because it going based on

2    what she knew.

3        MS. DALTON: Yes, and other meetings that didn't involve

4    A███, and that's my concern.

5        HEARING OFFICER:  But I don't recall - is that what you --.

6        MS. PUCKETT: I just asked her if she participated any other

7    meetings, I didn't say --.

8        HEARING OFFICER: We're not going to one of those--.

9        MS. PUCKETT: I mean I can ask my question without asking

10   about --.  Have You - have you and Ms. Kane ever have

11   discussions about speech and language services?

12       MS. JOHNSON: Yes.

13       MS. PUCKETT:  And have you - have you - have your reviewed

14   evaluation in regards to speech and language services at River

15   School?

16       MS. JOHNSON:  Yes I have.

17       MS. PUCKETT:  What is DCPS's position in regards to speech

18   and language services in evaluations from River School speech

19   and language services?

20       MS. JOHNSON:  We differ in our approach; it seems as if the

21   River School uses the speech and language pathologist as the

22   special educator in the classroom.  And so therefore, they

23   receive those amount of hours, not because the child needs the

1    special - - the needs specific for speech and language therapy,

2    which is my understanding that the children receive an hour - at

3    least it is my understanding that A███ receives an hour of pull-

4    out speech and language therapy where she is with a one-on-one

5    with a speech and language pathologist, who is the not the

6    speech and language pathologist that is in the classroom.  So -

7    what - we differ is that we feel in the District of Columbia

8    that the expertise of a hearing impaired teacher serves both

9    purpose that they use a speech and language pathologist for -

10   that there model is that they use because they do not have a

11   hearing-impaired teacher in the classroom. That they are using

12   the speech and language pathologist to serve as a special

13   educator in the classroom.  So that is why the hours are always

14   consistent 20/20.

15       MS. PUCKETT:  What do you mean the hours --.

16       MS. JOHNSON:  Always every - every child that we have had a

17   dealing - did for an IEP for with the River School, regardless

18   to their level of service, regardless to their individual plan,

19   all of them need 20 hours of speech and language services.  It

20   is our - and it seems as if it is because they are using, they

21   do not have a special educator in the classroom, they are using

22   the speech pathologist as the special educator.

23       MS. PUCKETT:  And has there been a time where there was

153

530

1   recommendations for less 20 hours?

2       MS. JOHNSON:  Never.  Not in any of the meetings that I

3   have been in attendance with.

4       MS. PUCKETT:  And does these students have different levels

5   of speech and level functioning?

6       MS. JOHNSON:  Yes every child is an individual and have

7   individual needs.

8       MS. PUCKETT:  And did DCPS consider that River School

9   evaluation in its determination for speech and language

10  services?

11      MS. JOHNSON:  We considered it.

12      MS. PUCKETT:  And did you agree with the recommendations in

13  the evaluation?

14      MS. JOHNSON:  No we did not.

15      MS. PUCKETT:  Does DCPS always agree with recommendations

16  and evaluations?

17      MS. JOHNSON:  Not always.  But sometimes we do.

18      MS. PUCKETT:  And what were our concerns as far as the

19  recommendations in that speech and language evaluation?

20      MS. JOHNSON:  Because we felt that the hearing-impaired,

21  the expertise of the hearing-impaired teacher would be - is what

22  the speech pathologist is functioning as.  That the child is not

23  - well - speaking in regards to the model.  In regards to A███,

154

1  she didn't need specialized instruction. In regards to this

2  model that they are using, using the speech pathologist as

3  opposed to a hearing-impaired teacher of the hearing-impaired,

4  we feel that that is a flawed model and that the speech and

5  language pathologist, unless she is also dual-certified as a

6  special educator, if there is not special educator in that

7  classroom, then who is providing the special education need of

8  the child with the hearing impairment.

9      MS. PUCKETT:  And based on your experience and expert in

10  early childhood programs, do you see other programs using the

11  speech and language therapist in this way for hearing-impaired

12  students?

13      MS. JOHNSON:  In my experience in the 30 years with special

14  education, no.

15      MS. PUCKETT:  And do you believe that based on your

16  experience in placement for students who are in need of early

17  childhood programs, is the student required to have the speech

18  and language therapist in the classroom over 20 hour a week?

19      MS. JOHNSON:  No.

20      MS. PUCKETT:  Now, did the occupational therapist

21  participate in the placement discussion?

22      MS. JOHNSON:  Yes they did.

23      MS. PUCKETT:  And who – who – was it a DCPS occupational

1    therapist?

2    MS. JOHNSON:   There were two. DCPS and the River School,

3    occupational therapist.

4    MS. PUCKETT:   And did the River School occupational

5    therapist participate in the discussion of placement?

6    MS. JOHNSON:   Yes he did.

7    MS. PUCKETT:   And what was the River School Occupational

8    Therapist discussion as far as placement.

9    MS. JOHNSON:   Well he made the statement, he was – he

10   seemed frustrated and he made the statement, why are we going

11   through this, aren't here for DCPS to fund the River School?

12   MS. PUCKETT:   And he made that statement in response to

13   what?

14   MS. JOHNSON:   Our recommendation for a placement at Janey.

15   MS. PUCKETT:   And did you respond to his statement of why

16   were going through the discussion of the Janey School?

17   MS. JOHNSON:   My response to the gentlemen, this is not a

18   meeting for funding of the River School, that this was a meeting

19   to develop, to determine eligibility for A████, to develop A████s

20   individual education plan to determine where that IEP can be

21   implemented.

22   MS. PUCKETT:   Now, did you – strike that.  Was there

23   discussion of any additional evaluations needed?

156

1        MS. JOHNSON:  Yes.  We did discuss the need for the – for a

2    physical therapy evaluation.  We – the evaluation that was

3    conducted in the early – from the early intervention part C

4    providers placed A█████ within normal limits.  But after further

5    discussion with the team and with  Mom's input and River

6    School's input, we felt that a PT evaluation was warranted.  It

7    is my understanding that the evaluation was conducted in the

8    home and it was not necessary the most ideal setting for – for –

9    to get a more accurate representation of her – her physical

10   therapy needs, her gross motor skills needs.  We also agreed to

11   conduct a educational assessment to be conducted by a teacher of

12   the hearing-impaired.  It is more specific the needs of children

13   with hearing impairments.

14       MS. PUCKETT:  And have those evaluations been conducted?

15       MS. JOHNSON:  They have been conducted and it is my

16   understanding that they have – last week typed and ready.

17       MS. PUCKETT:  And was there discussion at the meeting on

18   missed services?

19       MS. JOHNSON:  Yes, we did discuss missed services.

20   Discussed if she qualified for missed services and we – it is my

21   understanding if my memory serves me correct, I think we were 3

22   days off of the 120 days.

23       MS. PUCKETT:  And would the student would have received

1   those missed services.

2        MS. JOHNSON:  It would have been at Janey. We would have

3   just doubled up on whatever we – services that we had missed.

4        MS. PUCKETT:  And based on your experience on early

5   childhood programs and programming for students for early

6   childhood, was Janey an appropriate placement for this student?

7        MS. JOHNSON:  Yes.

8        MS. PUCKETT:  And why was Janey an appropriate placement

9   for this student?

10       MS. JOHNSON:  Because they had the OT services there, the

11  speech and language services there and the audiologist itinerant

12  would have been able to service the child there.

13       MS. PUCKETT:  And I want to refer you parent's document

14  number 27, which is the meeting notes.  Right here.  The meeting

15  note.  And in the meeting notes there is a discussion as to

16  providing some gym to the occupational therapist, did you

17  discuss with Janey School, did you discuss that with the parent?

18       MS. JOHNSON:  We discussed all the necessary equipment that

19  would to be – that need to be in place in order for the goals on

20  the IEP to be implement and we assured the parent – Mrs. Tiller,

21  that we would – that the District of Columbia would purchase all

22  necessary equipment for the child.

23       MS. PUCKETT: And did the parent accept the services at the

158

535

1    placement at Janey School.

2        MS. JOHNSON: Mom did not sign the IEP.

3        MS. PUCKETT: And has there been a request for these

4    services at Janey School?

5        MS. JOHNSON: No, not to my knowledge.

6        MS. PUCKETT: Are the services still available for the

7    student?

8        MS. JOHNSON:  Yes they are.

9        MS. PUCKETT: I have no additional questions.

10        HEARING OFFICER: Okay, Ms. Dalton.

11        MS. DALTON: Just one moment sir.  All right.  Isn't it true

12    Ms. Johnson, that you received lists from Part C that have the

13    children that are receiving services under Part C.

14        MS. JOHNSON:  Yes we do.

15        MS. DALTON: And that's relation to your role and your duty

16    to make sure there's a smooth transition for children from Part

17    C to Part B.

18        MS. JOHNSON:  We have knowledge of the children.  The list

19    is given to us, so that we have knowledge of the children that

20    are going to be there. And it assists us in the smooth and

21    effective transition.

22        MS. DALTON: So you agree with me that part of your role is

23    to ensure a smooth and transition to Part B.

1          MS. JOHNSON:  Yes.

2          MS. DALTON: And you also agree with me that has to be in

3    place by the time the child turns 3.

4          MS. JOHNSON:  If consent is given, yes.

5          MS. DALTON: Did you ever notify the parent prior to the

6    child turning 3 that she needed to provide consent?

7          MS. JOHNSON:  Yes. At the transition meeting?

8          MS. DALTON: When was that held?

9          MS. JOHNSON:  Ah transition meeting.   Do you have the

10   transition – do you remember --. I would have to look at the

11   document. Can I look at the document?

12         MS. DALTON: Okay, but that was in September correct?

13         MS. JOHNSON:  Can I look at the document and I can answer

14   you affirmatively.

15         MS. DALTON: Well DCPS participated in --letter of

16   invitation was sent to DCPS for the transition meeting, and that

17   would be document number 12, parent's document number 12.   The

18   letter was sent September 1st, and you had the meeting on

19   September 19th.   Is that the first time you notified the parent

20   that she needed to provide consent?

21         MS. JOHNSON:  That wasn't the first time we did. But of the

22   Part C provides that training for parents in regards to what it

23   takes it order for to initiate a referral with the District and

160

537

1    Columbia in the parent training and there are booklet that they

2    provide to the parent and training that they provide to parent

3    in regards to the transition process. They inform the parent

4    within that manual.  The parent handbook manual. It includes

5    everything that needs to be done in order for the child to be

6    referred to the District of Columbia, and it includes, in fact I

7    think it even includes a copy of a consent form.

8        MS. DALTON: And you have any consent form or a parents

9    rights manual that she signed?

10        MS. JOHNSON:  At the meeting?

11        MS. DALTON: HmmmmHmmm.

12        MS. JOHNSON:   I have to look through the documents.

13        MS. DALTON: I'm saying Part C, you're saying that there was

14    some procedural manual given to her in Part C --.

15        MS. JOHNSON:  Yes.

16        MS. DALTON: And advised her that she needed to notify DCPS.

17    Isn't it true that this meeting was convened to insure a true –

18    a smooth and effective transition to Part B.

19        MS. JOHNSON:  Yes.  Exactly.

20        MS. DALTON: And at that meeting, she wasn't allowed to give

21    consent, she had to call an 800 number, isn't that correct?

22        MS. JOHNSON:  No, we don't have a 800 number.

23        MS. DALTON: Isn't it true that she had to call a number,

1    that she was not allowed to register on that day.

2         MS. JOHNSON:   She was not allowed to register on that day

3    because that is not function of the meeting.   The meeting is a

4    planning meeting to inform the parent of what is happening next.

5         MS. DALTON: That was the first time she was informed --

6         MS. JOHNSON:   If you want me to continue --.

7         MS. DALTON: She needed to provide consent to evaluate.

8         MS. JOHNSON:   I cannot say that and the reason why is

9    because --.

10        MS. PUCKETT: I'm sorry can she finish her question.

11        HEARING OFFICER: Yes, she does get to finish her answer.

12        MS. PUCKETT: The answer, I mean answer.

13        MS. JOHNSON: And the reason why is because we participate

14   in monthly meetings with Part C and training parents in regards

15   what happens in a transition.   When its time to transition a

16   child from Part B to Part C.   As is one of our activity to

17   insure the smooth and effective transition of children. And one

18   of things that we do in those meetings is to provide the parents

19   with the information in regards to what it takes, what happens

20   when you are wanting to refer your child and consider your child

21   for Part B with the District of Columbia.   The parents are also

22   provided with information of their other alternatives.   DCPS is

23   not the only alternative for a smooth and effective transition.

1   So it – I cannot say that that is the first time, I would have

2   to talk to my Child Find Specialist to see if in fact they had

3   participated in one of those meetings and Mrs. Tiller was

4   attendance and whether that information was provided prior to

5   the transition meeting.

6       MS. DALTON: But you don't have any knowledge any of that

7   took place?

8       MS. JOHNSON:  Not today, no.

9       MS. DALTON: Okay, well you knew this case was coming up for

10  Hearing correct?

11      MS. JOHNSON:  I had no idea that this would be question.

12  Otherwise, I'd --.

13      MS. DALTON: You had no idea that this would be question of

14  when she was first told that she could provide consent to

15  evaluate? When you knew the issue was that she hadn't been

16  evaluated in time by her third birthday.

17      MS. JOHNSON:  Consent was not provided.

18      MS. DALTON: But you understand that part of your role is to

19  insure a smooth and effective transition.

20      MS. JOHNSON:  You are correct.

21      MS. DALTON: You get lists of those children.

22      MS. JOHNSON:  You are correct.

23      MS. DALTON: You don't attempt to contact the parent's of

163

540

1    those children.

2         MS. JOHNSON:  No we do not.

3         MS. DALTON: Now, because --.

4         MS. JOHNSON:  And can I explain why?

5         MS. DALTON: Sure.

6         MS. JOHNSON:  The reason why is because Part C does it.

7         MS. DALTON: Part C provides the list to you. Why would they

8    then call the parent?

9         MS. JOHNSON:  They do for the transition meeting.

10        MS. DALTON: Right and they did in this case, invite you to

11   the transition meeting.

12        MS. JOHNSON:  Exactly.

13        MS. DALTON: Invite you to the transition meeting.

14        MS. JOHNSON:  Exactly.

15        MS. DALTON: And the transition meeting took place, correct?

16        MS. JOHNSON:  Yes.

17        MS. DALTON: And at that meeting you did not allow the

18   parent to register?

19        MS. JOHNSON:  Because the reason why we did not allow her

20   to register at that time, all the documentation necessary – that

21   is not a meeting for registration.  The referral is initiated

22   when the parent comes to DCPS and selects to come to DCPS.  That

23   is a planning meeting, not a referral meeting.

1    MS. DALTON: Did the parent ask to register the child on

2  that day?

3    MS. JOHNSON:  I have no idea.

4    MS. DALTON: Now, you never observed A████ have you?

5    MS. JOHNSON:  No. Not A███.

6    MS. DALTON: At any time? ·

7    MS. JOHNSON:  No I have not.  Well let me take that back. I

8  think I did see her when she came to - I may have seen her when

9  she came to the Care Center.

10    MS. DALTON: You never observed her in a classroom?

11    MS. JOHNSON:  Not a formal, no.

12    MS. DALTON: And when you indicated in your testimony that

13  you could assist with getting her into Janey, you made it clear

14  to the parent's at that time, that she would not be able to

15  enroll in Janey this year?

16    MS. JOHNSON:  Yes, for the current year, exactly.

17    MS. DALTON: And for the next year, you would do what you

18  could to "kick her up the list."

19    MS. JOHNSON:  I don't know that I used that term, what I

20  don't know that I used "kick her up the list".  In fact it

21  doesn't seem like a terminology that I would use.

22    MS. DALTON: Well it was a quote taken directly from you,

23  Zaundra will inform Janey to "kick her up the list" for Pre-K

542

1  program?

2      MS. JOHNSON:  What are you referring to?

3      MS. DALTON: Meeting notes.

4      MS. JOHNSON:  The meeting notes. I've seen those meeting

5  notes.  And there's a lot of misrepresentation in those meeting

6  notes.

7      MS. DALTON: Did you ever --.

8      MS. JOHNSON:  Excuse me.  The person who took these because

9  we did not take this, and her memory utterly amazing for how

10  many pages.  I didn't say that.  There is a lot of things in

11  these meetings that I did not say.

12      MS. DALTON: Did you ever inform anybody of that?

13      MS. JOHNSON:  Of what?

14      MS. DALTON: That these were not correct?

15      MS. JOHNSON:  This is the first time that I've seen these

16  meeting notes.

17      MS. DALTON: Okay, you're saying that the River School never

18  provided these meeting notes to you?

19      MS. JOHNSON:  This is the first time that I've seen those

20  meeting notes, no.  They did not give them to me.  They may have

21  given them to Chris - someone on my staff, but not me.

22      MS. DALTON: So they were provided to - Zaundra --.

23      MS. JOHNSON:  I have no idea.  Do we have any documentation

166

543

1    of that?  I'm not saying that that is the case either.

2         MS. DALTON: Did you inform anybody when you first read

3    them?  Are you saying you never seen these until today?

4         MS. JOHNSON:  Today, that is correct.

5         MS. DALTON: You just seen them today.

6         MS. JOHNSON:  Yes!!

7         MS. PUCKETT: I'm going to object Mr. Woods, she said she

8    just saw these meeting notes.

9         MS. DALTON: I'm getting a clear --.

10        MS. PUCKETT: Let me finish.  We received meeting notes that

11   our people did. DCPS did their own meeting notes. So it's not

12   unreasonable for her not to know what some River School staff

13   typed up and to object to stuff that's in a River School staff

14   meeting notes.  So I don't know why parent's counsel is

15   badgering my witness about these meeting notes.  She said she

16   did not review them until today, and she did not agree to

17   everything in there.  Can we please move on.

18        HEARING OFFICER: I think she understood that that was the

19   answer.

20        MS. DALTON: Just one more question.  You knew at the time

21   that the River School was taking meeting notes, is that correct?

22        MS. JOHNSON:  Not - well I'm assuming yes!  Let me go back,

23   they were taking their notes.  The IEP meeting notes are a

1    function of the LEA. Now they were taking their own notes. But

2    at no time, it was - it - they are not the LEA.    They are not

3    writing on DCPS forms for IEP meeting notes. So yes they were

4    writing, all of them were writing.

5        MS. DALTON: Isn't it true that the parent asked you if she

6    could tape for the meeting?

7        MS. JOHNSON:  Yes that is correct.

8        MS. DALTON: And you refused?

9        MS. JOHNSON:  I said that we were not given prior notice to

10   have our own tape and under those circumstances, we could not

11   allow it.

12       MS. DALTON:  You've not attended every single IEP meeting

13   for every single student at the River School, correct?

14       MS. JOHNSON:  Oh no.

15       MS. DALTON: Now isn't it true that the DCPS speech and

16   language pathologist recommended that the student be placed in

17   our oral Hearing Impaired program? A classroom based program,

18   language based program?

19       MS. JOHNSON:  No she did not.  That's a team decision,

20   regardless.

21       MS. DALTON: And it is your position that no child with a

22   Hearing Impairment can have a separate disability of speech and

23   language impairment.

168

545

1        MS. JOHNSON:  What I said is that in A██████ case and in

2   every case that I have ever been involved with, I've never seen

3   a child with a disability with a who has a hearing impairment as

4   their primary disability also have a speech and language

5   disability, not as their disability code.  Yes they do have a

6   speech disability, which is serviced, but as their code, no.

7        MS. DALTON: Code meaning classification?

8        MS. JOHNSON:  Yes.

9        MS. DALTON: And you agree with me that if a child has

10  speech and language concerns that adversely affect them

11  educationally that that would be a speech and language

12  impairment?

13       MS. JOHNSON:  She has a speech and language impairment. But

14  is not a code. For example, a child can be learning disabled,

15  and also receive speech and language services.  We do not

16  classify them as multiplied disabled.  You can – children who

17  have orthopedic impairments. They also receive speech and

18  language services.  They are not classified as other – I'm sorry

19  – orthopedically impaired and speech and language impaired.

20  Children with mental retardation have speech and language

21  delays.  We do not qualify and classify  a child with mental

22  retardation as multiplied disabled as mentally retarded and

23  speech and language impaired.  Because we expect that that is a

1    associated disorder.  If you have mental retardation of course

2    you are going – the likelihood of you having a speech and

3    language delay is very high. And therefore you are going to

4    provided with speech and language services, but you are not

5    necessary identified as a code of speech and language and this

6    is the case with hearing impaired children.

7         MS. DALTON: So would it be fair to say that anytime a child

8    has another disability, they would not have a speech and

9    language impairment?

10        MS. JOHNSON:  I said that they have an impairment --.  It

11   is the code.

12        MS. DALTON: Classification.

13        MS. JOHNSON:  No, not necessarily.  But I am giving you an

14   example which – I'm sure you can see where it – it's  – it isn't

15   always the case. Nothing is indicated, and in the case of A████

16   it did not apply.

17        MS. DALTON: Okay. What is your definition of speech and

18   language impairment, when is a child eligible for classification

19   of speech and language impairment.

20        MS. JOHNSON:  I defer to what our classification in

21   accordance to the District of Columbia and our rules and

22   regulations. And I defer to our speech pathologist as the

23   qualified examiner.  I'm not the qualified examiner to tell you

1    what speech and language therapy is. We defer to our speech and

2    language pathologist. We defer to the speech and language

3    checklist, which we went through and determined that she did not

4    meet the criteria.

5        MS. DALTON: Do you have an understanding of what the

6    definition for a child to be classified as a speech and language

7    impaired?

8        MS. JOHNSON:  I have a general, but not a specific.

9        MS. DALTON: Can you describe the typically developing

10   communication abilities of children who are A⬛⬛ age.

11       MS. JOHNSON:  Again, specifically I can not (inaudible) of

12   a speech and language pathologist, I can tell you about

13   cognition as a school psychologist and a certified school

14   psychologist and special educator, but communication I would

15   defer to an individual who has expertise in that area.

16       MS. DALTON: Now with regard to the placement, it is my

17   understanding that the placement that DCPS proposed was A⬛⬛ was

18   only for related services?

19       MS. JOHNSON:  The placement which we determined that her

20   IEP can be met in the least restrictive environment was her home

21   school.

22       MS. DALTON: Did you anticipate that A⬛⬛ was going to be

23   able to enroll in the school and attend classes?

171

1      MS. JOHNSON:  She did not have special education – I mean

2   specialized instruction so there was no need for her to enroll

3   in a class.

4      MS. DALTON: But specialized instruction is more than

5   special education, correct?

6      MS. JOHNSON:  Pardon me?

7      MS. DALTON: Specialized instruction is different from –

8   special education is a broad term. Specialized instruction can

9   be provided from other than a special education teacher?

10     MS. JOHNSON:  Not in the District --.

11     MS. DALTON: It could be (inaudible) care teacher, it could

12  be a speech and language pathologist, --.

13     MS. JOHNSON:  In the District of Columbia the person who

14  delivers specialized instruction with the expertise and the

15  training and the knowledge is a special educator?

16     MS. DALTON: Where in the regulations, you mentioned you

17  were familiar with the regulations, where in those do they say

18  that it has to be provided by a special education teacher?

19     MS. JOHNSON:  Specialized instruction?

20     MS. DALTON: HmmmHmmm.

21     MS. JOHNSON:  It isn't in the regs that specific.

22     MS. DALTON: Now, so you did not anticipate that A███ would

23  be attending – you said she would be a non-attending student.

172

549

1    She would just go to Janey to get her related services of speech

2    and language, audiology, and OT. Correct?

3        MS. JOHNSON:  Yes.

4        MS. DALTON: The rest of the time under the plan developed

5    by DCPS, she would be at home until she reached school age.

6        MS. JOHNSON:  No. It was our understanding that she would

7    remain at the River School. We did not hear from Mom that she

8    was going to pull her out.

9        MS. DALTON: Didn't Mom ask you for a placement?

10       MS. JOHNSON: No.  It was not my understanding. She asked me

11   for a placement?

12       MS. DALTON: Yeah.

13       MS. JOHNSON:   Where?

14       MS. DALTON:  A public placement?

15       MS. JOHNSON: In the schools?

16       MS. DALTON: Didn't she ask you to propose a placement?

17       MS. JOHNSON:  Well, let me just explain this.  Placements

18   are driven by IEP, not requests.  We place children in the least

19   restrictive environment in accordance to the IEP that we

20   develop.

21       MS. DALTON:  So her least restrictive environment was home

22   in your opinion?

23       MS. JOHNSON: No. Her least restrictive environment was that

1    she was to go to Janey to receive the related services?

2         MS. DALTON: And the rest of the time where?

3         MS. JOHNSON:  I would assume that she would stay at the

4    River School.  I would assume Mom would pull her out to take her

5    home.

6         MS. DALTON:  Well if the parent didn't want to pay for

7    private school and wanted a free appropriate public education

8    and she's asking for a free appropriate public education, which

9    a parent is entitled to, from ages 3 to 21.

10        MS. JOHNSON: You're absolutely --.

11        MS. DALTON: Isn't it true that DCPS says that they have all

12   day classes for 3 and 4 year olds in every building?

13        MS. JOHNSON:  No, No, No.  That's not true.

14        MS. DALTON:  There's not a class --.

15        MS. JOHNSON: You're asking me to talk to something that I –

16   I like about 18 programs that are in the pre-school classrooms

17   for the pre-school 3 year-olds and the schools that have – the

18   majority of our schools, like 90 percent of our schools have

19   Pre-K programs and I would see – there are 1700 Head Start

20   children.  Now free and appropriate education, now the

21   appropriate education for her – is the related services.

22        MS. DALTON:  Okay, we provided it. I understand what you're

23   saying. So you're not a speech and language pathologist.

1    MS. JOHNSON:  No.

2    MS. DALTON:  You defer to the speech and language

3    pathologist with regards to her communications disorder --.

4    MS. JOHNSON: Yes.

5    MS. DALTON: So you're here today as an expert in childhood

6    development and you're position that a child that has is on the

7    1st percentile in receptive language and the 8th percentile in

8    expressive language, that she does not need any more services

9    than an hour and an half a week.

10    MS. JOHNSON:  What services?

11    MS. DALTON:  Speech and language?

12    MS. JOHNSON: I defer to a speech pathologist.  That was the

13    speech and pathologist recommendation.  And the recommendation

14    are based on what it would take to implement the goals and

15    objections.  We are not doing this because of this is a school

16    we want her in, we're not doing this because this is her

17    handicapping condition, placement is driven by IEPs.  The IEP is

18    developed and it was determined that the appropriate free and

19    appropriate program for her were the related services which were

20    delivered in the least restrictive environment at a normal

21    school.

22    MS. DALTON: Then why were you willing to assist the parent

23    for the following year to try to kick her up the list?

175

552

1      MS. JOHNSON:   That's a regular ed program.   That was – it

2    was so that she could get in the regular ed program.   It has

3    nothing to do with a special education placement.   I wasn't

4    kicking her up for a special education placement.

5      MS. DALTON:   But with her significant speech and language

6    delays, her communication disorder, her apraxia, you didn't take

7    that into consideration as to whether she needed to be in a

8    classroom?

9      MS. JOHNSON: Well you're referring it to me as if, I was in

10   the MDT.   The MDT team took all of things into consideration

11   with the qualified examiner as the speech pathologist, a part of

12   that time, and it was the team's decision that that is what she

13   required.

14     MS. DALTON: And now when you refer to team, I meant to ask

15   you this before.   You referring to DCPS?

16     MS. JOHNSON:   The parent and everyone else was there.

17     MS. DALTON:   And the parent didn't agree that's all she

18   needed.   And the parent didn't agree that that was the

19   disability classification.

20     MS. JOHNSON: And that's why we have this form when the

21   parent does not agree with the LEA.

22     MS. DALTON: When you say the team, you're just referring to

23   DCPS made the decision that her disability classification was

1    HI, made the decision that all she needed was the related

2    services, you're not saying that the parent agreed.

3        MS. JOHNSON:  As the LEA we have the responsibility to make

4    those determinations. We include the input of the parent, the

5    parent is a part of the team, but when we disagree, when the

6    school, the River and parents disagree, that is why we're here.

7        MS. DALTON:  But when you referred all through your direct

8    testimony that the team made these decisions, that the team made

9    that decision, you weren't including the parent in that.

10       MS. JOHNSON: That's your opinion.  But we did take into

11   consideration what the parent – what the parent's position and

12   we take into consideration the school's position. But the

13   ultimate responsibility for the implementation of the IDEA and

14   developing a IEP is the LEA.

15       MS. DALTON: You never told the parent about any of the

16   other pre-school programs that you mentioned in your direct

17   examination existed?

18       MS. JOHNSON:  I don't think that the parent inquired?

19       MS. DALTON:  I have no further questions.

20       HEARING OFFICER: MS. PUCKETT:

21       MS. PUCKETT: Yes. I'll get those.

22       MS. JOHNSON: I thought I was finished.

23       MS. PUCKETT: One second.  You indicated that the September

177

554

1    was a referral meeting, it wasn't for registration. Can you tell

2    us what happens at registration for Care Center and why it needs

3    to be scheduled?

4         MS. JOHNSON: What happens is that we – once the parent has

5    indicated that they selecting DCPS Part B to continue with the

6    determining whether or not a child – their child has a

7    disability under Part B, the parent comes into, we schedule the

8    parent to come in for a – in the morning we do an intensive – we

9    do an interview with the parent – a developmental interview the

10   parent, while we're doing the interview with the parent, one of

11   her team members is either observing the child or conducting a

12   school assessment that the child and then in the afternoon,

13   also, more importantly brings in proof of residency and provides

14   consent.  So in the morning we see the little ones.  And then in

15   the afternoon the parents come back and we do the SEP. We

16   determine whether or not further evaluations are warranted, or

17   if the evaluations that we have in place is enough, can suffice

18   that we don't need to re-evaluate children, we were very

19   cognizant of evaluating children unnecessarily.  So we make a

20   determination of whether or not the documentation that we have

21   is suffice, and that we just need to review it and then we

22   receive consent.  We cannot move forward with evaluations or

23   review without consent.

555

1    MS. PUCKETT: And you indicated that there is a

2    morning/afternoon set and portion to registration, can parent's

3    just show up to register?

4    MS. JOHNSON: Let me also say, because it is a comprehensive

5    screening process, it is not just come in, sign this paper we go

6    out and evaluate your child. Also a referral must be conducted

7    and recommended by a MDT.  At the planning transition meeting

8    there is not an MDT there. We're not just - and so at the

9    training meeting, we cannot just give a parent a - a permission

10   slip and sign here for consent register and sign here for

11   consent. Because we are conducting a comprehensive screening

12   process and it's an all day affair.  So, that's another reason

13   why we don't just here - sign this at a meeting because we need

14   our people to take a look at the children. We need to our team,

15   our MDT team to take a look at the evaluations thoroughly and to

16   observe the child to determine is this evaluation a reflection -

17   an accurate reflection of the child that we see?

18   MS. PUCKETT:  Now you were referred to counsel indicated -

19   some statements you made in AT 27, parent's document number 27.

20   Are those the notes from DCPS?

21   MS. JOHNSON: This one.  No, these are not DCPS notes.

22   MS. PUCKETT:  And at the meeting did the parent or anyone

23   from River School ask to include those notes as a part of the

556

1    MDT notes that DCPS was completing?

2        MS. JOHNSON: To be very honest, I don't remember.  I know

3    it is our position if you want to write notes, you can very well

4    do so. But the official IEP and MDT notes are written by the

5    District of Columbia Public Schools.

6        MS. PUCKETT: Now there was extensive cross-examination in

7    regards to why DCPS didn't – didn't label this student – put the

8    student's classification as speech and language impaired.  Would

9    the speech and language impairment classification have changed

10   the student's IEP?

11       MS. JOHNSON: No it would not have.

12       MS. PUCKETT: And why wouldn't it have changed the student's

13   IEP?

14       MS. JOHNSON:  Because the IEP is developed in accordance to

15   the child's strengths and weaknesses. We look a the areas of

16   deficit and determine what it would take – the goals are then

17   developed.  The goals are developed in accordance to the

18   evaluations and the other information that is gathered of the

19   evaluative information that is gathered, not on a disability

20   code.

21       MS. PUCKETT: And were there goals to deal with the concerns

22   of the speech and language concern for this student?

23       MS. JOHNSON: Yes there were.

557

1      MS. PUCKETT: Now you also testified – testified that,

2    parent's counsel asked you a question as to can this student

3    receive specialized instruction in other ways and things of that

4    nature, did the River team or the parent ever request any type

5    of form of specialized instruction for this student?

6      MS. JOHNSON: Not to my knowledge, requested specialized

7    instruction – let me recall—not to my knowledge.  That is

8    February, I do not recall that.

9      MS. PUCKETT: And there was information – there was on cross

10    you indicated that there was indication you did not allow the

11    parent to tape the meeting and you said because you didn't

12    receive prior notice. What's the purpose or policy in regards to

13    taping the meeting?

14      MS. JOHNSON: If a parent wants to tape the meeting, which

15    we are more than happy to allow them to do so, and in accordance

16    with the law, we recognize that sometimes parents need to tape

17    the meeting for various reasons, but we would have our own

18    equipment and be allowed to tape it also, not that we would

19    think that Mrs. Tiller would do so, but so that it is not

20    altered.

21      MS. PUCKETT: Was this team prepared to tape record the

22    meeting that day?

23      MS. JOHNSON: No we were not. We were not informed until we

1    came to the meeting that a request for taping for meeting.

2       MS. PUCKETT: Now there was a question in regards to if a

3    student only receiving related services part of the day, does

4    the student remain at home, the rest of the day.  Are there

5    students within DCPS Part B who are receiving related service,

6    part-time at the school and at home the rest of the day?

7       MS. JOHNSON: Yes.  3 year old childrens and  4 year old

8    childrens, sometimes we have children who have – who come

9    through the process and they have a speech only IEP. Where the

10   only services that are needed is a couple of hours of speech a

11   week. We do not place children who do not receive – need to – in

12   a classroom who don't need to receive specialized instruction.

13   Yes we have a quite a few children who are – who are – whose

14   parents bring the child to their home school just to receive a

15   related service.

16      MS. PUCKETT: And do we have students who are in private

17   schools and are eligible for related service and are going to

18   the home school for receiving those related services?

19      MS. JOHNSON: Yes we do.

20      MS. PUCKETT: And I believe this is my final question.

21   There a question about parent's counsel in regards to the parent

22   being offered any of the Head Start or – general ed Head Start

23   and related service – I'm sorry and general school pre-school

1    programs, is there anything preventing the parent from enrolling

2    or seeking to enroll into those Pre-K programs or those Head

3    Start programs?

4        MS. JOHNSON: No. Everyone that's a resident of the District

5    of Columbia who meet the age requirement can apply.

6        MS. PUCKETT: And when you indicated your assistance what

7    did you mean by your assistance?

8        MS. JOHNSON: My assistance was to – to talk with the

9    principal to – ask him to tell him that we're familiar with A███

10   and that she would benefit from this program.

11       MS. PUCKETT:  And you indicated that – just going back to

12   this  (inaudible) that at the referral process, if the parent

13   decides they want to go with DCPS for Part B, you need to know

14   that information.  Are there are other people who provide Part B

15   services?

16       MS. JOHNSON: We are the only ones that provide Part B

17   services, but we are not the only option for transition.

18   Transition also includes, that the child can go to a Head Start

19   program where Head Start does provide specialized – special

20   education services, in fact they are required 10% of their

21   population to provide special education services. So we are not

22   the only – we are as Part B, we are responsible for the

23   identification.  We are not the only program that a child can

183

560

1    transition into.

2         MS. PUCKETT: And how do the parent find out about their

3    options?

4         MS. JOHNSON: That is provided at the transition meeting.

5         MS. PUCKETT: And what agency provides that information?

6         MS. JOHNSON: Part C.

7         MS. PUCKETT:  And who runs Part C?

8         MS. JOHNSON: The Department of Human Services.

9         MS. PUCKETT: I have no additional questions.

10        HEARING OFFICER:  Anything further.

11        MS. DALTON: Yes, --.

12        MS. PUCKETT: I don't believe I asked - I mean it's my

13   redirect.  I don't believe I asked a question. I don't think it

14   is appropriate because we'll go back and forth.  Because then

15   I'll have another re-direct.

16        HEARING OFFICER: Well I just had a couple, that might open

17   the door for clarification questions.  I think I want to use

18   your early childhood developing skills just to get an education.

19   I think from your testimony, I'm now seeing there is difference

20   between Pre-K and Head Start. So is Head Start separate from the

21   school system?

22        MS. JOHNSON: Well there are - in the District of Columbia

23   as a city-state has several grants.  Head Start grants.  One of

1    the grants, the biggest grant is to UPL which is a community

2    organization. We have a smaller grant that DCPS, Board of

3    Education has a – has a Head Start also. So the District of

4    Columbia service, I think roughly I think about 1700 Head Start

5    children.

6         HEARING OFFICER:  And they would be serviced in a program

7    in a school or in a community --.

8         MS. JOHNSON: The grant that was awarded, the 1700 in total

9    there's about 4 – let me say abut 3600 children city-wide that

10   receive that are serviced by Head Start.

11        HEARING OFFICER:  Okay.

12        MS. JOHNSON: And the District service public schools

13   service about 1700.

14        HEARING OFFICER:  The balance would be where?

15        MS. JOHNSON: In organizations which are united of the grant

16   is – was awarded to United Planning organization.

17        HEARING OFFICER:  Oh I see.

18        MS. JOHNSON: Planning Organization.  And then they contract

19   or they are done in churches, centers, and different places.

20        HEARING OFFICER:  And among the contractees is DCPS?

21        MS. JOHNSON: Yes.  That's how it goes.

22        HEARING OFFICER:  Is that how it – I like to get educated.

23   Is that how it goes in most states, or that's unique because

1    D.C. is a city-state, county all in one.

2        MS. JOHNSON: Yes.  A horse of a different color.  Most

3    states, most jurisdictions whether the surrounding jurisdictions

4    Head Starts, the grantors are the school systems in most of the

5    jurisdictions around.

6        HEARING OFFICER:  Okay, now I think I understand the Pre-K.

7    The Pre-K at your school, you have 18 schools that actually will

8    provide services for age 3 to 4 year olds.

9        MS. JOHNSON: No.  90% of our schools provide –

10       HEARING OFFICER:  90 percent.

11       MS. JOHNSON: Provide – well we have 3 Pre-K programs.  We

12   have the Head Start program, we then have the universal Pre-K

13   program, and Pre-K is 4 years old. And then we have the 18 Pre-

14   schools which are 3 year old programs.

15       HEARING OFFICER:  Pre-K is both a generic term.

16       MS. JOHNSON: HmmmHmmm.

17       HEARING OFFICER:  And a specific term under this umbrella.

18       MS. JOHNSON: Yes.

19       HEARING OFFICER:  I got you.

20       MS. JOHNSON:  Pre-K is pre-kindergarten.  Right before you

21   go to kindergarten, you're 4.

22       HEARING OFFICER:  So I think I --. So when you say, Pre-K,

23   I've got it.  I know I was getting – it's both a generic term

1  referring your status in life and then you're also using it in

2  terms of names of programs for those in that status of life as

3  to where they can receive service because of their status.

4       MS. JOHNSON: Absolutely.  Yes sir.

5       HEARING OFFICER:  Okay.

6       MS. JOHNSON:  Yes sir.

7       HEARING OFFICER:  It might look like I'm going to sleep,

8  but it's interesting to me, because I sometimes I didn't

9  understand that until just now. That that is a generic umbrella

10 term among – and that's why you were saying there are options, I

11 didn't know what you were talking about.  Transition options

12 didn't – it didn't register with me; the other thing I think for

13 me with regard to clarification is, I'm still torn with the

14 speech and language services that A▮▮ needs.  I didn't realize

15 I think for whatever reason until your testimony that you're

16 saying that A▮▮ is getting the speech and language pathologist

17 20 hours in the classroom, and an hour pullout.

18      MS. JOHNSON: Well the model and reading their – the

19 literature on the website for the River School.  They used

20 their, its state that they use their speech pathologist who is

21 in the classroom as a teacher. So the services that she's

22 receiving is not what we would traditionally – what we would

23 think of as for speech and language therapy, when we think of

1    speech and language therapy.  And that's indicated on the

2    website. So the pullout services with a speech pathologist,

3    which is the services that we are offering A████, it is my

4    understanding that she receives one hour a week.  We were

5    offering – we are offering one and a half.

6        HEARING OFFICER:  So the pull-out is the actual

7    implementation of the IEP when River School pulls her out for

8    that one hour of service.

9        MS. JOHNSON: Well comparable to the hour, that's what we –

10   we see it.  Their program is unique.

11       HEARING OFFICER:  Do they – in the IEP's that you seen from

12   River School, do they put the 20 hours as speech and language

13   therapy 20 hours per week?

14       MS. JOHNSON: Well their IEP's are not like ours.

15       HEARING OFFICER:  Oh.

16       MS. JOHNSON:  Their IEP's are usually one page, and kind of

17   – they have a circle in the middle and it's not like the

18   traditional IEP.

19       HEARING OFFICER:  Because I am wondering how you make the

20   distinction between the 20 and the 1.

21       MS. JOHNSON: Exactly.

22       MS. DALTON: They put in the general ed setting, because

23   that's what happening outside would be a specialized setting.

1   The 20 hours is push-in, so they put it under -- .  You know

2   what a typical, I have done typical IEP's on DCPS forms.  There

3   is a section for general ed, there is section for special ed.

4        HEARING OFFICER:  They would put in it the general ed.

5        MS. DALTON: Specialized instruction under the general ed

6   setting.  Speech and language services.

7        HEARING OFFICER:  So technically it's not even agreeing

8   with her, it is not therapy, it is instruction?

9        MS. DALTON: No. It is specially designed instruction by a

10  speech and language pathologist who is providing therapy. It is

11  not just individual pullout therapy. It's providing therapy

12  within the classroom. I mean we can call a --.

13       HEARING OFFICER:  That's okay.

14       Ms. DALTON:  Mary O'leary Kane can explain it.

15       HEARING OFFICER:  No I didn't expect you to answer that.

16  But once you did, you muddied it up a little because.

17       MS. DALTON: Well I'm not so sure why you're muddied up, but

18  please explain to me what --.

19       HEARING OFFICER: No, I don't have to explain.  No I don't

20  have to explain. I'm getting the answers to my question. But

21  actually I really shouldn't be having this conversation with

22  you.  If you want to call a witness to answer the questions I

23  have or ask her questions. I really cannot engage in that

1    dialogue with you with regard to my questions.  Because my

2    questions are clear.  And all you have to do is re-cross or call

3    another witness to clarify the questions. Because when you

4    muddied it up to me, I thought  you sort of agree with her that

5    said, well that's general education instruction. Not therapy.

6        MS. DALTON: No that's not what I said sir.  But --.

7        HEARING OFFICER:  That's how I understood it.

8        MS. DALTON: That's what I understand, that's what I am

9    concerned about.

10        HEARING OFFICER: Well I'll let you clear that part up.

11        MS. DALTON: I don't know if I can clear it up with this one

12    --.

13        HEARING OFFICER:  No no. Just yourself.  Since I - that's

14    why I said, if you'd not said that I wouldn't have thought that,

15    but once you said it.  That's why I said, are you agreeing with

16    her that is actually instruction and not therapy.  And even if

17    it was on the IEP and the general education section, would it

18    appear there as 20 hours of general ed instruction or would

19    appear there as 20 hours of speech and language therapy in the

20    general ed setting?  That's what I thought was muddied up, when

21    you said - when you responded.  But if --.

22        MS. DALTON: When I responded what?

23        HEARING OFFICER:  It's instruction.  And I said well

1  therefore you're agreeing with her that it is --.

2       MS. DALTON: I was making a difference between it's not a

3  related service where she's pulled out.  But it is a related

4  service that's she's get in.

5       MS. DALTON: Receiving inside the classroom.

6       HEARING OFFICER:  And so it would be on the IEP as 20 hours

7  of speech language therapy?

8       MS. DALTON: Or services or whatever you call.

9       MS. PUCKETT: I really have a problem with parent's counsel

10  classifying it.  I think what would clear it up, is the

11  testimony of Ms. Kane herself, who indicated that the speech and

12  language therapist provides instruction in the classroom, and

13  then the students also receive pullout services. I think she was

14  very clear, she said they provide instruction with the teacher

15  in the classroom.

16       HEARING OFFICER:  But because she had interjected, I just

17  said, I agree that I shouldn't have the dialogue, but since she

18  did interject, I just thought I'd give her a chance to clear

19  that up, because I thought it made it appear that you were

20  agreeing with --.

21       MS. PUCKETT: The speech and language therapist said it

22  herself so --.  I don't know what --.

23       HEARING OFFICER:  That's it. I don't need anymore muddying

568

1    up the water. I was clear.  Anybody can follow up on what I just

2    asked though, if they felt that that in any way.  Ms. Dalton did

3    you want to ask her any questions.

4        MS. DALTON: No sir.

5        HEARING OFFICER:  Ms. Puckett?  Thank you Ms. Johnson.

6        MS. JOHNSON: Thank you.

7        MS. PUCKETT: I just need one second to see if our speech

8    and language pathologist was in jury duty all of the sudden, so

9    we're trying to see if she's out or is she is going to show up

10   here today.  Just one second.

11       HEARING OFFICER: Okay, back on the Hearing Record, Ms.

12   Puckett, any luck getting your witness?

13       MS. PUCKETT: No. My witness during the time in between the

14   last Hearing and now received a jury duty notice and jury duty

15   today.  We thought that she was possibly going to be finished

16   before then or would be able to testify via phone.  We tried to

17   contact her via cell phone, she's not picking up.  But she is

18   speech and language pathologist who sat on this team.

19       HEARING OFFICER: What is your pleasure with regard to how

20   we are going to proceed.  Is that your last witness?

21       MS. PUCKETT: That's my last witness.

22       HEARING OFFICER: And unfortunately, she thought she was

23   available for the 24th, and she got the note, jury duty notice, I

1    know Ms. Johnson, we had got a cell phone for her, so we thought

2    she was going to be able to testify via phone. And obviously she

3    is required to go to jury duty.

4         MS. DALTON: Should we proceed, if you're resting.  Should

5    we proceed with rebuttal and hopefully we can get done today.

6         HEARING OFFICER: Are you resting?

7         MS. PUCKETT: Not by choice. I mean this is my vital witness

8    in this case.  Speech and language therapy and there is a huge

9    issue with speech and language therapy.  I can't present my

10   witness because she had to have jury duty today. I know that the

11   Hearing Office as well as the Hearing Officer were gone last

12   week. She didn't find out about her jury duty until the last

13   minute and we did try to provide her via cell phone and she is a

14   vital witness in this case.  I guess I'm resting – I don't have

15   another – I can't get my witness right now at this point. But

16   she is the relevant witness who made the – and there has been

17   statements indicating that from parent's counsel that she agreed

18   with the 20 hours, but we have an IEP in which my witness

19   indicated that she did not agree with the 20 hours.

20        MS. DALTON: We never stated that she agreed with the 20

21   hours.

22        MS. PUCKETT: I believe parent's witness testified that DCPS

23   speech and language therapist agreed that the student needed the

1    20 hours in the classroom and that she was very impressed with

2    the evaluation and the thoroughness of the evaluation.  That was

3    the testimony of Ms. Kane. I clearly remember Ms. Kane's

4    testimony and that's why I specifically wrote a question down,

5    to ask Ms. Johnson as well as the question to ask my question,

6    if she indicated that she agrees with the 20 hours of the speech

7    and language therapy and I asked Ms. Johnson a question as to

8    who came up with the hour and a half of services.  She indicated

9    that our speech and language came up with that hour and a half

10   of services. So there is contradicting testimony here and that

11   contradiction could have been cleared up by witness.

12   Unfortunately is in jury duty and I am just wanted to indicate

13   that for the record.

14        HEARING OFFICER: Can she establish that she is at jury duty

15   at some point.

16        MS. PUCKETT: I'm sure she can.

17        HEARING OFFICER: If she's in jury duty, I --.

18        MS. DALTON: The problem I have Mr. Woods is that we were

19   never made aware of this until 4 o'clock today.

20        HEARING OFFICER: Because she just said, she had made an

21   arrangement that she would call her by her cell phone.

22        MS. DALTON: She didn't even say that we may have trouble

23   getting ahold of her because she is in jury duty. No one alerted

571

1    us to this fact.  May I finish?

2        MS. PUCKETT: I'm not saying anything.

3        MS. DALTON:  Before today.  Obviously she just didn't' find

4    out today or at 4 o'clock that she had jury duty.  So if Ms.

5    Puckett knew that she had jury duty that she may have trouble

6    getting in touch with her, she should have made that, alerted us

7    to that prior to 4 o'clock today.  Additionally, there is ore

8    than one speech and language therapist noted on their

9    disclosure, so if they knew that they were going to have

10   problems with one, they should have gotten another one.

11       MS. PUCKETT:  Which disclosure are you on, because remember

12   we already talked about my disclosure that I submitted for the

13   other case, remember?  We're on Mr. Price's disclosure, the only

14   speech and language disclosure is on Mr. Price's disclosure is

15   Ms. Thompson.  And that is the only speech and language

16   therapist who participated in this meeting that was from DCPS.

17   I was informed that she has jury duty.  I mean I don't know what

18   else to do Mr. Woods.

19       HEARING OFFICER:  If she has jury duty then her absence has

20   to be taken into consideration.  Why don't we take your

21   rebuttal, unless you wanted to wait till they close to put on

22   your case.

23       MS. DALTON: That's when rebuttal happens, yes.

1        HEARING OFFICER: Well if the witness that you are going to

2   use to rebut has already testified.   Rebuttal is to rebut a

3   witness, not a --.

4        MS. DALTON: But she is an expert rebutting other experts in

5   this case.

6        HEARING OFFICER: The only --.

7        MS. DALTON: I'm talking about Dr. Morere.

8        HEARING OFFICER: She is.   She is going rebut everybody.

9   There has only been one witness.

10       MS. DALTON: Whatever expert witnesses that DCPS propose.   I

11  assume that they are going to propose that the speech and

12  language pathologist is going to render expert opinions as well.

13       HEARING OFFICER: And she can rebut both?

14       MS. DALTON: Well of course.   Well whatever experts they put

15  on, she can rebut that testimony?

16       HEARING OFFICER: She is not an expert in both is she?

17       MS. DALTON: She has extensive experience in speech and

18  language communications disorders.

19       HEARING OFFICER: I have to go back through that.   I mean I

20  understand.   I--.

21       MS. PUCKETT: Can I call the Care Center and see if they

22  have a copy of her jury duty - copy of something that says she

23  is jury duty?

1    HEARING OFFICER: Okay, let me just make sure we're clear on

2  the record here.  You --.

3    MS. PUCKETT: My understanding is that she is in jury duty.

4    HEARING OFFICER: And I thought we could use the time with

5  Ms. Dalton's witness, but she would rather wait till your case

6  is close.

7    MS. PUCKETT: It doesn't matter me.  I mean if she wants to

8  call her witnesses now, that's fine.

9    MS. DALTON: Rebuttal happens after the defendant - after

10  DCPS rests.

11    MS. PUCKETT: Do you want me to call and see if they have

12  something saying that she is in jury duty.

13    HEARING OFFICER: Do you dispute that?

14    MS. DALTON: I don't have any knowledge.

15    HEARING OFFICER: Well comedy now.  I mean you are lawyers -

16  -.

17    MS. PUCKETT: Mr. Woods, and I was told.  I was told.

18    MS. DALTON:  And I think that --.

19    HEARING OFFICER: This is lawyer to lawyer now.

20    MS. PUCKETT: I would prefer to have a document saying she

21  that she is in jury duty.  This was I was told, so I can't say

22  100% sure that that is actually where she was.  But is the

23  information that was presented to me that the witness is in jury

1  duty.

2      MS. DALTON: At this time.

3      HEARING OFFICER: But if she is in jury duty, if she is not

4  in jury duty, but unavailable, would she just have to pass?

5      MS. PUCKETT: That's different.

6      HEARING OFFICER: Okay.

7      MS. PUCKETT: But my understanding is that she is in jury

8  duty.

9      HEARING OFFICER: But if she is in jury duty, would that

10  make a difference to you as to whether we could hold this record

11  open for her testimony if she is in testimony.

12      MS. PUCKETT: I'm only requesting that because she is in

13  jury duty.  I mean if my witness just didn't show up --.

14      HEARING OFFICER: It's not a matter is she didn't just show

15  up.

16      MS. PUCKETT: No.  It's different. I can't sit here and

17  argue that if she just didn't show up today and I can't get into

18  contact with her.  My understanding is that she is in jury duty

19  and that what was told to me.  Now do I have a document saying

20  that she is in jury duty right here today?  No I do not.  I

21  can't say 100% guarantee for sure on my everything that this

22  witness is in jury duty.  This is what information that was

23  provided to me.

575

1    HEARING OFFICER: If she is in jury duty would she be

2    excused.

3    MS. DALTON: I am saying I don't like how this all came

4    about, being told at 4 o'clock for the first time that there is

5    a possibility they might have one of their witnesses they intend

6    to have because she is in jury duty.  I think that in all

7    fairness that should have been, that information should have

8    provided at the beginning of today. Ms. Puckett said before she

9    went to lunch she would have no problem with concluding her case

10   today. I relied on that, and this expert Dr. Morere has spent

11   two days now, which the parent is having to pay her to be at

12   this Hearing and I wanted the Hearing to be concluded today. So

13   yes I have a problem with not having notice and I have a problem

14   with her not - now I'm hearing I don't know for sure, this is

15   what I've told.

16   MS. PUCKETT: If someone tells you something Mr. Woods, and

17   saying they are somewhere, can you say 100% that they are there,

18   If I told you I was going down the street to the store.

19   MS. DALTON:  I'm not faulting you.

20   MS. PUCKETT: I'm just saying to you that there is nothing

21   wrong with me saying that I can't 100% guarantee in this arena

22   today that my witness had jury duty. Because I don't have the

23   document in front me.  If I had a jury duty notice in front of

1  me to tell you that, then I can say with some certainty that,

2  yes, she's not here because she is in jury duty for a --.

3       MS. DALTON: I guess what should have been in my thinking

4  the appropriate thing to do is she knew she was going to be in

5  jury to duty to have that document to put into the evidence, so

6  that we would have that issue clear.

7       MS. PUCKETT: We actually thought that she would be able to

8  testify.

9       HEARING OFFICER: The question only - it still didn't - the

10 question only if she is jury duty, is she excused?

11      MS. DALTON: I think the question is they are asking for a

12 continuance.  Is there a good cause for a continuance?  The fact

13 that she is in jury duty, yes.  But the fact that we didn't

14 notice of that until 4 o'clock today, I would say that that is

15 not appropriate.

16      HEARING OFFICER: Okay.

17      MS. DALTON: And also I would think there would have to be

18 some type of documentation.

19      HEARING OFFICER: If there is documentation that she was in

20 jury duty --.

21      MS. DALTON: Not on call for jury, but actually in jury duty

22 on today at 4 o'clock.

23      MS. PUCKETT: We all know how jury duty works Mr. Woods.

1    When you're called for jury duty, you can sit at the courthouse

2    all day long and not get picked for jury duty. Everyone one here

3    - well the attorneys here.

4        MS. DALTON: You don't stay the whole day.

5        MS. PUCKETT: You do stay. Have you ever been called for

6    jury duty?

7        MS. DALTON: Until they started the case Ms. Puckett --.

8        HEARING OFFICER: No.  You could be waiting to be picked.

9        MS. PUCKETT: You could be waiting to be picked for jury --.

10       MS. DALTON: All I'm saying is that if she can prove that at

11   this time and this hour she was on jury duty and had to be at

12   the courthouse and couldn't be here, I still think that the

13   notice problem is a big issue.  But that's my opinion.

14       HEARING OFFICER: Okay.  If she is on jury duty, is their

15   mutual agreement to continue the case to allow that testimony?

16       MS. DALTON: I'm not agreeing because there was no notice

17   that this was a potential problem.

18       HEARING OFFICER:  Okay. It's going to get worse here.

19   Because I'm going to, I got ten days I can use my ten days to

20   hold this other meeting and I know you are scheduled.

21       MS. DALTON: Well, you can do whatever you want to do Mr.

22   Woods, but I can't waive.

23       HEARING OFFICER: I would hold this tomorrow.

1    MS. DALTON: I can't waive.

2    HEARING OFFICER: Let's do this tomorrow.  Well in other

3    words, because it still would be within your time limit to get

4    your order, but then again, and we need and if you all don't

5    want to agree, then I have to do it this way.  I want to be fair

6    to everybody. You don't want to go forward with your rebuttal

7    witness, but we could have used the time for that.

8    MS. DALTON: Rebuttal witnesses are after DCPS rests Mr.

9    Woods.

10    HEARING OFFICER: But again, I'll –never mind.  Either you

11    don't want to use this time for your rebuttal witness.  This

12    witness at DCPS may be excused because she is on jury duty.  I

13    don't know if I can hold that against her, if the government

14    called her.

15    MS. DALTON: Do you have any proof that this is the case.

16    MS. PUCKETT: I am willing to try to get some proof that she

17    is in jury duty.

18    HEARING OFFICER: We would go forward when she brings that

19    proof at the date that we set. If there isn't proof, you would

20    put on your rebuttal witness.

21    MS. DALTON: I see what you are saying.

22    HEARING OFFICER: If there is no proof, then unfortunately.

23    MS. PUCKETT: I'm not sure your rebuttal witness can testify

579

1    via phone.  I don't have a problem with that, so they don't have

2    to come back down here.  Or the parents.

3         HEARING OFFICER: If you all don't agree, I'm going to -

4    I'll have to  and again I'll have to do it.

5         MS. DALTON: What your schedule is.

6         MS. PUCKETT: And I can make myself available tomorrow.

7         HEARING OFFICER: I'm going to go check the schedule, should

8    I --.

9         MS. DALTON: I've been down here.

10        HEARING OFFICER:  My schedule.  My schedule to see if I

11   can, because to see if I can, -- because I may be already

12   assigned --. And how much time will we need?  Otherwise we do it

13   another day.  I'm just want to say --.

14        MS. PUCKETT: I did not anticipate that she had - that she -

15   that her testimony --.

16        HEARING OFFICER: The only reason I'm doing it this way

17   because you all are not agreeing.  If people don't agree then we

18   have to do it our way.  That I don't like doing that.  But if

19   you put me in a box then I'm going to deal with it on my time

20   and I have ten days, I'll use within the ten days the time that

21   I'll need and I have an obligation under the IDEA.  One of

22   things that they obligated the Hearing Officer to do is to make

23   the Hearing Record.  We are obligated to make a Hearing record

1  and we must make our findings based on that evidence.  It would

2  be very difficult for me to close this case and say that, DCPS

3  proffered to me that they are witness was on jury duty and I

4  didn't excuse that witness.  And the parent attorney didn't

5  agree to excuse that witness.

6      MS. DALTON:  I would certainly have no problem with

7  excusing her witness had I been notified about it before and I

8  some assurance that she actually was in jury duty at this time.

9      HEARING OFFICER: But the only prejudice to the parent is

10  that you wanted a rebut.  You choose not to.

11      MS. DALTON: No. She has a speech and language pathologist

12  who I assume is going to testify in a certain capacity.

13      HEARING OFFICER: You could rebut a second time. You can

14  rebut a second time.

15      MS. DALTON: That would mean Dr. Morere had to come back

16  twice.

17      HEARING OFFICER:  Well if she doesn't have an excuse for

18  today, the case is over.  But then again, it's you all's time.

19  But go ahead.  You all are using it.

20      MS. DALTON: She can come back and rebut again.

21      MS. PUCKETT: If I call my speech and language pathologist,

22  she can either come back or testify via phone to rebut it.  But

23  right now she can do her rebuttal for Ms. Johnson.

581

1       MS. DALTON: I don't have a problem with that. I just

2   thought once you testify the rebuttal that would be it, she

3   couldn't call again.

4       MS. PUCKETT: Let me get Ms. Johnson her phone and let her

5   know to keep trying --.

6       HEARING OFFICER: Well it's up to you and how you are going

7   to present your case.

8       MS. DALTON: As long as she called again in rebuttal after

9   this --.

10      MS. PUCKETT: I have no problem with her being called in

11  rebuttal for my speech and language pathologist.

12      MS. DALTON: That just means it is twice that she is going

13  to be called.

14      HEARING OFFICER: That's right.  So it's up to you all

15  whether you want to -- .  And again, this is only because there

16  is no agreement. When the attorneys --.  The easiest thing for

17  the Hearing Officer.

18      MS. DALTON: We have agreed.  We have agreed.

19      HEARING OFFICER: To what.

20      MS. PUCKETT: That she is going to testify now for rebuttal

21  --.

22      HEARING OFFICER: No, no I mean when there is no agreement

23  to continue a case.  This is the way we have to operate.  In

1   other words we couldn't continue --.

2        MS. DALTON:  But we won't continue the case if --.

3        HEARING OFFICER: You would if you allow her witness to go

4   first.

5        MS. DALTON: Unless she can document that she --.

6        HEARING OFFICER: Right. Right.

7        MS. DALTON: This will be the end of it.

8        HEARING OFFICER: That's right.

9        MS. PUCKETT: Yes.

10       MS. DALTON: Okay.

11       ?: That was my question, if there is no documentation, in

12   fact, what if that is true, then what happens?

13       HEARING OFFICER: Their case - they would rest.

14       MS. DALTON: It's the end.

15       HEARING OFFICER: That is my understanding.

16       ?: Right.

17       HEARING OFFICER: They would rest their case.

18       ?: (inaudible)

19       MS. DALTON: We wouldn't go forward. Right. We wouldn't have

20   to have another day.

21       HEARING OFFICER: Have another day.

22       ? (Inaudible).

23       HEARING OFFICER: Okay.

1       MS. DALTON: I forgot where I lost the paper.

2       HEARING OFFICER: Now are we going to be able to finish by

3    5?

4       MS. DALTON: I hope so.

5       MS. PUCKETT: Zaundra indicated that she submitted some

6    documents, so I am going to try to get a copy of (inaudible)

7    documents.

8       HEARING OFFICER: Okay.  So it sounds as if they will be a

9    produce the documents.

10      MS. PUCKETT: (Inaudible).

11      MS. DALTON: Just for the record, I just checked my

12   schedule, I cannot be back for tomorrow.  So, I can be here on

13   Monday.  But I have some --.

14      MS. TILLER: Monday is Memorial Day.

15      MS. DALTON: Oh.

16      MS. PUCKETT: Tuesday. (laughter).

17      MS. DALTON: I've already cancelled one class for today.

18      HEARING OFFICER: The only reason we're under this pressure,

19   if there is no agreement then we have to do it this way.  If

20   there is an agreement, I can do it your way.

21      MS. DALTON: I can be here at 8 o'clock in the morning if

22   need, I'll just have John meet me - my husband meet the bus, and

23   the problem is after that, I've got a - the next available time

1    I have is the following Friday and after that, I have a week --.

2    I have a 1 o'clock, you think we can be done by one.

3        HEARING OFFICER: I have to check my --. I am sure I am

4    already assigned cases, I don't remember what they are.  So they

5    have to fit within it.  But, situations like this, we just ask

6    the parties to come on stand-by like you would do at any other

7    court, you'd be on stand-by like you would do in any other

8    court, you'd be on standby.  It's the only thing we can do.  We

9    got to - you know.

10        MS. DALTON: You want to agree to tomorrow morning at 9

11    o'clock.

12        MS. PUCKETT: Yeah, I'll figure it out, yeah. But I mean,

13    she is going to try to get the document, today.

14        HEARING OFFICER: She is going to try to get the document

15    today.

16        MS. DALTON: Let's just go ahead and wait.  If we are going

17    to be here tomorrow at 9 o'clock.

18        HEARING OFFICER: Let me check my schedule. In other words,

19    someone schedules me, I don't get to pick my schedule.

20        MS. DALTON: Well let's go ahead and get his schedule and

21    see if - if that's going to work.

22        HEARING OFFICER: That's why I said we are going to have to

23    set a date anyway, because if she does have the documentation we

1  are going to have to come back.

2      We're back on the record, the Hearing Officer was

3  attempting to see if the parties would at this stage, with

4  parent's - DCPS's next witness being, DCPS's counsel advisor,

5  DCPS Attorney Advisor understands that it on jury duty and

6  therefore is unable to answer her cell phone.  She is unable to

7  call that witness.  The Hearing Officer then inquired as to

8  whether the parent wanted to call their rebuttal witness and the

9  parent counsel said she actually wanted the rebuttal witness to

10  rebut all of DCPS's witnesses so they would preferred to wait

11  until the speech language pathologist testified.  Then the

12  Hearing Officer if the speech language pathologist for the DCPS

13  did not have an excuse for being here would DCPS be resting its

14  case.  It's my understanding that they would.  So the Hearing

15  Officer would therefore keep the record open for the document

16  for --.

17      MS. PUCKETT: The document.

18      HEARING OFFICER:  The documentation proving the witness was

19  excused because of jury duty and then allow parent counsel to

20  decide whether they would go forward today with their rebuttal

21  witness.  And then be able to call them again --.

22      MS. DALTON: If needed.

23      HEARING OFFICER: If needed.

209

586

1    MS. DALTON: I just wanted the rebuttal witness Mr. Woods to

2   be able to hear all of the evidence before she did her rebuttal,

3   and that was my concern because we only had part of the

4   evidence.

5    HEARING OFFICER: So it's up to you all as to --.

6    MS. DALTON: With the understanding that Ms. Puckett had

7   agreed that if there is additional rebuttal based on the new

8   testimony if the speech and language pathologist testifies then

9   she would be called back to rebut that testimony.

10   HEARING OFFICER: Okay.  So the only thing we will need is

11   agreement to as when will supplement the record with the proof

12   that witness was called away for jury duty. And I am not limited

13   to that she was actually serving. She was called to the Court.

14   I'm not going to call as far to say, and she had to have been

15   picked.  Whether she was picked, she has no control over that.

16   The only thing you have to do is show up and then you, the Court

17   tells you what do from there.

18   MS. PUCKETT: My understanding is because she has submitted,

19   she has been excused from work today.

20   HEARING OFFICER: From work today.

21   MS. PUCKETT: Because of jury duty.

22   HEARING OFFICER: Okay, so then it becomes --.

23   MS. PUCKETT: We attempted to get her via cell phone.  Ms.

1   Johnson is the case manager of on this case, and I was informed

2   by the Care Center by Ms. Johnson that she is at jury duty and

3   that we were going to try to call via phone, but she is not

4   picking up her cell phone.

5      MS. DALTON: Okay (inaudible).

6      HEARING OFFICER: The only other thing is, because I don't

7   want to be running out, we need another date, so if I were you

8   I'd start thinking about that.  If she gives us the supplement

9   the record, we're going to need another date.  And if there is

10  no consent to continue the Hearing, the Hearing Officer will

11  pick that date.

12     MS. PUCKETT: Are you here tomorrow Ellen?

13     MS. DALTON: I'm not here tomorrow.  I can be here tomorrow.

14  I have a 1 o'clock.  I can be here in the morning.

15     MS. PUCKETT: You say you have a 1 o'clock Hearing.

16     MS. DALTON: No. No. No.  I don't have anything here

17  tomorrow.  But I can be here tomorrow except that I have 1

18  o'clock not here tomorrow.

19     MS. PUCKETT: Okay.

20     MS. DALTON: Not here tomorrow.  I can be here at 9, but Mr.

21  Woods is saying is only available at 3 o'clock tomorrow.

22     HEARING OFFICER: I'm only available at 3. So the parties

23  can be thinking about that as we take this testimony.  If there

1    is agreement, no problem.  But when there --.

2        MS. MORERE: Well the next time I'm available is the

3    following Friday on the first.

4        MS. DALTON: We're not here on the first. Are you available

5    at 3 o'clock tomorrow?

6        MS. PUCKETT: Yep, I can be available.

7        MS. DALTON: Is that going to be enough time to conclude the

8    case?

9        HEARING OFFICER: That would be up to you all.  I don't

10   know.

11       MS. PUCKETT: I don't - I don't have a lot question for my

12   speech and language therapist.

13       HEARING OFFICER: Okay.  Okay. It's 3 o'clock tomorrow. If

14   she is not on jury duty. If she is on jury duty, if she was

15   picked, she won't be here, possibly unless the Court closes.

16       MS. DALTON: Then how are we going to know.

17       HEARING OFFICER: Yeah, because if she is on a jury.

18       MS. PUCKETT: I don't think we are going to be able to know.

19       HEARING OFFICER: Yeah.

20       MS. DALTON: Let's go ahead and go with the rebuttal

21   testimony, we can talk about this at 5 o'clock, Dr. Morere needs

22   to go.

23       HEARING OFFICER: Dr. Morere - you're still under - well you

1    haven't been sworn in today, so why don't we do it again. Do you

2    swear or affirm that the testimony you are about to give will be

3    the truth?

4        DR. MORERE: Yes.

5        HEARING OFFICER: Parent counsel then can call her rebuttal

6    witness, Dr. Morere.

7        MS. DALTON: Dr. Morere you heard the testimony of Zaundra

8    Johnson and she indicated that the IEP developed for ▆▆▆▆ on

9    February 1st, 2007 could be implemented at Janey Elementary

10   School, can you state whether in your opinion that IEP—whether

11   the IEP including the goals that are on the IEP can be

12   implemented at Janey?

13       MS. PUCKETT: I'm sorry – I just need to clarification, Mr.

14   Woods, I'm confused as to how that's a rebuttal statement.

15   Because at this point, it just two experts opinions and the

16   credibility needs to be determined by the Hearing Officer.  I

17   think rebuttal is more if there were factual statements that

18   were in dispute and my witness said that something contrary to

19   something that there factual witness did, I think that is more

20   in terms of rebuttal. I'm not sure.  Because we can go all day

21   and I call my witness again to rebut her view if that's what

22   rebuttal was.  I'm just confused.

23       HEARING OFFICER: Certainly this is going to open the door

1    for them to call them to call their witness, but I don't want to

2    waste a lot of time of – but again if that is how we are going

3    to do it, I think this and they think that --, she can call her

4    witness again, and just say.

5        MS. DALTON: No sir.  The fact is that she can't --.

6        HEARING OFFICER: Well, you can't call your witness again.

7    Go ahead, I'm sorry.

8        MS. DALTON: She can testify on an expert bases, and as you

9    know the parent has the burden of proof in these cases and she

10   can use the what she has learned from the other experts and

11   basing her opinions.  That is part of the reason that an expert

12   is entitled to stay in and listen to the testimony. She is not a

13   fact witness, she wasn't at these MDT/IEP meetings.  She is an

14   expert witness, that's what she has been proffered for.

15       HEARING OFFICER: But she is saying didn't she already say

16   that on her direct.  She already said that.  How is she

17   rebutting it if she has already said that that they can't

18   implement the IEP.  She said that on her direct.  How is that

19   new?

20       MS. DALTON: Who said that on direct?

21       HEARING OFFICER: Your witness.

22       MS. PUCKETT: The witness said it on her direct.

23       MS. DALTON: But she didn't --. But they said that it can be

214

591

1    implemented. I want her to explain why it cannot be implemented.

2        HEARING OFFICER: But you see her point, is it going to be

3    any different than what she already said?  But you can go ahead,

4    but I'm just saying, that's her point.  You've already

5    established, that why she said, it comes down to who do you

6    believe Hearing Officer.

7        MS. DALTON: Alright then, if you want me to, I'll move on

8    to the next question --.

9        HEARING OFFICER: No, you can go ahead with that but she is

10    saying, didn't your witness already – that was her testimony.

11    They couldn't implement the IEP.

12        MS. DALTON: Then that's fine.  That's okay, wait a second.

13    Can the - - could the services, that A████ needs be – occur in a

14    Head Start classroom with – you've heard about Head Start

15    classrooms, could her needs be addressed in a Head Start

16    classroom?

17        DR. MORERE: It might be possible to address her needs in a

18    Head Start classroom, if there was an on-going support of a

19    speech language therapist within that setting.

20        MS. DALTON: Now when you say, on-going support of a speech

21    and language therapist within that setting, what do you

22    specifically mean?

23        DR. MORERE: I mean someone who – someone who has the

215

1   training and expertise to remediate her language deficits and

2   her dypraxia in that classroom.  So that in that classroom

3   setting, if there – particularly in Head Start, they are a lot

4   of kids who have immature speech and language, because these are

5   kids who at risk for academic delays and so these kinds  of

6   speech patterns are more difficult for a child with a hearing

7   loss to understand.  So she would need actually more

8   clarification by a speech and language therapist in that kind of

9   setting than she does in the current setting in which she has

10  good speech models for peers.  She also would need the ongoing

11  correction of the inaccurate speech sequencing. That is part of

12  that neurological disorder of dyspraxia that so – as you speak,

13  if you speak incorrectly and you repeat that incorrect pattern

14  that is the pattern that you learn to produce. Your brain learns

15  it that way.  So if you have someone in there to catch those

16  speech errors and correct them on an ongoing basis, then that

17  can go ahead and meet the goals.  So, it would be harder than in

18  her current setting, but it would possible to have ongoing push

19  – speech language services in a Head Start setting, you would

20  definitely need an ongoing speech language therapist available

21  in that setting to support both receptive communication and

22  expressive communication and to meet the IEP goals because she

23  would need someone who can help her satisfy the IEP goals that

216

593

1    are classroom based.

2    MS. DALTON: Now in determining her – you heard Ms. Johnson

3    state that A████ was functioning in the daily living skills,

4    typically developing in other areas that she was all typically

5    developing, can you address why she is not typically developing?

6    DR. MORERE: Well she is not typically developing because

7    she has phenomenal language delays.  In addition to the

8    receptive language delays that – in most areas over 92% of

9    typically developing child – children have better communication

10   skills than she has.  In the area of vocabulary, more than 99%

11   of typically developing children have better language

12   functioning.  Actually, more than 99% of all children and that

13   include the whole range of the children from children with

14   impairments all the way to advanced children. So it's not just

15   typically developing children.  It's 99% of all children her

16   age, based on the most recent evaluation have better speech

17   skills than she has.  Now, I would call that not typically

18   developing when a child is below the 90th percentile, below the

19   10th percentile in all areas of speech development.  I mean the

20   best predictor of academic success is language skills. So if you

21   get a child who reaches kindergarten with language delays they

22   are almost guaranteed failure at that point.  So unless – and I

23   mean we had testimony that the goal of the IEP – the goal of the

217

594

1   intervention programs produced by DCPS was to take the child

2   from the point at which they functioning now and bring them up

3   to that the level of a typically developing child.  A

4        MS. DALTON: And you heard Ms Johnson state that with any

5   hearing impaired student, the testimony I believe was with any

6   hearing impaired student, the speech and language concerns that

7   you are going to have are associated with that hearing

8   impairment and do not stand alone.  Do you have an opinion as to

9   whether that is appropriate for A▆▆ in her case?

10       DR. MORERE: A▆▆ in her case has based on medical history,

11  her progress over the years, she appears to have a separate

12  language disorder.  In addition to her hearing loss. Well it is

13  certainly exacerbated by the hearing loss.  She clearly has an

14  expressive language disorder. It would be difficult to refute

15  that, because she has motor – neuro motor sequencing

16  difficulties.  And that's just not something that every deaf

17  child has.  Deaf children have difficulty learning how to talk,

18  but is not because they can't control the neurological signals

19  that are telling their mouth to move in a certain pattern.

20       MS. DALTON: And then regard to – I'm sorry.  With regard to

21  Ms. Johnson stated that it didn't matter – it wouldn't make any

22  difference if she had a separate classification of speech and

23  language impairment that it wouldn't change her IEP or

1   placement.

2       DR. MORERE: Children with speech and language impairments.

3   Well all deaf children need language enrichment. Children with

4   speech and language disorders need language enrichment. If you

5   have a child with a dual diagnosis of a language disorder and a

6   educationally significant hearing loss, then you got a child who

7   needs multiplied level of intervention.  Because these two –

8   they don't act just in isolation, they act synergistically.

9   They work together to make the other one work.  So that the

10  language delays that you see secondary to hearing loss,

11  interacts with whatever, you know, speech difficulties or

12  additional impacts that post-meningitis has on language

13  development to make it worse.

14      MS. DALTON: Now if the A█████ had received the classification

15  of hearing impairment and speech and language, how would her IEP

16  or programming or placement be different?

17      DR. MORERE: With the dual diagnosis ––.  Well most children

18  who have a hearing loss should receive significantly more

19  intervention than is being proposed.  But with the dual

20  diagnosis that would mean that this child has an increased need

21  for intervention and so that if you're denying a dual diagnosis

22  then that means you're going to limit the amount of intervention

23  that would be recommended.

596

1    MS. DALTON: And you – Ms. Johnson testified that A████

2    T██████ deficits – that she does not have deficits requiring

3    specialized instruction, can you speak to that, do you differ in

4    that opinion?

5    DR. MORERE: I differ significantly in that opinion.  Again,

6    any child with a profound hearing loss, any child who qualifies

7    for a cochlear implant need some degree of specialized

8    instruction because they don't develop language in a normal way.

9    And its not just a matter of sitting down practicing "cat",

10    "cat", of the – "the box" "the ball is in the box" "the ball is

11    in the box" "where is the ball" "the ball is in the box" which

12    is what you see in pull-out speech language therapy.  It's

13    direct instruction on the basics of language. A child who has a

14    hearing loss, and particularly a child, and additionally

15    children who have language delays are typically also placed in

16    early intervention programs in a classroom setting and these

17    children need specialized instruction that takes what is

18    happening in a classroom setting and elaborates on it, corrects

19    it, clarifies it so that this is – this is a combination of

20    specialized instruction so that they are teaching, they are

21    supporting the teaching of the classroom information, but they

22    are also providing enhancement that is ongoing speech and

23    language therapy in conjunction with specialized instruction.

1       MS. DALTON: And does the specialized instruction have to be

2   provided only by a special education teacher?

3       DR. MORERE: No, and in fact in most deaf education

4   programs, it is provide either a teacher of a hearing impaired

5   or by a speech and language pathologist.

6       MS. DALTON: I have no further questions, but Ms. Puckett

7   may.

8       MS. PUCKETT: I don't have any questions.

9       HEARING OFFICER: I have clarification questions. The first

10  question that you began with, could her needs be addressed in a

11  Head Start classroom, yes?  If they could address her language

12  deficits and apraxia help her? I think what struck me or is it

13  the name of the program or what happens in the classroom?  Does

14  it matter what the name of the program is?

15      DR. MORERE:  Well it matters – it matters to the level of

16  regardless.

17      HEARING OFFICER:  Start with that.  Because it's Head

18  Start, does that have anything to do with her needs could be

19  met?

20      DR. MORERE:  It has something to do with her whether or not

21  her needs could be met.

22      HEARING OFFICER:  The questioning was asking about just the

23  name of the program and you said – and I was struck by that. I

1  mean it didn't say what would happen it that program, but by its

2  name, you said.

3      DR. MORERE: Well Head Start programs are designed for

4  children who are at risk for academic failure. So they are

5  designed for kids who most commonly because of environmental

6  reasons --.

7      HEARING OFFICER:  Can you structure A█████ program under a

8  ruling of a Head Start program?

9      DR. MORERE: Within - it's.

10     HEARING OFFICER: Can you just label the program at River

11  School Head Start?

12     DR. MORERE: No. No.  The River School is for typically

13  developing children?  Head Start is for children who are at risk

14  for Academic failure. A███ is clearly at risk for academic

15  failure.

16     HEARING OFFICER:  So that's it didn't happen?

17     DR. MORERE: She is clearly at risk for academic failure.

18  Because the best predicator of academic success is language.

19  And if you have a child who has a language level below --.  Her

20  language level is far below that of even children in the Head

21  Start program.  Children in the Head Start program are typically

22  lower than the typically  developing children.  This is more

23  commonly because of like environment reasons.  They are

222

599

1  frequently from impoverished environments.  They don't have

2  books in the home, they don't get read to, they have poor speech

3  models in the home.  Now if you put a child who has hearing loss

4  - the reason I was looking at Head Start program was, that had

5  been brought up repeatedly and because it's for children who are

6  at risk for academic failure.  She is clearly at risk for

7  academic failure based on her profound language delays.  Now the

8  reason it would be more difficult to address her needs in that

9  environment, she wouldn't have good speech models by the other

10 children in the classroom.  She would have more difficulty

11 understanding the speech of the other children in the classroom

12 and she would therefore need an elevated level of speech

13 language support in the classroom setting. So while it would be

14 possible, it would actually be more difficult to meet her needs

15 in that setting than it would be in her current placement.

16      HEARING OFFICER: Last question is again, this is just

17 something that struck me again.  And I think you already

18 answered it.  That even if and I'm going to have to go back to

19 the records, I'm almost sure you answered this question, even

20 though A████ is hearing impaired, she still in your opinion would

21 speech and language impaired even in she didn't have that

22 hearing impairment?

23      DR. MORERE: Right.  Actually -- .

223

600

1       HEARING OFFICER:  Now I want to square that with her I.Q.

2   at 145, what would have caused the speech and language

3   impairment when cognitive ability is so high?

4       DR. MORERE: It is not uncommon to see children who are

5   extremely bright when tested through non-verbal methods. Her

6   evaluation was based on --/

7       HEARING OFFICER:  I understand.

8       DR. MORERE: Purely non-verbal methods.

9       HEARING OFFICER:   I understand.

10      DR. MORERE: And I have seen multiple children who had

11  language levels that were far below expectations and yet their

12  cognitive abilities were in the superior range.

13      HEARING OFFICER:  So what's the intervening force?

14      DR. MORERE: Let me give you an example. I have worked with

15  a child who is deaf and who has deaf parents.  A deaf child with

16  deaf parents should develop language at a normal rate for a

17  child. He should be developing American Sign Language skills at

18  the rate of all of the other children in that group.  Okay.

19  This child has been in an early intervention program for deaf

20  children, at a school for the deaf, where American sign language

21  has been used, all along and yet, he has a profound language

22  delay based on his very, very, limited American sign language

23  skills.  Despite having American Sign Language within the home

1    the entire time, within the school the entire time.  Clearly

2    that child's language delay is not because of his hearing loss,

3    because it relates nothing to hearing. It relates to language

4    disorder separate from his deafness.  His deafness is

5    irrelevant.  Nobody cares about him not being able to hear.

6         MS. DALTON: What I think what the Hearing Officer is

7    asking, if I might say so Mr. Woods. What caused that then?

8    What caused that --.

9         HEARING OFFICER: Right.

10         MS. DALTON: What was the thing that caused - if it wasn't

11    the hearing impairment that caused her language delays, what was

12    it?

13         HEARING OFFICER: What was it?

14         DR. MORERE: This child had meningitis at the age of 2½

15    months.  Meningitis is well known to be - have a profound impact

16    on language.  In fact this child was identified with language

17    delays at a time when she passed the hearing screening. After

18    her meningitis, she passed the hearing test and yet was

19    identified as having language delays and was initiated into

20    speech and language services at 11 months, when she was still

21    being identified a child with hearing.  It was not until 15

22    months that she was identified as having a hearing loss.  So,

23    she was actually identified as child with a speech and language

1    disorder prior to being identified with hearing loss and after

2    she had passed a hearing evaluation post-meningitis.  So, what

3    do I believe is responsible for at least a significant portion

4    of her language disorder?  It's meningitis.  Meningitis has

5    profound impacts on a range of develop, and it --.  She's gotten

6    hit in motor skills, in the neuro motor control of her speech

7    apparatus, so the brain - so the brain based control of her

8    mouth, tongue, larynx, all of that and is well as in her

9    language skills development.  And I have seen other post

10   meningitic children who had language impacts that were totally

11   unrelated to hearing loss.

12        HEARING OFFICER: Could you define for the record

13   meningitis?

14        DR. MORERE: Meningitis is an inflammation of the coverings

15   of the brain. The brain is covered by three layers that are

16   called meninges.  Okay, so what you have is an infection that

17   causes an inflammation of the covering of the brain.  This is a

18   life-threatening disorder and the type of meningitis, there

19   viral meningitis.

20        HEARING OFFICER: There are just -- .

21        DR. MORERE: And there is bacterial meningitis.

22        HEARING OFFICER: So what did she have in --.

23        DR. MORERE: She had bacterial meningitis and bacterial

226

603

1    meningitis has been documented to actually to have more

2    significant impacts upon language skill development than viral

3    meningitis. So it is more more common to see impacts upon

4    language skill development than children who are post-meningitic

5    from bacterial meningitis than children who have had viral

6    meningitis. It's also well documented that children who have

7    this disease within the first year of life, tend to have greater

8    impact on language skill development as opposed to children who

9    have it after one year, and if fact some of the research

10   suggests that children who have this before six months have even

11   more profound impacts than children who it have it within the

12   first year of it, but after the first six months.

13       HEARING OFFICER: Is there any evaluations in this record

14   that state what you just said, that is the bacterial meningitis

15   that cause the speech and language impairment.

16       DR. MORERE: There are no evaluations that state that they

17   cause that, however, there are evaluations prior to the time

18   that she was diagnosed as being deaf, that state that she had

19   passed the hearing screening and that she was starting to

20   receive speech and language services because of language delays.

21       MS. DALTON: Just for the record Mr. Woods, if I might, the

22   record that she is referring to, unfortunately is attached to

23   number 1, it is the last page on number 1. It shows her normal

227

604

1  hearing. It should have been number 1, but when these got

2  labeled they missed that page.  So.  I think that's the one.

3      DR. MORERE: Okay well that states she has the normal

4  hearing, and then if you go to, let's see.

5      MS. DALTON: At six months of age she had normal hearing.

6      DR. MORERE: At.. then if you look at.

7      HEARING OFFICER: That's okay, you reviewed the record --.

8      DR. MORERE: At number 3 you can see that she was starting

9  to receive speech and language therapy intervention because of

10  language delays at that time.

11      HEARING OFFICER: You drew that conclusion from the record?

12      DR. MORERE: Right.  From reading the record - I drew that

13  conclusion based upon --.

14      HEARING OFFICER: From reading the record.

15      DR. MORERE: Based on this record. Based on the fact that

16  she had passed the screening, hearing screening after her --.

17      HEARING OFFICER: Okay.

18      DR. MORERE: Her meningitis, that she had been diagnosed as

19  having language delays and had started reading - receiving

20  speech and language therapy before her first year of life and

21  that she was not finally discovered to have a hearing loss until

22  she was about 15 months old.

23      HEARING OFFICER: So that you be your take on reading the

1    record, but you have not tested her and --.

2        DR. MORERE: I have not tested her.

3        HEARING OFFICER: And concluded scientifically that that's

4    the cause of - it's not scientifically - it cannot be

5    scientifically connected?

6        DR. MORERE: Her dyspraxia can't be connected to that.

7        HEARING OFFICER: No. Meningitis?

8        DR. MORERE: I can't be connected to hearing loss.

9        HEARING OFFICER: No. No. No.  From the bacterial meningitis

10   be connected - scientifically to her language deficits?

11       DR. MORERE: Her bacterial meningitis places her at a vastly

12   increased risk, --.

13       HEARING OFFICER: Risk but not cause.

14       DR. MORERE: Language disorder. And the fact - the fact that

15   she developed language delays prior to having a diagnosed

16   hearing loss and have after having been screened and discovered

17   to have normal hearing and the fact that her pattern of speech

18   development is not what one would expect for a child who had  --

19   residual -

20       HEARING OFFICER: You're my expert right?

21       DR. MORERE: Can it be scientifically - don't defend it,

22   just yes or no.

23       DR. MORERE: I'm sorry you're my expert.

1        HEARING OFFICER: You're helping me.

2        DR. MORERE: Oh, I'm sorry.

3        HEARING OFFICER: She's helping me understanding.

4        DR. MORERE: There's no one --.

5        HEARING OFFICER: So I wanted her to talk so I can

6    understand it.

7        DR. MORERE: There is no one --.

8        HEARING OFFICER: There is no connection.

9        DR. MORERE: What you do is you look --.

10        HEARING OFFICER: I see.

11        DR. MORERE: You look at what --.

12        HEARING OFFICER: You change it now to a risk - but not a

13    cause.

14        DR. MORERE: But there is no one test that you can say.

15    What you can say is --.

16        HEARING OFFICER: Bacterial meningitis is just like the

17    hearing impairment, those are intervening factors that happened

18    in A███████ life in the confluence of which we can't separate them

19    in quantity.

20        DR. MORERE: You cannot separate them and quantify them.

21    That's right.  When you have someone who is depressed and

22    dementing, you can't say how much of their performance is from

23    performance is from depression and how much is from dementia.  I

230

607

1    can't say how much of her language delays are from --.

2         HEARING OFFICER: Than helps me.

3         DR. MORERE: The meningitis and how much of her language

4    delays are from her hearing loss.  What I can say is the level

5    of language delay, the risk seen is not consistent with a simple

6    hearing loss.

7         HEARING OFFICER: Okay.

8         DR. MORERE:  See - the level of intervention she has--.

9         HEARING OFFICER: My questions are because you are my

10   expert.  I would to be able to say to you --. And I was thinking

11   I could say that, and now I know I can't.  Bacterial meningitis

12   caused that deficit.

13        DR. MORERE: It probably caused part of it.  Because the

14   hearing loss doesn't account for everything.

15        HEARING OFFICER: I understand.  It's a contributing factor,

16   but not cause.

17        DR. MORERE: Right. Well it's the two of them act -

18        HEARING OFFICER: Together.

19        DR. MORERE: Together, synergistically.

20        HEARING OFFICER: That's correct.

21        DR. MORERE: That's right, like I said, the two separately

22   make each other worse.

23        HEARING OFFICER: So we don't know the real --.

1    DR. MORERE: There is no one cause.

2    HEARING OFFICER: Okay.

3    DR. MORERE: That's the problem.

4    HEARING OFFICER: So how do you --.

5    DR. MORERE: There is no one cause, the two of them

6    interact.

7    HEARING OFFICER: So we now know that - this is - because

8    again, I have to deal with it as a practical matters of people

9    can implement or - so in light of the fact that she has speech

10   and language deficits, even if we can't identify its cause, you

11   certainly have suggested how it should be treated.  The deficits

12   should be treated.

13   DR. MORERE: Yes.

14   HEARING OFFICER: So that's science.

15   DR. MORERE: That's science.

16   HEARING OFFICER: That's science.

17   DR. MORERE: If I may, if you look at the IEP--.

18   HEARING OFFICER: From your perspective?

19   DR. MORERE: Well, if you look at the IEP, it has 12 speech

20   and language goals, some of which are designed to be performed

21   in the classroom. She has 12 goals in 90 minutes a week. So that

22   would be about 7 minutes per goal and that's if you don't spend

23   any time hanging up your coat, and doing anything. It is

232

1    physically impossible to accomplish that in 90 minutes a week.

2    In addition, say she sleeps for 10 hours a day, okay. Say she

3    sleeps for 10 hours a day, that leaves 14 hours a day, that

4    leaves over a space of a week, 98 hours out of 98 hours in a

5    week, its being proposed that a profound language delay can be

6    remediated in an hour and a half a week.  It doesn't make sense.

7          HEARING OFFICER: But the remediation needs to be speech

8    language services?

9          DR. MORERE: It needs to speech language services, but

10   provided not just a pullout, but in a setting that would allow

11   her to be interacting with the regular world.  In a classroom

12   setting would be ideal, but it can be done in the Mall if

13   necessary, if you had a speech and language therapist following

14   her around the mall and helping her interact with other people

15   at the mall.  Or a speech and language therapist following her

16   around the playground and helping her understand what people

17   were saying, express herself, correct her speech patterns, but

18   none of those are very practical.  The most practical setting in

19   which to provide that kind of ongoing naturalistic language

20   intervention that will allow her to understand what other people

21   are saying, to use her hearing, to learns what these sounds that

22   are coming into her head mean,-- because the speech and language

23   is also skilled at helping her support her listening.  A child

610

1    with a cochlear implant is not hearing like you and I hear.  The

2    cochlear has thousands of hair cells, thousands.  Her cochlear

3    implant has 24 electrodes. So we're trying to represent with 23

4    electrodes, one of which is a ground is another of which is a

5    reference. So you actually have 22 electrodes that are trying to

6    represent the information normally provided by thousands of hair

7    cells in the ear.  And so that's like to learn to understand

8    music played on a piano with only one or two keys per octave.

9    And a speech language therapist in the classroom can help

10   support her listening to understanding of this information.  And

11   she is having to learn the language at the same time this is

12   happening.  Okay.  And this isn't going to occur naturally, just

13   without somebody helping her to do that.

14       HEARING OFFICER: I think this testimony – cause I treat

15   experts as people that really can help me.

16       DR. MORERE: And that's my goal.

17       HEARING OFFICER: And I would have to say you and Ms.

18   Johnson really did.  Because it now it seems to me what had

19   distills down to is the nature and the amount of the individual

20   services, and that's where you all disagree.

21       MS. DALTON: Absolutely.

22       HEARING OFFICER: I think that's how well you – I think how

23   the both you presented your expertise to a layperson.  That it's

1  to me what it comes down to.  It is 1.5 or is it the structure

2  that River School has.

3       DR. MORERE: Where you have more intense.  And again, my

4  understanding of the development of the River School --.

5       HEARING OFFICER: Yes.

6       DR. MORERE: I've known about the River School since it

7  (inaudible) wasn't part of it. I've never been involved with it,

8  but because I've been involved with Johns Hopkins with the

9  listening center at Johns Hopkins where they have cochlear

10  implants, I've been involved with cochlear implants for over 13

11  - 14 years.  They developed the River School to address,

12  specifically address the needs of children who are learning to

13  listen through cochlear implants.  They also expanded that to

14  address the needs of children who are hard of hearing.  The

15  entire model was developed to addressed the needs of deaf and

16  hard of hearing children who typically do have speech and

17  language delays. That is why the model is consistent is because

18  it was developed specifically to address these kinds of needs,

19  and they developed this with the understanding that children

20  need language modeling from typically developing peers.  Which

21  is why they developed it as a general education environment and

22  then added in the speech and language services on an ongoing

23  basis to support the significant needs of children with hearing

1   loss and developing language particular those of children with

2   cochlear implants who are having to learn to listen and

3   understand the stimulus from an electronic pitch pike that

4   provides minimal information.  And they have to learn to

5   understand this and develop their language skills at the same

6   time that they are having to try to learn to understand this

7   sound that is coming in. This stimulus.  It's not really sound.

8   But it is a stimulus that's coming in. And that's why they have

9   that level of intervention in all of their classrooms because

10  that - it was developed specifically to address those needs.

11       HEARING OFFICER: I again - and I say again, you and Ms.

12  Johnson have been invaluable to me because, again, the Hearing

13  Officer we don't have any expertise in these areas. So my

14  questions might seem dumbfounded --.

15       DR. MORERE: No. No.  That's why I'm here.

16       HEARING OFFICER: But for us, we have to distill this down

17  for laypeople. We are not going to write an order for an expert

18  who would understand so I wanted to hear it and understand it in

19  my own language so that I could write it in my own language.

20       DR. MORERE: And certainly anything that I can clarify more,

21  I'd be more than happy to do.

22       HEARING OFFICER: No I have a --- then again, you may be

23  coming back. So maybe - I'll let you ask any questions about

1    what I said, and maybe we better talk about it next time.

2         MS. PUCKETT: I don't have any questions.

3         HEARING OFFICER: Ms. Johnson just indicated that the speech

4    supervisor has gone for the day.  So she--.

5         HEARING OFFICER: They won't be able to verify it?

6         MS. PUCKETT: No. Not today.

7         HEARING OFFICER: Okay.  And where are we at if she was

8    excused, if not --?

9         MS. PUCKETT: If not, then I'll be resting.

10        HEARING OFFICER: You'll be resting. And then we won't need

11   another hearing.  Now so, shall we pick that --. Maybe it

12   shouldn't be tomorrow then.  Because if you can't tell us by

13   tomorrow. I don't want --.

14        MS. PUCKETT: I'm not going to be able to tell you by the

15   morning. I am going to be searching and looking for - trying to

16   hunt down the speech and language person  tomorrow.

17        HEARING OFFICER: How much time do you need to let us know?

18        MS. PUCKETT: I mean - I should be able to - If I don't talk

19   to the speech and language supervisor then I should be able to

20   know something from - get a copy of it from Ms. Thompson

21   herself, like the next two business days.  Between now and

22   Tuesday, I should be able to get something.

23        MS. DALTON: The problem that I have, number one is that my

1   clients (inaudible) on the 1st is that correct?

2        ?: Evening of the 28th.

3        MS. DALTON: Evening of the 28th.  And Dr. Morere is not

4   available to come back until – which you say a week from Friday?

5        DR. MORERE: I can be here tomorrow or I could be here the

6   following Friday, but they won't be here.  The following week, I

7   can't.  I – I  .

8        MS. PUCKETT: Is the parent going to be testifying again?

9        MS. DALTON: I actually did want to ask her a few questions,

10  I can do it now and we could be done. We don that now and be

11  done.

12       MS. PUCKETT: We can do that now.  Because then we don't

13  have a problem, because if we only have – if we only have then

14  we can set it – we try to set it for that following Friday.

15       MS. DALTON: The parents might want to be here.

16       MS. PUCKETT: (LAUGHTER) Well I don't know. I don't know.

17       HEARING OFFICER: Well, I don't want to exclude them.

18  (laughter).  From your – from your witness (laughter).

19       MS. PUCKETT: Yeah, I understand.

20       HEARING OFFICER: Yeah.  What would be your first – what we

21  could do instead of picking a date, if Ms. Dalton knew your

22  dates, we could get on the phone.

23       ?: (INAUDIBLE) 7th.

615

1      HEARING OFFICER: Okay, the seventh?

2      MS. DALTON: We can't go that long. We got to do it before

3  they leave.  You leave on the 28th?

4      HEARING OFFICER: That's Monday.

5      MS. DALTON: That's Friday.  It's only tomorrow.

6      HEARING OFFICER: That's only tomorrow and she can't tell

7  us.  Yeah.

8      MS. DALTON: And you're back when, not till the 7th.

9      HEARING OFFICER: Yeah, that's how we got to this date,

10  yeah, because of their travel and your schedule with your school

11  - your daughter.  What was your first date Dr. Morere.

12      DR. MORERE: I can do it - I can do it tomorrow.  The first

13  date after that would be the first. Which is --.  Which is the

14  date they are going to be gone.

15      HEARING OFFICER:  Yes, we're looking at.

16      MS. DALTON: I don't see why DCPS can't be required to

17  produce that by tomorrow and if they can't produce it by

18  tomorrow, then we don't have anymore testimony if they do

19  produce it then we'll convene at 3 o'clock, when everybody is

20  available.

21      HEARING OFFICER: She can possibly be on jury duty.  She

22  could be on a jury, so how would they get it.  In other words,

23  if she's --.

616

1      MS. DALTON: Well if she's produced documentation, then we

2  will continue it. Well I think by tomorrow they ought to be able

3  to produce the documentation.

4      MS. PUCKETT: Can I try to present the documentation by

5  tomorrow, then if present it, we can set a date.

6      ?:   Right.

7      MS. PUCKETT: Let me try to present the documentation

8  tomorrow.

9      HEARING OFFICER: Okay.  And how would we go about that?

10      MS. PUCKETT: I'm going to call there, I don't --.

11      HEARING OFFICER: You're going to give it to Ms. Dalton--.

12      MS. DALTON:  Yes.

13      HEARING OFFICER: So we can have a time period, because they

14  might going on. You know it's the weekend.

15      MS. PUCKETT: I understand that.

16      HEARING OFFICER: Okay.

17      MS. PUCKETT: But I'll get in in the morning and I'll will

18  try to get the document.  I'm going to try tomorrow to get the

19  documentation that she is on jury duty.  Somebody should have

20  the documentation.

21      HEARING OFFICER: So by the close of business?

22      MS. PUCKETT: Yeah by close of business, tomorrow.

23      HEARING OFFICER: Okay.

240

617

1    MS. PUCKETT: We have her cell phone number.

2    HEARING OFFICER: Okay.

3    MS. PUCKETT: I mean, I don't.

4    HEARING OFFICER: How about --.

5    MS. DALTON:  And if you don't do it by close of business,

6  we won't set a new date.

7    MS. PUCKETT: We won't need to set a new date.

8    MS. DALTON:  If you do send it to me by close of business,

9  the date, let's pick a date now.

10    HEARING OFFICER: Yes, let's pick a date.

11    MS. PUCKETT: That's fine.

12    MS. DALTON:  Does that work?

13    HEARING OFFICER: That way --

14    MS. DALTON:  I really.

15    ?: We're back on the 7th.

16    HEARING OFFICER: On the 7th.

17    MS. DALTON:  Yeah, and I can't do that.

18    HEARING OFFICER: You can't do that.

19    MS. DALTON: My son middle school graduation is the morning

20  of the eighth, and the afternoon of the 8th, I have to go to

21  Towson because I coach special Olympics in the state games and

22  they start that afternoon, so I can't.

23    MS. DALTON:  Would you have a problem with us continuing?

618

1   Do you want to be here, --.

2          ?: Anytime after the 7th, we can be here. And then.

3          MS. DALTON:  I can do the 11th.

4          MS. PUCKETT: That's bad for you right? That's bad for you?

5          MS. DALTON:  I would not be available until possibly the

6   13th or 14th.  And then I am leaving again on the 15th.  So, --.

7          MS. TILLER: I can do the 13th.

8          MS. DALTON: Why do I have this open.

9          MS. PUCKETT: And I can't do the 13th.

10         HEARING OFFICER: The 14th?

11         MS. PUCKETT: I believe I can do the 14th. What's the 14th?

12         HEARING OFFICER: What would be your better time if it was

13  the 14th?

14         MS. DALTON: Wait, I'm not sure what my husband made for

15  plane reservations - if we're leaving on Thursday or Friday. And

16  I don't want to commit to that until I call him.

17         HEARING OFFICER: Oh, okay.

18         MS. PUCKETT: That's not good.

19         MS. DALTON: Because we're leaving on Friday, and I don't

20  know if we're leaving on Thursday, anyway we have to be in

21  Hartford Connecticut on Friday for --.

22         HEARING OFFICER: The 14th.

23         MS. DALTON: Student Advising Day.  It's my daughter's

242

619

1   college.

2       MS. PUCKETT: So, nobody's available on the 11th right?

3       HEARING OFFICER: Ms. Dalton?

4       MS. PUCKETT: You're not available.  That's when my

5   daughter's graduation.  And my daughter's graduation on 13th.

6       MS. DALTON: I'm the only one that -

7       MS. PUCKETT: And my daughter's graduation is on the 13th,

8   and so I am not going to be here on the 13th.

9       HEARING OFFICER: Keep in mind that this is maybe day, so.

10   Well I guess we should.

11       MS. DALTON: But it has be on --.

12       HEARING OFFICER: It has to be a definite date - yeah.

13       MS. DALTON: Mr. Woods I am much more comfortable if we

14   we're going to have to - I don't really like this at all, and I

15   am hoping that we don't have to come back, but I just - I don't

16   see how we're going to get around and I don't like stringing it

17   out that long cause I think it is harder for Hearing Officer too

18   but - I guess we have to look at the week of June 18th.  Are you

19   - when are you back --.

20       MS. DALTON: I'm not leaving.

21       MS. PUCKETT: I thought you said you were going to Towson--.

22       MS. DALTON: Well, Towson, Maryland.

23       MS. PUCKETT: Oh. Oh.

620

1        MS. DALTON: State games, Special Olympics.  What about the

2    week of the 18th?    I can work out any day if need be.

3        MS. PUCKETT: I haven't been scheduled anything, but let me

4    just check on thing. Right now it looks like I haven't been

5    scheduled for anything on that date - on that week. Where the

6    email - she just gave me some dates.  Just check that really

7    quick.

8        MS. DALTON: How about Wednesday the 20th?

9        MS. PUCKETT: Okay, one second.  The 20th, a Wednesday, June

10   20th, right?

11       MS. DALTON: That's fine. If we have to come back.

12       HEARING OFFICER: If we have to come back.

13       MS. PUCKETT: If we gotta come back.

14       HEARING OFFICER: It could be tomorrow.

15       MS. DALTON: If I don't get anything --. Will you just call

16   me and let me know.

17       MS. PUCKETT: I'll call you.  I'll call you.

18       MS. DALTON: Because I don't want to --.

19       MS. PUCKETT: I'll call you. I'll call you.

20       HEARING OFFICER: I guess its hard to get something to us,

21   but if you could - because our office assistant isn't here, but

22   I'll be here tomorrow, but maybe you'll just have too --.

23       MS. PUCKETT: I'll try to hunt you down.

621

1    HEARING OFFICER: Yeah.

2    MS. DALTON: Mr. Woods since we're still here, I know it

3  after 5, but I did, since we may not be coming back, there was

4  like three questions, I wanted to ask Ms. Tiller in rebuttal.

5  Yes you may leave. I'm so --.

6    DR. MORERE: I'm so late.

7    MS. DALTON: I am so sorry.

8    HEARING OFFICER: Okay. Ms. Tiller do you swear or affirm

9  that the testimony that you are about to give will be the truth?

10    MS. TILLER: Yes.

11    HEARING OFFICER: Okay. As a rebuttal witness to, Ms. Tiller

12  is being called to. Ms. Dalton you may proceed.

13    MS. DALTON:  Give me one second to find my questions I

14  have.

15    HEARING OFFICER: You know what, we didn't tell her the

16  time.

17    MS. DALTON: Is 9 o'clock okay.

18    HEARING OFFICER: Did you want to do the morning?

19    MS. PUCKETT: That's fine.

20    MS. DALTON: Will you just let her know?

21    HEARING OFFICER: Yeah. Let it say it for 9 to 1. We may not

22  need it but --.

23    MS. PUCKETT: That's fine.

1          HEARING OFFICER: Yeah.  I rather have more than not enough.

2          MS. DALTON:  Give me one second, because I lost my

3     questions.  Okay, I'm set.

4          HEARING OFFICER: Okay, she's all set.  She's sworn in and

5     ready to go.

6          MS. DALTON: Ms. Tiller, Ms. Johnson stated in her direct

7     examination that you did not ask DCPS for a public placement,

8     did you ask DCPS for a public placement for A█████?

9          MS. TILLER: Yes we did.

10         MS. DALTON: When and how many times did you ask for a

11    public placement.

12         MS. TILLER: We did so repeatedly, I don't know the exact

13    number of times, but I know the very first time was a meeting I

14    believe was on September 19th and Mr. (inaudible) was there I

15    know from DCPS.  And, Jean Tabenka was the audiologist for DCPS

16    and they referred to us the fact that they have a 3 and 4-year-

17    old program at Barnard Elementary School. And so we actually

18    visited that program and we also asked at that meeting if there

19    are one possibility.  And they said that was the program that

20    they had for oral hearing impaired children.  But for children

21    who are not using sign language, but learning to speak. .

22         MS. DALTON:  And Ms. Johnson testified that you would have

23    been advised by Part C people as to when that you had to enroll

246

623

1   and how to enroll at DCPS. Were you advised any specific time

2   period that you had enroll A████.

3       MS. TILLER: No. We were informed that we needed to have a

4   meeting to the 19th and then we arrived at the meeting on the

5   19th, the procedure was outline, i.e., call, make an appointment

6   so that A████ could be screened and I can show proof of residency

7   in D.C.

8       MS. DALTON:  Did you ask at that time to enroll A████ on

9   that date?

10      MS. TILLER: Yes.

11      MS. DALTON: And what was the response?

12      MS. TILLER: That was not possible, I needed to call.

13      MS. DALTON: And Ms. Johnson testified that there are number

14  of Head Start and Pre-school programs throughout the D.C. area

15  and that there are Part B services weren't your only option.

16  Did she ever provide to you any information about any pre-school

17  or Head Start program?

18      MS. TILLER:  No.  We were under the impression that they

19  were going offer us different educational opportunities for A████

20  within DCPS. But that we weren't supposed to go and examine lots

21  of different Head Start programs.

22      MS. DALTON: Did you at any times tell anyone that you were

23  opting out of a public placement and that you intended to keep

247

624

1    A████ at the River School?

2    MS. TILLER: No.

3    MS. DALTON: Was that your intent?

4    MS. TILLER: No.

5    MS. DALTON: Have you inquired as to whether A████ can attend

6    Janey in a regular 3 year-old classroom?

7    MS. TILLER: Yes.  I talked to the principal, Mr. Cartland

8    and he said that there is a lottery for 4 year-olds and for

9    Janey, that has already occurred for next year. But you also

10    have to be 4 by September 30th, and A████ will not be 4, until

11    October 17th. So she would not be able to attend Janey as a 4

12    year-old student next year.

13    MS. DALTON: I have no further questions, but Ms. Puckett

14    may.

15    MS. PUCKETT: I have one question.  You indicated that you

16    didn't receive any information regarding what the process was in

17    regards to your opportunities for - at the referral. Did you

18    receive any type of manual book or pamphlet from the Department

19    of Human Services at that meeting or prior to that meeting?

20    MS. TILLER: I don't recall. But I did receive some internet

21    pages that had different information on it.  It wasn't a manual

22    of sorts.

23    MS. PUCKETT: And you heard Ms. Johnson testify that the

625

1   Department of Human Services gives out some type of pamphlet or

2   something in regards that information had that? If those items

3   were in the information that you received?

4          MS. TILLER: I don't know.

5          MS. PUCKETT: I don't have any additional questions.

6          MS. DALTON: Were you ever advised by anyone as to specific

7   date as to when you when you needed to enroll A█████?

8          MS. TILLER: No.

9          MS. DALTON: Did you attempt to enroll her at her

10  neighborhood school, Janey?

11         MS. TILLER: But I did specifically ask at the September 17th

12  meeting if I should do that and if it was necessary. And I was

13  told to enroll A████ at the Care Center, or you know, bring my

14  documents about A████ to the Care Center so that DCPS would know

15  about A████.

16         MS. DALTON: I have no further questions.

17         HEARING OFFICER: Thank you. Okay we adjourned to --.

18         MS. DALTON: Unless we hear from you tomorrow, and then

19  we'll be on the books for June 20th at 9 o'clock.

20         MS. PUCKETT: And if not, we're finished.

21         HEARING OFFICER: Okay.

22         MS. DALTON: And if we're finished--.

23         MS. PUCKETT:  We'll just --.

626

1       HEARING OFFICER:  Oh yeah.

2       MS. PUCKETT:  Yeah, written closing if we're finished.

3       MS. DALTON: Want to do that Mr. Woods, so we don't have to

4  come back.

5       MS. PUCKETT: Can we have that June 1st date for a written

6  closing due if --.

7       MS. DALTON: Oh, I will. I will. I will.  Okay, let me go

8  back to make sure I write this down.  June 20th at 9 o'clock

9  right?

10      MS. PUCKETT: HmmmmHmmmm.

11      MS. DALTON: Now as far as closing arguments, what did you

12  propose?

13      MS. PUCKETT: June 1st.

14      MS. DALTON: June 1st.

15      MS. PUCKETT: Closing arguments due.

16      MS. DALTON: Okay.

17      MS. PUCKETT: That would be a week from tomorrow.  Or do you

18  want – we can go further out – I don't care.

19      MS. DALTON: No. No. No. No. I don't want to do any further

20  out, it gets worse further out. So June 1st --.

21      HEARING OFFICER: Close of business.

22      MS. PUCKETTS: Arguments due close of business.

23      MS. DALTON: Since the parent does have the burden of proof

627

1    and usually has an opportunity to go again after DCPS presents

2    their closing argument.  I would request that I be able to

3    respond her closing arguments.

4        MS. PUCKETT: When its typically done that way, I think its

5    more of a parent's submits and then DCPS response, and then the

6    parent's get the final response. But I haven't –

7        MS. DALTON: Right.

8        MS. PUCKETT: That's what I am saying, if yours is due June

9    1st, then when is mine due to response to your closing argument?

10       MS. DALTON: Well we can make my – why don't you make mine

11   the 30th and yours --. Make mine the 30th and yours the – do you

12   need to the 1st?

13       MS. PUCKETT: Are you saying 2 days?

14       MS. DALTON: Yeah to respond to the motion.

15       MS. PUCKETT: To respond to your motion?  I mean to your

16   closing?  I don't' think that is sufficient if we are going to

17   do it that way--. Unless we're just going to submit closing them

18   the same day, and just submit one closing without response.

19       MS. DALTON: Simultaneously.

20       MS. PUCKETT: Yeah. We can do it that way.  I mean that is

21   typically the way we end up doing them. Just submitting closings

22   and not responding to each others at this point.

23       MS. DALTON: Well how much time do you need. ?

1     MS. PUCKETT: I can submit that final closing by the first.

2     MS. DALTON: But if I am going to do mine on the 30th and you

3 want time to respond to mine, how much time do you need?

4     MS. PUCKETT: If you are going to do yours on the 30th, I

5 have hearings all day on the 31st and hearings all day on the 1st,

6 I would say that - that --. Wait a minute, one-second - I'm

7 looking at the wrong thing.  I can say - I can have it probably

8 by June 5th.

9     MS. DALTON: Okay, and I'll submit my response if any by

10 June 7th.

11     HEARING OFFICER: Okay.

12     MS. DALTON: Okay Mr. Woods?

13     HEARING OFFICER: That's fine.

14     MS. DALTON: Okay, DCPS.

15     MS. PUCKETT: Arguments for --.

16     HEARING OFFICER: (inaudible).

17     MS. DALTON: Yes. And then parent's response - and then your

18 10 days would run after the 7th, unless I don't respond and I'll

19 submit --.

20     HEARING OFFICER: Just let me know whether you can respond,

21 yeah.

22     MS. DALTON: All right!  Of course, we may just all be back

23 on the 20th.

629

1    HEARING OFFICER: Yeah.  If -the hearing goes --.

2    MS. PUCKETT: Are you doing yours - like a written—that's

3    okay, -- that's okay. Because it takes forever for them to log

4    stuff and put into my box.  Because I'll just be looking for it.

5    MS. DALTON: Do you want me to email it to you?

6    MS. PUCKETT: If you could email it to me.  Because I'm just

7    being honest.  Everything that --.

8    MS. DALTON: What is your email address?

9    MS. PUCKETT: Tiffany.Puckett@k12.dc.us.  So you if you want

10   to just, cause then I'll definitely, because I can't depend --.

11   MS. DALTON: Wait a minute? Tiffany Puckett.

12   MS. PUCKETT: Tiffany  dot Puckett -.

13   MS. DALTON: Is that two t's on the end?

14   MS. PUCKETT: HmmmHmmm. P U C K E T T

15   MS. DALTON: At

16   MS. PUCKETT: At K12 dot DC dot us--.

17   MS. DALTON: And yours I would just fax?

18   HEARING OFFICER: Yeah, I guess.

19   MS. PUCKETT: What is your email - what is your's?

20   MS. DALTON: e.DALTON@DALTONLAW.COM

21   MS. PUCKETT: E dot Dalton At

22   MS. DALTON: At Dalton law dot com.

23   MS. PUCKETT: E dot Dalton

630

1      MS. DALTON: Dalton law is altogether. Dot com.

2      MS. PUCKETT: I'm sending you a test email right now.  So

3    you'll get it. Because they have to log everything that comes

4    into the office, so I'm going to be in a hearing, I just want to

5    make sure I have so - instead of waiting for them to log it.

6    And it takes time to get to me.

7      MS. DALTON: And we could just fax ours to the Student

8    Hearing Office.

9      HEARING OFFICER: Yeah.  And they usually give it to us, the

10    day that you send it.  Close of business of course is the next

11    day. And they're gone, so I wouldn't get it that day.  I'll get

12    it the next day

13      MS. PUCKETT: I'll put a reminder on the 30th that you'll be

14    sending.

15      HEARING OFFICER: So tomorrow DCPS will let us know --.

16      MS. PUCKETT: If I have the documentation.

17      HEARING OFFICER: And if so --.

18      MS. DALTON: Otherwise --.

19      MS. PUCKETT: I'm going to let you guys know - HmmHmmm.

20      MS. DALTON: And then you'll let the Hearing Officer know.

21      HEARING OFFICER: I will go straight to closing arguments if

22    she don't give us the waiver.  And if she does give us the

23    waiver we'll come back on the 20yth.

1    MS. DALTON: If she doesn't.

2    HEARING OFFICER: I'm sorry if she does give us the waiver.

3    MS. DALTON: Tomorrow is scratched right?

4    HEARING OFFICER: Yes, tomorrow is scratched. Yeah.  She

5   needed a day to make sure she could those things. Okay, case is

6   submitted.

7    MS. PUCKETT: Thank you.

8     MS. DALTON: I'm really glad we're not coming back tomorrow,

9   no offense to you Mr. Woods, but I've been here too many days.

632