## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SARA & MICHAEL TILLER, *as parents and next friend of minor child* A.T.,
      Plaintiffs,

                                                    Civil Action No. 07-1736 (JR)

      v.

DISTRICT OF COLUMBIA,

      Defendant.

### FILING OF SUPPLEMENT TO THE ADMINISTRATIVE RECORD

Attached is a supplement to the administrative record filed on January 15, 2007.

In this case, an administrative due process hearing was continued on three separate dates:

May 9, 2007, May 24, 2007, and June 20, 2007.  The hearing transcript for the May 9,

2007, administrative hearing was inadvertently not filed with the rest of the

administrative record.  Thus, the administrative record transcript for the May 9, 2007

administrative hearing is attached hereto.  Consistent with LCvR 5.4(f), Defendant has

redacted personal information about the minor A.T.[1]

                                        Respectfully submitted,

                                        PETER J. NICKLES
                                        Interim Attorney General
                                        for the District of Columbia

                                        GEORGE C. VALENTINE
                                        Deputy Attorney General
                                        Civil Litigation Division

                                        */s/ Edward P. Taptich*
                                        EDWARD P. TAPTICH [#012914]
                                        Chief, Equity Section II

---

[1] Defendant has redacted the minor's name, date of birth, and social security number.

January 22, 2008

_**/s/ Amy Caspari**_
AMY CASPARI [#488968]
Assistant Attorney General
441 Fourth Street, N.W.
Sixth Floor South
Washington, D.C. 20001
(202) 724-7794
Amy.Caspari@DC.gov

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
STUDENT HEARING OFFICE

IN THE MATTER OF A T
DATE OF BIRTH ████████ 2003

HEARING DATE: MAY 9, 2007

TRANSCRIBED BY
LEGAL PERSONNEL, INC.   (301) 277-5711

1

<u>APPEARANCES</u>

HEARING OFFICER:                    FRED WOODS


ATTORNEY ADVISOR FOR
     DISTRICT OF COLUMBIA
     PUBLIC SCHOOLS                 TIFFANY PUCKETT

ATTORNEY FOR PARENT                 MS. DALTON

PARENT OF A    TI█████            MS. TILLER

EXPERT FOR PARENT                   DR. MORERE

1    HEARING OFFICER:  Hey good morning everyone. Today is

2    Tuesday - no, today is Wednesday, May 9, 2007. My name is Fred

3    Woods, the Hearing Officer convening the Due Process Hearing for

4    A████ Ti██████  And Ms. Tiller I have Anna's birthday as ████████

5    ████ 1996.

6        MS. TILLER:  No.

7        HEARING OFFICER:  Incorrect.

8        MS. TILLER:  Incorrect

9        HEARING OFFICER: Incorrect.

10       MS. TILLER:  She was born in 2█████

11       HEARING OFFICER:  Okay. Let's do this. But it is ████████

12   ████?

13       MS. TILLER:  That's right.

14       HEARING OFFICER:  Okay.  All right.  We'll take a moment

15   here and correct. - Pardon?  Oh.  Okay.  I'll make sure

16   everything - hopefully the school records do have that correct

17   birthday, because I notice the file has the incorrect date.  But

18   the record now reflects that Anna's birthday is ████████████

19   2003.

20       MS. TILLER: Correct.

21       HEARING OFFICER:  This Hearing is convened in accordance

22   with the Individuals With Disabilities Education and Improvement

23   Act and the Federal and District of Columbia laws and

1   regulations that implement the act.  My role in this Hearing as

2   the Hearing Officer would be to receive the testimony and to

3   review the documents that each party will submit and support of

4   their respective case, and then based on that information and

5   the law, reach a decision with regard to the issues presented to

6   the resolution.  That decision will be provided to the parties

7   through their attorneys within ten days of this Hearing date in

8   the form of a written order.  This Hearing is considered a

9   closed Hearing Ms. Tiller meaning that we will not invite anyone

10  else into this room unless they are witness or a party to this

11  case. If however you want it to be an open Hearing, meaning

12  anyone could come in and sit and observe, we just let the Ms.

13  Stark know and we won't put out a welcome mat, but anyone who

14  wants to come in we will allow them to come in and sit in and

15  observe.  Otherwise, we'll keep it a private Hearing.  The

16  Hearing is however being is audio recorded, so that I'd ask each

17  of you would, if you wouldn't mind making sure that you are in

18  front of a mike when you are speaking so that we make sure - we

19  could pick up your voice.  Before - before further explaining

20  how we proceed, I'd like to have everyone present to introduce

21  themselves.

22       MS. PUCKETT:  Good morning.

23       HEARING OFFICER:  Go ahead.  No, ahead.  I'll explain after

4

1    that what will happen after we take the evidence.

2        MS. PUCKETT:  My name Tiffany Puckett, attorney for DCPS.

3        MR. ABRAHAM:  Good morning Mr. Hearing Officer, Eric

4    Abraham, paralegal for DCPS.

5        MS. DALTON:  Good Morning Mr. Woods, Ellen Dalton, counsel

6    for the parent -- parents.

7        MS. TILLER:  Good Morning, Sarah Tiller, mother of A████

8    T███████

9        HEARING OFFICER:  And your husband?

10       MS. DILLER:  Michael Tiller, father of A███ T██████

11       HEARING OFFICER:  He's here, he's outside the Hearing.

12       DR. MORERE:  Good Morning. Donna Morere, PhD.,

13   Neuropsychologist for A███ T█████

14       MS. MULDOON:  Good Morning. Amy Muldoon, Director of

15   Teacher Training and Support at the River School.

16       MS. KANE:  Good Morning, I'm Mary O'Leary Kane, and I am

17   the Director of Speech and Language Services at the River

18   School.

19       HEARING OFFICER:  Let me welcome all of you here and I

20   thank you for coming here.  So Ms. Muldoon--. Is it Muldoon -

21       MS. MAULDOON:  Muldoon.

22       HEARING OFFICER: Muldoon. Pardon me?

23       MS. MAULDOON:  That's Ms. Muldoon.

1        HEARING OFFICER:  Okay.  M-U-L-D-O-O-N.  Okay. And Ms.

2    O'Leary Kane, is that correct?  Okay.  And both of you are from

3    the River School?

4        MS. KANE:  Yes.

5        HEARING OFFICER: Okay.  And is it "The," or River School.

6        MS. KANE: It's actually just River School.

7        HEARING OFFICER:  River School, okay.  And Ms. Tiller,

8    welcome again to you and I'll extend that welcome to your

9    husband, and you can tell him on break that we always welcome

10   the parent here as this Hearing is about you of course and your

11   child.  Let me ask Ms. Dalton and Ms. Tiller - the parents are

12   aware if their Due Process?

13       MS. DALTON: Absolutely, yes sir.

14       HEARING OFFICER:  Do you waive formal reading?

15       MS. DALTON: Yes sir.

16       HEARING OFFICER:  Okay.  Let me admit then the documents,

17   Ms. Tiller that the parties have provided in advance of the

18   Hearing that they want to rely on at the Hearing.  And I'll

19   refer to them as five-day disclosures or disclosure letter.  I

20   received on your behalf, Ms. Tiller a disclosure letter from Ms.

21   Dalton dated May 2, 2007 that lists ten witnesses and attached

22   and tabbed treatise.  Thirty-five exhibits.

23       MS. DALTON: For such a little young girl.

1      HEARING OFFICER: I know I was thinking, wow.  How did you

2  get that much information on a three-year old?

3      MS. DALTON: A complicated case?

4      HEARING OFFICER: Is that right?  Yeah, that is a lot of

5  information.  I was, but yes, 39 Exhibits.  Ms. Puckett are you

6  in receipt of that?

7      MS. PUCKETT: Yes I am in receipt of that.  I have no

8  objections.

9      HEARING OFFICER: No Objections.  It's submitted.  I've

10  received from Ms. Puckett a disclosure letter,  two disclosure

11  letters on behalf of DCPS.

12      MS. PUCKETT: One was submitted by Aaron Price and the other

13  one was submitted by me.

14      HEARING OFFICER:  Let me make sure I have this right then.

15  I'm going to - in the interest of time, I'll just count the

16  witnesses on the second letter.  It looks like its more there

17  than the first, to the extent that they are not duplicative.  I

18  might have to add more, I'll admit that later.  But--.  Might we

19  - this two - you all correct me because you've had a chance to

20  look at it probably longer than I.  I've received from DCPS two

21  disclosure letters dated April 30, 2007 and May 2nd, 2007 that

22  together lists twenty witnesses and attached 4 exhibits, if I

23  combine them.  Is that right?  It looks like the exhibits are

1  different in both.

2        MS. PUCKETT:  Yes they are.

3        HEARING OFFICER: Is it okay if they are numbered both 1 and

4  2 and if we can change one to 3 and 4.

5        MS. PUCKETT:  That's fine.

6        HEARING OFFICER:  Okay.  Any order?

7        MS. PUCKETT: I have no problem with that.

8        MS. DALTON:  I think Mr. Woods actually, the April 30th

9  letter was for the case that was on Monday.  So, I'm really not

10  sure that DCPS is entitled to have two disclosures, when one

11  disclosure was made in reference to the case that was on Monday.

12        MS. PUCKETT:  That is not true Mr. Woods. If you look at

13  the disclosure it does not say, what date the Complaint was set

14  for Hearing on.  It indicates that for an upcoming Due Process

15  Hearing.  The documents that are attached to that April 30th

16  disclosure are in reference to DCPS's involvement in this case

17  and are the same documents that are attached and parents'

18  counsel disclosure.  And actually, if you look at my April 2nd –

19  my May 2nd disclosure, that's the one that was actually the

20  disclosure that should have been for the Hearing that was set on

21  Monday. If you look at it is documents from Department of Human

22  Services.  And Mr. Price and I – I was assigned to one

23  complainant and he was assigned to the other complainant.

1    Subsequently the dates ended up getting mixed up.  Mr. Price did

2    a disclosure for this case.  I did a disclosure for the

3    Department of Human Services case.  If you look at my documents

4    they specifically relate to the Department of Human Services.

5    The reality is his documents came early.

6        MS. DALTON: So I would assume from what Ms. Puckett just

7    said, that the disclosure on May 2nd, was not the disclosure she

8    is relying on this case, she just stated that it's the

9    disclosure on April 30th, that they got mixed up.  I just don't

10   think she should be able to rely on two different disclosures,

11   one of which was for a prior Hearing.  I don't have a problem

12   with her picking one or the other, but there were two cases.

13       MS. PUCKETT:  (Cross-talk) the April disclosure, Mr. Woods?

14   It's the one that is related to this case.

15       MS. DALTON: Okay.  That's fine.  So that will make it a

16   shorter of witnesses that you have to count.

17       HEARING OFFICER: So if we just use the April 20th – excuse

18   me, April 30th disclosure, then --.

19       MS. PUCKETT:  April 30th disclosure.

20       HEARING OFFICER:  Six witnesses and two exhibits.

21       MS. PUCKETT: HmmmHmm.

22       HEARING OFFICER:  Ms. Dalton are you in receipt of that?

23       MS. DALTON: Yea I am.

9

1        HEARING OFFICER: Any objections?

2        MS. DALTON: No sir.

3        HEARING OFFICER: Then the disclosures are admitted as part

4    of our record.  As I understand the Hearing Request there is -

5    A█████is now 3?

6        MS. PUCKETT: There's a preliminary matter.

7        HEARING OFFICER: Oh I'm sorry.

8        MS. PUCKETT: DCPS is evoking the rule on witnesses.

9        HEARING OFFICER:  Okay. Any objection to that?

10        MS. DALTON: I have no objection to that. I would ask that

11    the Expert witness be allowed to stay.

12        MS. PUCKETT: I believe she needs to established as an

13    expert witness prior to her being to allow to stay in here.  I

14    am objecting to any witnesses that are testifying and not the

15    parent to remain in this proceeding at this point.

16        HEARING OFFICER:  Okay. What Ms. Puckett is asking is that

17    all witnesses be excluded from the Hearing Room until they are

18    called in for their individual testimony. And Ms. Dalton is

19    asking if an expert witness could stay in the room.  And Ms.

20    Puckett is objecting to that because the person, whoever that

21    is, is not been qualified as an expert witness.

22        MS. DALTON: I'd be happy to do that at this point.

23        HEARING OFFICER: Is that witness testifying based on the

1  testimony or based on the their data?

2      MS. DALTON:  Both.

3      HEARING OFFICER:  So they would have to hear DCPS's case?

4      MS. DALTON: Yes.

5      HEARING OFFICER:  DCPS is not going first.  You would.

6      MS. DALTON: I understand that.  But she may be called as a

7  rebuttal witness.

8      HEARING OFFICER:  But she can hear that case once she's in

9  though.  In other words, you're going first, so why would she

10  have to --.

11      MS. DALTON: So you want her to wait until after she

12  testifies?

13      HEARING OFFICER: No, I'm saying that --.

14      MS. DALTON:  Fine --. That's fine. I have no problem with

15  that.

16      HEARING OFFICER: Yeah, its just that if she's going to be

17  basing her testimony on DCPSs' evidence, then they are not going

18  to have it --.

19      MS. DALTON: I just want her to be able to testify in

20  rebuttal after DCPSs' witnesses.

21      HEARING OFFICER: There is no objection, if she stays in

22  after her testimony.

23      MS. PUCKETT:  Hold on. I believe she could do that.

1      MS. DALTON:  And still be able to rebut the testimony.

2      HEARING OFFICER:  And still be able --.  Well, we'll have

3  to --.

4      MS. DALTON: And still be have to rebut the testimony.

5      MS. PUCKETT: If she is establishing an expert and during

6  her testimony, then  I have no problem with her staying as a

7  witness to hear DCPS witnesses, especially if she is going to be

8  called to rebut some testimony.

9      HEARING OFFICER:  Okay. So what that means is -- I don't

10  know if the room next door is available, if not, it may be a

11  pantry.--.

12      MS. PUCKETT: It's not.

13      HEARING OFFICER: Then the pantry --.

14      MS. DALTON: Don't go too far though.  Especially, Dr.

15  Morere, because I'll probably call you next after Ms. Tiller.

16      HEARING OFFICER:  Any other preliminary matters?

17      MS. DALTON: Yes sir.

18      HEARING OFFICER:  Pardon me?

19      MS. PUCKETT:  DCPS is asking that we go to issues in

20  regards to - one of the issues our position that some of issues

21  are not valid legally as far as going forward today.  This is

22  the case in which the student has recently turned three years

23  old, has never enrolled in a DCPS school, is currently not - it

12

1    has been parentally placed prior to enrolling at the Care Center

2    and is very clear about the regulations that if a student has

3    been parentally placed by their parent, that there is no

4    individual rights to special ed services and related services.

5    They have a right to a proportionate amount of services. This is

6    a student who --.

7          MS. DALTON:  Mr. Woods, I hate to interrupt Ms. Puckett,

8    but she is doing an opening statement --.

9          MS. PUCKETT: I'm not doing an opening statement.

10         MS. DALTON: and I think it is patently unfair to let her

11   start an opening statement.

12         MS. PUCKETT:  I am saying that I think the issues should be

13   limited today, Mr. Woods.

14         MS. DALTON:  Well then say what issues.

15         MS. PUCKETT:  I think I was very clear - I think I was very

16   clear,  if I may finish --.

17         MS. DALTON: Well there are four issues.

18         MS. PUCKETT: I think I was very clear in indicating that

19   these issues should be limited.  And I will go through the

20   issues if I need to Mr. Woods.  The allegations in this

21   Complaint here today, specifically allege that DCPS is denied

22   the student FAPE for failure to develop an IEP in a timely

23   manner, failure for DCPS to provide the student with an

1    appropriate placement, as well as failure for DCPS to provide

2    the student with PT services.  In the issue I as specifically

3    relating to at this point, is the inappropriate placement issue

4    as well as the failure to provide services issue.  This student

5    is a student who was parentally placed by the parent at the

6    River School before the school year started.  The student did go

7    to the Care Center and registered as a non-attending student.

8    The student has not registered in any Head Start programs with

9    DCPS, the student has not registered in any early intervention

10   programs with DCPS.  The student is not of school age at this

11   point.  The student did - DCPS did develop a plan for this

12   student to receive related services and those related services

13   were offered at the neighborhood school.  Parent's counsel -

14   parent is arguing that a placement is inappropriate when this

15   student is not school age, does not require special ed

16   placement, there is no specialized instruction on this student

17   educational plan which is required for special ed services and

18   this student is currently attending a private school in which

19   she was in prior to going to the Care Center.  If you look at

20   their documents, they have a letter of unilateral placement,

21   which I am not sure why parent's counsel sent that letter

22   because this is not a situation with a unilateral placement. It

23   is very clear by the law that unilateral placement is for the

1   ten-day letters for students who are enrolled — who are enrolled

2   in a school by the public agency and their parents were provided

3   notice that they were going to be placing the child in a private

4   school. So that letter is far as the unilateral placement issue

5   should not apply to this case, because this is a student who was

6   parentally privately enrolled in a private school before they

7   went to the Care Center.  They are asking for reimbursement for

8   a private school that the student was currently in prior to the

9   services. If you look at this student's IEP, which was developed

10  it was only related services in which this student can be

11  provided these services at the school that was offered.  This is

12  not a child that was offered a special ed placement.  This is a

13  child who was parentally placed at a private school who was

14  offered services through the neighborhood school.  We are not in

15  that situation where this is child needs a special ed placement,

16  a location to receive services on a everyday basis, Mr. Woods.

17  I'm not sure why parent is requesting a reimbursement alleging

18  that Janie is an appropriate placement for this student. It is

19  our position that at this point, --.

20      MS. DALTON: Again, I believe that Ms. Puckett is giving her

21  opening statement.

22      MS. PUCKETT:  I believe the Hearing Officer can make the

23  determination if my points are valid or not, you are not the

1    Hearing Officer.

2        MS. DALTON: Ms. Puckett, there is no reason why to be so

3    argumentative and so --.

4        MS. PUCKETT: If you would not interrupt me while I'm

5    speaking, then I would --.

6        MS. DALTON: My problem is that you are giving an opening

7    statement and I asked you --.

8        MS. PUCKETT:  I don't need you

9        MS. DALTON: Which issues you felt were not appropriate –

10       MS. PUCKETT: – that is what DCPS is submitting, we believe

11   that a lot of these issues have not been brought legally correct

12   that is student is not a student who is enrolled in a DCPS

13   public school, is a student who recently turned three years old,

14   enrolled at the Care Center as a non-attending student who was

15   parentally placed by her parent in a private school and the law

16   is very clear as to what – what entitlements there are for

17   students who have been parentally placed by their parents. I

18   believe that if you look at the regs, Section 300.137.  It is

19   very clear that students who have been – it clearly says, that

20   no individual rights to special ed services or related services.

21   No parentally placed private school child with a disability has

22   an individual right to receive some or all of special ed or

23   related services that the child would receive if enrolled at a

1    public school.  They go on to talk about in Durkin 300.138, that

2    parentally placed private school students may receive a

3    different amount of services than a student who – then a child

4    who is placed with disabilities in a public school.  That

5    section continues to go on to talk about how students are in

6    private schools are only required to receive a proportionate

7    share of related services from the LEA as well as it talks about

8    how those services might be different than what the services are

9    that the student would have received if the student was

10   currently in a public school.  This student has never enrolled

11   in public school program like I said, the student is not even of

12   school age.  She has never enrolled in Head Start, has never

13   enrolled in our Early Intervention Plan and I am sure you are

14   very familiar with cases in which this student was enrolled in

15   an Early Intervention Plan – Intervention Service Program within

16   DCPS or a Head Start Program. This child has never enrolled in a

17   school by this Public Agency.  So this student, this case falls

18   upon section 300.137 and 300.138.  This parent is not entitled

19   to a certain amount of special ed services and related services,

20   especially not reimbursement.

21       MR. DALTON:  May I give my opening statement now, Mr.

22   Woods?

23       MR. PUCKETT:  I believe that there is -- that Mr. Woods

1   needs to -

2        MS. DALTON:  I think when he hears my opening—

3        MS. PUCKETT:  If Mr. Woods feel that our argument are more

4   of an opening argument, then Mr. Woods can indicate that.

5        HEARING OFFICER: Well, however you want to respond to Ms.

6   Puckett is fine with me.  I guess the concern is -- well I'll

7   let you go in the order you want.

8        MR. DALTON:  There is absolutely a right for the parent to

9   be here today, as you will see from the facts and from the

10  testimony. What is Ms. Puckett is referring to is when a parent,

11  parentally places a child, but there has not been denial FAPE.

12  In this case, it will be very clear to you Mr. Hearing Officer,

13  once you hear the evidence that there was a denial of FAPE. The

14  issues that are outlined in my Complaint are extremely relevant

15  and still very appropriate in this case.  Nothing has been

16  resolved, even though there was a resolution meeting. The first

17  issue with regard to whether DCPS violated ▉▉▉▉ rights by

18  failing to evaluate her in all areas of suspected disability and

19  in that particular issue goes to the evaluation of a physical

20  therapy evaluation.  And I could point to you in the documents

21  exactly where I am talking about.  This child in the very early

22  stages of her life, when she was born on October 17, 2003. She

23  was born as a typically developing child.  At two and one half

1   months she contracted bacterial meningitis which you will hear

2   from the testimony has widespread neurological impairments, can

3   result form bacterial meningitis. And in fact, that is exactly

4   what happened to poor unfortunate ▇▇▇ She did have a number

5   of neurological sequelae that happened as a result of this

6   bacterial meningitis.  She was born with normal hearing, but at

7   age fifteen months, it was determined as a result of the

8   bacterial meningitis, that she had become profoundly deaf.  She

9   had central neural deafness.  She was subsequently implanted

10   with a cochlear implant when she was thirteen months old and it

11   was activated when she was fifteen months old.  But even before

12   the hearing loss was determined and these are in the documents

13   of 1 and 2 of the parents' document is her background

14   information.  And the very last page of document 1 indicates

15   that when an April of '04, when she was 6 months old, she had

16   normal hearing, prior to the bacterial meningitis causing these

17   neurological deficits.  In any event, once you contracted the

18   bacterial meningitis, not only was the hearing affected, her

19   gross motor skills were effected and her language skills were

20   affected.  And if you look at the first documents, number 1 and

21   2 of the parents documents which are the background history of

22   A▇▇▇ it clearly shows that those were developing and

23   problematic even before the hearing loss took hold.  So we have

1   a child who is multiplied disabled.  Her parents at the time she

2   was born were living in Naples, Italy.  Her father was a doctor

3   in the military on active duty.   Shortly after she was

4   activated, the parents relocated to Washington, D.C. and she was

5   enrolled at the River School. Subsequent to that she had an IFSP

6   and again, Ms. Puckett seems to skip over the fact that she was

7   in the system because when she had an IFSP, in July 13th of 06,

8   she had registered and she had an individual family service

9   plan, and that is under part C regulations. And as you know,

10  there has to be an appropriate transition from ISFP from Part C

11  to Part B.  And in fact, the IFSP individuals responsible for

12  her plan did give appropriate invitation to DCPS in an

13  appropriate notification for the transition to occur.  The law

14  is very clear that the transition must occur by the time the

15  child is three years ago, and there has to be an IEP in place

16  for the child by the time the child is three years, unless the

17  DCPS has gotten written consent for the IFSP to continue. In

18  this case they did not.  In this case an invitation was sent to

19  DCPS on September 1st and that is parent's document number 12.

20  That invitation was sent for DCPS to attend the transition

21  meeting so that an IEP could be in place for her by October

22  17th, 03 -- '06, when she would turn three years old.  They

23  scheduled the meeting for September 19th.  DCPS participated in

1    that meeting however, no IEP was developed at that time. In

2    fact, the testimony from Ms. Tiller will be that they even

3    refused to allow her to register on that date, but told her she

4    must call an 800 number to register.  She did subsequently

5    register A████ on September 27th after making multiple phone calls

6    and I might say that when she was at the meeting on September

7    19th, she was in the same building where she could have

8    registered her.  She could have walked upstairs and registered

9    her, but they insisted that she wait and go home and call.  And

10   so she made that phone call and she actually went down to the

11   Shaw Care Center, registered the child before she turned three

12   with DCPS on September 27th and that is in the meeting notes,

13   parents document number 16.  Also on that day, DCPS prepared a

14   consent to evaluate and a student evaluation plan. It indicated

15   that they would just be reviewing outside assessments and do a

16   simple Regats evaluation.  They did not do any assessments on

17   their own except the Regats. They did not convene a meeting

18   prior to the time that A████ turned three.  And that is actually

19   parent issue number two.  That they failed to determine her

20   eligibility and develop an IEP and determine placement by the

21   time A████ turned three.  Now going back to the physical therapy

22   evaluation, the very first issue where we said they failed to

23   evaluate her in all areas, DCPS was well aware that on her ISFP,

1    because they took part in the transition plan, they were well

2    aware that she had physical therapy services on her IFSP. They

3    did not perform a physical therapy evaluation prior to convening

4    their meeting on September – Oh, I'm sorry.  They finally

5    convened an IEP meeting on February 1st, 2007, and that is in the

6    documents, parents document number 28. When they convened that

7    meeting, they did not have a physical therapy evaluation. The

8    only evaluation they had was the one that had been conducted

9    when she was under the IFSP by Little Hands and Feet.  However,

10   they were contending at the IEP meeting that she did not need

11   physical therapy.  There was a large argument about that and the

12   parent was not in agreement with that. Finally DCPS indicated

13   and this on page 6 of the meeting notes, which is document

14   number 26.  The pages are not numbered, but if you count back

15   six pages, it says physical therapy was not recommended for A█████

16   because her physical functioning does not have an adverse impact

17   in the educational environment.  However, DCPS went on to say,

18   and after there was a discussion, they finally said, that DCPS

19   recommends that a physical evaluation be completed.  What the

20   parent didn't understand and what the parent was upset with is

21   that they had had from September 19th, when they were put on

22   notice of this of A███ – all the way to February 1st.  And in all

23   that (inaudible) of time, they never performed a physical

1   therapy evaluation. They waited till the IEP meeting and then

2   recommended an evaluation. I will note that prior to the

3   convening of the meeting, there was never a physical therapy

4   evaluation completed by DCSP. However, in their answer that they

5   answered in this case, which is parent's document number 34,

6   they allege that DCPS denies that it did not evaluate A███ in

7   concerning physical therapy services.  A physical therapy

8   evaluation was conducted on November 21, 2006.  That is

9   absolutely incorrect, it was never provided to the parent, it

10  was never reviewed at the evaluation or the IEP meeting on

11  February 1st and in fact why would they in February 1st say they

12  were going to conduct an evaluation – if they say they conducted

13  one two months earlier.  With regard to the third issue, whether

14  DCPS failed at the February 1st meeting to develop an appropriate

15  IEP, including but not limited to A███ disability

16  classification as well as the type and amount of services, there

17  will be expert testimony in this case that the IEP that was

18  developed for A███ on February 1st which is parent's document

19  again number 28 is not appropriate for A███.  That she has an

20  additional disability classification beyond hearing impairment,

21  which was the only disability classification that DCPS was

22  willing to accept for A███ The expert testimony will be that

23  she in addition to that has a speech and language impairment

1    that makes her have multiple disabilities and that is the

2    classification that she should have been given.  In addition,

3    the expert testimony would be that the type and amount of

4    services that are listed on this IEP, which document number 28.

5    If you look at that, all DCPS offered to provide this student

6    once she turned three and she was eligible for special education

7    services is 3½ hours a week.  It was just related services.

8    They offered no other specialized instruction or support for her

9    and the expert testimony will be that this is woefully

10   inappropriate for this student.  And the law requires that a

11   free appropriate education be given to all students age 3

12   through 21.  With regard to the last issue, which kind of ties

13   in with the third issue with the inappropriate IEP following

14   that, they failed to provide an appropriate education placement

15   for A█████  The parent in this case gave DCPS every opportunity.

16   She went through the IFSP process. She went through the IEP

17   process. She asked them to prepare an appropriate IEP for her

18   child and propose a appropriate placement.  All DCPS ever

19   proposed in this case was related services. No placement for

20   A████she will begin either Kindergarten or first grade. For a

21   child that is multiplied handicapped, who has the disabilities

22   that A███has to leave her in what DCPS said her least

23   restrictive environment, home is absolutely going to cause her

1    great harm and cause her in the future to have to be in full

2    time special education. Currently she is able to an inclusion

3    setting with typically developing peers with the appropriate

4    instruction and specially designed instruction in language based

5    classrooms that she's in. For all of these reasons, the

6    contingents that are listed, the issues that are listed in the

7    parent's complaint are extremely appropriate and are still

8    valid.  They were valid when we filed this complaint. They are

9    valid today.  DCPS has done nothing to resolve this complaint

10   and the parent is asking that DCPS be required to place and fund

11   because they have failed to provide an appropriate IEP because

12   they have failed to provide an appropriate placement. They have

13   violated A█████ rights and therefore the parent is allowed to

14   propose an appropriate placement in which the child can make

15   educational progress.  The parent is requesting that DCPS be

16   required to reimburse since she turned, because that's when

17   their duty became to A████ to provide her with an appropriate IEP

18   and an appropriate placement.  They didn't do it.  And even when

19   they did convene the placement, or the IEP and placement meeting

20   they didn't propose an appropriate IEP or an appropriate

21   placement.

22        HEARING OFFICER: One quick - her birthday of age three,

23   10/17/06 to present.

25

1    MS. DALTON: Yes.

2    HEARING OFFICER: She's still there?

3    MS. DALTON:  Yes sir.

4    HEARING OFFICER:  Okay.

5    MS. PUCKETT:  Parent's counsel is alleging that the IEP is

6    appropriate because there is no specialized instruction. I would

7    like the Hearing Officer to take notice of the Complaint.  There

8    was no mention – no mention whatsoever that the IEP was

9    inappropriate because it did not have specialized instruction.

10   There was a mention though that they disagreed with the amount

11   of services provided for her.  She requires significantly more

12   speech and language services.  In addition, 1½  hours of pull-

13   outs speech and language and then 20 hours of Push-In Speech and

14   Language to address her significant language delays.  You do not

15   in this complaint have mention of the IEP being inappropriate

16   because no specialized instruction and I will ask that they not

17   be allowed to essentially amend this complaint today and add

18   that as in issue.

19   MS. DALTON:  Ms. Puckett the specially designed instruction

20   is the speech and language class pushing in the classroom.

21   Specially designed instruction can be designed by a speech and

22   language pathologist, a classroom teacher or other people.  So,

23   that is exactly what we're saying. We have never strayed from

26

1    that is that she requires.

2          MS. PUCKETT: If you look at the meeting notes, there was

3    never specialized instruction.

4          MS. DALTON: I'm not saying specialized instruction.

5          MS. PUCKETT:  I'm just saying Mr. Woods, you need to stick

6    within this Complaint.

7          MS. DALTON:  -- Specially designed instruction -

8          MS. PUCKETT: CAN I PLEASE FINISH. You're asking me why I'm

9    submitting --.

10         MS. DALTON: I don't know why you're talking. I'm supposed

11   to go first, it's my burden.

12         MS. PUCKETT:  Excuse me but I asked the Hearing Officer can

13   I have a response.  I did not interrupt you during your opening.

14   Mr. Woods can you please ask her to stop interrupting me!  I'm

15   trying to speak about your opening statement.

16         MS. DALTON: It's not appropriate in front of parents.

17         MS. PUCKETT: It's not appropriate for her to interrupt me

18   when I'm talking to the Hearing Officer.  I am asking you to

19   point something out in the Complaint to you that I believe is

20   very relevant to this case.  They  claim that the IEP is

21   inappropriate.  The facts that go along with the

22   inappropriateness of the IEP makes it speech and language

23   therapy.  It does not say that we did not provide the student

1    any specialized instruction.  And that was part of my argument

2    that the student does not have specialized instruction, so the

3    student does not require any type of placement where specialized

4    instruction - where is teacher is provided to provide

5    specialized instruction.  If you look at this Complaint, she

6    needs to stick within this complaint. It does not say

7    specialized instruction is required.  Look at the meeting notes.

8    We did meeting notes as well as River School did meeting notes.

9    Nowhere does it say that we are requesting specialized

10   instruction in the amount of five hours or whatever for this

11   student's IEP.  And actually River School took some very

12   detailed notes and they wrote down in the notes that we - that

13   the student is eligible for related services, but she is not

14   eligible for specialized instruction.  If you look at their

15   notes they talk about how our witness said that, she's not

16   eligible for any specialized instruction so she does not need a

17   school placement in terms of getting specialized instruction,

18   but we said she can get her related services through Janey.  So

19   my position here is that she needs to stick within what's in

20   this Complaint. You do not see a line in here that asks

21   specialized instruction in here.  Most complaints and Ms. Dalton

22   has written many of them, would say that DCPS did not recommend

23   any specialized instruction for this student.  It simply says

1    that she requires more than – more speech and language services

2    than what's proposed.  And it also says that she requires an

3    hour and a half of cool-out speech and language services.  Now

4    we all know what cool-out services as well as speech language –

5    20 hours of push-in speech and language services.  That's speech

6    and language related services Mr. Woods.  You don't have

7    anything here today saying that she needs services for the

8    special ed teacher.  And we all know that the law requires

9    specialized instruction for a child to really to be eligible for

10   special ed.  We offered her related services at Janey.  The

11   parent's counsel cannot come in here now and put down that the

12   student is required specialized instruction.  We were not

13   provided notice of that, you're not going to find it anywhere in

14   the meeting notes and she is --.

15       MS. DALTON:  Ms. Puckett if you can just --.

16       MS. PUCKETT:  CAN I PLEASE FINISH!!!!.  If she is trying to

17   amend her complaint today, I would ask that you continue this

18   matter. Because if I have to present today, why this student

19   does not need specialized instruction, I'm not able to do that

20   because it clearly says speech and language therapy, the

21   student's IEP is inappropriate because she needs more speech and

22   language therapy.  Its says --.

23       MS. DALTON: MS. PUCKETT I'M NOT ASKING FOR SPECIAL

1   EDUCATION SERVICES!!!

2       MS. PUCKETT: Please direct your comments to him.

3       MS. DALTON: You need to listen for a moment.

4       MS. PUCKETT: I don't need to listen you, you need to direct

5   your comments to the Hearing Officer.  I don't need to listen to

6   you.

7       MS. DALTON:  Mr. Woods –

8       MS. PUCKETT: Direct your comments to the Hearing Officer.

9       MS. DALTON: I don't know what Ms. Puckett's problem is

10  today, but –

11      MS. PUCKETT: I didn't' say you was  --- you were saying

12  that the IEP is inappropriate.  She mentioned in her opening

13  that the IEP was inappropriate, did not provide any specialized

14  instruction or anything. I believe if you rewind the tape, she

15  said that.  She said specialized instruction.

16      MS. DALTON: Specially designed instruction.

17      MS. PUCKETT: She did that, she said the IEP was

18  inappropriate because she needed more related services.

19  Specialized instruction and related services are completed two

20  different things.  Students can be eligible for related services

21  without being eligible for special ed, which requires

22  specialized instruction Mr. Woods.  Rewind the tape if you need

23  to, she said that it did not have any type of specialized

1    instruction in it.  And that is the only reason I brought that

2    issue up.  Because she specifically said specialized

3    instruction.

4        HEARING OFFICER: All right.

5        MS. DALTON: May I respond please/

6        HEARING OFFICER: Yes.

7        MS. DALTON: Thank you.  We are not contending that she

8    needs specialized instruction by a special education teacher.

9    We are still contending what we said in the complaint.  When I

10   used the term specialized instruction, it doesn't have to be

11   special education classes by a special education teacher.

12   Specially designed instruction is unique to an individual child.

13   In this child, this child needs significant more speech and

14   language in the class room all day long.  If you look at the

15   initial reports that were done when she was very little, they

16   said she needed to be bombarded with language throughout the

17   day. We are not saying that she needs specialized instruction by

18   a special ed teacher. We are saying that she needs push-ins in

19   speech and language services which can be specially designed

20   instruction, speech and language services by a speech and

21   language pathologist throughout her day in the classroom.  And

22   that she needs to have this in an educational environment.  That

23   1½ hours of speech and language a week to this child will not

1    allow her to make sufficient education progress to be ready to

2    enter either kindergarten or first grade.  So we're not saying

3    if Puckett would have let me talk, I could have said, we're not

4    saying she needs specialized instruction by a special ed

5    teacher.  She's not in a special education class.  She is in a

6    general education class, with a general education teacher, but

7    she has the services of a speech and language pathologist for 20

8    hours push-in a week, and that is what we are contending that

9    this student needs.

10       HEARING OFFICER: How many hours?

11       MS. DALTON: Twenty hours of push-in speech and language

12    services in the classroom and then 1½ hours pullout.  But the 1½

13    pull out is not sufficient at all for this child. And she needs

14    to be in a classroom environment with the speech and language.

15       HEARING OFFICER: Twenty hours per week?

16       MS. DALTON: Yes.

17       HEARING OFFICER:  If you're outside 1½ ?

18       MS. DALTON: Yes.

19       HEARING OFFICER: Is that 1 ½ on the IEP?

20       MS. DALTON: Yes.

21       HEARING OFFICER: It's the twenty – how much is of the –

22       MS. DALTON:  They only gave her 1 ½ hour of pullouts speech

23    and language.  The parent did not agree with the IEP.

1    HEARING OFFICER:  Does this clarify what your point was,

2  its not specialized instruction, it's the therapist.

3    MS. PUCKETT:  I understand that, but for special ed, Mr.

4  Woods there needs to be some type of specialized instruction.

5    MS. DALTON:  Absolutely not.

6    MS. PUCKETT: As far the amount of services that was

7  provided to this student Mr. Woods, I would also like to direct

8  the Hearing Officer back to the section that indicated students

9  that are parentally placed by their parents into private

10  placements are not entitled to the same amount of services as a

11  student who is in a pubic school.  I would just like you to take

12  that in consideration. Also, parent's counsel alleged that her

13  unilateral placement letter did not – she said that I was

14  focusing on when there wasn't a denial of FAPE issue.  There is

15  a section, the section that she is referring to dealing with

16  section 300.148, which is a placement of students by parents

17  when state is at issue. It does specifically discuss what I am

18  saying, and if you read that section it talks about parent's

19  removal of the student, when denial of FAPE is at a issue,

20  parent's removal of a student from a public school to a private

21  school.  This student was already privately placed prior to

22  coming to –

23    MS. DALTON:  That is a Care Center for age 3, obviously she

1    couldn't enroll at DCPS before age.

2         MS. PUCKETT: It still applies to her. She -

3         MS. DALTON:  It does not.

4         MS. PUCKETT: She could have enrolled in a early childhood

5    program and Head Start. And did not enroll in either one of

6    them. You have (inaudible) many hearings in front of you where

7    the students were not of school age, but they were in a DCPS

8    Head Start program or they were in a DCPS early childhood

9    program.  There are programs in which this parent could have

10   enrolled her child in.  There are several DCPS pre-school

11   programs.  They have not enrolled this child in any one of the

12   DCPS programs that are gullible for students prior to their -

13   prior to them being school-age Mr. Woods.

14        HEARING OFFICER:  What is the consequence of that, I'm not

15   sure?

16        MS. PUCKETT: You have been treatise as Section 300.137,

17   look at section as well as 300.138 which is the section that

18   deals with services for students who have been parentally placed

19   in a private setting by their parents. The requirements for

20   special ed services are different for students who have been

21   parentally placed by their parents prior to coming to the Care

22   Center than they are for students who might be in a public

23   school already.  I would like for you to look at those two

34

1   sections 300.137 as well as 300.138.  And actually go through

2   and read all the sections, in regards students who have been

3   parentally placed, the students - the LEA's are only required to

4   provide an proportionate amount of services for these sections,

5   that is section 300.133.

6        MS. DALTON: Ms. Puckett, you can argue those in your

7   closing argument, whatever you want to do, we need to move

8   forward with the witnesses, Mr. Wood. This is something that I

9   don't want to continue to keep arguing about.  This is something

10  she can make in hear closing statement.

11       MS. PUCKETT:  I'm not going to continue to argue, I just

12  want you to have clarity as what you are looking for when the

13  evidence is presented.  Because it is our position that the

14  student, this case has been looked at as a student who has been

15  parentally placed by a parent by a school prior to coming to

16  DCPS.  The student is not in Head Start.

17       MS. DALTON: And I would say, once the student registers,

18  DCPS has an obligation to provide an appropriate placement. And

19  if they don't provide an appropriate placement, then they have

20  violated her rights, and the parents are very much entitled to

21  ask for reimbursement.

22       HEARING OFFICER: At age 3 is the appropriate registration

23  at the Care Center?

1  MS. DALTON: Yes sir.

2  HEARING OFFICER:  Is that in the record?

3  MS. DALTON: Yes sir. It's document number twenty - hold on

4 one second - it's document number 16.  And before that you may

5 be lost when I was doing my opening statement, but there was an

6 invitation sent to DCPS to transition this child to Part B and

7 that's number twelve. That was sent from the ISFP Part C people.

8 So she was registered prior to her third birthday.

9  MS. PUCKETT:  That is correct Mr. Woods and DCPS tried to

10 convene meeting prior to that February meeting.

11  MS. DALTON:  Can we start with Ms. Tiller please?

12  HEARING OFFICER: Let me make sure I'm clear on this legal

13 piece.  If she's registered, I don't understand how that would

14 square with 137 and 138.

15  MS. PUCKETT:  Because we are responsible for providing

16 related services and special ed services to students who are

17 private school under Child Find.  Our responsibilities are

18 different for students who have been privately placed into a

19 private school. That's why I said it's going to be important

20 that you look at 300.3A,

21  MS. DALTON: But she enrolled --.

22  MS. PUCKETT: I'm trying to - The Hearing Officer asked me a

23 question. Can I please answer his question. It indicates

36

1      MS. DALTON: (whispering) It's going to be a long day.

2      MS. PUCKETT:  indicates in here - and look at 300.130, it

3   talks about the definition of parentally placed children with of

4   students with disabilities and then it talks about 30.131 talks

5   about DCPS must locate students who have been enrolled by their

6   parents in private school.  Then 300.132, goes on to talk about

7   what the basic requirements are as far what we should provide.

8   We have to provide service plans so that the students can

9   receive services. Students who are enrolled in private schools,

10   we must provide service plans so that they can receive services.

11   300.137, talks about equitable services determines has no

12   individual right to special ed and related services. No

13   parentally placed private school child with a disability has an

14   individual right to receive some or all of specialized education

15   or related services at a child would receive if enrolled in a

16   public school.  It also goes on to talk about the, it says the

17   LEA must make the final decision with respect to the services to

18   provide - to be provided to eligible parentally placed private

19   school students with disabilities.  Services planned for this

20   student served 300.130 through 300.144 if the child with the

21   disability is enrolled in an religious or other private school

22   by the parent, and will receive special ed services, or related

23   services from an LEA, the LEA must initiate and conduct meetings

1    to develop, review or revise the service plan for the student.

2    And sure a representative from a religious or private school is

3    at the meeting.  If the representative cannot attend the LEA

4    shall use other methods to insure participation. And then the

5    section under that - and I can make a copy of all of this for

6    you. 300.138 - which says, the services provided by parentally

7    placed private school children must be provided by personnel

8    meeting the same standard. - The standards where they have to be

9    qualified individuals, but section 2 of that section says

10   parentally placed private schools with disabilities may receive

11   a different amount of services than students with disabilities

12   in public schools.  It goes on to talk about equitable services

13   and what amount of services must be provided and then 300.139,

14   says vocational services. Services on prior school premises or

15   services to be provided by parentally placed private school

16   children were may be provided on the premises of private

17   including religious schools or the extent of the law required or

18   it can be from be the student's home school or site of another

19   private school.  If you through these sections Mr. Woods and --.

20        HEARING OFFICER: I can get back - just to make sure I'm

21   clear because I think we should move forward.  It's sounds like

22   you're saying this isn't typical inappropriate IEP placement

23   case. I have to filter it through this prism of (one) 1. the

1    parent has privately placed the student, she is not able - I

2    don't think you're saying this but to some extent her challenge

3    to the IEP and placement is limited.

4        MS.PUCKETT:  Exactly, because the law allows a limitation

5    on services that are provided to students who have been

6    parentally placed by their parents in private schools

7        HEARING OFFICER: Let me ask this though.

8        MS. PUCKETT: HmmmHmmm.

9        HEARING OFFICER: It sounds to me and again, I haven't read,

10    but listening to your lead of it, that those never - those

11    provisions never took into consideration whether the parent did

12    register for the services to the school system providing it.

13        MS. PUCKETT: If the parent didn't register, what do you

14    man?

15        HEARING OFFICER: Did register for those services?

16        MS. PUCKETT: The parent registered at the Care Center as a

17    non-attending student which is what parents do.  If the student

18    was registering for services within DCPS it would have been at

19    the student's home school, or if it was Early childhood program,

20    or a Head start program, then it would not have been the way

21    that she registered.  It was registered as a non-attending

22    student.

23        HEARING OFFICER: Let me make sure I'm following this. Maybe

39

1   this is just something that is not understood.  Now I'm hope I'm

2   not bringing in information from this case from the other day.

3   If the student was enrolled apparently on the date that she

4   registered which was 9/27/06, which is before her second - her

5   third birthday, she was registered at the Care Center - at least

6   according to this exhibit.

7       MS. PUCKETT: At the Care Center as a non-attending student

8   attending a private school.

9       HEARING OFFICER: Okay. But that was under an IFSP.

10      MS. PUCKETT: The student registered - the student's IFSP

11  was provided by the Department of Human Services.

12      HEARING OFFICER:  Department of Human Services.

13      MS. PUCKETT: Okay.

14      HEARING OFFICER: So they couldn't change - your duties then

15  kick in until 10/17/06.

16      MS. PUCKETT: Yeah, we had to have it in place before the

17  students are three.  But the student did not register for a DCPS

18  school.  This is a student registering as a non-attending -

19  attending a private school. So this is a student who had

20  parentally been placed private by her parent prior to coming to

21  register for DCPS services.  This is not a child that was in a -

22  say for instance the parents would have moved and went to Janey,

23  which would have been a local school and said, okay, we just

1  moved here, we want our student to be in DCPS public schools.

2  Register at Janey and say what pre-school programs do you

3  available, or what head start programs you have available.  This

4  is not the same situation.  We all know that Care Center

5  registers the students who are in private school as non-

6  attending student. This is a student who was registered as a

7  non-attending student who was parentally placed by her parents

8  into a private school.  This is not the same case, where they

9  are coming saying we want a placement at the local school or

10  coming to Care Centers saying, we want a placement for this

11  child.

12     HEARING OFFICER:  But if you are bringing them to the Care

13  Center to register and asking for an IEP and placement, how do

14  you separate those two?  That's the part I don't understand.

15     MS. PUCKETT: No. The parent never, never intended to

16  register the student within a DCPS school Mr. Woods.

17     MS. DALTON:  I don't why she can say -

18     MS. TILLER: We visited Barnhartd too.

19     MS. PUCKETT: Mr. Woods is asking me a question and I am

20  responding.

21     MS. DALTON: Well there is nothing in the registration

22  document that says she is registering as non-attending student.

23     MS. PUCKETT:  Mr. Woods if the student was not registered

1   as a non-attending student, if she was registered for a DCPS

2   program, she would not have registered at the Care Center.

3       MS. DALTON: Well that's where Mr. Brockenberry from DCPS

4   told her at the transition meeting to register, Ms. Puckett.

5       HEARING OFFICER: So that is what it comes down, if she was

6   told to register there and did not know to register at her home

7   school, is what you are saying that is the difference?

8       MS. PUCKETT: No, I'm saying that - the student is a

9   parentally placed - you cannot force them - Can I please finish—

10  goodness gracious, let me finish,

11      MS. DALTON: I am very concerned -- It is 12:15 and we

12  haven't started --.

13      MS. PUCKETT: Mr. Woods, if you wanted me to answer your

14  question.

15      HEARING OFFICER: I just wanted to be clear how to filter

16  her case through --.

17      MS. PUCKETT: This student was parentally placed before

18  registering.

19      HEARING OFFICER:  No, but I understand that.

20      MS. PUCKETT: Yes.

21      HEARING OFFICER: I think what I am hearing you say,

22      MS. PUCKETT: Yes.

23      HEARING OFFICER: That the student was parentally placed for

1    what was to happen after she registered, and I don't know if

2    that's true.  She happened to be in that school at the time of

3    registration.

4          MS. PUCKETT: Yes.

5          HEARING OFFICER:  So you're saying that cut-off

6    responsibility?

7          MS. PUCKETT:  I said that you have the treat the situation

8    as what services are available to the student differently from

9    your traditionally situation, because this is a student was

10   parentally placed by her parents.

11         HEARING OFFICER:  Let me ask you this, this may help and we

12   can just move forward.  If that piece can be dealt with

13   immediately, that might be the first piece to deal with. If –

14   keep in mind if child – her child's birthday – the parent's

15   child birthday is 10/17/03.  So she turned three on 10/17/06.

16         MS. PUCKETT: Yes.

17         HEARING OFFICER:  Would your argument hold better if they

18   came in on 11/17/06, and registered her at the Care Center and

19   she is at the River Center - the River School.

20         MS. PUCKETT:  It wouldn't matter because the student is a

21   student that was parentally placed by her parent in a private

22   school prior to registering with DCPS.

23         HEARING OFFICER: It didn't matter where she was before the

1    third year of her birth because you had no responsibility.

2        MS. PUCKETT: I understand that.

3        HEARING OFFICER: Well then how did that -- .

4        MS. PUCKETT: She was still a student.  They don't - if you

5    read that it does not say, what timeframe you an look at.  It

6    simply talks about students that were parentally placed.

7        DALTON:  If you look at 300.124, that is the transition of

8    children from the Part C programs and that clearly says that

9    DCPS has an obligation by the time the child's third birthday to

10   have in effect and IEP for the child.  So I think we can move on

11   to the testimony, I think it would become very clear once we

12   have the testimony.

13       MS. PUCKETT:  We have to have IEP's in effect Mr. Woods,

14   but we're responsible for IEPs for not only public school

15   students, we're responsible for IEPs for private school students

16   and religious school students.  If you read that section, there

17   is a whole Child Find section on these students.  So no matter

18   if she was in public school, or a private school we're still

19   required to have an IEP for her.  But that does not mean she is

20   obligated to receive all the services that a student who is

21   enrolled in a public school would receive. And that is what

22   those sections say.

23       HEARING OFFICER: Except for one thing you didn't say. It

1   didn't talk about the time period, because again.  If you didn't

2   have any obligations at the time --.

3       MS. PUCKETT:  This section does not clarify as to if it has

4   to be done before DCPS has an obligation or not.  It simply

5   talks about students and it gives you a definition of what

6   students qualify under that section.

7       HEARING OFFICER: But how do you square that with 124, that

8   the provisions.

9       MS. PUCKETT: It says you have an IEP.  It goes along with

10  each other. We have to have an IEP from these students.

11      HEARING OFFICER: But we didn't.

12      MS. PUCKETT:  But what I am saying to you is the only

13  issues when I brought this whole thing up, what I was meaning to

14  say – which I didn't get an opportunity to say, was that these

15  issues should be limited.  I did not contest the fact that the

16  IEP was not in effect

17      HEARING OFFICER: Okay.

18      MS. PUCKETT: before the day of October.

19      HEARING OFFICER: Okay, let's narrow the issue then.

20      MS. PUCKETT: Exactly.

21      HEARING OFFICER: It's quite narrow the issues.  In other

22  words, basically your case is I would have to consider that

23  because Ms. – the parents Mr. And Mrs. Tiller put A▮▮ in a

1    private school at the time they registered at the Care Center,

2    the services that Ms. Dalton argue for should be limited.

3        MS. PUCKETT: Should be limited.

4        MS. DALTON:  They are limited only to the point where DCPS

5    is obligation kicked in when she turned three.  She was there

6    under her IFSP.  We gave DCPS an opportunity when she turned

7    three. We registered her in the appropriate way, the way that

8    they told us.  We asked her to evaluate her.  We asked her to

9    hold an IEP meeting.  They did that.  They did not propose an

10   appropriate IEP or an appropriate placement, public placement.

11   The parent would have been willing to look at the public

12   placement had it been an appropriate public placement in an

13   appropriate IEP.

14       MS. PUCKETT:  (inaudible) which was Janey for student to

15   receive her services. If you look at her IEP with only related

16   services, so there was a placement proposed and if you at the

17   records, it says, the student to receive services at Janey.  The

18   student --.

19       MS. DALTON: But only the related services.

20       MS. PUCKETT: EXACTLY!! Only related services – there is no

21   specialized instruction!!!  How are we supposed - Mr. Woods that

22   is my point exactly, she just said it.  Only related services.

23   Where are the specialized instruction –

1          HEARING OFFICER: Let me just – let me move.  I think we

2     narrowed the issue so--.

3          MS. DALTON: Part of the picture is that we –

4          HEARING OFFICER: But I think this issue is very limited.

5     With respect to this issue, whether the IEP placement was on

6     10/17/06- - it wasn't correct?

7          MS. PUCKETT: It was not. It was done…-- It was done in

8     February.

9          HEARING OFFICER:  So there is no question about –

10         MS. PUCKETT: But we attempt to have a meeting in December,

11    so two months prior to it being done.

12         HEARING OFFICER:  So, were done with that issue. Now as to

13    whether there were the IEP is providing even the appropriate

14    related services --.

15         MS. PUCKETT: It is our position that --.

16         HEARING OFFICER: It does.  Because that's the issue.

17         MS. DALTON: And it is our position that it's not.

18         HEARING OFFICER: It's not.

19         MS. PUCKETT: Then that is what they need to dispute.

20         HEARING OFFICER:  And as to placement, you would say that –

21    under the current IEP, that placement at Janey is appropriate.

22         MS. DALTON: She's only saying, she would only be a drop-in

23    for those related services.  She would only go to Janey for 3½

1   a week.

2   MS. PUCKETT: But that's how students who are enrolled in

3   private schools - if you read the section we're allowed to

4   provide services like that.

5   HEARING OFFICER: I understand, but I've already dealt with

6   that piece.

7   MS. PUCKETT: Okay.

8   HEARING OFFICER: I would factor that into the discussion.

9   MS. PUCKETT:  We're allowed to provide services, it can be

10  in.. in can be in the home, in can be in the private school, or

11  in can be in the religious school, or it can be at the student's

12  home school. That's what the law says.  So we provided placement

13  at Janey for the student to receive related services.

14  HEARING OFFICER:  If the Hearing Officer were to agree that

15  there was more related services needed

16  MS. PUCKETT:  HmmmmHmmm

17  HEARING OFFICER:  and therefore the IEP is inappropriate—

18  MS. PUCKETT: Okay. Then what is my position on that?

19  HEARING OFFICER:  Yes.

20  MS. PUCKETT:  My position is that the student can receive

21  some comprehensive services. This student does not --

22  HEARING OFFICER:  Can Janey provide the services?

23  MS. PUCKETT: Janey can provide student services Mr. Woods.

1    These are related services.  The student does not need a special

2    ed - special ed teacher.

3        MS. DALTON: Mr. Woods I want to make sure you understand,

4    this is not pull-out speech and language, but this is speech and

5    language by a speech and language pathologist in the classroom.

6        HEARING OFFICER: Inside the classroom. I understand.

7        MS. DALTON: Facilitating language with the other students.

8        MS. PUCKETT: We do have students who speech and language

9    therapists who go into the classroom Mr. Woods. It does not --.

10   The client (inaudible) that are not in the IEP, does not DCPS to

11   fund a whole placement which is not what this child has on her

12   IEP.  So our problem is, if you find that the student needs more

13   services related services and we need to fund those services,

14   then that's fine.  This case does not warrant reimbursement for

15   a private school over some related services, more related

16   services needed in an IEP.

17       MS. DALTON: Mr. Woods this case does warrant reimbursement.

18   If you find that DCPS violated the students' rights. The

19   reimbursement comes in when in (inaudible) and all those cases,

20   when DCPS fails to provide an appropriate IEP, an appropriate

21   placement, then you Mr. Hearing Officer, have the authority to

22   grant reimbursement and to place that child in an appropriate

23   setting. So, with regard to the comp ed issue that Ms. Puckett

1    is arguing, first all I have never known of any local school to

2    have a speech and language pathologist in the classroom for

3    twenty hours.  I've never seen that in any DCPS school that

4    wasn't even proposed by DCPS. They say the child doesn't need

5    it.  That's their position. Not, that if you want more, we'll

6    give you more.  They never offered that, not even at the

7    resolution meeting.  They maintained that their position was

8    it's appropriate the IEP that we gave you.  And this is why

9    we're here today because IEP is not appropriate.

10    MS. PUCKETT: And I didn't' make an representation that we

11    said we would give more Mr. Woods. I believe you asked me if it

12    was found that more services were needed, what is my response.

13    My response would be the student could receive it at Janey,

14    that's what I said.

15    MS. DALTON: (WHISPERING) Sorry.

16    HEARING OFFICER: Okay. I think I understand the issues,

17    we're still looking at the -I should services is the argument. I

18    have to look at the statutes, but the issue still remain,

19    whether the IEP is appropriate and is the placement

20    MS. PUCKETT: Yes.

21    HEARING OFFICER: is the placement to implement it

22    appropriate, and I think already, we have resolved is that there

23    was no IEP in place at the time of her child.

50

1    MS. PUCKET:  We intended to put one in place a month and a

2    half after her birthday.

3    MS. DALTON: There will be testimony about that.

4    HEARING OFFICER: Well that, but yeah I didn't want to spend

5    a lot of time if it is resolved.  So is that where we're at that

6    then?  Then why don't we take the testimony and what we'll do is

7    - Mr. And Mrs. Tiller, the parents go first in these Due Process

8    Hearings, not that we're clear on the issues and Ms. Dalton will

9    call her witnesses one-by-one.  Each will give their testimony

10   based on her questioning and then to be followed by questions by

11   Ms. Puckett.  And she'll just continue down the line with her

12   witnesses.  After that Ms. Puckett will call her witnesses and

13   they will be first questioned by Ms. Puckett and then to be

14   followed by questions from Ms. Dalton and they will continue

15   until completion, and then there can be summary remarks with

16   regard to each party's positions in this matter.  So, Ms. Dalton

17   the hearing is turned over to you.

18   MS. DALTON:  Thank you sir.

19   HEARING OFFICER: Present your witnesses, on those issues on

20   the IEP and placement, and who is going to be your first

21   witness?

22   MS. DALTON:  MS. TILLER.

23   HEARING OFFICER: Before giving your testimony, do you mind

1    taking this oath. Do you swear or affirm that the testimony that

2    you are about to give would be truth?

3         MS. TILLER: I do.

4         HEARING OFFICER:  Okay, Ms. Dalton, you may proceed.

5         MS. DALTON: Thank you.  Can you please state your full name

6    for the record.

7         MS. TILLER:  Sarah Louise Tiller.

8         MS. DALTON: And are you the mother of A████ Tiller?

9         MS. TILLER: Yes I am.

10        MS. DALTON: And what is her date of birth?

11        MS. TILLER: She was born on ████████ 2003.

12        MS. DALTON: And where was she born?

13        MS. TILLER: In Naples Italy.

14        MS. DALTON: Can you describe for the Hearing Officer, the

15    background with regard to A████ birth and early developmental

16    years.

17        MS. TILLER: Yes.  A████ was born almost full term. She is a

18    twin. The delivery unremarkable. She was developing typically up

19    to the age of two and one-half months at which point she

20    contracted bacterial meningitis.  We were fortunate because we

21    caught it fairly early on, and she received the appropriate

22    medication in an Italian Hospital.  She was first treated at

23    Naval Medical Center in Naples, Italy and then moved on to the

1    Contuna Hospital for Infectious Disease.

2        MS. DALTON: How long was she hospitalized?

3        MS. TILLER: One month.  And she received antibiotics at

4    that time, and we also know that due to bacterial meningitis

5    perhaps her hearing was affected also by her immune function.

6    And so when she left the hospital, we realized that there could

7    be further questions about her development and what exactly

8    disease had brought on.  So we continued to observe her and --.

9        MS. DALTON: What are some of things that you observed early

10   on.

11       MS. TILLER: We noticed that her gross motor skills were

12   entirely affected, so she as an infant had been sitting up and

13   holding her head erect.  And she at that point, we pretty much

14   debilitated.  She needed to stay on her back a lot, and she

15   couldn't hold herself up.  And we were quite concerned and

16   continued to have regular doctor's appointments, but the other

17   thing we needed to watch for was possible deafness.  Although,

18   as most Michael and myself as parents, we noticed that although

19   she was babbling, and continuing to vocalize, she was not

20   developing in a way as parents knew what we would expect.  So at

21   six months, we had her hearing tested, just with auto acoustic

22   emissions which is actually is not really a definitive, test but

23   it is possible until that point, she was still receiving some

1    sensory input into her ears.  But after that we began to have at

2    ten months, serious questions about what the effects of

3    bacterial meningitis had been and we brought her again once

4    again to the audiologist. She had fluid in her ears so they

5    couldn't immediately tell us whether she was profoundly deaf or

6    not. But we moved on two months later to tubes placed.  We hoped

7    that a sufficient amount of the fluid had been cleared. We moved

8    on to have her sedated ABR -which checks pretty definitively

9    whether or not a child can hear.  We had one done in Naples

10   Italy, but the equipment was sub par, it was a small hospital,

11   and immediately the military allowed us to take A█████to Walter

12   Reed here in Washington, D.C. where they performed the ABR at

13   twelve months at age – I mean at fourteen months of age or so.

14   And at that point, they found in fact that she was profoundly

15   deaf in both ears.  Our concerns and one the things the Navy was

16   addressing very well was the fact that she had also had a severe

17   lag in gross motor developments, low muscle tone and balance

18   issues. So were receiving speech and language therapy because

19   she was delayed at home through the Navy in Naples, Italy and

20   also physical therapy. After she received  -- after we received

21   the information that she was profoundly deaf at Walter Reed.

22   Immediately the Navy was able to provide us with the opportunity

23   to have A█████receive a Cochlear Implant.  And she did so about

1    three weeks later.  And this brought us to early February or so,

2    yes in fact it was the 2^(nd) or 3^(rd) of February.  She received her

3    Cochlear Implant and we stayed in the United States for two more

4    weeks, and just checked on how she was going.  Michael and

5    myself took A███ back to Italy and proceeded to move the family

6    back to the states, even if Michael was stationed in Naples. We

7    did this so that A███ could receive her first audiological

8    sessions in the states.  Italy doesn't really have a

9    rehabilitation program for children with Cochlear implants yet.

10   So we had come to the states.

11        MS. PUCKETT:  I have to object.  The parent has been going

12   on for two minutes for a narrative testimony.  I do believe that

13   it is appropriate.

14        HEARING OFFICER: Okay. Why don't we --

15        MS. DALTON: I asked her to describe her early developmental

16   years.  That's what she's doing.  If you want me to ask

17   questions, I'll be happy to do it.

18        MS. PUCKETT:  It is not appropriate.

19        MS. DALTON: Well I disagree with it, anyway.  Ms. Tiller,

20   since she had her cochlear implants, you testified.

21        MS. TILLER: Yes.

22        MS. DALTON: And then when did you relocate to Washington,

23   D.C.

1    MS. TILLER: We relocated in April of 04. 05 maybe.

2    MS. DALTON: Okay. When did she – how did IFSP get developed

3  for A██████

4    MS. TILLER: We, continued to work of course with the Navy.

5  And they told me that the Navy does not provide services within

6  the United States the same way they do for overseas personnel.

7  And we needed to go through the state or district of our

8  residency, which was the District of Columbia. And so we began

9  the process of looking into how to get her enrolled in the under

10  three. Before that I thought that the Navy would provide her

11  with a physical therapist and with speech and language

12  pathology, but in fact that was not the case. So at that point,

13  we began to address the question the Part C.  And, what happened

14  there was I placed a number of phone calls and then found out

15  that I needed to prove that A████was eligible for Part C and I

16  faxed the information about her profound deafness, and they said

17  in fact she was going to be considered eligible and that we

18  should set up a meeting at our house.

19    MS. DALTON: And so was an ISFP then developed for A██████

20    MS. TILLER: It was an interim IFSP and that was because, we

21  knew – we wanted the input also from the people who had been

22  working with her. So her speech and language pathologist at that

23  time.  And so we actually met in July and we worked on that

1    interim ISFP, and then in September we got together and firmed

2    up the actual IFSP and during that time we specified what A█████

3    needs were. So we were enrolled at that time with the Part C.

4          MS. DALTON: And then did there come a time when you were

5    notified by the Part C people that you needed to transition to

6    Part B?

7          MS. TILLER: Yes.  We were informed that A███ █ third

8    birthday, that she could enroll with DCPS and not until that

9    time.  I think the confusing issue was that I asked several

10   times If we needed to enroll at Janey, just right up the street

11   from us, and we were told no, and in fact what we needed to do

12   was enroll her through --.  We needed to call an 800 number and

13   set up a time in which we proved our residency with D.C. and she

14   had a screening to see if she was eligible - what she was

15   eligible for with DCPS.  During the meeting on September -

16   during a meeting on September 19th when we were discussing an

17   IFSP --.

18         MS. DALTON: All right.  Let me back up for just one moment.

19   I want to show you what's been marked document number 12, which

20   is titled invitation to IFSP meeting.  And did you receive a

21   copy of that?

22         MS. TILLER: Yes.

23         MS. DALTON: And what was this meeting for?

57

1      MS. TILLER: Well, it was – I believe at the time that it

2  was in order for them to tell us what we needed to do in order

3  to get into the DCPS system.

4      MS. DALTON: Was there a DCPS person --

5      MS. TILLER: Yes.

6      MS. DALTON: --present at this meeting?

7      MS. TILLER: Yes. Mr. Rockenberry.

8      MS. DALTON: And where did this meeting take place?

9      MS. TILLER: That took place at the Care Center.  Shaw High

10  School I believe.

11      MS. DALTON: Okay.  All right.  You were talking about, what

12  was the date of that meeting?

13      MS. TILLER: That was September 19th.

14      MS. DALTON: And what happened at that meeting?

15      MS. TILLER: Oh, well, we all came together at the table and

16  discussed what had written on her interim ISFP plan and we

17  discussed that that should continue until her third birthday.

18  And at that point, I asked repeatedly, how I needed to register

19  her.  And I was concerned because it was a month before her

20  birthday, but in my mind a month was a sufficient amount of

21  time.  So I asked her if we needed to register her at Janney and

22  I was clearly told no, that that was not necessary. But I was

23  given a piece of paper with an 800 number on and told that I

1    needed to call this number and tell them that I needed to have

2    her screened and she needed to be - I needed to set up an

3    appointment for a screening and I needed to prove my DC

4    residency.  Which I acknowledged.  And then we began to talk

5    about what possibilities there were for a three-year-old in the

6    DCPS system. And I was told that Barnard was a possibility where

7    they had hearing impaired three and four-year-olds.  And in fact

8    I visited Barnard and went there to look at the program and see

9    if it was a possibility for A█████

10        MS. DALTON: Now this occurred at the September 19th meeting?

11        MS. TILLER: That's when we began talking about Barnard. And

12    actually I visited Barnard two or three days beforehand because

13    I wanted to be prepared to ask if there was anything else.  I

14    just wanted to see what there was within the DCPS system.  At

15    that point, I actually didn't known whether or not Janney had

16    three-year-olds.

17        MS. DALTON: But now let's stick to the September 19th

18    meeting. So they told you they needed to register. They told you

19    how to register.

20        MS. TILLER: Exactly. They told me how to register. At that

21    point, I knew that there was an office where I needed to

22    register upstairs, so I asked if I could please just walk

23    upstairs and take care of that at that moment.  But I was told

59

1   that it wasn't all right to go upstairs into the office but I

2   needed to actually call the number.  So I went out of the

3   basement into the upper area and used my cell phone to call the

4   number, but I couldn't get through to anybody. And then

5   basically I was informed that the person I needed to speak to

6   wasn't going to be there because she was in a meeting.  So the

7   next day, about 10 or 11 o'clock in the morning, I called again.

8   Once again being very concerned that the timeline – I wanted to

9   it to be finished before A███ turned three. So I was trying to

10  accelerate things as best that I could. When I finally did get

11  through to someone on the telephone, they told me that the first

12  available date to have A███ screened, which is not even being

13  enrolled but being screened was December 6th.  And I said, you

14  know she is going to be three on October ███$^{h}$ and this worries me

15  that the very beginning of the process will be on December 6th,

16  is this anything you can do?  Well Ms. Tiller at this point, I

17  don't know but I will definitely call you if we have a

18  cancellation.  And they said would it be all right for me to

19  bring A███ to sit there on Wednesday and see if anyone cancels,

20  that way I can bring her right in.  They said, we don't allow

21  that to happen. What we would like you to do is to just call us

22  on the phone.  I called them one other time which I believe,

23  maybe the next week, mid-week  and they said that there had been

1    cancellation for the 27th of September. And so I brought A⬛ in

2    on the 27th of September –

3        MS. DALTON: And when you say in, where did --.

4        MS. TILLER: To the Care Center.  Excuse me, to the Care

5    Center.  And there she went into a separate and I believe got

6    that test. I don't know what the name of the test was, but

7    anyway there was someone who was conducting the initial part of

8    the screening of A⬛  And I took my documents to support the

9    fact that I was a resident of D.C.

10       MS. DALTON: Let me show you what has been marked as

11   parents' exhibit number 16 and ask you if are those are the

12   documents you are referring to?

13       MS. TILLER: Okay. Yeah. An unexpired D.C. motor vehicle

14   operator's permit, yes; and one utility bill.  That's correct.

15   Those are the two documents that they ask me to furnish as proof

16   of residency in D.C.  So of course we had intent to register

17   with the D.C. system, and we did all this knowing that we needed

18   together at a meeting and come up with an education plan for

19   A⬛

20       MS. DALTON: Now after that September 27th date when you were

21   at the Shaw Care Center, what happened next after that?  What

22   was your next contact with DCPS?

23       MS. TILLER: We continued to go back and forth. We at that

1    point told them that we had many private assessments of A▮▮ and

2    would they agree to use those.  And there was the agreement to

3    use those.  At that point though, they also stated they needed

4    to come see A▮▮ at the school.  DCPS needed to see A▮▮ at the

5    school in order to see – to grant her eligibility.  I confirmed

6    that that was okay.  And in fact they did go and do a small

7    assessment. I heard nothing until December, and I don't have the

8    dates of the emails back and forth between myself and A▮▮s

9    case manager.  But in December --.

10        MS. DALTON: Do you remember who her case manager was?

11        MS. TILLER: I don't remember her name – Kaufman was the

12    last name, Ms. Kaufman.

13        MS. DALTON: Okay. Let me show you what has been marked

14    parent's document number 20, and is that the email that you

15    received from Ms. Kaufman.

16        MS. TILLER: Yes it is. That's right.  We received an email

17    saying, from Ms. Kaufman saying that the 22nd of December of was

18    her last date with DCPS.  And that my case manager would be

19    changing.  And did I have any time before the week of the 22nd to

20    meet.  At that point anybody who had been involved with A▮▮

21    education up to that point that needed to give us input for what

22    she needed to further her education was not available.

23        MS. DALTON: Why were they not available?

1        MS. TILLER: It was the week of Christmas or mid-year break.

2    And so that was not a week that any of were in session. People

3    were traveling and whatnot. And we had one week of time in

4    December and that did not work.  During which I said, well we

5    can't do it that week, but even if you're not there, when the

6    first available date that we can do it after that.

7        MS. DALTON: Let me show you what's been marked as document

8    number 22.  Did you then email back to her?

9        MS. TILLER: Yes and let her know that after January 2nd we

10   would be available.

11        MS. DALTON: Did you also indicate that you could available

12   before the 18th?

13        MS. TILLER: Yes.  Yeah.

14        MS. DALTON: What did you specifically tell her in the

15   email, if you can recall?  If you can't recall, ask that you

16   permitted to look at the documents in evidence?

17        HEARING OFFICER:  Which documents?

18        MS. DALTON: It's number 21, sir.

19        MS. TILLER: Right.  Okay.  I asked to be provided with the

20   all of the copies of the evaluations or reports that have been

21   conducted by DCPS.

22        MS. DALTON: With regard to the dates, what did you tell her

23   about the dates of the IEP meeting.

1        MS. TILLER: That we would be happy to do it before that in

2   order to --.

3        MS. DALTON: Before what?

4        MS. TILLER: We were happy to convene before that the date

5   in December?

6        MS. DALTON: Okay, which before the fifteen or after the 2nd?

7        MS. TILLER: Yes, absolutely.  Before the fifteen of

8   December, yes, or after the 2nd of January.

9        MS. DALTON: And that was because during that time--.

10       MS. TILLER: The whole school was in recess but we were

11  traveling as was everyone else. You know, but before the 15th of

12  December we were absolutely on board to ahead, yes.

13       MS. DALTON: And did you receive a email back from Ms.

14  Kaufman?

15       MS. TILLER: After that date, we didn't.  We just waited

16  actually to see when we would receive a letter of invitation to

17  a meeting.

18       MS. DALTON: Let me show you what is marked document number

19  22 and see if that refreshes your memory that you received an

20  email back from her.

21       MS. TILLER: Right.  I did receive it - information back,

22  but it wasn't an invitation to a meeting.  After December 22nd I

23  will not longer be working for DCPS, right.

1       MS. DALTON: What did DCPS say with regard to your offer to

2   hold it before the 15th of December.

3       MS. TILLER: They said no.

4       MS. DALTON: They said what?

5       MS. TILLER: They said they would not hold it.

6       MS. DALTON: Okay.  All right, and after that when do you

7   recall the first time that you received an invitation after

8   that?

9       MS. TILLER: I don't recall the date.  The exact date.

10      MS. DALTON: Do you recall the month?

11      MS. TILLER: March. No.  It was not March.  It was – it was

12  in late January.

13      MS. DALTON: Okay. All right.  And do you recall what

14  happened in regard to that invitation?

15      MS. TILLER: Yes, we actually were all set to have the

16  meeting and then the date of the meeting, an hour before, it was

17  set to take place, at the River School where we had requested it

18  to take place, they called and said they could not come.

19      MS. DALTON: Okay, and then after that, did you receive –

20  when was the next time you heard anything from DCPS?

21      MS. TILLER: After that it was approaching February 1st or

22  2nd.  I believe we re-scheduled a meeting for that date. I don't

23  remember if it was February 1st or 2nd.  And in fact, it did go

1   forward and we held it.

2          MS. DALTON: Now at that meeting, were there DCPS

3   representatives there?

4          MS. TILLER: Yes.

5          MS. DALTON: And did they review the evaluations?

6          MS. TILLER: We talked about the different findings from the

7   different experts, so everyone was aware of the documents that

8   we had.

9          MS. DALTON: And with regard to the physical therapy, what

10  do you recall the discussion was with regard to the physical

11  therapy?

12         MS. TILLER: The physical therapy document that had been in

13  place, had been in an evaluation by a company called Little

14  Hands and Feet.  And they clearly stated that A█████ necessitated

15  - she needed PT, Physical Therapy.  But at that meeting they

16  said, no in fact did not consider that she needed one, but there

17  hadn't been any further evaluation. So I asked that please since

18  I knew as her mother that she was actually having gross motor

19  difficulties which in fact impact her ability to you know, do

20  certain things in a class room, like sit up right for a long

21  period of time because it was all affect her core motor strength

22  - core strength, that please if they would come back and re-

23  evaluate her again. And they agreed to that.  We never received

1    that – that subsequent evaluation.  But someone did come to the

2    River School and look at A███one more time, but it quite

3    recent, in April.

4        MS. DALTON: And then after, during the after you discussed

5    the evaluations, was an IEP drafted by DCPS?

6        MS. TILLER: And IEP was proposed and I clearly stated that

7    it concerned me because it did not offer A███everything that

8    she needed.  As I said earlier, we had checked one possible

9    placement for A███ we had gone to Barnard, which had been

10   suggested to us.  And at that point, I didn't know exactly what

11   further placement they would suggest, but I was absolutely open

12   to hear what they suggested for A███ But when they said it was

13   only 1½ hours of – of you know speech and language therapy a

14   week.  I knew from A████ situation which would be (inaudible)

15   later, that would be insufficient.  So I clearly stated that

16   that seemed to me would not address A███ needs at all.

17       MS. DALTON: Okay.  I am going to show you what is marked as

18   parents' document number 28, which is the IEP dated February 1st

19   and did you sign that IEP?

20       MS. TILLER: That I attended.

21       MS. DALTON: Right.

22       MS. TILLER: I was very worried about signing it.  Because I

23   did not want to acknowledge that it was something that agreed

1    to.

2        MS. DALTON: But you did not sign it where it says that you

3    agreed to it.

4        MS. TILLER: No.

5        MS. DALTON: And then after the IEP was developed was there

6    discussion about where DCPS was proposing her placement to be?

7        MS. TILLER: There was a discussion – I do believe it was

8    said that she not offered a placement.  She offered speech and

9    language therapy and occupational therapy.  There was discussion

10   later on – you know, because I actually asked when she could be

11   begin studying at Janey and when that was possible, because I

12   know that not all children get into the three and four year-old

13   early start program.  And so I was told that she would in fact

14   be allowed in, but I was very worried about that because

15   obviously there wasn't document stating that, and I didn't want

16   to walk out of the meeting with just a verbal assurance that she

17   would be able to begin Janey immediately as a three-year old.

18       MS. DALTON: Did they tell you that she begin Janey?

19       MS. TILLER: They said that the speech and language services

20   would begin immediately. But they did not say that she could

21   attend Janey.

22       MS. DALTON: Okay, that's what I wanted to get.  What was

23   your understanding of how much time she would be at Janey?

1    MS. TILLER: Just for the speech and language therapy and

2    occupational therapy.

3    MS. DALTON: Were you supposed to take her there for the

4    related services?

5    MS. TILLER: Yes, okay. I guess what I was trying to say, is

6    that I was very concerned that she would not be in a school

7    environment being with her language being fostered all day.  But

8    that concern was not sufficiently addressed or addressed at all.

9    MS. DALTON: What did they to you in anything when you

10   raised that concern?

11   MS. TILLER: It was not - basically they told me that the

12   possibly in this case, the least restrictive environment was to

13   be at home?

14   MS. DALTON: Did you agree with that?

15   MS. TILLER: I don't agree with that. I'm not able to

16   educate my child because of her special needs.

17   MS. DALTON: I have no further questions.

18   HEARING OFFICER: Ms. Puckett.

19   MS. PUCKETT: Yes, Ms. Tiller you testified that, that you

20   went to visit Barnard and Barnard was a possibility for student

21   at the September 19th meeting, was the student still currently

22   enrolled in River School, even though you said you went to

23   Barnard?

1        MS. TILLER:  Absolutely.

2        MS. PUCKETT: Did you ever fill out any enrollment papers at

3    any local school for DCPS?

4        MS. TILLER:  No.  But we asked whether we should and we

5    were told that we did not need to. And it was not part of the

6    process.

7        MS. PUCKETT:  And when the student had an IFSP, where was

8    the student enrolled in school?

9        MS. TILLER:  At the River School.

10       MS. PUCKETT: And was that for the 2005 - 2006 School year,

11   correct?

12       MS. TILLER:  Yes.

13       MS. PUCKETT: And isn't it true that you enrolled the

14   student into the River School for the 2006 -2007 school year?

15       MS. TILLER:  Yes.

16       MS. PUCKETT: Now, you indicated that that you were, that

17   you were told to call an 800 number, and that you couldn't get

18   through and that you wanted to finish everything before she was

19   three?

20       MS. TILLER:  Right.

21       MS. PUCKETT: Why did you want to finish everything before

22   she was three?

23       MS. TILLER:  Because otherwise she couldn't get into the

1    DCPS system.

2        MS. PUCKETT: What do you mean by get into the DCPS system?

3        MS. TILLER:  Well she couldn't be enrolled in the District

4    of Columbia public school before three?

5        MS. PUCKETT: What did you say, I'm sorry?

6        MS. TILLER:  Before the age of three.

7        MS. PUCKETT: Did you intend to remove her from the River

8    School?

9        MS. TILLER:  Depending on the placement.

10       MS. PUCKETT: How is River School tuition paid? Is it ahead

11   of time or is it month-to-month, or is it --.

12       MS. TILLER:  She is currently not paying tuition at all.

13       MS. PUCKETT: Who is paying tuition?

14       MS. TILLER:  She has a grant.

15       MS. PUCKETT: And it is my understanding is the parent's

16   seeking reimbursement for River School, what reimbursement would

17   be --

18       MS. TILLER:  At this point, she is covered at the River

19   School. Her tuition is $40,000 a year, which I have not paid

20   out.

21       MS. PUCKETT: You've indicated that she has a grant, so

22   you're not paying anything for the school, correct?

23       MS. TILLER:  At this point, my salary goes toward her

1    tuition?

2        MS. PUCKETT: You currently work for the River School?

3        MS. TILLER:  That's correct.

4        MS. PUCKETT: And so there is no tuition this year, correct?

5        MS. TILLER:  The tuition at the River School is reduced by

6    40% by my salary?

7        MS. PUCKETT: And so how much are you paying?  How many

8    bills have you paid to the River School this year?

9        MS. TILLER:  It's $6000.00 a month.

10        MS. PUCKETT: $6000.00 a month.  And you have documents that

11    you pay $6000.00 a month?

12        MS. TILLER:  That's correct.

13        MS. PUCKETT: Is that in the form of cash or credit or what?

14        MS. TILLER:  It's directly removed from my account.

15        MS. PUCKETT: Directly removed from your checking account?

16        MS. TILLER:  Yes.

17        MS. PUCKETT: So your testimony that you weren't paying

18    tuition and that she was receiving a grant --

19        MS. TILLER:  But I don't do anything other than that. When

20    I received my pay, it comes directly out from our account,

21    that's correct.

22        MS. PUCKETT: So where does this grant come in that you just

23    testified about?

72

1         MS. TILLER: We have other children at the River School.

2         MS. PUCKETT: And you testified that when I first asked you

3    the question, that you weren't paying any tuition, so are paying

4    tuition or are you not paying tuition.

5         MS. TILLER:  Yes, it is removed directly from my account.

6         MS. PUCKETT: $6,000.00 a month correct?

7         MS. TILLER:  That is for all the children, yes.

8         MS. PUCKETT: What portion is being paid for A██████

9         MS. TILLER:  $40,000 a year.

10        MS. PUCKETT: Is it true that you are receiving one of the

11   benefits of your employment is your student being able to attend

12   that school at a reduced or basically no tuition?

13        MS. TILLER:  No, it's not no tuition. It is 40% reduced. So

14   --.

15        MS. PUCKETT: You testified that - all your kids go to River

16   School you said?

17        MS. TILLER: That's correct.

18        MS. PUCKETT: How many other kids do you have?

19        MS. TILLER:  Four.

20        MS. PUCKETT: And what are their ages?

21        MS. TILLER:  Nine and down.

22        MS. PUCKETT: And what's the other age?

23        MS. TILLER:  seven, six, three.

1          MS. PUCKETT: And does your nine-year old attend a DCPS

2     public school?

3          MS. TILLER:  No, but she will next year.

4          MS. PUCKETT: Where will she be attending?

5          MS. TILLER:  Janey.

6          MS. PUCKETT: And does your seven-year old attend a DCPS

7     public school?

8          MS. TILLER:  No.

9          MS. PUCKETT: Is she going to be attending one next year?

10         MS. TILLER:  Yes, well she will.

11         MS. PUCKETT: What about your six-year old?

12         MS. TILLER:  Same thing. And the other three-year old.

13         MS. PUCKETT:  You indicated that --

14         MS. TILLER:  They are attending the River School because

15     A███ needs to be at the River School.

16         MS. PUCKETT: I'm sorry I didn't ask the question, in the

17     middle of asking another one. You indicated that - DCPS agreed

18     to do a physical therapy evaluation, but at that February

19     meeting they indicated that the student did not receive

20     services, but we were going to do an evaluation.  Isn't it true

21     that DCPS had a problem with that evaluation because it was

22     conducted in a home setting and not in a classroom setting.

23         MS. TILLER:  That was not explained to me but I was fine

1   with having her evaluated in a classroom.

2   MS. PUCKETT: Did anyone say anything about - did any DCPS

3   members indicate that they had a problem with the evaluation

4   because it was in a home setting and not a school setting?

5   MS. TILLER:  That's entirely possible, during which I

6   probably said, come to the River School and evaluate her, and if

7   fact they did, much later.

8   MS. PUCKETT: You indicated that once they talked about

9   school settings, you thought about Barnard and you did bring up

10  Barnard. Who did you bring up Barnard to?

11  MS. TILLER:  Mr. Brockenberry, and everyone at the meeting?

12  MS. PUCKETT: I'm sorry. I'm at the February meeting?  At

13  the February meeting, did you bring up a public DCPS school?

14  MS. TILLER:  No, we asked what public DCPS school they were

15  proposing?

16  MS. PUCKETT: Did you say at the meeting that you wanted

17  your student to be enrolled in a DCPS public school?

18  MS. TILLER:  I said that I wanted to know what they were

19  offering?

20  MS. PUCKETT: Offer as in school, public school placement,

21  or offer as in services?

22  MS. TILLER:  Public school placement?

23  MS. PUCKETT: And who did you say this to?

1        MS. TILLER:  Everyone in the room.

2        MS. PUCKETT: Now, you also testified that – that – that you

3    believed that the student needed more services.  At the time

4    what more services did you believe the student needed?

5        MS. TILLER:  Many more hours of speech and language therapy

6    and physical therapy and occupational therapy.

7        MS. PUCKETT: So she needed more hours of OT services, more

8    hours of speech and language therapy--.

9        MS. TILLER:  OT and PT, I believe are fine amounts. I don't

10   remember exactly what it was.  But speech and language I did not

11   believe that would be sufficient at all.

12       MS. PUCKETT: And did you request more hours of speech and

13   language at the meeting?

14       MS. TILLER:  I said that I did not agree with what they

15   determined?

16       MS. PUCKETT:  Did you tell them specifically what problems

17   you had with the IEP?

18       MS. TILLER:  Yes.

19       MS. PUCKETT: And who did you tell specifically?

20       MS. TILLER:  Everyone.

21       MS. PUCKETT: And what was those specific problems?

22       MS. TILLER:  Well, number one she was classified only as

23   hearing impaired, but she is actually speech and language

1    impaired because she has a disorder called dyspraxia as well.

2    And so, I thought that just a few hours a week - two hours a

3    week or so, would not sufficient to address that.  Because she

4    needs someone to support her in her diction and in formulating

5    sentences and using words pretty much all day during the school

6    day.

7        MS. PUCKETT: And isn't it true that the DCPS speech and

8    language therapist indicated that the dyspraxia - (I'm tongue

9    tied) could be dealt with under the hearing impaired disability

10   classification and is very common for students who are hearing

11   impaired to also have those concerns?

12       MS. TILLER:  And my response to that was that -

13       MS. PUCKETT: I'm sorry - isn't it true?

14       MS. TILLER:  Isn't it true? Yes.

15       MS. PUCKETT:  And isn't the true that the student was given

16   speech and language services to address the concerns with the

17   student's speech and language concerns, as well as any speech

18   and language diagnosis?

19       MS. TILLER:  They said they would give her an hour and a

20   half a week, yes.

21       MS. PUCKETT: And isn't it true that DCPS staff indicated

22   that the student's IEP was being written not to - it was --

23   their focus was to provide the student with services that are

1   needed, and they did not need to put every eligibility

2   classification on that IEP?

3        MS. TILLER:  They said that.

4        MS. PUCKETT: And the IEP did address hearing concerns,

5   speech and language concerns, as well as some other concerns,

6   correct?

7        MS. TILLER:  It addressed it, to me not sufficiently but it

8   addressed it.

9        MS. PUCKETT:  You testified that - that you were - you were

10  under - you thought that - you were told that she could go to

11  Janey.  Who told you she could go to Janey for--.  When you said

12  she can go to Janey, what do you interpret as she can go to

13  Janey?

14       MS. TILLER:  That she can be enrolled there.

15       MS. PUCKETT: Enrolled for what type of services?

16       MS. TILLER:  I understood that she could go there as a

17  student, when she is of school age.

18       MS. PUCKETT: Of school age?  And did you request that the

19  student attend Janey now?

20       MS. TILLER:  Yes, in the sense that - well I wanted her to

21  have an educational placement now.  I don't know if I said, can

22  she start Janey next week?

23       MS. PUCKETT: Did you make River School staff aware that you

1    would be possibly be removing her from--.

2         MS. TILLER:  Absolutely.

3         MS. PUCKETT:  When did you make them aware of that?

4         MS. TILLER:  They've known that all along.

5         MS. PUCKETT: Now, did you ever sign up for any DCPS pre-
6    school?

7         MS. TILLER:  No.

8         MS. PUCKETT: Did you ever sign up for any DCPS Head Start
9    Program?

10        MS. TILLER:  We signed up for under three, so I don't know
11   what that is.  I assumed that was all she could have under the
12   age of three.

13        MS. PUCKETT: Is that a Head Start program?

14        MS. TILLER:  I don't know.

15        MS. PUCKETT: Are you familiar - are you a teacher?

16        MS. TILLER:  Of science, yes.

17        MS. PUCKETT: Are you familiar with the Head Start program?

18        MS. TILLER:  No.

19        MS. PUCKETT: Did you sign up for any early intervention
20   special ed program through DCPS?

21        MS. TILLER:  No, we just signed up for the end of three
22   that was supposed to provide her services.

23        MS. PUCKETT: When you went to register the student back in

1    September did you list her as a non-attending student?

2        MS. TILLER:  I don't think they asked me that.

3        MS. PUCKETT: Was the student a non-attending student?

4        MS. TILLER:  She was not attending DC public schools. No,

5    she was under three years old.

6        MS. PUCKETT: Is River School currently a special ed school?

7        MS. TILLER:  No.

8        MS. PUCKETT: Is the -- does the student currently have a

9    special ed teacher?

10        MS. TILLER:  No.

11        MS. PUCKETT: And is it correct that the student is only

12    receiving related services, correct?

13        MS. TILLER:  She is not receiving anything.

14        MS. PUCKETT: She is not receiving any services?

15        MS. TILLER:  No. So its has been a big problem.

16        MS. PUCKETT: And why did you reject the services that could

17    be provided at Janey if she is not receiving any services?

18        MS. TILLER:  We just said that that was not an appropriate

19    or sufficient placement, that's all.

20        MS. PUCKETT: And just going - I am return to documents at

21    this point. Who is Mary O'Levy Cain?  O'Leary Cain?

22        MS. DALTON (whispering) We need some documents.

23        MS. TILLER:  Mary O'Leary Cain?.

1      MS. PUCKETT: HmmmHmmm.

2      MS. TILLER:  She's the head of speech and language

3  pathology at the River School.

4      MS. PUCKETT: Is she currently seeing the student at the

5  school?

6      MS. TILLER:  Yes, she observes her, yes. Now A▮▮▮ at the

7  school receives speech and language all week, and then has 1½

8  hours of pullout.  But it is not DCPS services that she is

9  receiving, if I need to be clear on that.

10     MS. PUCKETT:  And are those services that you are paying

11  for?

12     MS. TILLER:  Yes. The same way, basically her tuition is

13  (inaudible).

14     MS. PUCKETT: You also testified that – who is Michael

15  Smith?

16     MS. TILLER:  He is an Occupational Therapist.

17     MS. PUCKETT: And where is currently at?

18     MS. TILLER:  He's at the River School.

19     MS. PUCKETT: Let me just, one second, of course indulgence

20  --  one second.  Did Michael Smith participate in the

21  eligibility meeting?

22     MS. TILLER:  No.

23     MS. PUCKETT: Did he participate in any meetings regarding

1    the student this year?

2        MS. TILLER:  He only came to the meeting on February 2nd.

3    (Whispering – was it February 2nd?)

4        MS. PUCKETT: That is the eligibility meeting, correct?

5        MS. TILLER:  Oh, I'm sorry.  Yes, he did participate in

6    that meeting.

7        MS. PUCKETT:  One second, let me go to,--. And what is he -

8    - is he currently providing services for this student?

9        MS. TILLER:  He is not.

10       MS. PUCKETT: Is the student receiving any type of OT

11   services at the school right now?

12       MS. TILLER:  Not right now.

13       MS. PUCKETT: Is the student receiving any type of physical

14   therapy services right now?

15       MS. TILLER:  No.

16       MS. PUCKETT: Is the student receiving any type of

17   audiological services right now?

18       MS. TILLER:  She has an audiologist at the National Naval

19   Medical Center.

20       MS. PUCKETT: And does that individual come to the school,

21   or is that individual --.

22       MS. TILLER:  That individual is at National Naval Medical

23   Center.  All those services are in place at the school. A

1    does not receive them.

2        MS. PUCKETT:  You indicated that the student currently has

3    a speech and language therapist, how long has this speech and

4    language therapist has been working with the student?

5        MS. TILLER:  Since the beginning of the school year.  Since

6    the 7th of September.

7        MS. PUCKETT:  And you indicated that she provides pullout

8    as well as class services inside the classroom?

9        MS. TILLER:  She does not provide the pullout. That's

10    another, Ms. Sarah Kuhleman who does the pullout.

11        MS. PUCKETT:  Who?

12        MS. TILLER:  Ms. Sarah Kuhleman.  I don't believe her name

13    is on any of the notes.  Cause she…

14        MS. PUCKETT: Sarah Kuhleman.  And how many hours of pullout

15    does Sarah Kuhleman provide?

16        MS. TILLER:  One hour.

17        MS. PUCKETT: One hour.  And how many hours does the other

18    speech and language pathologist provide in the classroom?

19        MS. TILLER:  Let me think about that a minute.

20        MS. PUCKETT: Excuse me.

21        MS. TILLER:  Twenty-five hours.

22        MS. PUCKETT:  Twenty-five hours?

23        MS. TILLER:  Yes.  She's with A████  all day, everyday.

1        MS. PUCKETT: Is she with students, students all day too,

2    other students?

3        MS. TILLER:  Yes, twelve students in the class.

4        MS. PUCKETT: Is she assigned to that classroom, or he is

5    she specifically assigned to --.

6        MS. TILLER:  She is one of the classroom teachers.

7        MS. PUCKETT: One of the classroom teachers.

8        MS. TILLER:  Speech and language pathologist, yes.

9        MS. PUCKETT: So is her role a teacher, or is her role a

10   speech and language therapist?

11       MS. TILLER:  Both.

12       MS. PUCKETT: And approximately how much one-on-one time

13   does she provide to A████

14       MS. TILLER:  I don't know.

15       MS. PUCKETT: How many students are in the classroom?

16       MS. TILLER:  Twelve.

17       MS. PUCKETT: And does all the students receive speech and

18   language services from her?

19       MS. TILLER:  No.

20       MS. PUCKETT: No?

21       MS. TILLER:  But I am not comfortable here because I don't

22   know exactly what the model is for the River School.  Perhaps

23   they consider the typically hearing children are also receiving

1    speech and language.

2         MS. PUCKETT: Now going back to - the OT evaluation and the

3    February meeting.  Isn't is true that Michael Smith, the River

4    School's Occupational Therapist also agreed that there needed to

5    be a PT done at the school, instead of - because the student had

6    been assessed in the home setting?

7         MS. TILLER:  Yes.

8         MS. PUCKETT: How many hours a day does the student spend at

9    River School?

10        MS. TILLER:  From 8 in the morning until 3 --. 8:25 I

11   believe till three.

12        MS. PUCKETT:  And my understanding is that she has a speech

13   and language therapist and a teacher in the classroom?

14        MS. TILLER:  Correct.

15        MS. PUCKETT:  Are there two individuals in the classroom?

16        MS. TILLER:  Correct.

17        MS. PUCKETT: Speech and language therapist and a teacher?

18        MS. TILLER:  Correct.

19        MS. PUCKETT: And that the speech and language therapist is

20   also a teacher?

21        MS. TILLER:  There is one teacher who is speech and

22   language pathologist and there is one teacher who is an

23   educator.

1      MS. PUCKETT: Does the speech and language therapist provide

2  academic teaching along with the speech and language services to

3  the classroom?

4      MS. TILLER:  Yes.

5      MS. PUCKETT: Do you know how many hours of academic

6  teaching that do no relate to speech and language that she

7  provides to the student?

8      MS. TILLER:  I really don't know.  I don't know how to

9  split it out.

10      MS. PUCKETT: Your complaint indicates that you believe that

11  the student needs at least 20 hours of weeks of pull-in speech

12  and language services.  Isn't it true that this student is not

13  receiving 20 hours a week from this speech and language

14  therapist --?

15      MS. TILLER:  She very well--.

16      MS. PUCKETT: Can I please finish the question? From a

17  speech and language therapist who is also providing academic

18  services as a teacher in this classroom.

19      MS. TILLER:  I can't say that that is a true statement.

20      MS. PUCKETT: Twenty hours a week would require her to spend

21  four hours a week with A███ providing services, correct?

22      MS. DALTON:  I'm going to object to the form of the

23  question.

1      HEARING OFFICER: You're just doing the math?

2      MS. PUCKETT:  Yes, I'm doing the math.

3      HEARING OFFICER:  Five days a week?

4      MS. TILLER:  Four hours a day, it is entirely possible that

5      A███ receives that?

6      MS. PUCKETT: But you don't know?

7      MS. TILLER:  I'm her mother. Yes, that's true.  I'm not

8  watching it happen, but it is entirely possible that she

9  receives that much.

10     MS. PUCKETT: And so how did you come up with the number of

11 - she needs twenty hours of week of pull-in services.

12     MS. TILLER:  That's what we discussed with the different

13 experts that she would need for her situation.

14     MS. PUCKETT: You, participated in the discussion of

15 placement at the February meeting, do you recall Ms. Johnson -

16 Ms. Saundra Johnson indicating that the student really did not

17 need special ed services, she just needed related services?

18     MS. TILLER:  I do not remember that. But it is very

19 difficult for me because it's so lingo involved.

20     MS. PUCKETT: Maybe something will refresh your memory.  Can

21 you show your clients, your meeting notes from - these are the

22 meeting notes from the River - these are the meeting notes that

23 the River School prepared. And they are parents document number

87

1    27, and I believe it is second to the last page.  The top, these

2    are notes from River School, where Saundra stated that she is

3    not a special ed student, that she – that she does not need a

4    special educator because of no cognitive deficits.  And that she

5    stated that when the school – that when the student reaches

6    school age and enters school-age program, one can be provided by

7    the time for addressing her hearing and speech and language

8    skills. I believe you're talking about FM; do you recall that?

9         MS. TILLER:  I recall that discussion, yes.

10        MS. PUCKETT: And isn't true that DCSP staff believed that

11    this student only needed related services?

12        MS. TILLER:  That's what they put on the IEP.

13        MS. PUCKETT: Did you ever request specialized instruction

14    for this student?

15        MS. TILLER: Special Ed?

16        MS. PUCKETT: No.  Have you ever requested specialized

17    instruction with a special ed teacher for this student?

18        MS. TILLER: I don't think so.

19        MS. PUCKETT: Do you believe that the student requires

20    instruction by a special education teacher.

21        MS. TILLER:  I think she for sure requires speech and

22    language pathologist.

23        MS. PUCKETT:  What about a special ed teacher?

1       MS. TILLER:  What do they do?

2       MS. PUCKETT: Are you a teacher?

3       MS. TILLER:  This is a serious question, what exactly would

4   a special ed teacher do that is different from a regular

5   teacher?

6       MS. PUCKETT: I can't answer questions, but do you believe

7   that the student needs services provided by a teacher who is

8   certified to teach students who have special needs? A special ed

9   certified teacher?

10      MS. TILLER:  She needs someone who is qualified to teach

11  someone with speech and language needs and someone who knows

12  about her cochlear implant and the equipment.

13      MS. PUCKETT:  So that is a no for a special ed teacher?

14      MS. TILLER:  I guess.

15      MS. DALTON: I'm going to object.

16      MS. PUCKETT: She's not angering the question.

17      MS. DALTON: She's already told you.

18      MS. PUCKETT: I can ask her a yes or no question, and I ask

19  --.

20      MS. DALTON: And she didn't' know what you termed to be a

21  special education teacher.

22      MS. PUCKETT: She is a teacher. We all know.  She is

23  assuming --.

1

2  MS. TILLER:  I'm not trying to.  The only thing I am trying

3 to say is that I don't want to dis-acknowledge that A▮▮ needs

4 lots of help, i.e., support from a speech and language

5 pathologist.

6  MS. PUCKETT: I'm not saying that. I'm saying does she

7 believe that the student needs support from a special education

8 teacher?

9  HEARING OFFICER: Why don't you ask it in --. She said she

10 didn't know what--.

11  MS. PUCKETT: And then I changed the question - I said do

12 you believe that she needs special ed services by a teacher who

13 is certified to address the needs of students who have special

14 needs?

15  MS. TILLER: That must be a whole gamut of certifications.

16  HEARING OFFICER: I don't know if she knows. Are you saying

17 --?

18  MS. PUCKETT: I'll strike that.  Do you know what a special

19 education teacher is?

20  MS. DALTON: I'm going to object because that she is being

21 argumentative.

22  MS. PUCKETT: I am not being argumentative.

23  MS. DALTON:  Every since that we've walked in here, you've

1    been extremely hostile.

2         MS. PUCKETT: If you not would have interrupted me, very

3    unprofessionally, like you did several times, that we would not

4    be at this point okay.  Mr. Woods I don't believe my question is

5    unreasonable, she is a teacher.  We all know what specialized

6    instruction is. It is required to be provided by a teacher who

7    is certified in special ed.

8         MS. DALTON: It must be different all over the world.

9         MS. PUCKETT: I am asking a question if student needs

10   services from a special teacher.  If we are here on a special

11   complaint, this is very relevant question.  I'm sorry but I

12   believe that the witness is still under oath and I'm in cross

13   and she is talking to her attorney.

14        HEARING OFFICER: That wasn't.

15        MS. TILLER:  And just to be sure, I don't know how exactly

16   to proceed. I don't want to hurt ████ but saying anything that I

17   don't understand.

18        HEARING OFFICER: And I understand the nature of this

19   question is getting to placement.  And one of things you might

20   recall is when we were initially discussing the issues in this

21   case is whether or not A██ needed specialized instruction.  You

22   don't understand what that means?

23        MS. DALTON: We're not asking for that. Is that clear?

1          HEARING OFFICER: She is asking --.

2          MS. TILLER: She needs something than other than what she

3     would happen if she were just sitting in a local public school

4     everyday. She needs what we have been tried to specify all the

5     long.  She needs quite a lot of speech and language therapy.

6     She needs occupational therapy, and she needs physical therapy.

7          HEARING OFFICER:  Does that answer that question?

8          MS. PUCKETT: I'm checking it as non-responsive and she

9     needs and she doesn't need any specialized – she is not asking

10    for specialized instruction.

11         MS. DALTON: I'm going to object because she said she didn't

12    understand what you were saying. Specialized instruction is

13    different from special education --.

14         MS. PUCKETT:  She didn't want to answer it Mr. Woods.  The

15    reality is everyone who is an academic arena knows what special

16    ed teacher is.

17         MS. DALTON:  She testified previously that she did not

18    believe that she needed special education instruction by a

19    special education teacher.  The record will reflect that she

20    said that.  The record will also reflect that she said she did

21    believe she needed instruction by a speech and language

22    pathologist.

23         MS. TILLER:  Right.

1    MS. DALTON: I am saying that is specialized instruction.

2    MS. PUCKETT:  I believe she said services.

3    MS. DALTON: She said that from the very beginning.

4    MS. TILLER:  This is what worries me. I don't know what the

5    right term is.  But I hope I'm being clear in what we think A

6    needs.

7    MS. PUCKETT: I don't think I can clarify it anymore than

8    what I've did.  I'll continue.  At the -- .  In going back to the

9    February meeting, was there - do you recall there being a

10    discussion with Michael Smith and Zandra Johnson in regards

11    Janey being able to provide the OT and PT services if they were

12    put on the IEP.

13    MS. TILLER: I remember that, yes.

14    MS. PUCKETT: And do you recall Ms. Johnson indicating that

15    if Janey did not have something and they would provide and make

16    sure that the person over there provides it for the student?

17    MS. TILLER:  Yes.

18    MS. PUCKETT: And isn't it true that DCPS indicated that

19    this student services can be provided essentially the day after

20    the meeting?

21    MS. TILLER:  Yes.

22    MS. PUCKETT: And isn't it true that - I'm sorry. Strike

23    that.  Did you ever at the meeting tell DCPS that you were not

1  going to be sending the student to Janey for services?

2      MS. TILLER:  No.

3      MS. PUCKETT: Isn't it true that DCPS indicated that if

4  there's with any services that were missed because of

5  transportation or problems with transportation that we would

6  have no problem making those services up?

7      MS. TILLER:  There would have no problem with making up

8  services. I remember that.  I don't remember the transportation

9  issue.

10     MS. PUCKETT: Do you recall there being discussion with you

11 and Ms. Johnson in regards the individual who would be working

12 the student as far as hearing impairment and some of the things

13 she'd be working on with that student?  As far as testing?

14     MS. TILLER:  I don't remember that.

15     MS. PUCKETT: Now you indicated that someone recently came

16 up to the school in April to do testing?

17     MS. TILLER:  I believe that someone came to physical

18 therapy.  But we never received a report.

19     MS. PUCKETT: And about how long ago was that?

20     MS. TILLER:  That was about a month ago?

21     MS. PUCKETT: And do you know that individual's name?

22     MS. TILLER:  I do not; except that I think he is on some of

23 these documents, so someone I've met before.

1      MS. PUCKETT: And was there – did DCPS provide a – hold on

2  one second -- one second – Was there a physical therapist at

3  the meeting, the February 1st meeting?

4      MS. TILLER:  There was.

5      MS. PUCKETT: Do you recall who the physical therapist

6  worked for?

7      MS. TILLER: It was DCPS.

8      MS. PUCKETT: And isn't it true that the physical therapist

9  believed at the time that he student physical therapy was not

10  warranted in the school environment?

11      MS. TILLER:  That's correct.

12      MS. PUCKETT:  Did – Was there a River School or an

13  Independent Physical Therapist to say otherwise at the meeting?

14      MS. TILLER:  We just had a report from an individual – I

15  mean from a different physical therapist from Little Feet and

16  Hands, Ms. Pam Brown-White?

17      MS. PUCKETT: He was there?

18      MS. TILLER:  "She" – She was not there.

19      MS. PUCKETT: Was that the report that Mr. Smith, who is

20  from River School as well as --.

21      MS. TILLER:  He's OT.

22      MS. PUCKETT:  Okay.

23      MS. TILLER:  He is Occupational Therapy.

1      MS. PUCKETT: No I'm – was that the report that Mr. Smith,

2  who is the Occupational Therapist as well the DCPS staff had

3  concerns with because it was conducted in a home setting instead

4  of a school setting?

5      MS. TILLER:  Yes.

6      MS. PUCKETT: Now, and I want to take your attention to

7  parents' document, I believe number 25.  Which is a letter from

8  River School to DCPS.  Is River School the current LEA for the

9  student?

10      MS. TILLER:  What's LEA?

11      MS. PUCKETT: If you don't understand – then you can't ask

12  me questions.

13      MS. TILLER:  I'm sorry.

14      MS. PUCKETT: If you don't understand, then you just don't

15  understand.

16      MS. TILLER:  Okay. I don't understand.

17      MS. PUCKETT: And I see that there is a letter written to

18  DCPS, attempting to convene a meeting – why the school trying to

19  convene an IEP meeting if they are not the LEA?

20      MS. TILLER:  I know of an LEA.

21      MS. DALTON: I'm going to object, she just stated before she

22  doesn't --.

23      MS. PUCKETT: Why was the school attempted to --.

96

1          MS. TILLER:  All of the people who needed to be working

2     with ███ that needed to speak at the IEP were at the River

3     School at that time, except for Ms. Pamela Brown-White, who

4     subjected - who had already submitted her report earlier.

5          MS. PUCKETT:  One second.  How long has ██ been at the

6     River School, altogether?

7          MS. TILLER:  She attended the parent-infant group there

8     when she was very tiny and that was right after the Cochlear

9     implant, and then the former school year, say 2005-2006, she

10    attended two days a week.

11         MS. PUCKETT: Is this her first year attended the whole day?

12         MS. TILLER:  Yes.

13         MS. PUCKETT: And last school year was she receiving any

14    related services by River School? 2005 -2006.

15         MS. TILLER:  2006.  She at that point was doing the speech

16    and language with Meredith Willette one hour a week. And she was

17    doing half a school day, two hours a week with a teacher and a

18    speech and language pathologist in a class.

19         MS. PUCKETT: one-half a school day?

20         MS. TILLER:  Two days a week.

21         MS. PUCKETT: You indicated that you went to Barnard prior

22    to the September meeting?

23         MS. TILLER:  Yes.

1    MS. PUCKETT: Who did you speak with at Barnard?

2    MS. TILLER:  We were lead around the school by audiologist

3    called Jean Tambenka.  And so we went into the various

4    classrooms, I don't remember the people's names, but basically

5    we went into a program with three small children who were

6    hearing impaired and then we visited a typically hearing program

7    with three and four year olds, and a bilingual program where

8    they were speaking Spanish and English with three and four year

9    olds just to see the schools.

10    MS. PUCKETT: Were there Head Start Programs or Pre-School

11    programs.

12    MS. TILLER:  I think they were called Head Start. I'm still

13    a little - You know I don't know what Head Start and what's Pre-

14    school, but they were three and four year olds of the DC Public

15    School.

16    MS. PUCKETT: Did you ask anyone at Barnard how to enroll in

17    those programs?

18    MS. TILLER: We just had an on-going discussing enrolling in

19    DCPS.

20    MS. PUCKETT: With Barnard staff?

21    MS. TILLER:  I don't know, I don't think so.  This was with

22    Mr. Brockenberry at that other meeting we talked about enrolling

23    with DCPS in general.


98

1      MS. PUCKETT: And, I know you indicated in your Complaint

2   that you believe the student should be found eligible for

3   hearing impaired/multiple - well basically multi-disabled,

4   hearing impaired and speech and language impairments?

5      MS. TILLER:  Yes.

6      MS. PUCKETT: Isn't it true at that meeting DCPS believed

7   that her main - the student's main disability was hearing

8   impairment which her speech and language deficits were result of

9   her hearing impairment?

10     MS. TILLER:  That's what they said.  Yes.

11     MS. PUCKETT: I don't have any additional questions.

12     HEARING OFFICER: Ms. Dalton.

13     MS. DALTON: Thank you Mr. Woods.  Ms. Tiller in the four

14  months that DCPS had from the time you enrolled her, until the

15  time that they actually convened the meeting which was in

16  February did they ever attempt to conduct a physical therapy

17  evaluation?

18     MS. TILLER:  No.

19     MS. DALTON:  At the meeting in February, at the IEP

20  meeting, did they then agree that a PT evaluation should be

21  conducted?

22     MS. TILLER:  In February they agreed that a PT evaluation

23  should be conducted.

1    MS. DALTON:  And what was your concern with regard to that?

2    MS. TILLER:  I was - I wanted her to have a PT evaluation

3    because I feel as a mother that she needs physical therapy.

4    MS. DALTON: Were you concerned at all of the fact that it

5    hadn't been done prior to the meeting?

6    MS. TILLER:  Yes. I was concerned because it needed to be

7    discussed at that meeting, but also because up until this point

8    she has not received PT. So time has passed.

9    MS. DALTON:  And at any time from the time that you started

10   speaking with DCPS personnel or people, did anyone ever advise

11   you about enrolling in any other way other was than through the

12   Shaw Care Center.

13   MS. TILLER: No. I was specifically told not to enroll at

14   Janey.

15   MS. DALTON: And were you advised of any Head Start or Pre-

16   School Programs that you could enroll your daughter in?

17   MS. TILLER:  Immediately. No.

18   MS. DALTON: I have no further questions.

19   HEARING OFFICER:  Okay. Thank you.

20   MS. TILLER:  Can I take a short break and then proceed?

21   HEARING OFFICER: We here and continuing with the parents

22   the case, Ms. Dalton are you prepared to call your next witness?

23   MS. DALTON:  Yes sir.

1      MS. PUCKETT: Are we discuss scheduling.  You said something

2  about --.

3      MS. DALTON: Can we do this witness and do that toward the

4  end of the day.

5      HEARING OFFICER: Let's do that yeah.

6      MS. DALTON: I don't want to hold her up.

7      MS. PUCKETT: That's fine.

8      HEARING OFFICER: M'ame do you mine taking that off before

9  giving your testimony.  Do you swear or affirm that the

10  testimony you about to give would be the truth?

11      DR. MORERE: Yes I do.

12      HEARING OFFICER: You'll be first questioned by Dalton and

13  then be followed by question from Ms. Puckett.

14      MS. DALTON:  Can you please state your full name for the

15  record Ms. Morere.

16      DR. MORERE: Donna Anne MORERE.

17      MS. DALTON: Can you please briefly describe your

18  educational background and your degrees.

19      DR. MORERE: I have a doctorate in clinical psychology with

20  a neuro psychology specialization from the University of Alabama

21  at Birmingham, with an internship in neuro psychology at the

22  Veteran's Administration in Memphis and a post-doctoral neuro

23  psychology training at University of Rochester Medical Center.

1    MS. DALTON: And what is your professional work experience

2 please?

3    DR. MORERE: I have a private practice in clinical neuro

4 psychology specializing in deafness with a subspecialty focusing

5 on the assessment of deaf children with additional disabilities

6 affecting language development and also an Associate Professor

7 of Psychology in the clinical psychology program at Galludet

8 University, teaching psychology to deaf and hard of hearing as

9 well as hearing graduate students within that, my primary

10 teaching responsibilities are associated with the biological

11 courses including teaching neuroanatomy and neurophysiology and

12 psychopharmacology as well as teaching intellectual assessment

13 and neuropsychological assessment.  I'm also frequently called

14 upon to provide supervision of cases at the mental health center

15 at Galludet that are being performed by students who have cases

16 involving neuropsychological assessments or complex pediatric

17 cases.

18    MS. DALTON: I want to show you what's been marked as

19 parents' exhibit number 39, and ask you if that is your

20 curriculum vitae?

21    DR. MORERE: That is, it's actually a little outdated, but

22 yes that is it.

23    MS. DALTON: Are there any additional publications or items

102

1   that you would want to pay particular attention or emphasis that

2   are not on this current curriculum.

3       DR. MORERE: Well there are a couple of things.  I had a

4   publication of a paper, just in the past couple of months on the

5   Neuropsychological Assessment of Deaf Individuals and

6   Individuals with Physical and Vision Disabilities.  Also this

7   past year, I provided a workshop at the National Academy of

8   Neuropsychology in conjunction with one other individual

9   concerning neuropsychological assessment of individuals with

10  disabilities, including vision, motor disabilities and hearing

11  loss. In the fall I provided a workshop for Kendal Demonstration

12  Elementary School on diagnosis and intervention of children with

13  multiple disabilities affecting language development with

14  particular note of children with non-verbal learning

15  disabilities and primary language disorders and the differential

16  diagnosis and differential interventions for those children.

17  Also at the National Academy of NeuroPsychology meeting, there

18  were a couple of posters on complex cases, that were presented

19  and during the past year I presented it at a number of

20  conferences, again, diagnosis and intervention with deaf

21  children who have additional disabilities affecting language

22  development.

23      MS. DALTON: Okay. At that time I would ask that Dr. Morere

1   be qualified as an expert in the field of clinical

2   neuropsychology.

3        HEARING OFFICER:  MS. PUCKETT:

4        MS. PUCKETT: (inaudible), so I'm objecting right now.  You

5   indicated that you have presented in regards to hearing

6   disorders in regards with disability classifications, when with

7   recently you did you present in regards to that?

8        DR. MORERE: I'm not sure – you're saying classifications of

9   hearing disorders?

10       MS. PUCKETT: Yes.

11       DR. MORERE: I'm not an audiologist, I'm a psychologist.

12       MS. PUCKETT: I know but you indicated that – and maybe I

13  didn't hear you correctly, you said something in relation to

14  presenting or you did a publication in regards how hearing

15  disorders are impacted by the students disability ––. It was

16  really fast.

17       DR. MORERE: Okay, I'll present more slowly.  I was

18  presenting for example, in the Fall, I presented at Kendal

19  Demonstration Elementary School, children – deaf children who

20  have additional disabilities affecting language development,

21  diagnosis and intervention of children with additional

22  disabilities affecting language development.  So children who

23  have a hearing loss but who have additional conditions that

1    affect their language development in addition to what would be

2    expected of a child who just has a hearing loss now.

3        MS. PUCKETT: Have you been found an expert in any other

4    jurisdictions?

5        DR. MORERE: Yes.

6        MS. PUCKETT: Which ones?

7        DR. MORERE:  Well, in D.C. and Texas and in California, in,

8    -- let's see I think it was Detroit, so the Michigan area.

9    That's all I could come with up.

10       MS. PUCKETT: What was that area specifically?

11       DR. MORERE: Clinical Neuro psychology.

12       MS. PUCKETT: Clinical Neuro Psychology.  And you indicated

13   that re- NBC and how recent was that.

14       DR. MORERE: Just last year.

15       MS. PUCKETT: Was that within the Court system or within--.

16       DR. MORERE: It was for a Due Process hearing.

17       MS. PUCKETT: Due Process hearing.  Do you remember which

18   Hearing Officer it was?

19       MS. DALTON: I'm going to object to this line of

20   questioning.  I'm not sure it's even.

21       MS. PUCKETT: I'm not even - Mr. Woods.  Can I ask her my

22   last question please?  I do believe I have the right to Voir

23   Dire the witness.

1    HEARING OFFICER:  She hasn't --.

2    MS. DALTON: But I have the right to object to a question.

3    MS. PUCKETT: I just asked her four questions. And I didn't

4  anticipate asking many more, I just asked her which Hearing

5  Officer was it? I do believe I have a right to know that

6  information, if she does not know who that Hearing Officer is,

7  then she can say she does know the witness.  And I would ask Ms.

8  Dalton to please stop interrupting me when I am trying to do my

9  job.

10    MS. DALTON: I'm allowed to insert objections.

11    MS. PUCKETT: What is the objection?

12    MS. DALTON: I just told you I'm objecting to the

13  questioning of asking her what the name of the Hearing Officer

14  is because it is not relevant to this case.

15    MS. PUCKETT: I think it is relevant to this case Mr. Woods

16  because she indicated that she has been found an expert in this

17  arena, and that I think it is relevant to know what Hearing

18  Officer she was found an expert, it could have been you. It

19  could have been you.

20    HEARING OFFICER: Is it, is it --. It's relevant --

21    MS. PUCKETT: To her in regards to her being an expert.

22    HEARING OFFICER: Not to your believing whether she has been

23  qualified--.

106

1        MS. PUCKETT: No, not to me believing she said that, why

2    would she lie on the record.  I'm just asking a question.

3        HEARING OFFICER:  Well what - would it be -

4        MS. PUCKETT: Because I want to know which Hearing Officer -

5    she said in this jurisdiction. I'm trying to find out what

6    Hearing Officer.  She indicated several other places; I want to

7    know which Hearing Officer she found an expert in front of?

8        HEARING OFFICER: If you know?

9        DR. MORERE: I don't recall.

10        MS. PUCKETT: I mean she has been found an expert in the

11    past. I don't have any additional questions.

12        HEARING OFFICER: Any objections?

13        MS. PUCKETT: In the area of Neuro psychology, it appears

14    that she has been found an expert, and this jurisdiction before.

15        MS. DALTON: Dr. Morere are you familiar with A Ti

16        DR. MORERE: Yes.

17        MS. DALTON: And have you reviewed prior or previous

18    evaluations regarding her developmental speech and language

19    occupational therapy and physical therapy?

20        DR. MORERE: Yes.  Although with the physical therapy, I've

21    only seen the developmental evaluations.  I haven't seen a

22    specific PT evaluation.

23        MS. DALTON: And have you also had an opportunity to observe

1   A█████

2       DR. MORERE: Yes.

3       MS. DALTON: And can you say approximately when you observed

4   her.

5       DR. MORERE: I believe it was March 16th, and I spent about

6   an hour and a half observing her at the River School.

7       MS. DALTON: Okay.  And then have you had an opportunity to

8   review her evaluations and her developmental history and based

9   on that, and based on your review of her developmental history

10  and evaluations, can you describe what - and what your

11  observations, what are A█████deficits and her weaknesses.

12      DR. MORERE: Well she has some weaknesses in the areas of

13  motor development and particular motor planning and balance and

14  coordination. Even during my observation which is - an hour and

15  a half is not a huge amount of time, she was observed to have

16  wide-based gait, to lean on the wall for support or crawl up

17  against the wall or even walking out the classroom, just banging

18  into the doorway.  She has a number of deficits of area of

19  language development, both receptive and expressive.  And these

20  include problems, severe problems with vocabulary development.

21  She has some areas that are relatively preserved, but those are

22  relatively few in the language area.  Most areas of language

23  development are what - two standard deviations below the mean or

1    more.  So, the vast majority of children would be performing at

2    a higher level than she is.  She has some fine motor and gross

3    motor problems, but the main problems appear to be in addition

4    to of course to deafness to be with the motor planning,

5    coordination, some motor strength and with the language, both

6    receptive and expressive.

7        MS. DALTON: Okay.  Now you mentioned that you spent an hour

8    and half observing her.  Did you feel like you had a sufficient

9    amount of time to make a decision as to what her needs were?

10       DR. MORERE: In addition to the review of the previous

11   documents, yes. I wouldn't have said that in isolation.

12       MS. DALTON: Okay. Have you reviewed her IEP that was

13   developed on February 1st?

14       DR. MORERE: That's the - yes. Number 20, yes.

15       MS. DALTON: And so you've had an opportunity to review that

16   IEP?

17       DR. MORERE: Yes.

18       MS. DALTON: Can you state whether you have an opinion as to

19   whether or not that IEP based on A▮▮▮▮ deficits and weaknesses,

20   whether that IEP is appropriate?

21       DR. MORERE: I can state that I believe that it is not

22   appropriate.

23       MS. DALTON: Can you describe in detail why you believe it

1   is not appropriate

2        DR. MORERE: Even for a child who has a simple hearing loss,

3   and hour of half of speech therapy a week would not really not

4   adequately address the developmental needs of a child so that

5   they would prepared for entry into kindergarten.  When you have

6   a child with the degree of delays that A████has, which are

7   really in excess, for what I would expect for a child who is

8   born with hearing – had a hearing loss, and then got a implant

9   at the age at which you received it, that would be far less than

10  what we would be needed to address the delays and continue with

11  the development, because she is at a critical age for language

12  development.  During the next two years, language should be

13  really exploding.  By the time a child is five years old and

14  enters kindergarten, they should have the basics of an adult

15  understanding of language and A████is at this point, has

16  extremely deficient vocabulary and is communicating in two to

17  three word phrases at most.  So she is not functioning at the

18  sentence level. So there are really significant delays that are

19  needed to be met.  So the amount of service would be not

20  adequate to meet her needs.  In addition, just – can I address

21  some of the goals?

22       MS. DALTON: Sure.

23       DR. MORERE: Because I noted that there are number of goals

1    for speech and language, but there are no vocabulary development

2    goals.  And her - and one of her greatest needs is in vocabulary

3    development.  She is down at the first percentile in vocabulary.

4    And for child to be able to interact with world and certainly

5    interact with her classroom, you have to have the basic

6    vocabulary before you can develop the more advanced vocabulary

7    needed to academic skills.  You can't learn to read and write if

8    you don't have the basic vocabulary to be able to understand

9    what the teacher is saying.

10        MS. DALTON: Yeah how many goals on her IEP under

11   communications or speech or language are there?

12        DR. MORERE: Let's see.  Twelve.  Now those include the

13   intervention for her motor - oral motor sequencing, because in

14   addition to the receptive and expressive language there is a

15   specific difficulty with her ability to manage the motor

16   sequencing for her mouth. So that for example, when I observed

17   her, she would frequently miss sequence, phonemes names in a

18   word.  So she would me to say, for example, ghosts, and say

19   goats and she clearly -- it was not - it wasn't a vocabulary

20   mistake, it was a motor planning and production mistake. And she

21   would leave out phonemes simply because she couldn't plan

22   appropriately for the speech production. So some of the goals

23   that are in there, under the language, speech and language,

1   really actually about half of them address the motor planning

2   and the oral control.

3       MS. DALTON: Would those also be addressed by a speech and

4   language pathologist?

5       DR. MORERE: Yes.  Those are come under the purview of the

6   speech and language pathologist. Of the actual language related

7   goals there are – one – two- three – four- five – language

8   related goals.

9       MS. DALTON: Before a speech and language pathologist, you

10  have twelve total goals.

11      DR. MORERE: Correct.

12      MS. DALTON: My question is would it be reasonable for a

13  speech and language pathologist to be able to work toward making

14  progress with all twelve of those goals with only an hour and a

15  half a week?

16      DR. MORERE: No.

17      MS. DALTON: Now is there any, you've talked about the

18  amount of goals that are on her IEP and you've talked about the

19  amount of service, not being appropriate.  What about, do you

20  have any opinion with regard to her disability classification,

21  and whether that is appropriate on the IEP?

22      DR. MORERE: I have an opinion, yes. I believe that simply

23  labeling her has hearing impaired doesn't address the range of

1    her disabilities.  As I said before, she really – for a child

2    who was born hearing and then had a period of time when they

3    were hearing and then had – if you believe the fact that at six

4    months old, there was an auditory evaluation that indicated

5    within normal limits functions. There was at least some degree

6    of hearing at that point.  And then she had a hearing loss some

7    time in that period and then at 15 months received an implant.

8    So at most, she was approximately 11 months of hearing loss that

9    was not re-mediated with the implant.  She should be

10   approaching, not at, but starting to approach more age

11   appropriate levels.  Kids who have early access to sound and

12   then rapid implantation tend to perceive towards their goals

13   more quickly than A███ seems to be doing.

14        MS. DALTON: What does that tell you?

15        DR. MORERE:  That tells me that there is probably in

16   addition to the apraxia, which has been diagnosed, a language

17   disorder which is affecting her ability to function.  This

18   really makes a lot of sense considering her medical history.

19   Okay.  Bacterial meningitis, there is a lot of research on

20   bacterial meningitis and the impacts of that on development.

21   And in fact in a 2001 article in the British Medical Journal,

22   and one of the editors reviewed the literature and made a

23   statement and I'm don't know if I'm going to quote it exactly,

1   but basically said that it's really important that caregivers

2   and school teachers –

3        MS. PUCKETT: I'm sorry, I'm going to have to object, Mr.

4   Woods we don't have that medical journal in front of us, it was

5   not provided to DCPS does not have an opportunity to cross-

6   examine this expert or provide it to our witnesses in regards

7   the reliability of the journal, the reliability of the statement

8   and I believe that if it is not in the record she not be able to

9   base her testimony on it right now. It should be based on her

10  work and experience as an expert.

11       MS. DALTON: May I respond?

12       HEARING OFFICER: Yes.

13       MS. DALTON: In your work and experience have you read

14  certain medical journals and are you relying on your reading of

15  those medical journals in formulating your opinions here today?

16       DR. MORERE Yes.

17       MS. PUCKETT: But I am objecting to her citing specifically,

18  she's about to indicate word - -.

19       HEARING OFFICER:  The fodder that she used to form those

20  opinions, do you have them with you?

21       DR. MORERE: The journals?

22       HEARING OFFICER: Yes.

23       DR. MORERE: No, well that's what she is asking.

1     HEARING OFFICER:  If you're going to give an opinion, you

2   do have to provide the basis for it, if you are going to use

3   other information.

4     DR. MORERE: My expertise is based on the fact that I have

5   reviewed the literature over time and in addition to seeing

6   children.

7     MS. DALTON: What is your opinion with regard to children

8   who have contracted bacterial meningitis

9     DR. MORERE: Children who have contracted bacterial

10  meningitis have significant negative impacts on their

11  development.  One of the most profoundly impacted areas is

12  language, and this is particularly true in children who develop

13  their meningitis prior to the age of one.  And over the years I

14  have seen other children with bacterial meningitis and these

15  children tend to have more profound impacts and this is the

16  literature.

17    MS. DALTON: Now with regard to her disability

18  classification, what in your opinion should her disability

19  classification be?

20    DR. MORERE:  I think the most appropriate classification

21  would be multiplied handicapped, and that her primary disability

22  at this point would be speech and language.

23    MS. DALTON: And now - you also were made aware that the

1   program was proposed for A███ by the school system was that she

2   received these related services of 3.5 hours at her neighborhood

3   school, Janey. But that was the only services that she was to

4   receive, is that correct?

5      DR. MORERE: Yes.

6      MS. DALTON: So the rest of the day what your understanding

7   of where she would be?

8      DR. MORERE:  At home with her mother.

9      MS. DALTON:  Is that appropriate?

10     DR. MORERE: No.  Even if she were only deaf, even if he she

11   didn't have an additional condition affecting language

12   development, that level of intervention would not prepare

13   adequately for entering into kindergarten.  And – I mean its –

14   its – its common knowledge that deaf children, even if they

15   don't have additional disabilities, need intensive language

16   stimulation to be able to develop adequate language.  And this

17   is a child documented severe language delays.

18     MS. DALTON: And are you familiar with other jurisdictions

19   and/or this school jurisdiction that have programs with three

20   and four year olds?

21     DR. MORERE: I've actually observed a program through DCPS

22   for three to four year olds who are deaf and hard of hearing,

23   where they provide intensive stimulation in a classroom

1   environment.  I'm also either observed classes in Fairfax

2   County, Frederick County, and Montgomery County and other

3   jurisdictions in the area, not always for three and four year

4   olds, but in specifically in Fairfax and Montgomery County as

5   well as in DC.  I've observed classrooms, some of them are full

6   day starting at three years old, some of them are half day at

7   three years old, and then full day starting at four years old,

8   in order to develop the basic language skills necessary to

9   succeed in kindergarten.

10      MS. DALTON: Now with regard to the rest of this IEP, was

11   there anything else in the IEP you found inappropriate based on

12   our knowledge that she was only to receive three and one-half

13   hours of related services?

14      DR. MORERE: Well there were a couple of other things that I

15   didn't' know how they were going to achieve?  For example, in

16   their audio logy goals, they stated that A██ will localize her

17   name in a noisy classroom environment at a distance of six to

18   eight feet in three out of four trials.  And I'm not sure how

19   she would be able to achieve that goal if she has no experience

20   in a noisy classroom environment.  Additionally they had a goal,

21   that A████will notify her teacher or other staff members when

22   her cochlear implant is not on or not working with 80% accuracy.

23   Again, something I don't know how she could achieve if she were

117

1    not in a classroom environment.  On the next page, on the OT

2    occupational therapy goals, A███ will sustain attention and

3    achieve participation in classroom and small group activities

4    with occasional visual cues and/or movement breaks.  Again, a

5    goal that I don't see how could possibly be achieved in A███ has

6    no classroom experience.  There were a couple of other things

7    like, just below that, will sustain and active participation

8    during desk top activities and assignments up to 15 minutes with

9    occasional cues and sensory inputs as needed. That is something

10   that would typically occur in a classroom setting.

11       MS. DALTON:  And in your opinion based on your observation

12   of A███ and based on your review of her evaluations, what is

13   your opinion as to the appropriate amount of speech and language

14   services that is necessary for A███ at this time?

15       DR. MORERE: I think that individual services of probably

16   two hours a week, would be reasonable. However, she really needs

17   a full day program that would allow for - is what they call -

18   push, so she has a classroom environment where she has the range

19   of appropriate language models, because a child her age needs

20   three kinds of language models.  They need adult-to-adult

21   modeling, adult-to-child modeling, and child-to-child modeling

22   to get the appropriate range of language input.  So in a

23   classroom environment with a small group at appropriate

1    acoustics, then she would be able to get the adult with the

2    observation with the observation of the adult communication, the

3    adult to child, as the adult not only interacts with A████ but

4    with the other children in the classroom, and then the child-to-

5    child with regularly developing peers, hearing peers who could

6    provide good language modeling.

7        MS. DALTON: Now with regard, you used the word I think,

8    "push-in"?

9        DR. MORERE: HmmmHmmm.

10        MS. DALTON: Are you speaking of speech and language?

11        DR. MORERE: Right, someone there who can facilitate her

12    communication in such a setting. Because if A████ is just placed

13    in a classroom, without support by a speech and language

14    pathologist, then most of the language is going to go right past

15    her. She is not going to really be able to benefit as much. But

16    if she has a speech and language pathologist there who can

17    facilitate her communication insure that she understood what was

18    said by others and provide her with support on expressive

19    language, then she can develop that language in that enriched

20    environment.  And I actually observed her seeking out this kind

21    of support when I observed her in the classroom. When she wanted

22    to make a comment but was not sure how to formulate the answer

23    or was not sure of the words to use, she would elicit support

1    from the speech language pathologist in the classroom with her.

2    At other times it would be apparent that she didn't understand

3    whether or not she was aware of it.  Because children are not

4    always aware of when they don't understand what is being said,

5    but the SOP is trained to be aware of this.  The notice would

6    facilitate that.  And also at times she herself requested

7    clarification about what someone else had said.

8          MS. DALTON: From?

9          DR. MORERE: From the speech and language therapist?

10         MS. DALTON: Okay.  And let's see.  In addition to the

11   service you've already described, as that are necessary for

12   A█████ the push-in speech and language and the pullout speech and

13   language, are there any other services that you believe in your

14   opinion based on her disabilities that she requires?

15         DR. MORERE:  Well she certainly requires OT and PT

16   intervention.  And that's been well documented over the years.

17   One of the earliest reports in her post-meningitis evaluations

18   were problems with motor control.  And those have been on-going

19   and in the most recent evaluation that I saw that mentioned PT

20   which was that comprehensive developmental evaluation that was

21   performed last year I think by Little Feet.  They agreed that

22   she needed continuing physical therapy intervention and the most

23   recent reports on her by OT evaluations agree that she needed

1    continuing intervention for occupational therapy as well.  Plus

2    she needs on-going audiological support, auditory training,

3    because a child with an implant has to learn how to hear.  And

4    so ongoing auditory training is important for that as well as

5    maintenance of the auditory equipment.  Unfortunately, and I

6    have been working with kids who have cochlear implants since at

7    least 1995 and even at three years old, they aren't always aware

8    of when their equipment is not functioning accurately. So that

9    they need to have someone who can test their equipment on a

10   regular basis because, when a child has an implant that is not

11   completely failed, so it's really pretty obvious to everybody.

12   But it is not functioning normally, there getting distorted

13   input and they are learning to hear wrong. And then of course

14   they produce what they are hearing. So, there are mislearning

15   language information. And when you have a child who is has

16   serious language delays, that's going to complicate things even

17   more because they have to unlearn that mislearned information.

18   And relearn it correctly.  So having ongoing maintenance of the

19   cochlear implant equipment is really important because if you

20   have a child who has a cochlear implant who doesn't have a

21   functioning implant, there is no way to provide that language

22   support.

23        MS. DALTON: Now you mention the term, I think – apraxia

1    when you were in your testimony earlier.  Can you describe what

2    apraxia is?

3        DR. MORERE: Apraxia can affect a wide range of body parts.

4    Its basically not knowing how to control your movements.  It's

5    not a matter of strength.   I mean she does have some trunk

6    strength problems.  But it is a matter of knowing how to manage

7    the muscles.  Basically it is a miscommunication between the

8    brain and the muscles.  And there is parts of the brain are

9    focused on planning sequences, motor sequences.  And she has

10   difficulty with the planning of sequences of speech production.

11   And actually she seems to have some more widespread effects on

12   motor planning too.  The focus or the concern is on speech

13   production because that's impacting her development of

14   expressive language.  And its basically, it's like for example,

15   the right part of your jaw doesn't know what the left part of

16   your jaw is doing.  Or if you want to produce a series of

17   phonemes, these are a series of very complex movements, just

18   producing the phonemes "Ba" requires that you have several steps

19   involved in moving the tongue, the voice box, the mouth, you

20   know, the pallet, the lips, the placement of the jaw, it's a

21   very complex movement for just that one phoneme.  And if you

22   think about it, if you're trying to say the word, "bat", then

23   you are adding not only the other two phonemes, "at" and "t",

1   but the transition between. And she sometimes getting these

2   transitions mixed up.  And so she is putting the phonemes out of

3   order as well.  So that's it's a fairly complex problem in

4   developing the neurological muscular interface, so that it is

5   functioning properly.

6       MS. DALTON: And again, that disorder of apraxia is it - how

7   is treated by what - in what in the educational setting?  Who

8   works with a child who has apraxia?

9       DR. MORERE:  That would be a speech and language

10  pathologist.

11      MS. DALTON:  What is your opinion had A▓ only received -

12  if A▓ had been placed in the program that was proposed by DCPS

13  for the related services of 3.5 hours a week, what is your

14  opinion as to whether or not she would have made educational

15  progress?

16      DR. MORERE:  I suspect that she would not only have not

17  made educational progress, but that there maybe some falling

18  behind. Well, it's not just a matter of making a year's gain in

19  a year's time, she needs to make that up.  But I suspect that

20  she would not have made a year's gain in a year's time and there

21  may be some decline in functioning, because children who have

22  language disorders really need ongoing stimulation to maintain

23  the level of language development that they have.  Not only to

1    increase their language development.

2        MS. DALTON: Right now what is your understanding of the

3    type of placement and I'm talking about least restrictive

4    environment that she's in currently at the River school?

5        DR. MORERE:  Rephrase that.

6        MS. DALTON: I'm sorry.

7        DR. MORERE: That seemed like two different questions to me.

8        MS. DALTON: What is the type of educational placement she

9    currently in at River School?

10        DR. MORERE: Currently at the River School, she is in a

11    mainstream placement with support from a speech language

12    pathologist.

13        MS. DALTON: So it is a general education classroom, with

14    general education peers?

15        DR. MORERE: Yes, the peers, I think there is one other

16    hearing impaired child in the class.  But all the other

17    classmates - actually seemed to be fairly high functioning.

18        MS. DALTON:  So they would be what you call typically -

19        DR. MORERE: Typically developing peers, yes.

20        MS. DALTON: And then what would be your opinion as to the

21    type of placement that if she were to have received the services

22    that are this IEP, and if your opinion you testified that she

23    may actually have regressed if she had received these services

1    and only these services, what is your opinion as to whether or

2    not her placement would have changed?  Her requirements for

3    placement would have changed?

4         DR. MORERE: Okay.  Again, I'm not quite sure.

5         MS. DALTON:  Would she have made a more restrictive

6    environment if she had declined?

7         DR. MORERE: Oh you mean by kindergarten?

8         MS. DALTON: Yes.

9         DR. MORERE: Oh yes, yes.  I'm sorry. I wasn't sure about

10   what timeframe you referring to.

11        MS. DALTON: I'm sorry.

12        DR. MORERE: Yes, I'm sorry.  If she, if she were to receive

13   only the services provided in here, by kindergarten, it is my

14   opinion based on close to 20 years of experience working with

15   deaf children and at least 10 - 12 years specializing in deaf

16   children with additional disabilities affecting language

17   development, by kindergarten she would probably need a self-

18   contained classroom with significant intervention for language

19   and academic delays.

20        MS. DALTON: I have no further questions, but Ms. Puckett or

21   Mr. Woods might.

22        HEARING OFFICER: Ms. Puckett.

23        MS. PUCKETT:  Yes, how do you pronounce your last name?

1     DR. MORERE: Morere.

2     MS. PUCKETT: "More- Rare?

3     DR. MORERE: "Morere, like more air."

4     MS. PUCKETT: Okay, Morere.  I hate to mispronounce people's

5    name.  Dr. Morere you testified that if she was to receive the

6    amount (inaudible) services in her IEP, and IEP that proposed by

7    DCPS, that by kindergarten she would be a more restrictive

8    classroom, placement.  You've indicated that you are basing off

9    your experience and do you currently have any speech and

10    language training?

11    DR. MORERE: I am not a speech and language pathologist.  My

12    focus is on deaf children with additional disabilities affecting

13    language development.  I've worked with a broad range of

14    children who have a variety of causes of language delays in

15    addition to their hearing loss.

16    MS. PUCKETT: Have you ever in the past been responsible for

17    insuring speech and language goals are implemented?

18    DR. MORERE: I actually have not to direct services, but as

19    a support person, I was actually contracted by the Maryland

20    School for the Deaf to insure that some of their children who

21    had speech and language – primarily language, rather than speech

22    delays were able to progress adequately and support their

23    classroom instructors as well as their language intervention

1    instructors to insure their language development over time. I've

2    also worked with students in Fairfax County and other counties

3    in the local area to insure that their language development was

4    appropriate due to additional disabilities affecting their

5    language development.

6         MS. PUCKETT: Now you indicated that you were to insure that

7    students are making adequate progress in their speech and

8    language goals, but are you qualified to perform testing to

9    determine what type of progress students are making in their

10   speech and language impairment?

11        DR. MORERE: As a clinical neuro psychologist, I provide

12   broad-based assessments including assessments of language

13   functioning.  When I perform a neuro psychological evaluation, I

14   perform evaluations of cognitive functioning, visual spatial

15   functioning, memory function, language functioning, academic

16   development, motor functioning and executive functioning.  So

17   language assessment is part of what I provide.

18        MS. PUCKETT: And how is the broad-based language

19   functioning assessment different from what a speech and language

20   licensed speech and language pathologist would test?

21        DR. MORERE:  I provide some of the same tests that an SLP

22   would provide.  Part of the difference in what I do and what an

23   SLP does is that I look at that integrated performance of the

1    child over the range of functioning, rather than just focusing

2    the speech language performance.  I do not do assessments for

3    apraxis of the mouth.  I do general motor apraxis assessments.

4    But my feeling is that an SLP is much better qualified to do

5    oral motor apraxis evaluations, but I evaluate the various areas

6    of language functioning.

7        MS. PUCKETT: Now you testified that there are concerns of

8    apraxia in regard to this student.  Can apraxia be addressed

9    under a hearing impairment diagnosis if there are speech and

10   language concerns addressed in that IEP?

11       DR. MORERE:  Apraxia is a neuro muscular disorder that is

12   separate from hearing loss.  Some children who have hearing loss

13   have oral motor apraxia.  What is seen in A▇▇ is more than

14   would be expected of a child who is simply has a hearing loss.

15       MS. PUCKETT: You also testified that -- you testified that

16   she - she would need a full day push in services where the

17   speech and language pathologist, do you currently know what she

18   is receiving right now?

19       DR. MORERE:  I believe that she is receiving at least half

20   day, if not a full day of service of with a speech and language

21   therapist in the classroom to support her functioning.

22       MS. PUCKETT:  And do you know if that speech and language

23   therapist is providing services to her only or to the whole

1    classroom.

2        DR. MORERE:  You would have to address with the school, but

3    my understanding is that she provides the services to the

4    hearing impaired students in the classroom of which there are

5    two.

6        MS. PUCKETT:  You said there are two?

7        DR. MORERE:  Yes.  When I observed, A███ was getting the

8    primary service from the speech language therapist.

9        MS. PUCKETT: And you indicated that she would need two

10   hours a week of pull out services and that would be with just a

11   related services provider?

12       DR. MORERE:  That would be with a speech therapist?

13       MS. PUCKETT: You testified that you reviewed the student's

14   evaluations.  I don't believe you indicated exactly which

15   evaluations you reviewed for the student?

16       DR. MORERE:  I reviewed the OT, PT - not PT, but the

17   developmental evaluation, the occupational therapy evaluation

18   from January of 07, the River School Speech Language evaluations

19   from October 11th and the psychologicals assessment from

20   September 12 of '06 and the comprehensive developmental

21   assessment of July 13, 06.  The speech language evaluation of

22   June 20th and the addendum for that on July 10th of '06 as well as

23   the comprehensive developmental assessment provided - oh that's

1    the same one - the speech therapy treatment record and the early

2    intervention program information.

3        MS. PUCKETT: Now you also testified that you observed the

4    student, I believe for an hour and a half.  What was going on

5    during the observation was it a classroom time or was it

6    lunchtime, or what was going on during that time?

7        DR. MORERE:  It was classroom time.  They did things like,

8    the morning circles, speech enrichment. They had a musician come

9    in and do a brief time in the classroom. One thing that really

10   impressed me was that even the musician who apparently who is

11   not an employee of the River School was aware of A███████ needs

12   and encouraged her to sit in the proper place to most benefit

13   from it and drew her out and asked her questions specifically

14   so, even their people who are providing services from outside of

15   the school had been made aware of her needs and support her

16   development, and they were doing reading time and speech and

17   language functions, like classroom activities.

18       MS. PUCKETT: Did you ever go over to Janey to speak with

19   the speech and language therapist over at Janey?

20       DR. MORERE:  I have not gone to Janey.

21       MS. PUCKETT: Did you ever call Janey to find out what

22   speech and language services we have over there?

23       DR. MORERE:  I did not.

1          MS. PUCKETT: Did you ever call Janey to discuss any OT or

2      services with an audiological as well as possible PT services.

3          DR. MORERE: I have not had any contact with Janey.

4          MS. PUCKETT: You indicated that you reviewed the student's

5      IEP. Were you a part of the IEP team?

6          DR. MORERE:  No I was not.

7          MS. PUCKETT: Did you participate in that meeting?

8          DR. MORERE:  No I did not.

9          MS. PUCKETT: Are you aware of what the discussions were in

10     that meeting.

11         DR. MORERE:  I have reviewed the notes from the meeting

12     that were provided.

13         MS. PUCKETT: Have you spoke to any individuals of the DCPS

14     team that was a part of that meeting?

15         DR. MORERE:  I have not.

16         MS. PUCKETT: You indicated that – that her placement would

17     have been home with services at Janey.  Isn't it true that the

18     student is currently enrolled at a private school at the

19     development of IEP?

20         DR. MORERE:  My understanding is that the placement

21     recommended by DCPS was home with the services provided at

22     Janey.

23         MS. PUCKETT: Was the student enrolled in a private

1  placement at the development of his IEP?

2     DR. MORERE:  To my knowledge yes.

3     MS. PUCKETT: Now you indicated that you are aware of many

4  students who are essentially pre-K that have language concerns,

5  are all these students enrolled in a program, or are some of

6  these students receiving related services without being in

7  school right now?

8     DR. MORERE: The three to four year olds?

9     MS. PUCKETT: Yes.

10    DR. MORERE:  The ones that I have interacted with in a

11 variety of school systems have all been in pre-school programs,

12 generally within the school system.

13    MS. PUCKETT: Are you aware of students who are three to

14 four that are not in pre-school programs are receiving related

15 services through a school district?

16    DR. MORERE:  No.  All of the students that I've seen in the

17 wide range of school systems of which I've been involved, have

18 received their services through class room environment as well

19 as pullout. There is one exception with a student who had a

20 severe medical disability and he was receiving homebound

21 education so a teacher was actually going to his home.

22    MS. PUCKETT: And do you know if these students enrolled in

23 pre-school or head start through the school district?

1      DR. MORERE:  These are primarily pre-school deaf and hard

2   of hearing programs.  So programs that were focused on the

3   hearing impairment and language enrichment because of the severe

4   language delays that are typical of children with hearing

5   impairment.

6      MS. PUCKETT: And what school districts were these?

7      DR. MORERE:  Well I've seen one in D.C., I've seen programs

8   in Fairfax County, in Montgomery County, as well as in some of

9   the other counties in the area in Howard County. I've seen one

10  in a number of the counties in the area.

11     MS. PUCKETT: What schools in D.C. did you see programs at?

12     DR. MORERE:  There was one at the Key School though they

13  were moving that pre-school program to another school at the

14  time.  I saw them while they were still at the Key School, I

15  think this year they were moving it to a different school. But

16  it was a program for that included pre-school and pre-K.

17     MS. PUCKETT: And do you know how these students got

18  enrolled in these programs?

19     DR. MORERE:  I was not involved in the enrollment and have

20  no idea how they did so.

21     MS. PUCKETT: Are you familiar with DCPS's procedures in

22  regard to enrollment in pre-school programs?

23     DR. MORERE: I am not involved in enrollment at all.

1        MS. PUCKETT: Are you familiar with Head start programs.

2        DR. MORERE:I am familiar with Head start programs.

3        MS. PUCKETT: What are Head Start programs?

4        DR. MORERE: Head Start programs are typically for children

5    with anticipated – who are at risk for academic delays is how it

6    is typically stated.  Who for one reason or another, either

7    because of recognized disabilities or impoverished environments

8    or a number of different reasons are suspected to have a risk of

9    not being prepared for school when they hit kindergarten?

10        MS. PUCKETT: And are those voluntary programs that a parent

11   can enroll their students in?

12        DR. MORERE: As far as I know.

13        MS. PUCKETT: And are pre-school programs are voluntary

14   programs or are they programs that are mandatory by the school

15   district?

16        DR. MORERE: I suppose a parent can refuse to have a child

17   in a preschool program. The program that I have been associate

18   with, the parents are lead into them by the deaf and hard of

19   hearing programs, the early intervention program contacts the

20   preschool program when the child is approaching three years old

21   to make the transition into the early intervention through the

22   preschool and kindergarten programs for deaf and hard of hearing

23   children.

1        MS. PUCKETT: And those are the programs outside of DCPS

2    correct?

3        DR. MORERE: No. I don't know how DCPS manages that, other

4    programs outside of DCPS do it that way.  I don't know how DCPS

5    enrolls their children into preschool program for hearing

6    impaired children.

7        MS. PUCKETT:  I just wanted to clarify it, you said earlier

8    that you didn't know.  Now you also testified that - that it's

9    been through your experience and knowledge that students who

10   have had meningitis have a significant impact on their speech

11   and language skills and that this is something that you believe

12   you're seeing in A▇▇▇ Have you've spoken to - I'm sorry.

13   Strike that.  Who would make the determination as to the

14   meningitis has impacted her speech and language to the degree

15   that you indicating that it's been impacted.

16       DR. MORERE:  That would be --.

17       MS. PUCKETT: Would it be a medical doctor who would do

18   that?

19       DR. MORERE: No that would be through speech language

20   evaluation.

21       MS. PUCKETT: Okay.

22       DR. MORERE: And in looking at - see when you have a child

23   with meningitis who also has a hearing loss, you have to look at

1   what would be expected of a child with a hearing loss with a

2   similar history without the meningitis.  What language

3   development would be expected?  And compare that to the child

4   that you are evaluating.  So you look at children who for

5   example, had an early hearing loss, they were born hearing, but

6   some hereditary forms of deafness.  The child is born hearing

7   and then looses hearing within the first two years.  And you

8   look at that child and their language development. Particularly

9   one who also had a implant shortly after they loss their

10  hearing, and then you look at A████and look at the differential

11  progress that we see. And you can't compare one child, but you

12  look at a whole series of children over time and you see that

13  the kind of progress that one would expect of a child who is

14  born hearing, loss their hearing, then received an implant and

15  then received intensive intervention, what would one expect of

16  that kind of child.

17      MS. PUCKETT: So that in the speech and language pathologist

18  would make that determination?

19      DR. MORERE: A speech and language pathologist would provide

20  the information that could be used to make that determination.

21  As a neuro psychologist I can look at the whole picture, of the

22  medical history, the known risks associated with meningitis, and

23  the progress that has been documented in her compared to my

1  experience with other children who had similar histories and

2  histories without the meningitis.

3      MS. PUCKETT:  You indicated that in regards to, you

4  indicated that the student had some significant vocabulary

5  concerns.  You indicated that the speech and language

6  pathologist can address those vocabulary concerns, but who

7  typically addresses vocabulary concerns in the classroom?

8      DR. MORERE: Well it depends on the severity of the

9  vocabulary concern.  When you got a child who has expressive

10  vocabulary – well 2 2/3 (two and two-thirds standard deviation)

11  below the mean so performing more poorly and 99.6 percent of

12  children that age on vocabulary, a classroom teacher alone is

13  not adequate to address to those needs.  And that would be

14  addressed generally by a speech language pathologist and

15  frequently a program's for hearing impaired children, a teacher

16  of the deaf would support that.  But that severity of a

17  vocabulary delay really needs the intervention of a speech

18  language pathologist.

19      MS. PUCKETT:  And you testified that you participated in

20  the development of many IEP's.  Have you participated in the

21  development of 504 plans?

22      DR. MORERE: I have.

23      MS. PUCKETT: And what's the difference between IEP's and

1  504 plans?

2      DR. MORERE: 504 plans generally related to medical

3  conditions, things outside of the standard academic - direct

4  academic deficits.  So things like ADHD, or a seizure disorder

5  or something like that that needs accommodations for another

6  condition.  We would need a 504.

7      MS. PUCKETT:  And can a student with a hearing impairment

8  or a speech and language impairment 504 program?

9      DR. MORERE: It would be possible, but it wouldn't address

10  their academic needs.

11      MS. PUCKETT: Does this student have academic goals on her

12  IEP that are required to be provided by special ed teacher?

13      DR. MORERE: There are goals that are relevant for academic

14  development. Any language development that prepares a child for

15  entry into kindergarten should be considered an academic goal.

16  Because preparation for Kindergarten - if you have a child who

17  doesn't have the language that they need to succeed in

18  kindergarten, then they are not going to be able to function at

19  all. So their academic goals for children prior to kindergarten

20  are language development in preparation of pencil grip, and

21  being able to sit in a chair, and focus for 15 minutes at a

22  time. Those are considered pre-academic skills.  And having

23  goals that meet those pre-academic skills should be considered

1    academic goals.

2        MS. PUCKETT:  Now you testified that you have participated

3    in a lot of IEP meetings, have you seen many IEP's that are –

4    that are related to hearing impairment and speech and language

5    without some type of specialized instruction with a special ed

6    teacher or classroom instruction?

7        DR. MORERE: Primarily the IEP's that I've seen have

8    included teacher of the deaf. And that is considered part of the

9    special education system. So yes, they have special ed goals,

10   special ed teachers, special ed involvement, if you consider a

11   teacher of the deaf special ed, which most jurisdictions that I

12   have been involved do consider teachers of the deaf and deaf

13   education programs to be part of special education.

14       MS. PUCKETT: And does this student IEP have any inclusion

15   of a teacher of the deaf or any type of special education

16   teacher?

17       DR. MORERE: Well it's interesting because the front sheet

18   that says what's going to be provided doesn't and yet the

19   classroom goals clearly do. If you look at the goals, the goals

20   for the language development are to be provided by the speech

21   pathologist, classroom teacher, audiologist and classroom staff.

22   So, those goals involve the classroom teacher. If you look at

23   the next page again, speech pathologist, classroom teacher,

1    audiologist, classroom staff.  So, the occupation therapy goals

2    include the occupation therapist and the classroom staff, so

3    while specific generalized goals aren't academically focused,

4    the IEP itself does include a requirement for a classroom

5    setting.

6        MS. PUCKETT: It is correct that the student was in a

7    classroom setting when the IEP was developed?

8        DR. MORERE: They were in a classroom setting in the current

9    situation. They were not in a DCPS classroom setting.

10       MS. PUCKETT: But they were in a classroom setting?

11       DR. MORERE: The IEP was targeted for the placement that

12   DCPS was intending.  That's the goal of this document.

13       MS. PUCKETT: You weren't at the meeting correct?

14   (Inaudible)? Did you get the chance to read the meeting notes in

15   regard to this student?

16       DR. MORERE:  Yes.

17       MS. DALTON: Which meeting notes are you talking about?

18       MS. PUCKETT: I am referring to River School meeting notes.

19       MS. DALTON: And what page?

20       MS. PUCKETT: I believe it is the second to the last page of

21   River School reading notes.

22       MS. DALTON: Next to last page?

23       MS. PUCKETT: HmmmmHmm.

140

1        HEARING OFFICER: What exhibit?

2        MS. PUCKETT: It is their exhibit number 27.  The next to

3   the last page of meeting notes. Just a second.  One second.  And

4   actually I'm looking at parent's document number 26, the last

5   page.

6        MS. DALTON: These would be the DCPS notes?

7        MS. PUCKETT: DCPS notes, yes.

8        MS. DALTON: Last page of that document?

9        MS. PUCKETT: Yes, the last page of that document.

10       DR. MORERE: It starts with physical therapy?

11       MS. PUCKETT: Yes, it starts with physical therapy.  You

12   indicated that you reviewed these notes --.

13       MS. DALTON: I'm sorry.

14       MS. PUCKETT: Are you ready?

15       DR. MORERE: Yes.

16       MS. PUCKETT: Isn't it true that the team determined that

17   the placement was Janey as a non-attending student.

18       DR. MORERE: That's what it says.

19       MS. PUCKETT: What is your definition of a non-attending

20   student?

21       DR. MORERE: A student who doesn't go to the school, who is

22   not a member of the classroom.

23       MS. PUCKETT: And most likely where are those students

1    usually at?  Are you familiar with the Care Center?

2         DR. MORERE: I know that it is a place where children go to.

3         MS. PUCKETT: And what students register at Care Centers

4    that are non-attending?

5         DR. MORERE: What students register at the care Center that

6    are non-attending?

7         MS. PUCKETT: What type of student?

8         DR. MORERE: Students who are not going to that school?

9         MS. PUCKETT: Where are those typically attending?

10        DR. MORERE: Well they may be staying at home, they may be

11   going to a day care, they may be going to another program.

12        MS. PUCKETT: Let me go back to - You said you reviewed the

13   meeting notes, isn't it true that DCPS was aware that the

14   student was a non-attending student attending a private school?

15        DR. MORERE: As far as I know, yes.

16        MS. PUCKETT: And isn't it true that DCPS indicated that

17   this student can receive her services at the neighborhood

18   schools, since she was going to a private school?

19        DR. MORERE: My understanding was that the statement of the

20   DCPS was that the least restrictive environment was home, and

21   that would be the placement that would recommend.

22        MS. PUCKETT: Did they recommend the placement home?

23        DR. MORERE: That is my understanding.

1          MS. PUCKETT: What is the placement notice indicate, can you

2     refer your client, your witness to the initial placement, of

3     parents' document number 29?

4          MS. DALTON:  Number 29.

5          MS. PUCKETT: Does it say home?

6          DR. MORERE: There is nothing saying where the child is.

7          MS. PUCKETT: Can you go three-fourths down the page where

8     it says after development of the IEP and the MDT team has

9     determined that the child receives special ed and related

10    services at Janey Elementary School?

11         DR. MORERE: Right for 0 to 20%.

12         MS. PUCKETT: And does that indicate home?

13         DR. MORERE: No I just said that it doesn't have any

14    indication where the child is?

15         MS. PUCKETT: Is this an initial placement notices?

16         DR. MORERE: That is what is says, yes.

17         MS. PUCKETT: And have you seen these before?

18         DR. MORERE: Yes I have.

19         MS. PUCKETT: And I'd like to take your attention to - go

20    the last page of the IEP, under the placement consideration.

21         MS. DALTON: What document?

22         MS. PUCKETT:  The last page of the IEP, I believe that is

23    your document number 30.  Your document number 28, right before

1   the placement notice, the document right before the placement

2   notice.  And I am looking at page 404 of the IEP.  I'm sorry are

3   you there yet?

4       DR. MORERE: Yeah.

5       MS. PUCKETT: Okay, can you go to the placement

6   consideration and the adjustment - and justification.  Does it

7   indicate anywhere on there that the placement is at home?

8       DR. MORERE: No it does not.

9       MS. PUCKETT:  I just have a few more questions and I'm

10  almost finished.  Have you ever evaluated this student?

11      DR. MORERE: I have not.

12      MS. PUCKETT: Did you ever provide consulting prior to the

13  development of the IEP?

14      DR. MORERE: No.

15      MS. PUCKETT:  You said no?

16      DR. MORERE: No.

17      MS. PUCKETT: Have you ever worked for River School?

18      DR. MORERE: Worked for the River School?

19      MS. PUCKETT: Yes.

20      DR. MORERE: No.

21      MS. PUCKETT: Do you currently work with the River School?

22      DR. MORERE: No.

23      MS. PUCKETT:  I have no additional questions.

1    MS. DALTON:  Just a few follow-up, I'm sorry.

2    HEARING OFFICER:  okay.

3    MS. DALTON: You were asked several places in the document

4    where it indicated that Janey was the placement for this

5    student, can you tell me what is your understanding after

6    reviewing all of these documents and talking with the parents as

7    to what services were to be provided at Janey?

8    DR. MORERE: She was to be provided with an hour and a half

9    a week of speech therapy and hour a week of OT and hour of

10   audiology services.

11   MS. DALTON: Okay.  And you testified previously that there

12   was something in the record that you remembered where home was

13   mentioned as her least restrictive placement?

14   DR. MORERE: Correct.

15   MS. DALTON: Do you recall exactly where in those documents

16   in was.

17   DR. MORERE: Yeah it was in the meeting notes from the IEP

18   development, I think that is number 27 on our documents.  And

19   let's see --.

20   MS. DALTON: What page?

21   DR. MORERE: That would be on the next - next to the last

22   page.

23   MS. DALTON: Before the signature, oh no, there - okay, 26,

145

1   next to the last page of document number 27.

2        DR. MORERE: And it's the first full paragraph within there,

3   and it basically – let's see—it says that – Zaudra – second

4   sentence, Zaundra stated that in preschool it is an inability to

5   access age appropriate skills not academic --.

6        MS. DALTON: I'm sorry I'm not following where you're.  Oh,

7   I see it now.

8        HEARING OFFICER: Where are you?

9        DR. MORERE: First full paragraph next to last page,

10   document 27.

11        MS. DALTON: And start the line where you are reading from.

12        DR. MORERE: It's midway the second line of the first full

13   paragraph, not the top carryover of the first paragraph. So that

14   Zaundra stated that increased – it is an inability to – well

15   actually we can start before that.  Start on the page before

16   that at the end of that.

17        MS. DALTON: Okay.

18        DR. MORERE: Zaundra, at the last line of that the page

19   before that – all right.  It is a paragraph that starts "Zaundra

20   has discussed the last page of the IEP."

21        MS. DALTON: Okay, is everybody following that?

22        HEARING OFFICER: I think so.

23        DR. MORERE: The last line.

1      HEARING OFFICER:  What does that paragraph start with?

2      DR. MORERE: Zaundra discussed the last page of the IEP.

3      HEARING OFFICER: Okay. Are you there I am there.

4      MS. PUCKETT: Wait.  Zaundra.  We're on the page before the

5  last page.

6      DR. MORERE: We're at the page before that, at the bottom of

7  that, because the paragraph carried over.

8      MS. PUCKETT:  Okay.

9      DR. MORERE: Zaundra so the – the last line before the page

10  turns.  "Zaundra stated that because there is no need for

11  special education services then there is no need for a

12  placement.  She has no need for an educator because she has no

13  cognitive deficits. The deficits areas are in the areas of OT,

14  SL and audiology.  DCPS can provide these services at her

15  neighborhood school.  The (inaudible) spoke to the need for an F

16  system.  Zaundra stated that she is not a special education

17  student.  Jen stated that she will require an FM sytem to access

18  her school environment. Zaundra stated that when she reaches

19  school age and enters the school age program, one can be

20  provided, at this time we are addressing the hearing and speech

21  and language.  Dr. Alnut spoke to the discrepancy of verbal and

22  non-verbal language, children with this discrepancy requires

23  support.  Zaundra stated that in preschool it is inability to

1   access age- appropriate skills not academics.  Dr. Alnut spoke

2   to the Vineland and her rating of 4 percent. Dr. Alnut spoke to

3   Vineland done by the classroom teachers and specifics to the

4   classroom environment.  Rachael Smith asked if Janey had an OT

5   gym. Zaundra stated that DCPS would shift gym over to Janey and

6   supply this one.  Mom can bring her to Janey and the audiology

7   SLP and OT will work out services—a service schedule for A█████

8   Zaundra will inform to Janey to kick her up the list for pre-k

9   program.  Mom asked how this will affect her socialization until

10  the school age programs begins. Zaundra stated that typically

11  developing children are not in school till 4 years old, for this

12  age the least restrictive could be home.  Mary stated that the

13  progress that she has made in the last six months, not at home

14  but in the school setting.  Will DCSP provide speech –

15  audiology? So that was the area within which I saw that the

16  least restrictive environment would be the home. So that was the

17  – that was the area within which I saw that the least

18  restrictive environment would be the home.  "Zaundra stated that

19  typically developing children are not in school until 4 years

20  old for this age, the least restrictive environment could be

21  home.

22       MS. PUCKETT:  "Could be home." (Chuckle).

23       HEARING OFFICER:  That was your question.

1      MS. DALTON: That was my question.  Sorry I forgot.

2      HEARING OFFICER: Yeah.

3      MS. DALTON:  She was asking the question, I thought you'd

4   gone back to her.

5      HEARING OFFICER: Nah, you asked her that.

6      DR. MORERE:  It sounded like you were making a question so,

7   --.

8      MS. PUCKETT: No I wasn't.

9      MS. DALTON: Since you were not making an objection, I

10  assumed you were making a question, since it is not appropriate

11  to make statements.  But in any event, Dr. Morere can you state

12  in your opinion, whether it would have been appropriate for A▬▬

13  to have received just the related services that DCPS proposed

14  and to then have enrolled in a regular preschool or head start

15  program.

16     DR. MORERE: No. Not well.  Not unless she had the speech

17  language pathology support within that program.  If she had the

18  speech language pathology support in such a program, so she

19  could have the ongoing facilitation of communication and

20  language enrichment that may be a reasonable setting.  Just

21  being in that setting without the additional support, she

22  wouldn't really have the adequate access to language development

23  that she really needs.

1        HEARING OFFICER: Ms. Puckett.

2        MS. PUCKETT: I think that --. I mean - I just --.  If it

3    says "could be" --. Where in the record does it say "is home?" I

4    think that it was misleading. Because it says "could be home."

5    There is nowhere in the documents that it says, "home."  I guess

6    that is more for my argument.

7        HEARING OFFICER: Yeah, in closing. I just had one question,

8    I think, and it might lead to two and that is, the deficits now

9    that I think you are proposed services should deal with, are -

10   let me make sure I understand. I always like to make sure I

11   understanding, is because of the deficits that A████ has from the

12   time she went deaf to the time it was discovered.

13       DR. MORERE: Well, its not only - its not only from the

14   times she went deaf, it from the time that she became - well -

15   well it's from the time that she became ill until the current

16   time.  Because speech and language delays were noted before she

17   was diagnosed as being deaf.  And she was actually receiving

18   services to speech and language intervention prior to her

19   diagnosis of deafness. Now it's not clear whether she had

20   hearing at that time or not, or whether these were speech

21   language delays that were simply secondary to the meningitis and

22   then were further complicated by a developing hearing loss.

23   Cause hearing loss can develop over time after a disease such as

1    meningitis.  But the language delays are what we are seeing from

2    the time of her illness till now.

3        HEARING OFFICER:  Okay, so -

4        DR. MORERE:  So she was - she was having the normal typical

5    childhood cooing and developmental behaviors that one would

6    expect of a baby, you know before her illness.  I mean it is

7    hard to identify language development of a two and a 2½ month

8    old.  But she was doing what 2½ month olds normally do.

9        HEARING OFFICER: So, give me the time period, are you

10   saying 2½ months till when?

11       DR. MORERE: I'm not sure what your question is again, Mr.

12   Woods, it's unclear.

13       HEARING OFFICER: For me it's with regard to the proposed

14   services that you, the doctor said that ▇▇ needs.  I'm trying

15   - I tend to think that what your saying - this is what I

16   understood your testimony to say.  Now if I'm wrong on your

17   testimony.  That part of your recommending is to deal with a

18   deficit and the deficit, as I understood it, occurred because

19   there was this time period when no one knew that she had a

20   condition.

21       DR. MORERE: I see.

22       HEARING OFFICER: And then you want the services because you

23   believe that this is what is going to be necessary for her to be

1    ready for Pre-K - ah - for kindergarten.  Now that is how I

2    understood your testimony.  And if I didn't understand it that

3    way.

4         DR. MORERE: I'm sorry If I was unclear.  Let me see if I

5    can clarify.  She has these deficits and these are appeared to

6    be have a mixed cause. Part of the deficits appear to be because

7    of a language disorder that was caused by the meningitis.  Okay.

8    And meningitis frequently causes language disorders. Kids have

9    no hearing loss at all who have bacterial meningitis in the

10   first twelve months often have significant language disorders.

11   Okay.  So even if she hadn't had the hearing loss, I suspect she

12   would have had language delays.  But then you have the hearing

13   loss that occurs sometime in that period between six and eleven

14   months that complicates things.  So she was getting services for

15   speech language delays that were observed.  And at the same

16   people were starting to notice that she was not responding to

17   hearing.  But it's not clear which happened first the language

18   disorder or the language deficits or the hearing loss.  Then you

19   have in addition to that a relatively brief period where she was

20   completely without auditory stimulation. Her hearing loss was

21   diagnosed I think at eleven months and she was implanted at 14

22   months and activated at 15 months.  So a relatively brief period

23   when she didn't have that auditory stimulation.  But what

1   happens with children with hearing loss even if there is no

2   language disorder, they have an accumulated deficit that occurs

3   and that tends to get worse over time if they don't have the

4   intervention they need to develop those basic language skills.

5   The first three years of a child's life are the most important

6   for language development. In the field of deafness we call – we

7   talk about pre-lingual hearing loss and post-lingual hearing

8   loss.  While there is some disagreement about the exact timing

9   of it, its very clear that children who lose their hearing prior

10  to 18 months have significantly greater difficulty with language

11  development than those who have a hearing loss after three years

12  old.  Okay. You compound that with the problem of language

13  delays that are often seen in children who have bacterial

14  meningitis and these apparently aren't as much as problem with

15  viral meningitis.  It's primarily associated with bacterial

16  meningitis.  So you have all of these delays that then lead up

17  to a child who is three years old who in some respects is

18  functioning language-wise, below the level of one year old. Now

19  if you think about a one year old, their language is very

20  limited.  You know they are starting to understand that words

21  means things and when I a word, I get something for it.  But

22  they have fairly limited language.  And so at a three year old,

23  she has a range of language skills, but most of them are quite

1    deficient. This is probably due to a combination of her hearing

2    loss and that impacts at the meningitis.  Now what has to be

3    done is these delays have to be caught up. But at the same time,

4    you have to keep developing the massive skills development that

5    occurs in the three to five-year old level.  There is a – you

6    know – in the three to five year old level you're going from

7    simple sentence structure to relatively complex sentence

8    structure.  From being to able to understand one to three

9    sentences of time to being able to understand stories and

10   respond and analyze these things and you know, you give a

11   response to them.  So, in addition to making up all of this lost

12   time, and these deficits that may require because if they really

13   are post-meningitic language disorder, they will require more

14   intervention than a typically – a typical child with language

15   delays.  We got to re-mediate all of that and at the same time

16   move her ahead and try to start catching up to her same age

17   peers.  So that she won't be, you know, two years behind when

18   she hits kindergarten. Because if she is a classroom with other

19   five year olds, functioning at a three year old language level,

20   she'll be completely unable to function.

21        HEARING OFFICER: Okay. You know that basically took me on a

22   journey. I think I followed it, but I have it very simple

23   because I write simple orders. So I think what I've understood

154

1    you to say.  It's really confluence of the Hearing Officer and

2    the post.

3        DR. MORERE: Correct.

4        HEARING OFFICER: Bacterial meningitis.  You really can't

5    give an – argue a point as to what triggered what. There are

6    just deficits based on the confluence of those two situations.

7        DR. MORERE: My personal and professional opinion is even if

8    she hadn't had hearing loss, she would have had language delays.

9    Okay.

10       HEARING OFFICER: Because of the bacterial --.

11       DR. MORERE: Because of the post bacterial meningitis

12   sequelae. And that is a common finding in children who have

13   meningitis – bacterial meningitis in the first year of life.

14   And there is some suggestion that the first three months

15   actually they're making them even more vulnerable.  Not every

16   child who has meningitis will have this.  But approximately 20%

17   of children who have meningitis in that first year have some

18   significant impact on development.  And the most common impact

19   is on motor skills functioning and particular motor planning and

20   on language.

21       HEARING OFFICER: Okay.  I think I can put in a sentence

22   now, that – basically it is the confluence of the hearing loss

23   and bacterial meningitis.  The meningitis alone could have

1    caused the language delays.

2         DR. MORERE: Probably not as bad.

3         HEARING OFFICER: But it been basically exacerbated because

4    of the hearing loss.

5         DR. MORERE: Correct.

6         HEARING OFFICER:  And the purpose for the your proposed

7    relief – well the things that you think she should receive in

8    terms of services are both to re-mediate and to catch up.

9         DR. MORERE: Yes.

10        HEARING OFFICER: Now I wrote down a line that you said, and

11   I might have wrote this wrong.  You make up a year's loss in a

12   year's times.  You don't think that's possible.

13        DR. MORERE: Well – Okay.  I probably – If I said it like

14   that that was probably poorly stated.

15        HEARING OFFICER: It was catchy.  I wrote it – cause it – it

16   brought it home for me.  So I'm trying to figure out what are we

17   doing?

18        DR. MORERE: Alright. She is functioning below the three

19   year old level in some areas in the – like in the receptive –

20   expressive language in the – like the one year – nine month

21   level – or one year – she's like thirteen months behind at this

22   point, so okay. We are not going to make up a year's time in a

23   year.  We hope that we will make more than a year's progress in

1   a year's time, so that she will start making up.  And she has

2   done that somewhat with receptive language.  She has not made a

3   year's progress in a year's time for expressive language.  And

4   this is a big concern because she needs to move faster than the

5   typically developing child, not more slowly.

6        HEARING OFFICER:  Okay, now that's the piece that - If I

7   think that would be my last question. How to measure this?   The

8   measurement of it is  --.

9        DR. MORERE:  Speech -.

10       HEARING OFFICER: Go ahead.

11       DR. MORERE: Speech language evaluations.

12       HEARING OFFICER: Receptive and Expressive.

13       DR. MORERE: And I mean - she has repeated speech language

14   evaluations.

15       HEARING OFFICER: Right

16       DR. MORERE: That document this.

17       HEARING OFFICER: Right.

18       DR. MORERE: That look at what was her delay at this age?

19   What are her delays you know seven months later?  What is her

20   delay six months after that.  And looking, and that way we can

21   see. Because what happens is, if you look at the age scores and

22   the standard scores on some things for standard scores, actually

23   went backwards.  And that's because she didn't keep up with the

1  developmental expectations that occur over a year.  She is

2  making progress. She is not regressing. But she is not making

3  enough progress to keep up with those people who are already two

4  years ahead of her.  So there - okay.  There are starting at -

5  I'm two years old and I need to go from two to three.  And she's

6  starting at I'm one year old and I need to go from one year old

7  to three year but I know I'm know I'm not going to going to make

8  it, so let me try to go from one year old to two year old.  And

9  there going from two to three and she's going from one to not

10  quite two.  And what she needs to do is go from to more than

11  two.  Not to three, because that's not reasonable.  But it

12  getting making a little bit more than a year's progress in a

13  year's time.

14       HEARING OFFICER: This is the last question, because I

15  thought about this as I listened to the testimony.  If you have

16  the person in the class basically serving as the interpreter,

17  how do you know she is making the progress or is she simply

18  responding to the stimulation of the interpreter?  Did you

19  understand that this is what this meant?  Okay, this is what

20  you're trying to say. She still didn't say it. She didn't

21  receive that information. Someone else is doing it for her.

22  What - do you see what I am saying?

23       DR. MORERE: I see what you're saying.  That's not quite how

158

1    it happens.  Let me just clarify that and probably the people

2    from the River School can speak more to this. But in the

3    classroom it's not so much that the speech therapist is

4    interpreting - if she were signing that would be appropriate.

5    But she is an oral child. She uses her hearing through her

6    implant and speech to try to communicate.  So what the speech

7    therapist is doing is, if somebody says, "h I see the pretty

8    cat" and A███doesn't quite get it, the speech therapist will

9    repeat her for it, close to her implant and if she still doesn't

10   get it, then she will clarify it. And if A███tries to say

11   something or wants to respond, then she may have a hard time

12   pulling up words.  Or she may like, like she is only using two

13   to three words utterances.  So she may say, "cat pretty."  And

14   the speech therapist will use that, but elaborate on it.  "Oh

15   yes there is a pretty cat."  Then have A███ reproduce that

16   complete sentence and that is common means of enhancing the

17   linguistic output of a child either one who has language

18   disorder or one who has a hearing impairment.  To enhance.

19   Because that is providing her with practice with the appropriate

20   grammatical structure with elaboration with proper sequencing.

21   If A███ miss says a word, so she say "Tippry" instead of

22   "pretty", then the speech therapist will come "pretty", "pretty"

23   and have A███ practice it.  "Pretty", "oh yes, that is a

1    "pretty" cat" and then do the elaboration. And so correct the

2    impaired speech production and still do that elaboration.  But

3    when they are taking the test, sitting down to take that speech

4    language test, A███ is on her own. So that the test documents

5    her performance in a very standardized setting without the

6    support.  Okay.  But it is based on the gains made through these

7    kinds of supportive and elaborative interventions.

8        HEARING OFFICER:  That's the thing that – I – I can't

9    figure out how you measure that. You just – I going to do a

10   different example, you – is a teacher – it is not a speech and

11   language pathologist.  "A███ what is this?" There is a picture

12   of act on the board. A███ says it's a cat.

13       DR. MORERE: Okay.  A███ actually would be more likely to

14   say, "Cat."  Because that's her level of sentence structure.

15       HEARING OFFICER: Okay. So.

16       DR. MORERE: And --.

17       HEARING OFFICER: And so she says Cat.  And you'd say, No

18   she should have said it in a sentence?

19       DR. MORERE: I wouldn't say, "No she should have said it in

20   a sentence."  I would say that some one needs to be there to

21   support her to produce a sentence.

22       HEARING OFFICER: Did the teacher want that in a sentence?

23       DR. MORERE: When A███ says- Cat.  You have a teacher in the

1   classroom who's doing that kind of thing. "Say –ooh what is

2   that?" And you know, A███ says, "Cat."  And the speech therapist

3   is there to support her language development and say, "That" or

4   if she says "cat" "that is a cat, yes."  "That is a cat."  And

5   A███ would then say, "That is a cat."  So that that practice

6   that rehearsal of using the correct the sentence structure

7   making that elaborated production then supports the language

8   development.  Then later in a testing situation, that's just the

9   classroom situation.  That's the academic environment.  That's

10  the not the evaluation of her progress on language development.

11  Then you go into a testing situation, you have a standardized

12  measure and you give her this measure and you say, "A███ what's

13  that?"  And A███ says Cat.  And that's okay for vocabulary, but

14  then their challenge to do things answer "wh" questions. Which I

15  was sorry to see was not a goal in the DC IEP because that's a

16  really important concept for pre-k kids is "wh", like who, what,

17  where, and these are often very difficult for children both with

18  language delays and hearing loss.  And so, "A███ where is the –

19  where is the PDA?" as if A███ would know that.  And what A█████

20  should say is, "the PDA is on the paper."  Okay. Now if A████

21  says "paper."  That she's missing the sentence structure, she is

22  missing the "on" the preposition, which is really an important

23  part of speech that should be developing at this point in time

1   and actually should already be developed.  The sequence of the

2   sentence, so that would scored as such.  So that each component

3   of that, that was missing would be scored, and then the next

4   time if we say, do the say tests six months later and she said,

5   "on the paper."  Great she got the preposition, she's the place,

6   and she is still missing the elaboration of the speech.  But she

7   has made progress towards that goal.

8       HEARING OFFICER: I guess the only thing --- wouldn't every

9   child have to be taught that sentence?

10      DR. MORERE:  Unfortunately, that is something that is

11  primarily focused.  We don't teach our kids how to say things

12  normally. Normally developing children pick up language just as

13  easy as they pick up being able to see.

14      HEARING OFFICER: Are you saying that she can not under –

15  because you gave three models: adult-adult, adult – child and

16  child-child, under none of those models she could pick up that

17  sentence anywhere else except with a speech language pathologist

18  sitting with her in a classroom.  Is that --?

19      DR. MORERE: Because she needs –

20      HEARING OFFICER: Is that what you --

21      DR. MORERE: Because she needs the direct teaching. Because

22  --.  With the adult-to-adult, adult to child, and child-to-

23  child, there is a lot of great exposure.  And lot of you know, a

1   lot of information that is going in.  But she's not getting, she

2   is passed the age of which that is going to happen naturally,

3   plus, with the combination of the language delay and the hearing

4   loss, that makes it more difficult. So that normally, when

5   parents are teaching their children how to talk. They don't

6   teach them sentence structure.  They teach them to say, "thank

7   you."  They don't say, when someone is trying to teach their

8   child how to interact with other people.  They don't correct

9   their sentence structure. People used to think that that was

10  true, but that's not true.  Parents don't correct sentence

11  structure.  Parents correct behavioral appropriateness of

12  communication.  She needs the direct teaching of the sentence

13  structure of the mass practice of "where is the doll?"  "The

14  doll is in the basket."  "Where is the doll?"  The doll is by

15  the basket."  "Where is the doll?"  "The doll is under the

16  basket."  Rehearsal, rehearsal, rehearsal to get those things

17  that she hasn't gotten normally.  She has missed all of that

18  natural language development that, you know - and this is a

19  common outcome with children, either with a hearing loss with a

20  language disorder.  When you have a child who has a combination

21  of the two, we are going to need a whole lot of direct practice,

22  getting this stuff right.  And there are going to need a lot of

23  elaboration and practice in a range of environments so that this

1    will carry over.  So, that if they do just sit down one-on-one

2    an hour or so a week, that's going to help, but that's not going

3    to be like having it the classroom in a natural environment, we

4    naturally occurring events we get this support correction

5    elaboration clarification. And that is just something that kids

6    like A█████ just don't do naturally. And what happens is, if they

7    don't get that kind of intervention, they not only don't make

8    that that year one to year two gain in a year's time, then they

9    make a three month gain, a four month gain, and so they are

10   getting further and further behind.  So they get to kindergarten

11   with language levels below that of a preschooler.

12         HEARING OFFICER: This question you may not know the answer

13   to. A three-year is not a classroom setting from 8:20 - did you

14   hear - not you were outside.  I understand that the school she's

15   in at the River School is 8:20 till 3.  So they are not actually

16   at instructional phase for that entire time right?  So I was

17   wondering - or is the speech and language therapist needed for

18   the instructional time, play time, -- how do want it - what is

19   your vision there?

20         DR. MORERE:  The speech language therapist is really

21   required for the instructional time. For the playtime there

22   should be adults available who can provide that kind of

23   elaboration and support.  You know, that can be less intensive.

164

1    But you want to have some kind of elaboration and support

2    available throughout the day.  So that, for example during the

3    music time, there was a speech therapist sitting there helping

4    with her understanding of what he was saying and what the other

5    students in the classroom were saying and helping her formulate

6    responses, elaborate correction speech production so that it's

7    really, it's—it really isn't all day program.  There are certain

8    aspects of the day, such as recess and lunchtime in which there

9    can be less intensity. But somebody needs to be available to

10   make sure that communication occurs. Because one other problem

11   that we see with children who have language delays is when they

12   attempt communication and there is communication breakdown, they

13   begin to have frustration and there are communication attempts

14   to climb, plus you have secondary psychological sequelae such as

15   anxiety, acting out and depression. So that if she is on the

16   playground and routinely on the playground, she is not able to

17   make herself understood by her hearing peers or is not able to

18   understand what her hearing peers are saying, then she may

19   isolate herself and not respond and begin having some of these

20   secondary psychological impacts.  Whereas, you know if you have

21   someone available who may or may not a speech therapist who can

22   insure that she continues to interact with the other students,

23   that communication occurs, if not perfectly, at least adequately

165

1    then, you know you have to have that something there available

2    to support her needs.

3        HEARING OFFICER: So your proposal is for twenty hours is

4    based on when - instructional time --.

5        DR. MORERE: Primarily instructional time.

6        HEARING OFFICER: So if instructional time was less than

7    twenty hours would that be where she needs the help --.

8        DR. MORERE: If instructional time was less than twenty

9    hours, then the residual time could be used to support her

10    functioning in other settings.

11        HEARING OFFICER: You still would want that?

12        DR. MORERE: I would still - I want some - It doesn't have

13    to necessarily be a speech therapist on the playground, but

14    somebody needs there to support communication with her.

15        HEARING OFFICER: This is just way off the subject, you're

16    at Galludet. You speak --.

17        DR. MORERE: I'm hearing.

18        HEARING OFFICER: You are very articulate and you hear?

19    Yeah.

20        DR. MORERE: Yes.

21        HEARING OFFICER: You know there are teachers at the --

22        DR. MORERE: Yes. Most of the teachers in the doctoral

23    program and clinical psych are hearing, although we do have one

166

1   professional in the clinical psych program who is deaf, and then

2   in the school psychology Masters plus specialist program they

3   have one instructor who is hard of hearing and another one who

4   used to be in that program who is deaf, who decided she

5   preferred teaching in the undergraduate programs.

6         HEARING OFFICER: So the students are mixed too?

7         DR. MORERE: The doctoral students are mixed. Undergraduates

8   are all deaf, except for very select set of hearing students.

9         HEARING OFFICER: Yeah.  It was fascinating when you said

10  you were from Galludet.  I didn't realize that.  You sign

11  though, don't you.

12        DR. MORERE: Yes, I sign. I use key speech. I use oral

13  communication, whatever the individual needs. That's what I do.

14        HEARING OFFICER: A███ needs no sign?

15        DR. MORERE: A███ does not need sign at this time.

16        HEARING OFFICER: Okay. I'm sorry. You were very helpful

17  with my questions so..

18        DR. MORERE: If you have any other questions, let me know.

19  Because I want to make sure I'm clear.

20        MS. DALTON: I just have one follow-up as a result of your

21  question, I just want to make sure it's clear that – at least

22  from what I understood.  He asked you a question about whether

23  you were proposing these services to make up for something she

1  didn't get in the past and I was confused by that. My question

2  to you, is it your opinion that the services you're proposing

3  that she needs now are based on her present deficits or present

4  problems?

5  DR. MORERE: Right.  And the hearing loss and the language

6  disorder are not going to disappear. We can make up for that, we

7  can train so that she has higher functioning in language, that

8  she has better use of hearing through the implant. She is still

9  a deaf child and she is still is going to be child with a

10  language disorder.

11  MS. DALTON: And I guess the only other question that I had

12  is there was a lot of question about my understanding, couldn't

13  a teacher do what the speech and language pathologist could do,

14  and I think you explained that but, also, beyond sentence

15  structure and formulating the sentences, aren't there other

16  things that the speech and language pathologist does with ████

17  within the classroom?

18  DR. MORERE: Well yes, she does a range of things. One of

19  those things that I tried to point out was that when her oral

20  apraxia is apparent in the classroom, that she addresses that

21  before doing the elaboration and other things.

22  MS. DALTON: And how does she address that?

23  DR. MORERE: For example, like if she does say, "bufferfly",

1  the speech therapist might, get her face-to-face, "ut ter fly"

2  and I'm not sure how they do it, but some speech therapists use

3  manual signals to show the movements inside the mouth, and then

4  have ▆▆▆▆ repeat it until she gets it accurate.  That's really

5  important, because if she says "bufferfly", she is going to

6  learn that's how you say butterfly.  And so, if you get the

7  immediate re-mediation and rehearsal and then move on to the

8  elaboration, then you can correct it before it becomes worse.

9  Because with oral motor apraxia, it can actually worse if they

10  practice things wrong.  So if you get that immediate feedback to

11  support the correct motor sequencing, because the brain doesn't

12  know what the word is supposed to be like.  The brain will learn

13  whatever is practiced.

14     MS. DALTON:  Does a classroom teacher have the experience

15  and training from your experience to deal with disorder of

16  apraxia.

17     DR. MORERE:  Absolutely not.  That is a very specialized

18  area of intervention.  I wouldn't be able to deal with it.

19     MS. DALTON: But a speech and language pathologist are

20  trained.

21     DR. MORERE: But a speech and language pathologist are

22  trained in that.  I have no further questions.

23     HEARING OFFICER: Ms. -

169

1       MS. DALTON: I think we're done.

2       HEARING OFFICER: Oh okay.  You're done with - can she be

3  excused?

4       MS. DALTON: Yes.

5       HEARING OFFICER: Okay.

6       MS. DALTON: My question is, I know Dr. Morere wants to

7  leave, I would like to get one more, at least both witnesses on,

8  but because she is going to leave and I know that I wanted to

9  have her for rebuttal, and I know you want to talk about re-

10  scheduling.

11      HEARING OFFICER: Yes.

12      MS. DALTON: Because today, DCPS probably won't be able to

13  put theirs on today.

14      MS. PUCKETT: I just want to make it for the record that I

15  have to leave her at five o'clock.

16      MS. DALTON: We can leave here at five o'clock, but we still

17  have another hour.

18      MS. PUCKETT:  I'm just letting you know, you indicated that

19  you want to get witnesses on and I am assuming that I'm going to

20  have to cross-examine them.

21      MS. DALTON: Okay, If I can't, I can't.  But I just wanted

22  to deal with possibly setting the day while Dr. Morere is here

23  so I wouldn't have to worry about her not being available.

1    DR. MORERE: If need be, I can stay till five.

2    HEARING OFFICER: It probably be better to get the date

3  though before we re-schedule her.  Yeah, this is going to -

4    MS. DALTON:  In that regard Mr. Woods, I would ask that

5  according to the standard operating procedures, it needs be

6  within ten business days, so --.

7    HEARING OFFICER: Yeah, unfortunately all the Hearing

8  Officers are out next week, so we know it won't happen next

9  week.

10    MS. DALTON: I'm available tomorrow and I can someone to

11  cover my hearings on Fridays.

12    MS. PUCKETT: I'm not available tomorrow or Friday. I have

13  hearings all day tomorrow and I have hearings on Friday.

14    MS. DALTON: It does need to be within ten business days.

15    HEARING OFFICER: Yeah. But. But.  But then again, we've

16  lost five. We have to deal with that.  We're required also under

17  the consent decree by a court that the Hearing Officers have to

18  attend a training, this is a training, so unfortunately there's

19  been a clash with the - so we would let the Federal court ferret

20  that out if we couldn't get it in ten days, because we're in a

21  clash with its order.  It told us to do this in ten days, and

22  you told us to go the training to.  So, I mean hopefully under

23  these circumstances everyone would be understand the

171

1   circumstance, but I don't see them having. It can't be next

2   week, and if she can't do Thursday or Friday, we're already into

3   - what is the next after that.  We're into May 2nd through May

4   21st.  So we might can go that week.

5       MS. DALTON:  I would ask that it not go beyond that, we're

6   already way beyond the ten days.  And the day that I have open

7   that week all day, right now I don't see anything, Quinn hasn't

8   said anything yet.  It is Thursday, the 24th.

9       HEARING OFFICER: So you're set up until 14th?

10      MS. PUCKETT: I'm set up until the 24th. And if she's - and

11  if they are available then, if we can get that date, then I need

12  to let Quinn know it as soon as possible before she assigns me

13  to something other - so as of right now she has not set me to

14  anything on that day.

15      HEARING OFFICER: How much more time do we actually need?

16  How much time are you going to need for the next hearing?

17      MS. DALTON: If we get the two witnesses on, if not I'll

18  have only one more witness. If we get one witness on then I'll

19  have one witness.

20      HEARING OFFICER: One.

21      MS. DALTON: So then she would have I think the whole day.

22      HEARING OFFICER: You want to go for the whole day then.

23      MS. PUCKETT: Yeah we need the whole day.

1      HEARING OFFICER: And the first preferred day is – what day

2  again.

3      MS. PUCKETT:  I have all day on the 24th open right now.

4      HEARING OFFICER: What day of the week is that?

5      MS. PUCKETT:  That's Thursday, May 24th.

6      HEARING OFFICER: How about the 25th?

7      MS. PUCKETT: I have an all day with – actually Houston --.

8      MS. DALTON:  I was going to say don't look at me because I

9  don't' have any on my schedule.

10      MS. PUCKETT: No, I'm talking about (inaudible).  I have a

11  continuing case with a parent counsel and a charter school

12  counsel.

13      MS. DALTON: How about the 22nd?

14      MS. PUCKETT: I have hearings already set.

15      HEARING OFFICER: She was saying that the 24th is the first

16  date she didn't --.

17      MS. PUCKETT: I have the 21st set, the 22nd set already and

18  the 23rd, and the 25th.  The only thing I have not received

19  schedule for is on the 24th, and then I can tell you I have not

20  received any thing for May 30th , May 31$^{st.}$  I haven't received

21  anything for those dates yet.  So right my calendar is

22  completely open for May 24th, May 30th, May 31st, and June 3rd. I

23  haven't received anything yet on those days.

1     MS. DALTON: I can't May 30th. Well I would ask that it

2  would be the very first available date that – the 24th – that's

3  even beyond the ten days. I'm not comfortable with that, but if

4  the very first day that opposing counsel, I don't have much

5  choice. So we're going to have to ask the parent waive to talk

6  about that. Because if we go beyond the ten days, which in the

7  clash is already there. I mean as I --.

8     MS. DALTON: I'm not sure I can waive my client's rights to

9  the Federal Courts. Consent decree.

10     HEARING OFFICER: Oh – that's not true. Counselor waive the

11  rights all the time. Well so yes you could, as to whether you

12  would, it's not that you can't.

13     MS. DALTON: Well I would be inclined to my client about

14  doing it. As long as it is the first available date that we can

15  get, and it doesn't get strung out till June. I mean if May 24th

16  and she is available on the 24th, I'm available on the 24th, the

17  Hearing Officer has to make a room available, that's all there

18  is.

19     HEARING OFFICER: Yeah, I don't' know. I have to check my

20  schedule, that I continue any cases like this to the 24th. I

21  might go in there and they say, you've already booked yourself

22  on the 24th.

23     MS. DALTON: Well do you want to check to see that it --.

1    HEARING OFFICER: That's why I need some flexibility in that

2    - . What we typically do and this is a circumstance where the

3    child is certainly in a placement where you want the child to be

4    in, so it's just a matter of reimbursement at this point.

5    DR. MORERE: It is a matter of her having an appropriate

6    placement going forward, they are not providing certain

7    services-- .

8    HEARING OFFICER: We can only do it for this year.

9    DR. MORERE: Right, but she is not being provided certain

10   services until she has a placement there. In other words, she is

11   not getting OT I think you heard, and she's not getting PT at

12   this point.

13   MS. PUCKETT: We've offered those services Mr. Woods, you

14   can go to Janey to get the services.  Ask the mother is the

15   student - if she - didn't she reject the services.  The reality

16   even if they are not in agreement with Janey as a placement for

17   the student, the student still (inaudible) speech and language

18   therapy, occupational therapy and audiological services at

19   Janey. Those services are available to the student and I believe

20   if you read the record, we said that we would have those

21   services in the next day for her, and if there was a problem

22   with transportation, that we would make sure that she receives

23   some type of comp ed for missed services.  So we have offered.

1     MS. DALTON: So they are going to pick her up and take her

2  to those services?

3     MS. PUCKETT: No they did not grant the student

4  transportation, because it is her neighborhood school.  We said

5  that if there is a problem with the parent not being able to

6  start the services the next day, the note said there's a problem

7  with the parent not being able to start the services on the next

8  day, then we would make sure she gets any missed services until,

9  until missed services are added any time period where the parent

10  had concerns getting her to school. But the services.

11     MS. DALTON: The parent works full time how would she get

12  her to the school?

13     MS. PUCKETT: We did not offer transportation services.

14     MS. DALTON:  You did not offer.

15     MS. PUCKETT: We did not offer transportation services.

16     MS. DALTON: Any way Mr. Woods, getting back to the 24th,

17  what did you say you had available, the 25th?

18     MS. PUCKETT: No I did not say I had the 25th available, I

19  said I had the 24th available, I have the 30th , the 31st and the

20  1st available.

21     MS. DALTON: I'm not available on the 30th, I have a

22  mediation in federal court.  The 31st is a potential.

23     DR. MORERE: I can do the 31st.

1     MS. DALTON: And the first.  You're going to be out of town?

2     HEARING OFFICER: When will you be back?

3     DR. MORERE: I'll be back on the 6th.

4     MS. DALTON: When do you leave? Are you going to be

5     available on the 29th?

6     MS. PUCKETT: I'm not available on the 29th.

7     DR. MORERE: Is there anyway we can just call the student

8     hearing office so we don't have to wrangle any more if the 24th

9     is open, then we have it solved?

10    HEARING OFFICER: No, I need. I'm not sure if I can do the

11    24th, but I was saying, I can give you another Hearing Officer,

12    but that wouldn't make much sense, they could read – they could

13    listen to the transcript.  I mean if you all force the issue, we

14    might have to do that.  But if you waive the time, then we'll

15    get a good date, but that's the only thing we really do at this

16    point and I don't think that –

17    MS. DALTON:  Waiving the time is one thing, but going way

18    beyond, I'm just not comfortable.  We've got several dates that

19    we proposed that we're available.

20    HEARING OFFICER: You've only got one date, basically the

21    24th.

22    MS. DALTON: But I proposed several before that.

23    HEARING OFFICER: If she can't make it.  We have to do it

177

1  mutual.  We have to --.  You can't have a hearing just by

2  yourself.  So the only dates we have mutual if the 24th, and now

3  it's after June 6th.

4      MS. DALTON: But we had plenty of dates before the 24th is

5  all I'm saying.

6      MS. PUCKETT: What is the plenty of dates?

7      MS. DALTON: We did.

8      MS. PUCKETT: We're having no hearing next week Mr. Woods.

9  I'm not available tomorrow which is not unreasonable to not be

10  available, considering that this is tomorrow.

11      MS. DALTON: When don't you find out when you're going to be

12  available.

13      MS. PUCKETT: Thank you.  I mean I'm not going to change my

14  schedule, we're already short attorneys.  I mean - I have cases

15  that I are assigned.  I gave four different dates that I am

16  available for and they only put you past a couple of days past

17  the 75-day date in this case.  The 75 day date in this case is

18  not up, until believe around the 23rd.  So the day before the

19  24th, so it's not like the time period waived, it's going to be

20  waived for a significant amount of time.

21      HEARING OFFICER: When are you back?  Because if it is not

22  that date, its got to be when you're back, it's June 6th. Any

23  dates after that that are not good for you.

1    DR. MORERE: Yes.

2    HEARING OFFICER:  All of them are good?

3    DR. MORERE: Yes.

4    HEARING OFFICER: All of them are good.

5    MS. DALTON: Yes.  My daughter is graduating from high

6    school.  And if I'm not there.

7    HEARING OFFICER: So after June 6th, what should we

8    eliminate.

9    MS. DALTON: I would not be available the 7th or 8th.  I could

10   be available the 11th or 12th.

11   HEARING OFFICER: Okay.

12   DR. MORERE: (inaudible) June 6th is the return date.

13   HEARING OFFICER: You really need to go --. Are those

14   working for you Dr. Morere?

15   MS. PUCKETT: What dates are we looking at.

16   HEARING OFFICER: See mother the parent's aren't here.

17   MS. PUCKETT: The 7th is the first date.

18   HEARING OFFICER: So those are no good because you can't

19   make it.  So now we're at the 11th and 12th.  That's where I think

20   we are going to end up.

21   MS. DALTON:  Actually that is not really good for me,

22   because I'm going to have company from all over. If the hearing

23   office have the 24th open –

1      HEARING OFFICER: I'd have to make sure that date, I know is

2    not a date that I am normally here.  So I'd have to make sure

3    that I could make some adjustments, if that is even a

4    possibility with their office.

5      MS. DALTON: Well can we work toward that date?  Can you

6    check and see?

7      HEARING OFFICER: Yeah.  That's my schedule though too.  It

8    not just their office.

9      MS. DALTON:  Do you have your schedule here where you can

10   check?

11     HEARING OFFICER:  No. No.  I keep my schedule with them.

12   They know that I am going that I am going to be here.  That is

13   not a date that I would be here.

14     MS.  DALTON:  What are the dates you're usually here, are

15   there certain days of the week?

16     HEARING OFFICER:  Yeah.  So, but - I don't want that to be

17   a problem. We're going to get you a hearing.  I said, even if it

18   meant changing the Hearing Officer.  They read the record, I

19   mean that is goofy, if you waive the ten days.  If you don't

20   waive the 45 days.

21     MS. DALTON:  The 75 days.

22     HEARING OFFICER:  Well.

23     MS. DALTON: Whatever it is.


180

1    HEARING OFFICER:  Well it's 45 now, now that you go through

2    resolution.  So 11 and 12 doesn't work for you.

3    DR. MORERE: Of June.

4    HEARING OFFICER: Of June.

5    MS. DALTON: And I think frankly, it's just too far out.

6    HEARING OFFICER:  But that's just we are, I mean we just

7    went through those days.  There gone from the 28th to the 6th.

8    They could be here on the 7th and 8th and you can't. Yeah, we

9    crossed it out.  But I'm just saying the parents are back on the

10    7th and 8th, but you're saying you couldn't do the 7th or 8th. So

11    we're moving forward now because of your schedule, not.

12    MS. DALTON: I had plenty of days available within the ten

13    days.

14    HEARING OFFICER: But we don't have five of them.  That's

15    what I'm saying. And she doesn't have two of them.  She doesn't

16    two.  And we don't have five, the whole office is shutting down

17    for five.  And that is what I'm saying. No, the Hearing Officer

18    is going through training.  And they shut down the office for

19    time period. For five business days.  We're probably one of the

20    few states that are under this Court Order and the court order

21    requires certain things.  We're one of the few states that

22    actually comply with the ten-day.  People look at us like, "you

23    all get your hearing office decision with - most states don't.

1    No one puts that pressure on them, but this does.  We're under

2    that pressure, because we're under this court order that we have

3    to turn.

4         MS. PUCKETT: We have hearings for months.

5         HEARING OFFICER:  Yeah, the hearings actually goes --.

6         MS. PUCKETTS: We have two-month hearings.

7         HEARING OFFICER: They have longer hearings and they don't,

8    they have pre-trial conferences.

9         MS. PUCKETT:  Case doesn't get to hearing for about 6 to 7

10   months.

11        HEARING OFFICER:  They don't even get to the hearing for a

12   while. So we're one of the few states that we do try to,

13   probably the only to be honest with you. We really do comply or

14   attempt to comply when we can.  And this is usual that we're off

15   for five days.

16        MS. DALTON: I guess my feeling is since both opposing

17   counsel and the parent and Dr. Morere are available on the 24th,

18   I would like to see if the Student Hearing Office could make

19   that happen.

20        HEARING OFFICER:  They could, except the Hearing Officer.

21   So if they could are you willing to trade Hearing Officers and

22   let them review the record. That is the only thing I said, you

23   may have to change Hearing Officers, if you push that date, we

182

1    would probably have to change the Hearing Officer, and you have

2    to make sure the Hearing Officer could review the record.

3       MS. DALTON:  Well there is certainly enough time.  The

4    other thing is that you might find out that your schedule

5    permits you to be here.  ]

6       HEARING OFFICER:  Yeah, but you need an answer right now.

7    That's why I am trying to be fair to everybody.

8       MS. DALTON: Can I talk to my client for a moment.

9       HEARING OFFICER: Yes.

10      MS. DALTON: OKAY.

11      HEARING OFFICER:  I'll check on their dates too. Okay.  I

12   am going to put that date on the record.  Okay the Hearing

13   Officer went to confer with the Student Hearing Office with

14   regards to dates of availability and the next availability for

15   the Due Process hearing is June 11, 2007.  Ms. Dalton is that

16   date acceptable to you?

17      MS. DALTON: No, I object to that date because is beyond the

18   ten days that is required by the Student Hearing Office manual,

19   I think that date would fall on the 23rd and I know that opposing

20   counsel and I have indicated that we're both available as well

21   as our witnesses are available on Thursday, the 24th, which would

22   only be one day beyond the ten days. So if all parties

23   available, to my understanding the only reason it cannot go

1    forward is the Student Hearing Office doesn't have a space

2    available.  So I would object to it on that ground.

3         HEARING OFFICER:  Ms. Puckett are you available for June

4    11th?

5         MS. PUCKETT: Yes I am available.

6         HEARING OFFICER:  So all witnesses are available except

7    parent's counsel, apparently for June 11th?  The Hearing Officer

8    is already put on the record because of the prior discussion

9    about the dates in on the record.  And the Hearing Officer would

10   make it clear again, for the parent. The District of Columbia is

11   under Consent Decree Order, which requires us to do things

12   within a specified time periods as requires also by the IDEIA.

13   Because we are under a Court Order there, there are consequences

14   beyond the IDEIA for our inability to perform as the IDEIA

15   requires.  One of the Consent Decree required the Hearing

16   Officer to do is take training. All Hearing Officers therefore

17   have been scheduled to attend training next week. So that

18   eliminated five days of the ten days.  Two days that would have

19   been available would have been this Thursday and Friday.  Ms.

20   Puckett, DCPS already booked and for so her to attend another

21   all day hearing, she is unable to do that.  So that is 7 days.

22   The 24th by the Student Hearing Office is a date that is beyond

23   the ten day time period and therefore we would not have complied

1   with the rules, and now it is matter of degree that there was

2   not time period within the ten day time period in which we could

3   have re-set this hearing.  There is a clash with two rules under

4   the Consent Decree.  One is that we continue cases not beyond

5   ten business days, and two, the rule that require the Hearing

6   Officers to attend training.  If we leave it at that and leave

7   to the appellate court judge, or the district court magistrate

8   or judge to decide, that's no problem, if that is how you all

9   want leave.  If you want to pick a date in the parent waive the

10  ten-day, the 45 day rule, that's the only thing the Hearing

11  Officer can say because even the first available date that all

12  parties are present is beyond the ten day.

13      MS. DALTON: If so I understand right Mr. Woods, you're

14  telling me that unless I waive the 75 day time requirement, and

15  accept the date after that, then my only choice is to appeal.

16      HEARING OFFICER:  No. I think the –

17      MS. DALTON: I think I misunderstood.

18      HEARING OFFICER: I think the only – there is no other

19  reason than to bring up the rule then to say that I want relief

20  within that time period.  I said most people waive it.  That is

21  a very unusual discussion that I am having.  Most people realize

22  that can't the hearing done today. The understand the volume of

23  cases here.  They understand the Consent Decree and that it is a

1   rule that was written in the standard operating procedures based

2   on the Consent Decree and they waive the rule.  This is unusual

3   that it is not being - this is very unusual that it is not being

4   waived. It is very unusual for me so that is why I am making the

5   record. The only reason why one wouldn't waive it is because

6   they are trying to make a case that we have failed to

7   procedurally comply with the rule. That would be the only

8   reason.

9      MS. DALTON: Well I disagree Mr. Hearing Officer.

10     HEARING OFFICER:  The only other reason that you would not

11  is that you are not getting the relief and that is why I talked

12  about that a few minutes ago, before I even went to dates.  Was

13  there any particular relief that the parents needed while we are

14  waiting this hearing and Ms. Dalton said this child is not

15  receiving the services. Ms. Puckett responded that the services

16  are available to the parent and it was just a matter of - and I

17  think when we left, is there a concern about getting the child

18  from River School to Janey and we didn't--.

19     MS. DALTON:  And there is because the parent works and

20  cannot take the child from the River School to Janey.

21     HEARING OFFICER:  And so if that's the fate, I mean unless

22  that changes, what are you - I mean you can propose something

23  else.  Again, because the Hearing Officer is always entertained

1    relief if that's necessary in light of a continuance. That is

2    sort of the quid pro quo.  If we continue the case beyond the

3    ten days, we certainly don't want to put the student in a

4    position where they'd be worse off than they were.

5        MS. DALTON:  So would the Hearing Officer entertain having

6    DCPS provide transportation for her to get to the Janey School.

7        HEARING OFFICER: Is that possible Ms. - if that's an issue.

8        MS. DALTON: The OT and the PT?

9        MS. PUCKETT:  I know the team determined that she wasn't

10   eligible for transportation.  I think the school is in - it's

11   her neighborhood school.  But I am not sure that they would be

12   able to do transportation.  I haven't discussed that option with

13   them. They are not here to discuss it with me.

14       HEARING OFFICER:  Where's the River School at?

15       MS. DALTON: McArthur Blvd in northwest.

16       MS. PUCKETT: Janey is northwest also.  The mother works at

17   River School with students. I know that some students were

18   receiving services after school, because our related service

19   provider at the local schools.  I don't know how it's going to

20   be set up with Janey School.  Zaundra Johnson was going to set

21   up the services.

22       MS. DALTON: Nobody contacted my client with any scheduled

23   services.

1    MS. PUCKETT: There is no scheduled services because the

2    client rejected the services Mr. Woods.  They made it very

3    clear.

4    ?:  (MALE VOICE) We only rejected the IEP.

5    MS. PUCKETT: The services at Janey were rejected also.  The

6    service location for the services on the IEP was at the

7    student's neighborhood school. There was extension discussion as

8    to the services being provided at Janey.

9    HEARING OFFICER:  So it is a matter of this parent needed

10   to accept the services and then to be transported to the

11   services.  You saying that would have to accept the services

12   too?

13   MS. PUCKETT: There is to problem.  They can call tomorrow

14   and say, "Hey, the student is coming for services." That is not

15   the problem.

16   HEARING OFFICER:  Then it is just getting her there?

17   MS. PUCKETT:  I don't think it was ever a transportation,

18   transportation was ever a big issue as to why the services were

19   rejected.  If you look at the meeting notes, it wasn't a big

20   issue as to why the services were rejected.  We're not here

21   because of the rejection due to transportation not being able to

22   be provided.  It's because the services were rejected overall.

23   MS. DALTON: The IEP was rejected, and the placement was

1    rejected.  Because the IEP only called for a minimal amount of

2    services that the parent did not think was appropriate for A█████

3        MS. PUCKETT: But the services are in the IEP. And they were

4    supposed to provided by Janey, there is a letter indicating -

5        MS. DALTON: I don't think we are going to get very far, Mr.

6    Woods.

7        MS. PUCKETT: that they were rejecting the services and the

8    placement at Janey.  The student's placement for the services,

9    on the IEP was Janey.

10        HEARING OFFICER: But you're saying if the services were

11    accepted, that is no problem, they could get them, the only

12    problem now is, how does she get to the school to get the

13    services.

14        MS. PUCKETT: I am assuming that that is a problem is now,

15    because it was never in the Complaint, I don't know. There was

16    no discussion that they were rejecting the services because f

17    transportation.  It's the neighborhood school. It wasn't a big

18    discussion. It was the placement in general period. I am just

19    indicating to you that those services are still available to the

20    student at Janey. The student can receive Occupational Therapy,

21    Speech and language services, as well as the audiological

22    services at Janey.

23        HEARING OFFICER:  So we were trying to determine if the

1   hearing has to delayed in order to accommodate scheduling to

2   make sure A████would be receiving services, so that the issue.

3   Ms Puckett thought you rejected the services at Janey, and so if

4   you want them, they are available, but there was never an issue

5   about transportation.  Her position was that the expectation was

6   that the parents would get A███to the school.

7       MS. TILLER:  Okay, so what is your question for me.

8       HEARING OFFICER:  Is it possible?

9       MS. TILLER: Is it possible for me to get A███to Janey for

10  the services:

11      MS. DALTON: We don't know what their schedule is.

12      MS. PUCKETT: There is no schedule Mr. Woods (chuckle)

13  because they didn't put together a schedule because the services

14  and the placement of services was rejected.

15      HEARING OFFICER: They said they didn't put together a

16  schedule because you didn't ask for the services.

17      MS. DALTON: They rejected the IEP because it wasn't

18  appropriate.

19      MS. TILLER: This is all I can say to that matter.  And that

20  is the fact that we do not think this IEP adequately addresses

21  A███s needs, so this - we did not accept this IEP.

22      MS. PUCKETT: And I asked the parent on cross-examination,

23  what if - if she accepts the services at Janey and she clearly

1    said no.  She did not accept the services at Janey. The student

2    is currently receiving speech and language services in the

3    classroom as well as – I believe the witness testified that

4    there was some pullout services. The student can receive the OT

5    services and the audiological services at Janey during the

6    interim period of this complaint.

7        MS. DALTON: That is only if she remained at home and her

8    mom was home to take her to Janey.

9        MS. PUCKETT: There is nothing that says this student home

10   placement – this students' placement is home, Mr. Woods.  If you

11   look at it says "could be home." But all the documentation that

12   DCPS submitted which is placement notice that says Janey, which

13   is a placement determination that says general education

14   setting, the student has been privately placed and we're

15   offering services at the local school. In compliance with that

16   section 300.137 and 300.138 which says we can offer the services

17   at the school, at the home at the local school.

18       HEARING OFFICER:  And the only reason why this is being

19   discussed was that you are saying, she is not receiving her

20   services.

21       MS. DALTON: Her OT and PT.

22       MS. TILLER: That's correct, she is not.

23       HEARING OFFICER: Is that acceptable if they arrange for the

1    services at Janey?

2        MS. TILLER:  For me to take her there. Now I'm afraid to

3    say that is going be okay.  I mean this has to go forward, but

4    this an offer of some sort of interim relief - .

5        HEARING OFFICER:  Yes.

6        MS. TILLER:  To have her have services at Janey?  Those

7    two, OT and PT?

8        MS. DALTON: That would mean you'd have to take her there

9    and whatever they determine to be her schedule, do you

10   understand?

11       MS. TILLER: I understand,  I don't know how think - I don't

12   know that can work either, but you know.  My understanding as

13   well from the conversation was that there is no OT gym at Janey

14   and that they were going to set that up.

15       HEARING OFFICER: No. You still would have your challenge as

16   to whether it was appropriate.

17       MS. TILLER: Right.

18       HEARING OFFICER:  It's just what was happening was, if the

19   hearing is scheduled outside of the time period.

20       MS. TILLER:  This was an order not to prevent --.

21       HEARING OFFICER: Yeah.  And I asked you was there anything

22   - because I thought it was - basically she getting everything

23   and it was more of an reimbursement case.  But if she is not

1   getting the services and a reimbursement case, then yeah she is

2   not getting services.  So that has to be considered in this

3   interim.

4        MS. TILLER: Let's put it this way.  I don't know what we've

5   determined as far the date of the hearing.  If it goes out

6   months and months, that also becomes more of a problem, if can

7   be heard on the 24th, can do that?  I know that you are not

8   available, if this works, then you know I would say,  let's go

9   forward with the hearing and not set up a schedule.  But if this

10  is going to be mid-July before we have hearing.

11       HEARING OFFICER: It looks like I thought I had gone to the

12  office with the wrong information. I thought everyone was

13  available on June 11th, and Ms. Dalton is not, so that date

14  doesn't work.

15       MS. TILLER:  Right.

16       HEAING OFFICER: So now it's has to go out further.  I

17  thought that that was a good date.

18       MS. DALTON: I thought the 11th and 12th were not good dates.

19       HEARING OFFICER: Yeah, I just wrote it down, so now we're

20  at the - have to go out a little bit further. I think - I mean I

21  am not sure how much further the Student Hearing Officer is

22  going to accommodate it.  If you went to the next day, 13th

23  probably.  I don't know what that day is?

193

1       MS. DALTON: It's a Wednesday.

2       HEARING OFFICER:  They could probably do the 13th.

3       MS. DALTON:  Can I let my one witness go that had to leave

4   at 4:30?

5       HEARING OFFICER:  Okay.  I'm almost sure that date --.

6       MS. PUCKETT: Here's a parent objecting to the IEP and the

7   placement, that does not get rid of the parent's right, if they

8   had accepted those services - that does get rid of the parent'

9   right to challenge the IEP or the placement.  The parents could

10  have accepted these services at Janey.  We had the services

11  available, even if she did not agree with IEP, or the placement,

12  she still could have accepted the services and came in front of

13  you for determination that the placement was inappropriate and

14  the IEP was inappropriate.  Just because the parent accept

15  services, does not mean that it is - that they are waiving their

16  right to a Due Process hearing to have a determination that

17  something is inappropriate.  And I just want to put that on the

18  record.  And no services have been accepted at this point.

19      HEARING OFFICER: So, no if you did take the services, that

20  doesn't deprive you of your claim.

21      MS. TILLER: Well I have no idea about that, so since

22  February, I did not known.  Well that is why I actually - okay

23  go ahead.

1      MS. PUCKETT: Well that is what the attorney is for.

2      MS. DALTON: Ms. Tiller did anyone from DCPS at that

3      MS. TILLER: No.

4      MS. DALTON:  Tell you that could accept those services if

5  you didn't accept the IEP?

6      MS. TILLER: No, and Ms. Dalton was not there.

7      MS. DALTON: Was it your understanding that it order to get

8  the services, you had to agree to the IEP?

9      MS. TILLER:  That was my understanding was that - that was

10  the IEP. And if the - if I assigned and agreed, and got those

11  services I would have no further recourse nor for A███ to have

12  full - another IEP - an appropriate IEP.

13      MS. DALTON: And now, when you were at the IEP meeting, what

14  were you told --.

15      MS. PUCKETT: Are we accepting this, I mean I don't

16  understand where we doing right now?

17      MS. DALTON: SCREAMING LOUDLY!  YOU PUT YOUR ARGUMENT ON THE

18  RECORD MS. PUCKETT, THEN MS. TILLER SHOULD BE ABLE TO RESPOND -

19  I'M TIRED OF YOU OVER-TALKING ME:  4 42 49

20      MS.PUCKETT: SCREAMING!!! YOU KNOW WHAT!!! I'M TIRED OF YOU

21  INTERRUPTING ME.  IF YOU WOULDN'T INTERRUPT ME THEN I WOULDN'T

22  HAVE TO OVERTALK YOU. OKAY.  MR. WOODS

23      MS. DALTON: Totally inappropriate.

1    MS. PUCKETT: YELLING:  MR. WOODS, THE PARENT GAVE HER

2  TESTIMONY AND I WOULD OBJECT TO HER ASKING HER ANY ADDITIONAL

3  QUESTIONS.

4    HEARING OFFICER: But I thought you Ms. Dalton was

5  clarifying that the parent didn't know those things that would

6  have changed.

7    MS. PUCKETT: Mr. Woods, the parent has an attorney who is

8  aware of these things.

9    HEARING OFFICER: But she still says she didn't know.

10    MS. PUCKETT: Okay, if she not aware of it, we still have

11  the services.  Does not the parent want the services or not?

12    MS. DALTON: Mr. Woods I am going to ask that Ms. Puckett

13  not continue to be hostile in this hearing or I am going to have

14  to suspend the hearing and ask for some kind of relief, because

15  from the very beginning of this hearing, she has been hostile

16  and rude.  And I can't even put in an objection the record or

17  respond to her arguments without her screaming and yelling.  And

18  it is not appropriate in front of this parent.

19    MS. PUCKETT: Mr. Woods, if you would review the record, it

20  is Ms Dalton who is continuously interrupting me and my

21  discussions with you was well as my responses to your questions.

22  I have not became rude with Ms. Dalton until she interrupted me.

23  And I don't believe that her view of me being rude, is any type

196

1  of reasoning for a relief for this parent.  This hearing can go

2  forward and I am well – and I am able to have this hearing go

3  forward. I need to know if the parent wants services or not Mr.

4  Woods.  Because the services are available, and if I need to be

5  calling my team to let them know that they need to set up

6  services at Janey, then I need to do that.  All I indicated to

7  you, was that I'm not sure how long this is going to take. The

8  services were available in February.  The services need to be

9  set up with Janey.  I can't just call Janey and "Oh, tomorrow

10  the student is going to come over for speech and language

11  services especially if they are not aware that the student –

12  that the student is going be receiving services. The last thing

13  Janey knew was that this parent was rejecting services at Janey.

14  I need a clarification as to if the parent wants the services or

15  not.

16      HEARING OFFICER:  If the hearing was held on the 24th, you

17  would let everything stand as it is?

18      MS. TILLER: I'm sorry.

19      HEARING OFFICER:  If the Hearing was held May 24th, you

20  going to leave things as are?

21      MS. DALTON: That means not get services, is that what you

22  are saying?

23      HEARING OFFICER: Not get services?  And if the hearing is

1    held on June 11th, do you want the services.

2         MS. TILLER:  Well let's put it this way, let's just say, I

3    get to determine this right?

4         HEARING OFFICER:  Correct.  This is you.

5         MS. TILLER:  Okay, I want services.

6         HEARING OFFICER: Regardless.

7         MS. TILLER: Go ahead.

8         HEARING OFFICER:  So she wants the services.

9         MS. PUCKETT: So, just for the record, I'm just indicating -

10        MS. DALTON: But do you need transportation for A██████

11        MS. TILLER: Yes.

12        MS. PUCKETT: We are not agreeing to transportation at this

13   point. Just pointing this on the record that the parent is going

14   to be out of town from the 28th to the 7th.  And I assuming that

15   the student will be the parent.  I just wanted that clearly on

16   the record.  I am not sure how long it is going to take for

17   services to be set up. We are currently at May 9th. And like I

18   said, the parents are going to be out of town from the 28th to

19   the 7th.

20        MS. DALTON: Can I put on the record that I think it is

21   ample time to start the services before the 28th, that shouldn't

22   take that long.  If the services were available at Janey before

23   there is no reason that can't be available now.  It shouldn't

1    take two to three weeks to make them available.  And the parent

2    would request transportation because that is the problem, she

3    cannot transport her child from the River School to Janey.

4         HEARING OFFICER:  Is that possible?

5         MS. PUCKETT: I'm not sure.  There was no big discussion

6    about transportation.

7         HEARING OFFICER:  I understand.

8         MS. PUCKETT:  I can't make any representation –

9    Unfortunately they have their people here right now. I don't'

10   have my people right here Mr. Woods, so I can't make a

11   determination as to if this student – and keep this in mind too,

12   transportation is going to take time to set up.  So we actually

13   might be back here before transportation actually gets into

14   place for this child. If the students –

15        HEARING OFFICER:  Where would the transpirations be from –

16   would it have to be from her home or could it be from River

17   School?

18        MS. PUCKETT: I believe the transportation would probably be

19   from River School over to Janey.  I know that's how they're

20   doing with other private schools.

21        HEARING OFFICER: Is that what you are proposing?

22        MS. DALTON:  Yes, because the child is in River School.

23        HEARING OFFICER: But that schedule would be, well – let's

1  say they came in the afternoon, the bus would have to pretty

2  much wait and then take her back.  Who is going to sit with this

3  infant?

4      MS. TILLER: That is why is was so strange for that was

5  proposed?

6      HEARING OFFICER: The way they proposed was you would have

7  been bringing her to the school, not that they would have been

8  picking her up.  That's is what she is saying.

9      MS. TILLER: If her environment were home, if she were at

10  home with me then I'd be at home and --.

11      HEARING OFFICER: Well based on this IEP, that's how.

12      MS. TILLER: Which is why we had a big problem.

13      HEARING OFFICER:  Right, that you would have – that she

14  would have been home I guess. Then you would have --.

15      MS. PUCKETT: No, she wouldn't been home.  The team was

16  aware that she was at River School.

17      HEARING SCHOOL:  The team made this based on her being at

18  River School.

19      MS. PUCKETT: The team was fully aware, and knows that the

20  student is currently at a private school.

21      HEARING OFFICER: Well that should have been factored in

22  then --.

23      MS. PUCKETT: Another way to handle things, is sometimes

1    they get services after school.  Sometimes the students at

2    private schools get services during the school day, where they

3    are picked up from the private school and transported over to

4    the school where they are receiving the services and I think

5    sometimes they are dropped off at home. So it just really

6    depends on what the services are and the schedule of the

7    services, as to how the transportation is going to be set up.

8    It really depends on the student schedule at school, the

9    parent's schedule and how it is going to be implemented.  There

10   has to be a schedule set up for these services, especially if

11   there is going to be any type of transportation.  So the

12   transportation is going to be based on, the schedule for the

13   services.

14        HEARING OFFICER:  Okay.

15        MS. PUCKETT:  So it just really depends.

16        HEARING OFFICER:  So the answer to Ms. Tiller's question is

17   you don't know when her services could be set up nor how they

18   would set up.

19        MS. PUCKETT:  They could be set up tomorrow; they could be

20   set up next week.  What I am saying is that I don't have anybody

21   here right now who can tell me when the services could be set

22   up.

23        HEARING OFFICER:  Okay.

1    MS. PUCKETT: I know that we could probably get the services

2    set up before transportation kicks up, but it might take some

3    time because it is at the school year and for transportation to

4    work out their schedule, there is going to have to be an

5    official schedule for the services, but Janey might be able to

6    start services immediately without transportation.

7    HEARING OFFICER: Let me go back to proposed dates.  May 24th

8    was off the table but in light of this discussion, I'm going to

9    see what I can.  I don't know if I can do anything because the

10   Hearing Office has already planned everything and they said,

11   they don't have any space.  If there any – maybe there is

12   something that can be done.

13   MS. DALTON: I know Mr. Wood that they had hearings up on

14   the ninth floor before, because I have been involved and have

15   used a room up there.

16   MS. PUCKETT: I think that is our conference room and it is

17   completely booked with meetings right now. I mean I can check on

18   but I have several meetings, set that I literally have had

19   meetings this month in the little cafeteria upstairs because

20   there is a lot of meetings going on, but not only our staff use

21   that office, but other staff, the superintendent's office and

22   other individuals have been using our office to schedule

23   meetings.

1    HEARING OFFICER:  Which would then put us at June 13th,

2  where I know we have a room.  But I need again, I have to go

3  through an attorney, either one of those dates that would

4  require the waiver of the 45 days.  I could do my best on the

5  24th since that's a possibility.  I've already been rejected by

6  the student hearing office, but I could see if there – that

7  under these circumstance we've got a child in need of services

8  that we can't – you can't – you know it may take too long to

9  figure out what's going to happen to get it set up and to get it

10  going, and then as soon as it happens, she's gone out of town,

11  and they are back off the schedule.  Yeah, this is a --. I mean

12  it seems to me that again, it – I think I comes down to – I'm

13  almost sure I can get June 13th, I can ask quickly, but I am

14  almost sure that if they can gave me the 11th or 12th, I am sure

15  they can give me the 13th.  It would just be a matter if that is

16  acceptable and if under those circumstances, the 45 day just

17  gives us additional time to put the hearing in place and from

18  that date, we get the HOD out.

19    MS. PUCKETT: I'm just looking at this point as to how this

20  date changes impacting our relief if the only thing they are

21  requesting in their relief is reimbursement as a finding as a

22  denial FAPE, they don't have anything

23    MS. DALTON: WHISPERING –

1    MS: PUCKETT: in this Relief saying that we are requesting

2    that DCPS fund independent OT services or independent PT

3    services, they don't anything addressing these services that are

4    not in the IEP, except for the student's attendance at the

5    private school being reimbursed and we all know from the

6    testimony that the student's not receiving OT or audiological

7    services which are the services that could right now be - those

8    two services could be provided at Janey. There is nothing in the

9    relief addressing any case that the determination that DCPS is

10   required to provide comp ed for missed PT services.  And that

11   was based on us not putting PT on the IEP. But there is nothing

12   in here, if you look at the relief, there is nothing in the

13   relief that address how we're going to deal with the fact that

14   this student rejected the services at Janey has not been

15   receiving OT services or audiological services.  You don't have

16   that in here.

17       HEARING OFFICER:  But no, that was in response to my

18   question, that if we continue the Hearing Date beyond the ten

19   days, then the Hearing Officer, this is just a matter of course

20   for this Hearing Officer, is I don't want to leave the child in

21   a situation that is not good for that child.  And that's when

22   Ms. Tiller indicated that well the child is not receiving the

23   services.  So that how that discussion came up.

1       MS. DALTON: And just so the record is clear Mr. Woods, the

2    child could have received those services at the River School if

3    there was funding in place for her.  They are already giving her

4    a grant. They already allowing her to stay there without

5    funding. They can't go out and independently contact with a OT

6    and an PT which they would do, if they funding in placement.

7       HEARING OFFICER: So that would be another alternative.

8       MS. PUCKETT: And that's not requested in the IEP, and I

9    just wanted to point that out.

10       HEARING OFFICER: No. No.

11       MS. DALTON: It's interim relief.

12       HEARING OFFICER: It's interim relief.  She is just saying

13    in light of --.

14       MS. DALTON: The fact that --.

15       HEARING OFFICER: This is going to go beyond the time

16    period.  No, it's interim. None of this --.

17       MS. PUCKETT: I understand that. I understand.  It would be

18    different if the services were not offered at Janey, and not

19    available at Janey.  What I am saying to you is, I don't know

20    what exact date they can be provided.  As of February these

21    related service providers were at Janey.  There was an extensive

22    determination as what exactly Janey would provide.  And Janey

23    could provide the student services.   At this point, the problem

1    is I can't give you an exact date as to when those services will

2    start.  But I don't believe that DCPS should have to fund

3    interim relief for OT services and audiological services when we

4    have the services available to the student and they have been

5    available since February.

6         HEARING OFFICER:  The parents said fine, you couldn't tell

7    her as you just said --.

8         MS. PUCKETT: No one said Tiffany get on the phone and call

9    someone, we've been sitting going to back and forth to what's

10   going on.

11        HEARING OFFICER:  Okay.  That's possibly --. Okay.

12        MS. PUCKETT: They could possibly, we could find out --.

13        HEARING OFFICER:  Why don't you do that and I'll check the

14   13th.

15        MS. PUCKETT: And I'd like to go on the record, it past 4

16   something, so I'd not sure I am going to make any contact with

17   anybody as to what services are available.

18        HEARING OFFICER: (laughing), But you asked me to - Ms.

19   Puckett you just asked me to let you do it, and then --.

20        MS. PUCKETT: No, but we spent a significant amount of time

21   discussing this Mr. Woods.  I can't give you an exact date. The

22   services were available for the student at Janey.

23        HEARING OFFICER: No, she is not arguing the merits of the

1  case.  This is my thing.

2      MS. PUCKETT:  I know we're not arguing the merits of the

3  case. I understand that interim relief.

4      HEARING OFFICER: Interim relief.

5      MS. PUCKETT: We provide the parent some funding for the

6  services --.

7      HEARING OFFICER: No. No. No.  You said you that you could

8  services at the school.

9      MS. PUCKETT: Yes.

10      HEARING OFFICER:  So she said let's hear the schedule.

11      MS. PUCKETT: I don't have a schedule.

12      HEARING OFFICER: I thought you were going to check.

13      MS. PUCKETT: I'm going to see if someone is at the Care

14  Center right now. But what I'm saying is that realistically, I'm

15  probably not going to be able to get any contact with anyone

16  because I know that after 3:30, it's very difficult to get into

17  contact with anyone. I do have witnesses who were going to

18  testify via cell phone. I can try to contact them, the problem

19  is not the care center.  The problem is Janey. I need to contact

20  Janey to determine what the student can start services.  So I

21  can get in contact with somebody at Care Center, but I need to

22  contact Janey's principal and the special ed coordinator -

23      MS. DALTON: WHISPERING

1    MS. PUCKETT: To determine when this student can start

2    services.  Like I said there is always going to be the option

3    for the start services.  If you were to order transportation,

4    there is always the option for the student to have services

5    provided before the transportation comes because I'm just saying

6    MS. DALTON: whispering.

7    MS. PUCKETT: I'm just saying that there are going to be

8    some time before transportation gets put into place for this

9    student, especially since transportation has never granted for

10   this child.

11   HEARING OFFICER:  Okay.  Why don't you and I have an idea

12   in my head about what we can do.  Why don't you try what you and

13   then I check the 13th.  I know the 24th is not good. So I am not

14   even going to go there again. But if we can – I'll keep date and

15   see if there is something I can do and figure out down --.

16   ?:  Is there still a Hearing going on?

17   HEARING OFFICER:  Yeah, we're almost done though.

18   ?: Oh, okay.

19   HEARING OFFICER:  The Hearing Officer did check with the

20   Student Hearing Officer, we're going to do everything

21   conceivably possible for the May 24th,

22   MS. DALTON: Good.

23   HEARING OFFICER: And if not, the 13th. That Thursday, Math

208

1  24th that is still good for everybody right?

2      MS. TILLER: Yes, Thank you.

3      HEARING OFFICER: In light of that I still would need, --

4  because I'm – a day beyond my day ten day, actually it's --.

5      MS. DALTON: I'll waive the one-day Mr. Woods.

6      HEARING OFFICER: (LAUGHTER) Wow, that's gracious of you.

7  Would that work for Dr. Morere, did we find out?

8      MS. DALTON: I'm pretty  -- yes she said, yes she said, that

9  would work for her.

10      HEARING OFFICER: Okay, so let's plan on the 24th and the

11  fallback is the 13th.

12      MS. DALTON: Right.

13      MS. TILLER: I can be there.

14      MS. DALTON: On the 24th?

15      MS. TILLER:  Yeah.

16      Male voice (Mr. Tiller): We can try to work it out.

17      MS. DALTON: Okay.

18      HEARING OFFICER:  Is that going to be okay –

19      MS. DALTON: Yes.

20      HEARING OFFICER: Okay.

21      MS. DALTON: Everyone will be here.

22      HEARING OFFICER: In light of that,

23      MS. TILLER: This is good.

1      HEARING OFFICER:  Just let everything else go, interim

2  relief, leave that alone and --.

3      MS. DALTON: Assuming that we can go on the 24th, yes.

4      HEARING OFFICER: Okay.

5      MS. DALTON:  We can really work hard on the 24th.

6      HEARING OFFICER:  And if there are - and here is the way --

7  .    MS. DALTON:  Is there anyway (inaudible) you'll let us

8  know?

9      HEARING OFFICER: Yes, I am going to send out an Interim

10  Order.  In any event that doesn't --.

11      MS. PUCKETT: The 13th is the backup date?

12      HEARING OFFICER: Yes, it's the backup date.  And if there

13  is a need for the backup date, the Hearing Officer has heard

14  arguments with counsel with regard to --.

15      MS. PUCKETT:  And I still have - (inaudible).

16      HEARING OFFICER:  Interim relief.  And if I need to give

17  interim, I'll order that interim relief.

18      MS. DALTON: Thank you.

19      HEARING OFFICER:  Okay, thanks a lot.  And we'll be re-

20  schedule.

21      MS. PUCKETT: Do you anticipate what timeframe, what

22  timeframe like you'll be issuing either on the 24th or --.

23      HEARING OFFICER: Can you let me know tomorrow?

1          MS. PUCKETT: Can I let you know whether the services can be

2     provided?

3          HEARING OFFICER: If …If…

4          MS. PUCKETT: Yeah, I'll let you know.

5          HEARING OFFICER: If and when and how would the child get

6     there? Not that that is going to happen.

7          MS. DALTON: Right.

8          HEARING OFFICER: But if I do get--.

9          MS. DALTON: Just so we know.

10         HEARING OFFICER: But if I do give interim relief, I do want

11    her to have - I already know what yours would be - funding the

12    services --.

13         MS. PUCKETT: I don't ask until Friday because I know that

14    the audiologist is not there everyday.  So,

15         MS. DALTON: We are not asking for audiology, it's OT and

16    PT.

17         MS. PUCKETT: Well, PT hasn't been added to the student's

18    IEP yet.  That's still in question. That's one of the issues--.

19         MS. DALTON:  OT is on there, PT hasn't been added.

20         MS. PUCKETT: That's what I meant. PT is not added. PT is

21    not a service that we are offering right now, It's not on the

22    student's IEP.

23         MS. DALTON: So it would only be OT that you'd be offering.

1        MS. PUCKETT:  OT services.

2        MS. DALTON: But she is audiology and speech and language,

3    only the OT. Now there is an OT person at the River School.

4        MS. PUCKETT: Yeah, the OT person should be at (inaudible).

5        HEARING OFFICER: Okay.  So I can know tomorrow, or Friday

6    at the latest?

7        MS. PUCKETT: Friday at the latest, you should hear from me.

8        HEARING OFFICER: I should have my interim order for you by

9    Monday.

10        MS. DALTON: Okay.

11        HEARING OFFICER:  And it's either going to say we're on the

12    24th with relief or we're 24th and I might not have any relief.

13        MS. DALTON: All right.  Can we start at 9 o'clock next

14    time? Instead of 11 so we have a full day.

15        HEARING OFFICER: YEAH.

16        MS. PUCKETT: That's fine.

17        HEARING OFFICER: Okay.

18        MS. TILLER:  That's good.

19        MS. DALTON: Cause I think we might need it since we have

20    two more witnesses on my side and then she has her witnesses.

21        HEARING OFFICER: Is that good?

22        MS. TILLER: That's great.

23        HEARING OFFICER:  All right.  Thank you. The case is

1    submitted and will either convene on the 24th or the 13th and I'll

2    have it confirmed and are pushing for the 24th.

3          MS. TILLER: Thank you.

4          MS. DALTON: And you'll have an Order to us by –

5          HEARING OFFICER: By Monday.

6          MS. DALTON: By Monday.

7          HEARING OFFICER: I'm going to have to do it over the

8    weekend. Once I get the information from --.

9          MS. DALTON: So If I haven't heard from the student hearing

10   office by Monday, I should check with them.

11         HEARING OFFICER: Yeah, I should have an order in there,

12   either a paper order or some order is going to be in there, even

13   if it is a paper order.

14         MS. TILLER: Okay.

15         MS. DALTON: All right. Thank you very much.

16         HEARING OFFICER: Okay.

17

18

19

20