**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SARA & MICHAEL TILLER, *as parents
and next friend of minor child* A.T.,

     Plaintiffs,

     v.

DISTRICT OF COLUMBIA,

     Defendant.

Civil Action No. 07-1736 (JR)

**DEFENDANT'S OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

     A June 29, 2007, Hearing Officer's Determination ("HOD") was issued pursuant to the Individuals With Disabilities Education Improvement Act of 2004, 20 U.S.C 1400 et seq. ("IDEIA") rejecting various of the Plaintiffs' arguments, and finding that the District of Columbia Public Schools ("DCPS") had not denied A.T., a minor student, a free appropriate public education ("FAPE").  In his decision, the Hearing Officer ("HO") concluded that the challenged individualized education program ("IEP") and educational placement were appropriate.

     In their Motion for Summary Judgment, Plaintiffs assert the HOD to be deficient for essentially four reasons: (1) the Hearing Officer erred in concluding that DCPS had properly evaluated the student (Motion, pp. 8-9); (2) the Hearing Officer erred in concluding that the IEP and placement were appropriate (id., pp. 10-13); (3) the Hearing Officer erred in crediting the testimony of  DCPS' witness Ms. Johnson over that of the

Plaintiffs' witnesses Ms. O'Leary and Dr. Morere (id., pp. 13-15); and (4) the Hearing

Officer "displayed a clear bias in favor of DCPS" (id., pp. 15-17).[1]

As shown below, Plaintiffs have failed to prove by a preponderance of evidence

that the HOD was not supported by record evidence. Accordingly, Plaintiffs' Motion

must be denied and the Complaint dismissed.

## ARGUMENT

### 1.      The Standard of Review for an HOD.

The party challenging the Hearing Officer's Determination bears the burden of

persuading the court that the HOD was incorrect. Reid v. District of Columbia, 401 F. 3d

516, 521 (D.C. Cir 2005) (citing Kerkam v. McKenzie, 862 F. 2d 884, 887 (D.C. Cir.

1989)). Then the court may, "basing its decision on the preponderance of the evidence,

[ ] grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B)(iii).

In Diatta v. District of Columbia, 319 F. Supp 2d 57, 64 (D.D.C. 2004), this Court

explained that, in determining whether to reverse an HOD, the reviewing court must

apply the two-prong test established in Board of Educ.of Hendrick Hudson Central Sch.

Dist. v. Rowley, 458 U.S. 176, 206 (1982). First, the court must determine whether the

state has complied with the procedural requirements of the IDEIA. Second, the court

must determine whether the Individualized Education Plan ("IEP") developed by the state

is reasonably calculated to enable the child to receive educational benefits. Id. If the

court determines that the state has not met the Rowley test, then the court may, "basing

---

[1] At pages 19-20 of the Motion, there are a series of one-sentence summary assertions of error on the part of the Hearing Officer. To the extent these recitations are intended as other than summaries of arguments presented earlier in the Motion, they are explained and unsupported, and are without decisional consequence here.

its decision on the preponderance of the evidence, [ ] grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B)(iii).

Here, Plaintiffs have failed to show by a preponderance of evidence that the decision of the Hearing Officer—that under the IDEIA DCPS met its obligations to provide A.T. with FAPE—is wrong.  Thus, Plaintiffs' Motion should be denied.

**2.      The Hearing Officer Correctly Determined that DCPS met its Obligation under IDEIA With Regard to the Issue of Evaluating A.T. in all Areas of Suspected Disability.**

In their Motion, Plaintiffs allege that the Hearing Officer erred when he concluded that DCPS met its obligations under IDEIA with regard to evaluating A.T. Motion, p. 8.  Plaintiffs argue that DCPS did not perform a physical therapy ("PT") evaluation, and that the Hearing Officer erred because he only addressed whether an occupational therapy ("OT") evaluation, and not a PT evaluation, was performed.  Id. Plaintiffs' arguments are not supported by the record evidence and their Motion should fail as to these claims.

Plaintiffs state that at a February 1, 2007, multidisciplinary team ("MDT/IEP") meeting, DCPS admitted that a PT evaluation needed to be completed.  Motion, p. 8.  The record shows, in fact, that even though a current PT evaluation existed for A.T., DCPS agreed to perform a new evaluation.  On February 23, 2007, 23 days following the MDT/IEP meeting, a PT evaluation of A.T. was completed by DCPS. See Exhibit 1.

Further, on May 9, 2007, at the administrative due process hearing, Mrs. Tiller, A.T's mother, testified that a PT evaluation was in existence.  A.R. 66, 103.  Mrs. Tiller also noted that at the time of the MDT/IEP meeting, DCPS agreed to perform a PT evaluation, and further acknowledged that someone from DCPS came to the school to

observe A.T. in April 2007.  A.R. Supplement 66-67.  Additionally, Mrs.Tiller testified that the amount of OT and PT the student was receiving was sufficient. A.R. Supplement 76.

As to the Plaintiffs' argument that the Hearing Officer erred when he only addressed whether an OT evaluation and not a PT evaluation was due, Plaintiffs fail to state that other than listing a claim for a PT evaluation in their due process hearing complaint, they failed to make any argument for a PT evaluation at the administrative due process hearing.

The only mention of a PT evaluation at the hearing came from Mrs. Tiller, in response to questions raised by DCPS, where she admitted that a PT evaluation had been completed.  AR Supplement 66-67.  Accordingly, since no argument was presented at the due process hearing that a PT evaluation had not been completed there was no reason for the HO to make a separate determination regarding the PT evaluation.  More importantly, the existence of the PT evaluation performed by DCPS on February 23, 2007, shows that DCPS complied with the IDEIA.

Plaintiffs also argue that DCPS now recommends a further PT evaluation for the minor student.  Motion p. 9   However, the fact that a new PT evaluation may or may not be deemed necessary at this time does not establish that a PT evaluation had not been completed at the time of the due process hearing.  Thus, this issue is not properly before this Court.

**3.     The Hearing Officer Correctly Found that the Three-Month Delay in Creating A.T.'s IEP did not Result in a Denial of FAPE.**

Plaintiffs argue that the Hearing Officer erred when he did not find a denial of FAPE where DCPS completed A.T.'s IEP three months late.  Motion, pp. 10-13.

Pursuant to the IDEIA, 20 U.S.C. § 1414 (E) (ii), 34 C.F.R. § 300.513, and 34 C.F.R. § 300.327, where a procedural violation is asserted, a Hearing Officer may find that a child did not receive FAPE only if the procedural inadequacies caused a deprivation of educational benefits, resulted in harm, or deprived the parent the procedural rights afforded by the IDEIA.  *See, e.g.,* Lesesne v. District of Columbia, 447 F. 3d 828, 834 (D.C. Cir. 2006); *accord* Metro Bd. Of Pub. Educ. v. Guest, 193 F.3d 457, 464-65 (6th Cir. 1999); Kruvant v. District of Columbia, 99 Fed. Appx. 232, 233 (D.C. Cir. 2004) (denying relief under IDEA because' although DCPS admits that it failed to satisfy its responsibility to assess [the student] for IDEA eligibility within 120 days of her parent's request, the [parents] have not shown that any harm resulted from that error'); *See also* Razzaghi v. District of Columbia, Civ. No. 03-1619 (D.D.C. Sept. 28, 2005), Mem. Op. at 16; C. M. v. Bd. Of Educ., 128 Fed. Appx. 876, 881 (3d Cir. 2005) (per curiam) ('[O]nly those procedural violations of the IDEA which result in loss of educational opportunity or seriously deprive parents of their participation rights are actionable.'); M.M. ex rel. D.M. v. Sch. Dist., 303 F.3d 523, 533-34 (4th Cir. 2002) ('If a disabled child received (or was offered) a FAPE in spite of a technical violation of the IDEA, the school district has fulfilled its statutory obligations').

In the instant case, the minor student turned three in October 2006. An Occupational Therapy examination was performed on January 7, 2007, and an IEP was created on February 1, 2007.  A.R. 143.  As the Hearing Officer concluded, however, the

alleged procedural inadequacies—a three month delay in developing her IEP, and a failure to timely perform an OT Evaluation—did not impede A.T.'s right to a FAPE nor deprive her of educational benefit because "the student has been attending the parents' selected 'stay put' private school placement both before and after her 02/01/07 IEP was developed and PWNOP issued." A.R. 21 Emphasis added. Further, A.T.'s mother participated in the 02/01/07 MDT/IEP meeting where the IEP was developed, and agreed with the IEP goals and objectives that were all written by The River School staff, where the student was attending. A. R. 9. Thus, the parent's right to participate in the decision-making process regarding the provisions of a FAPE was not impeded. A.R. Supplement 67-68. Accordingly, Plaintiffs have failed to show the required harm or deprivation of procedural rights afforded to the parent as a result of the delay.

Moreover, Plaintiffs' own delays contributed to the late IEP meeting. DCPS originally attempted to schedule the IEP meeting on December 18, 2006. However, because the parent informed DCPS that the school A.T. was attending would be closed on that date and none of the staff would be available for such a meeting, a new date for the IEP meeting needed to be chosen. A.R. 191-192.

Thus, where no substantive harm has been alleged or shown, and where Plaintiffs themselves contributed to the delays in scheduling the proposed meeting, DCPS cannot be found to have violated the student's right to FAPE.

4.     **The Hearing Officer was Correct in Finding that A.T.'s Least Restrictive Educational Placement is "At-Home."**

The Hearing Officer found that the student's IEP, indicating that her placement should be at-home while she received related services at her neighborhood school, is an appropriate placement. Plaintiffs argue that because A.T. allegedly needs 20 hours a

week of push-in speech and language therapy services, DCPS failed to transition A.T.
into an appropriate preschool program by placing her at-home instead of at the River
School—the parents' suggested placement.  Motion p. 10.

IDEIA requires that states provide disabled children FAPE in the "least restrictive
environment."  20 U.S.C. § 1412(a)(5); 34 C.F.R. § 300.550; D.C. Mun. Regs. 5, § 3011
(2006).  In determining the least restrictive environment, consideration is given to the
types of services that the child requires. 34 C.F.R. § 300.552(d); <u>Roark v. District of
Columbia</u>, 460 F.Supp.2d 32, 43 (D.D.C. 2006).

At the administrative due process hearing, Ms. Johnson, DCPS' Care Center
Supervisor of the Early Childhood Education Program, and Ms. Thompson, DCPS'
Speech and Language Pathologist, both testified that in addition to the child only being
three years old, and because A.T. has a 145 nonverbal IQ score (99% above the
normative population) (A.R. 171), she does not require a full time placement.  A.R. 291,
298, 512-515. "Typically developing children are not in school until 4 years old.  For this
age the least restrictive environment could be home." [2]

Ms. Johnson and Ms. Thompson further testified that the parent's argument—that
A.T.'s IEP should call for 20 hours of push-in services at the River School—is not a plan
narrowly tailored for A.T.  because it is the River School's policy that all HI students are
SLI, and so it programs all of its students with similar IEPs for 20 hours of push-in
Speech-Language services, whether appropriate or not. A.R. A.R. 529-532, 564-566.

---

[2] Based on A.T.'s HI classification, and pursuant to the SL goals and objectives proposed by the River School, and agreed to by DCPS at the meeting, DCPS offered the following related services: 1.5 hours of speech and language therapy, 1 hour of occupational therapy, and 1 hour of audiology services per week, and 1/2 hour of occupational therapy consult per month to be implemented at Janney ES, A.T.'s neighborhood school.  A.R. 161, 173.

The HO credited this testimony, and Plaintiff's Motion has not shown that this testimony was not reliable or accurate, by a preponderance of the evidence, and this Court should affirm the HOD in that regard.

5. **Ms. Thompson Was Qualified to Review A.T.'s Speech and Language Assessments, and to Provide Opinions Regarding the Speech and Language Therapy Services Required by A.T.**

The Hearing Officer found that DCPS' Ms. Thompson was qualified as an expert in the evaluation and assessment of hearing impaired students who fall in the early childhood range. A.R. 284-285. Plaintiffs also admitted at the hearing that Ms. Thompson has experience in evaluating and reviewing assessments of hearing impaired students. A.R. 283. Nonetheless, Plaintiffs argue that Ms. Thompson should not have been qualified as an expert because she has not published anything with regard to students with hearing impairments or cochlear implants, and none of her continuing education units has anything to do with the aforementioned subject. Motion p. 13 and A.R. 283. Plaintiffs also argue that because Ms. Thompson stated that she did not consider herself an expert in students with hearing impairments or cochlear implants that she is not capable of determining the educational services required for this student under the IDEIA. Id.

The Plaintiffs' arguments fail because they have not presented any evidence and/or documentation which requires that only a person who is a cochlear implant expert could be qualified to testify in a case such as this. Nor have they established why a speech and language pathologist can be considered an expert in the evaluation and assessment of a hearing impaired student only if that person has treated a student with a cochlear implant. The HO was correct when he stated that: "The issue in this case has

nothing to do with the fact that – the issue is not that the child has a cochlear implant. That's a condition of the child, but that's not an issue of the case." A.R. 283-284. Here, Ms. Thompson is a perfectly qualified expert in the area of early childhood speech and language pathology—the exact issue in this case— and the exact issue addressed within Ms. Thompson's testimony at the due process hearing.

The record shows that Ms. Thompson graduated from Howard University in 1993 with a Bachelor's of Science in Communication Sciences and Disorders, with minors in Psychology and Sociology. In 1995, she received her Master's of Science degree from Howard University in Communication Sciences and Disorders. Ms. Thompson subsequently worked as a speech and language pathologist for four years doing contract work for several prominent hospitals in the Washington D.C. area. Ms. Thompson then worked another two years with patients in rehabilitation. In 2001, Ms. Thompson was hired as a speech and language pathologist for DCPS, where she has continued to work with early childhood students. A.R. 281-282.

Simply because Ms. Thompson does not consider herself as an expert in students with cochlear implants or hearing impairments does not mean that she is not an expert in the field of speech and language pathology, capable of recommending an educational plan, including speech and language services for this student. The argument which the Plaintiffs proffer -- that Ms. Thompson has not published or that none of her continuing education units have anything to do with hearing impaired students or those wearing cochlear implants (Plaintiffs' Motion pp 13-14) -- is not sufficient to dispel a 13 year career in the field of speech and language pathology. Ms. Thompson, as indicated by the Hearing Officer, has had sufficient experience as a speech and language pathologist with

students who fall into the early childhood range to qualify as an expert speech and language pathologist capable of assessing a student in the early childhood range with a hearing impairment. A.R. 283-284.

Plaintiffs cite <u>Daubert v. Merrell Pharms</u>., 509 U.S. 579, (1993) (Motion pp. 14-15) for the proposition that an expert's scientific conclusions must be relevant and reliable, in support of their argument that Ms. Kane, the River School's SLP, was superior to Ms. Johnson because Ms. Kane had experience with children with cochlear implants and hearing disorders.  However, despite Ms. Kane's testimony as to the characteristics of hearing-impaired students, Ms. Kane did not provide any scientific conclusions as to A.T.  Ms. Kane simply expressed her opinion as to the educational services needed by A.T. based upon her review of A.T.'s file—the same analysis performed by Ms. Thompson.

Plaintiffs further allege that the Hearing Officer was biased, giving more weight to DCPS witnesses' testimony that A.T. should only be classified as HI and not SLI, while both Ms. Kane and Dr. Morere testified to the exact opposite—that A.T. should be classified as SLI in addition to HI, and thus should be given 20 hours of push-in services per week.  A.R. 15-17.  However, the HO's refusal to credit Plaintiffs' testimony is supported by the record evidence.

Plaintiffs' experts failed to show scientifically, or otherwise, how they concluded "twenty hours" was appropriate for A.T. versus ten, fifteen, eighteen, or twenty-one hours. What Plaintiffs' witnesses conveniently recommended was the River School's standard model program for HI students, which is that all HI students are to receive twenty hours of push-in services. A.R. 529-532 and 564-565.   Determinations about

credibility are best left to the hearing officer who had an opportunity to observe the witness.  Johnson v. Secretary, Department of Health and Human Services, 1984 Dist. LEXIS 18529, *6 (D.D.C. 1984).

The Hearing Officer also found that while this parent should not be punished for seeking the best opportunities for her child, that Mrs. Tiller's case is essentially based on her desire to have A.T. attend school where she works as a science teacher and has three other children enrolled (A.R. Supplement 73).

The IDEIA does not require that education judgments be designed according to the parent's desires:

> The primary responsibility for formulating the education to be accorded a [child with a disability] and for choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parent or guardian of the child. Thus proof alone that loving parents can draft a better program than a state offers does not, alone, entitle them to prevail under the Act.

Shaw v. District of Columbia, 238 F. Supp. 2d 127, 139 (D.D.C. 2002).  *See also,* Shoenbach v. District of Columbia, 2006 WL 1663426 (D.D.C. 2006) (the IDEIA does not require an education to satisfy the parent's wishes).

## CONCLUSION

Plaintiffs have failed to show in their Motion that the Hearing Officer erred in finding that the District of Columbia met its obligation under the IDEIA to provide FAPE to A.T.  Thus, their Motion should be denied, and Defendant's Cross Motion for Summary Judgment should be granted.

Respectfully submitted,

PETER J. NICKLES
Interim Attorney General
for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

**/s/ Edward P. Taptich**
EDWARD P. TAPTICH [#012914]
Chief, Equity Section II

**/s/ Amy Caspari**
AMY CASPARI [#488968]
Assistant Attorney General
441 Fourth Street, N.W.
Sixth Floor South
Washington, D.C. 20001

**/s/ Maria L. Merkowitz**
MARIA L. MERKOWITZ [312968]
Senior Assistant Attorney General
441 Fourth Street, N.W.
Sixth Floor South
Washington, D.C. 20001
(202) 442-9842
FAX – (202) – 727-3625
Maria.merkowitz@dc.gov

February 29, 2008

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

SARA & MICHAEL TILLER, *as parents*
*and next friend of minor child* A.T.,
     Plaintiffs,

      v.

DISTRICT OF COLUMBIA,

     Defendant.

Civil Action No. 07-1736 (JR)

## DEFENDANT'S STATEMENT OF MATERIAL FACTS IN DISPUTE

1.     Undisputed.

2.     Undisputed.

3.     Undisputed.

4.     Undisputed.

5, 6.     Disputed that DCPS would not allow Plaintiff to register A.T. until 9/27/07. A.R. Supplement 58 and 59.

7.     Undisputed.

8.     Undisputed.

9.     Disputed that the speech and language classification was supported by evaluations. A.R. A.R. 17 ¶ 22(g) and A.R. 169 and 305-306.

10.     Undisputed.

11.     Undisputed.

12.     Disputed that significantly more speech and language services were required than were proposed.  A.R. 11 ¶ 18(f), pp.176 and 303, and A.R. 291, 298, 512-515.

13.         Undisputed.

14.         Disputed that a PT evaluation was not known by Plaintiffs to have

            occurred on February 23, 2007.  Exhibit 1 Defendant's Opposition.

15.         Disputed that A.T. only remained at the River School. A.R. 173 and

            Exhibit 1, Defendant's Motion for Summary Judgment.

16.         Undisputed.

17.         Undisputed.

18.         Undisputed.

19.         Disputed that Janney ES was not an appropriate placement. A.R. 173, 535-

            536 and Exhibit 1, Defendant's Motion for Summary Judgment.[3]

20.         Disputed that these facts are relevant as to Plaintiffs' claims in this case.

21.          Disputed that these facts are relevant as to the Plaintiffs' claims in this

            case.

22.          Disputed that these facts are relevant as to the Plaintiffs' claims in this

            case.


                        Respectfully submitted,

                        PETER J. NICKLES
                        Interim Attorney General
                        for the District of Columbia

---

[3] Defendant disputes the admission of the documents attached in paragraphs 19-22.  These documents are
not part of the administrative record and have not been properly authenticated.  Documents supporting or
opposing summary judgment must be properly authenticated. Carmona v. Toledo, 215 F.3d 124, 131 (1st
Cir. 2000) citing Fed. R. Civ. P. 56(e). "To be admissible at the summary judgment stage, 'documents must
be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e).'" Id. citing Orsi
v. Kirkwood, 999 F.2d 86, 92 (4th Cir. 1993); see also McGann v. Northeast Ill. Regional Commuter R.R.
Corp., 8 F.3d 1174, 1178 (7th Cir. 1993)(In reviewing motion for summary judgment, court refused to
consider any supporting materials that were not properly authenticated.); see also Cummings v. Roberts,
628 F.2d 1065, 1068 (8th Cir. 1980)(records attached to affidavit but not certified as required by Fed. R.
Civ. P. 56(e) not properly considered by district court.)

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

**_/s/ Edward P. Taptich_**
EDWARD P. TAPTICH [#012914]
Chief, Equity Section II

_/s/ **Amy Caspari**_
AMY CASPARI [#488968]
Assistant Attorney General
441 Fourth Street, N.W.
Sixth Floor South
Washington, D.C. 20001

**_/s/ Maria L. Merkowitz_**
MARIA L. MERKOWITZ [#312967]
Senior Assistant Attorney General
441 Fourth Street, N.W.
Sixth Floor South
Washington, D.C. 20001
(202) 442-9842
FAX – (202) – 727-3625
Maria.merkowitz@dc.gov

February 29, 2008

# EXHIBIT 1

C.A.R.E Center at Shaw
925 Rhode Island Ave., NE
Washington, DC 20001
202 671-0882

# facsimile transmittal

| | | | |
|---|---|---|---|
| **To:** | Amy Caspari | **Date:** 02-21-08 | |
| **From:** | Chanda K. Whitaker | **Pages:** 8 including fax cover | |
| **Re:** | A. T█████ | **Fax:** (202) 727-3625 | |
| **CC:** | | | |

☐ Urgent     X For Review     ☐ Please Comment     ☐ Please Reply     ☐ Please Recycle

Enclosed you will find a copy of the PT Evaluation completed for A. T████ dated

February 23, 2007.

Thank you,

*Chanda K. Whitaker*

Chanda K. Whitaker

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

SARA & MICHAEL TILLER, *as parents
and next friend of minor child* A.T.,
    Plaintiffs,

    v.

DISTRICT OF COLUMBIA,

    Defendant.

Civil Action No. 07-1736 (JR)

## DECLARATION OF CHANDA K. WHITAKER

    I, Chanda K. Whitaker , do hereby declare under penalty of perjury that the

foregoing is true and correct:

1. I am a citizen of the United States of America, and over the age of 18, I have personal knowledge of the facts contained herein.

2. I have earned a masters degree in Social Work.  I hold licensure as a Licensed Graduate Social Worker (LGSW) in the District of Columbia.

3. I am currently an Education Program Specialist at the District of Columbia Public Schools Care Center.  My job responsibilities include attending Transition Meetings, Completing the Registration and Intake Process with families, Scheduling Screening appointments and assisting with Maintaining the Child Find Log and other duties as assigned.

4. Pursuant to the February 1, 2007, MDT/IEP meeting notes, DCPS did conduct a Physical Therapy ("PT") evaluation of A.T. on February 23, 2007.

5. A true and accurate copy of that examination is attached hereto.

_____
Signature of Chanda K. Whitaker

_____02/21/08_____
Date:

1

## Central Assessment Referral and Evaluations (C.A.R.E.) CENTER



Office of Special Education
(Located at Shaw Junior High School)
925 Rhode Island Avenue, NW
Washington, DC 20001
(202) 671-0882



### PHYSICAL THERAPY INITIAL EVALUATION REPORT

### SECTION I. IDENTIFYING INFORMATION

**Patient/Client:** A▮▮ T▮▮             **Date of Birth:** ▮▮/2003
**Chronological Age:** 3 years 4 months (40 months)
**Parents:** Sarah and Michael Tiller      **ID#**
**Date of PT Evaluation:** 02/23/2007     **Date of Report:** 02/23/2007
**Evaluator:** Jose F. Seijas, PT

### SECTION II. GENERAL INFORMATION, MEDICAL HISTORY (INCLUDE BIRTH HISTORY AND SURGICAL PROCEDURES) AND REASON FOR REFERRAL:

A▮▮ is a 3-year-4-motnh old female who was referred for a Physical Therapy evaluation by the Multidisciplinary Team to determine her current gross motor skills status as part of the process for establishing eligibility for Shool-Based Physical Therapy services in the DC Public Schools System.

She is the product of a 37-weeks gestation, and was born via c-section secondary to a prolapsed umbilical cord. She has a twin sister who was born vaginally. She presented with mild jaundice at birth, and experienced bacterial meningitis at 2 ½ months of age. She was diagnosed with sensorineural hearing loss by the 15th month of age. She received a cochlear implant in February 2005, with activation in March of the same year.

She currently receives speech and language and Occupational Therapy services at River School. She was evaluated by Pamela D. Brown-White (Physical Therapist) on 07/13/06, who recommended direct physical therapy treatment. A▮▮ was seen by the physical therapist twice, however services ceased secondary to her achieving the age of three, according to information provided by Amy Moldoon.

Physical Therapy Initial Evaluation Report               2

Anna Tiller
D.O.B.: 10/17/2003     Age: 3 years 4 months (40 months)

## SECTION III. ASSESSMENTS USED/RESULTS:

- Peabody Developmental Motor Scales-2 Gross Motor Subtests.
- Clinical Observations
- Record Review
  - Comprehensive Developmental Assessment, performed by Pamela D. Brown-White, PT on 07/13/06.
  - IFSP (Individualized Family Service Plan) dated 07/13/06.

**Clinical Observations:**
A▪▪▪ was evaluated at her school. She accompanied the evaluator to the evaluation area willingly and smiling. She participated in all the evaluations items she was engaged in. She was observed to walk with a fairly accurate heel to toe pattern, with good balance/speed.

**Interactive/Social Skills:**
*Tracking/Focusing/Eye Contact:*
She was attentive and alert to the examiner, and was able to establish and effectively maintain eye contact with him.
*Attention/Alertness/Reaction to Stimulation:*
A▪▪▪ did not appear to demonstrate any difficulties tolerating handling when placed into different positions.

**Neuromotor/Musculoskeletal** (having to do with the brain, nerves, muscles and bones):
A▪▪▪ Muscle Tone (*the resistance felt to movement or the tension in the muscles at rest*) is slightly decreased throughout her arms, trunk and legs.
Her Passive Range of Motion (*PROM – the amount of movement reached at a joint with help*) is within functional limits in all her joints.
Muscle Strength: *The ability of a muscle to produce force, which may result in the production or prevention of movement.* Formal muscle testing of A▪▪▪ was not performed due to her not yet totally developed ability to follow specific instructions required to complete a muscle strength test, however it could be said that her overall muscle power is within the functional limits.

**Description of the PDMS-2:** The Peabody Developmental Motor Scales-Second Edition (PDMS-2) is composed of six subtests that measure interrelated abilities in early motor development. It was designed to assess gross and fine motor skills in children from birth through five years of age.

*Gross Motor Skills (Gross motor skills are the bigger movements — such as running, jumping and throwing and catching a ball — that use the large muscles in the arms, legs, torso, and feet. They require balance and coordination)*

*Reflexes (Re): This subtest measures aspects of a child's ability to automatically react to environmental events. Because reflexes typically become integrated by the time a child is 12 months old, this subtest is given only to children ages 2 weeks through 11 months.*


D.O.B. ▓▓▓2003    Age: 3 years 4 months (40 months)

*Stationary (St):* This subtest measures a child's ability to sustain control of the body within its center of gravity and retain equilibrium.

*Locomotion (Lo):* This subtest measures behaviors that children use to transport themselves from one place to another, such as crawling, walking, running, hopping, and jumping forward.

*Object Manipulation (Ob):* This subtest measures a child's movements needed to catch and throw objects. Because these skills do not become apparent until a child reaches 11 months of age, this subtest is only given to children ages 12 months and older.

*Grasping (Gr):* This subtest measures a child's ability to use his or her hands. It begins with the ability to hold an object with one hand and progresses up to actions involving the controlled use of the fingers of both hands to button and unbutton garments.

*Visual-Motor Integration (Vi):* This subtest measures a child's ability to use his or her visual perceptual skills to perform complex eye-hand coordination tasks such as reaching and grasping for an object, building with blocks, and copying designs.

**Note**: Only the first four (4) subtests will be considered for the purpose of this evaluation, as they relate to his gross motor functioning, therefore a Total Motor Quotient (TMQ) will not be obtained.

***Gross Motor Quotient (GMQ):*** *This quotient measures the ability to utilize the large muscle systems to move from place to place, assume a stable posture when not moving, react automatically to environmental changes, and catch/throw objects. Children with well-developed gross motor abilities make high scores on this composite. These children would have above average movement and balance skills. They are likely to be children who could be described as agile, well coordinated, and graceful in their movements. Low scores are made by children those who have weak movement and balance skills. These children may have difficulty in learning to crawl, walk, and run. A deficit in gross motor abilities can be mild and the child's movements may be described as clumsy and uncoordinated. More severe gross motor problems may limit a child's use of their legs to such a degree that they will need assistance to move from place to place.*

## SECTION IV. RECORD OF PDMS-2 SUBTEST SCORES, AND RECORD OF GROSS MOTOR QUOTIENT SCORE

| Subtest | Raw Score | Std. Score | Percentile Rank | Age Eq. Months | Rating |
|---|---|---|---|---|---|
| **Reflexes (Re)** | - | - | - | - | - |
| **Stationary (St** | 39 | 6 | 9 | 21 | Below Average |
| **Locomotion (Lo)** | 108 | 5 | 5 | 24 | Poor |
| **Object Manipulation (Ob)** | 25 | 7 | 16 | 29 | Below Average |

Physical Therapy Initial Evaluation Report    4

A████ T████
D.O.B.: ██/██/2003    Age: 3 years 4 months (40 months)

| Subtest | Ability Measured |
|---|---|
| Reflexes (Re) | Reaction to environmental events |
| Stationary (St) | Center of gravity and equilibrium |
| Locomotion (Lo) | Transfer from one base of support to another |
| Object Manipulation | Throwing, catching, and kicking of objects |

*Raw Score*: Total points a child receives on each subtest. The significance of this score is limited to research purposes.

*Age equivalent*: This is the "motor age" of the child that corresponds to a raw score obtained on a subtest. The significance of this result is controversial and is used with some caution.

*Percentile*: This is the percentage of children that the child being tested performed better than or performed at the same level (e.g. if the percentile is 67 the child performed at the same level or better than 67% of the standardized sample).

*Standard Scores:* Subtest standard scores are converted from raw scores. Standard scores are used in the PDMS-2 that were computed from the raw scores of the children tested in the standardization sample.

**Gross Motor Quotient:** This is derived from the standard scores of the subtests. This value is a measure of a child's gross motor development.

| Quotient | Sum of Std. Scores | Quotient Score | Percentile Rank | 95% Interval | Rating |
|---|---|---|---|---|---|
| Gross Motor (GMQ) | 18 | **74** | 4 | 66-82 | Poor |

*Percentiles, Standard Scores, Gross and Fine Motor Quotients are the results mainly used to interpret a child's' ability, and to measure any progress made from one test to the other.*

## SECTION V. IMPRESSIONS AND RECOMMENDATIONS:

A████ was able to:

- Maintain balance for five seconds while kneeling and rotating head.
- Walk up 4 steps placing one foot on each step using the rail for support.
- Walk down four steps using only the examiner's finger for support.
- Run 30 ft. in approximately 9 seconds, stiffly.
- Kick a stationary playground-sized ball forward 8-9 feet without deviating more than 20 degrees to either side of midline. She performed this task with her right lower extremity, and emerging knee flexion/hip extension.
- Throw a ball overhand so that it travels seven feet forward in the air.
- Bring her arms toward chest in effort to catch after a playground-sized ball contacts her arms and hands. The ball was tossed from 5 feet away.

Physical Therapy Initial Evaluation Report           5


D.O.B.: ████/2003     Age: 3 years 4 months (40 months)

A███ was not able to:

- Stand on one foot with hands on hips for three seconds.
- Jump down from a 12-21 inches height.
- Underhand throw a tennis ball, and hit a target located 5 feet away, 2 of 3 trials.
- Throw a ball overhand so that it travels seven feet forward in the air.

## Summary

A███ is a student that ambulates independently on even surfaces while carrying small objects, and needs close supervision while ascending/descending the stairs of her school. Her muscle tone, overall strength and range of motion are within the functional limits. A███ Gross Motor Quotient (GMQ) of 74 represents Poor performance. Strictly speaking, the GMQ is a numeric representation of A███'s overall performance on three subtests for children 1 through 5 years old (i.e., Stationary, Locomotion, and Object Manipulation).

Generally, A███ presents with reduced ability at utilizing the large muscle systems to move from place to place, assume a stable posture when not moving, react automatically to environmental changes, and catch or throw objects.

This information will be shared during A███ Multidisciplinary Team Meeting, and recommendations for any services she may require will be made at that time.

## *School-based Physical Therapy:*

*In medical clinics, physical therapists (PTs) typically assess their clients' impairments, which might influence movement behavior, such as pain, muscle strength, endurance, etc. Treatment objectives focus on reducing impairments and improving function. In schools, physical therapists identify impairments and functional limitations, which interfere with students' ability to participate fully in the educational program.*

*School-Based Physical Therapy as an educational support service focuses on removing barriers from the students' ability to learn. It helps students develop skills, which increase their independence in the school environment, and improves students' performance in school classrooms, hallways, playground, physical education and other areas that may be part of their educational program. The physical therapist works to help students function better in classrooms, the lunchroom, or restrooms and may work with school personnel on adapting or modifying their seating and other equipment/materials. Therapists work in a supportive role, working closely with teachers, to promote the highest level of function possible for students pursuing educational goals. The Physical Therapist plans and implements programs that will help students meet their educational goals and objectives and benefit from special education services. The therapist is concerned with facilitating the child's overall performance in the classroom, considering the student's developmental level and physical disability. Services are provided to enhance independent functioning and may include positioning, strengthening, modifications and adaptations to the environment. Although medical concerns are significant, rehabilitation is not the focus of school-based physical therapy. School PTs assess students' functional performance during the school day, rather than conduct "impairment specific" examinations. School therapy intends to help students and teachers compensate for and accommodate students' impairments so that students can*

<u>Physical Therapy Initial Evaluation Report</u>                                     6


D.O.B.: ██████/2003    Age: 3 years 4 months (40 months)

*participate in school as much as possible. Also the school-based physical therapist instructs parents, students and teachers about precautions that students with disabilities need to take at school, and advises parents about what they can do at home to maintain or promote educational performance of their children, including incorporating equipment, positioning, and exercise into family routines and activities. Other scope of school-based physical therapy is to establish a line of communication with therapists and physicians who are seeing the student in a medical clinic.*

Thank you for the opportunity to work with A████.  Please do not hesitate to contact me in case you had any questions regarding to this report.

Jose F. Seijas, PT
School-based Physical Therapist